## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brian Kelly,<br><br>        Plaintiff,<br><br>v.<br><br>United Payment Center, Inc.,<br><br>        Defendant. | **CASE NO. 0:22-cv-1799-ECT-JFD**<br><br>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY** |

## INTRODUCTION

This case is about an unlicensed debt collector who unlawfully attempted to collect a stale, 17-plus-year-old debt from Plaintiff using threats, coercion, and abuse while pretending to be a law firm. Defendant violated a number of state and federal consumer protection laws in doing so and has been sued several times for similar collection misconduct in the past. Plaintiff now seeks summary judgment on liability for his claims under the Fair Debt Collection Practices Act, Fair Credit Reporting Act, Drivers Privacy Protection Act, Unauthorized Practice of Law, Invasion of Privacy and Fraud, but reserves the issue of damages and all other claims for trial.

## FACTS

Plaintiff Brian Kelly (hereinafter "Plaintiff") is a natural person who resides in the County of Anoka, State of Minnesota, and is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3). Declaration of Brian Kelly ¶4. Defendant United Payment Center Inc. ("Defendant") is a foreign corporation formed under California law and a collection agency

- 1 -

unlicensed in Minnesota, illegally operating without a license in this state. Declaration of Peter F. Barry, ¶¶4-6; Exhibit A - Deposition of Michael S. Martinez, p. 41, lines 2-19. Defendant uses interstate commerce and United State's mail in its business, the principal purpose of which is the collection of debts. Defendant regularly collects or attempts to collect, directly or indirectly, debts owed, due, or asserted to be owed or due by another and is a "debt collector" under the FDCPA. Martinez Depo. p. 79, lines 15-24. Defendant also operates under the pseudonyms "Bradford and Associates" using various spoofed phone numbers to communicate with Minnesota consumers. B.Kelly Decl. ¶5 and ¶10. Despite being required to be licensed as a debt collector in both California and Minnesota, Defendant has never obtained a license to collect debts in Minnesota nor California. Martinez Depo. p. 79 line 15 to p. 81 line 9; Cal. Fin. Code § 100002; Minn. Stat. §332.33.

Sometime around 2005, Plaintiff allegedly incurred a financial obligation that was, namely, a personal auto loan with CitiBank, that was for personal, family and household purposes and is a debt under the FDCPA ("debt"). B.Kelly Dec. ¶4. This alleged debt was beyond the statute of limitations in Minnesota, as it had been approximately 15 years since Plaintiff had made a payment when a payment was due and Plaintiff has lived continuously and openly within the state of Minnesota since before 2000. B.Kelly Dec. ¶6. These financial obligations were money, property, or their equivalent, which were alleged to be due or owing, from a natural person to another person and were therefore "debt(s)" under the FDCPA. 15 U.S.C. § 1692a(5).

On or around June 29, 2022, Defendant contacted Plaintiff by telephone to his parent's home in Minnesota. Declaration of Nancy Kelly, ¶4. Around 10:00 a.m. CST, Plaintiff's mother received a phone call with the caller ID displaying North Branch MN with an area code of 651–a collection call from Defendant. Over the phone, Defendant's debt collector said her name was Mary and was asking for the Plaintiff Brian Kelly. Plaintiff's mother told the debt collector that Plaintiff did not live there. Defendant's debt collector then asked for Plaintiff's phone number which Plaintiff's mother told her she would not provide. Defendant's debt collector then said that Plaintiff had been mailed information regarding this matter. Plaintiff's mother then asked Defendant's debt collector for her phone number which she gave as 1-866-709-8145. Defendant's debt collector said that she was from "Process Service Dispatch" regarding case number 2022413072 and that Plaintiff had a one-week window to resolve this matter. Plaintiff's mother said she would relay that information to Brian. During this initial communication, Defendant's collection employee demanded payment for this alleged consumer debt from Plaintiff. N.Kelly Dec. ¶¶5-13.

On or around June 29, 2022, Defendant communicated directly with Plaintiff in an attempt to collect this stale debt, by telephone in Minnesota. Plaintiff was informed by his mother that she received a collection call from Defendant and Defendant further left a voicemail on Plaintiff's phone. Plaintiff called Defendant and throughout the course of this collection call Defendant repeatedly demanded payment of this alleged debt from Plaintiff. At the start of this collection call, Defendant's receptionist answered the phone "Bradford

and Associates." Plaintiff asked for "Mary" and the receptionist stated that she was out in the field and asked if Plaintiff had an extension or case number. Plaintiff gave the receptionist the case number that Defendant had provided to Plaintiff's mother and was then connected to Defendant's collection agent, identified as "Anthony Rubio." B.Kelly Decl. ¶¶7-12.

Rubio told Plaintiff that he needed to collect on a judgment filed against Plaintiff concerning an auto loan that he had taken out in 2005 with Citiserv. Plaintiff asked Rubio what vehicle was associated with this alleged debt and Rubio stated that he didn't have that information ready. Plaintiff then asked if the account was for a 2001 F150 and Rubio confirmed that it was. Defendant's debt collector Rubio then told Plaintiff that he owed $10,400 on the debt and that Defendant obtained a judgment against Plaintiff in that amount. Rubio told Plaintiff that he should have received a letter from Defendant with that information in it. B.Kelly Decl. ¶¶13-17.

Rubio then illegally threatened Plaintiff by telling him that Defendant would place a lien on his home and automobiles if the debt was not paid within a week. Plaintiff asked Rubio if he was located in Minnesota and Rubio told him, "No, I'm in Pennsylvania" or words to that effect. Plaintiff then asked if Rubio knew the statute of limitations for collecting a debt in Minnesota and Rubio responded, "I'm not collecting on a debt I'm filing a judgment against you for that debt." Plaintiff then told Rubio the debt had already been settled to which he responded, "I thought you just asked about how long I can collect on a debt and now you are saying it has been settled, which is it?" Plaintiff stated that the

debt had been settled and that he would get back to Defendant later. Rubio then again demanded payment for this stale debt, after lying about having obtained a judgment against Plaintiff and implying that Rubio and Defendant were lawyers capable of obtaining such a judgment. Plaintiff reiterated his position that this debt had been settled and ended the call with Defendant's debt collector. During this communication, Defendant's collection employee demanded payment for this alleged consumer debt from Plaintiff, which was a "communication" in an effort to collect a debt as that term is defined by the FDCPA. B.Kelly Decl. ¶¶18-25; 15 U.S.C. § 1692a(2).

On or about June 29, 2022, Defendant left a voicemail for Plaintiff indicating that they were calling from "Process Service Dispatch" and that they had legal documents requiring a signature that day. The documents allegedly related to a "lien" which was placed on Plaintiff's home on Galaxy Drive in Circle Pines, Minnesota. The message from "Mary" went on to say that Plaintiff should contact the issuing "firm" at (866) 709-8145 with "case number 2022-413072." B.Kelly Decl. ¶¶26-29. See also, Martinez Depo., p. 130 lines 14-22 for full transcript of voicemail.

Plaintiff was very upset by this collection activity by Defendant. He was worried that he might lose his home and/or his vehicles because of Defendant's actions. Plaintiff was frightened, intimated, and worried sick about what might happen to him and to his financial situation because of Defendant's efforts to collect this stale debt. B.Kelly Decl. ¶¶30-32.

Defendant engaged in shocking and abusive debt collection tactics toward Plaintiff. Plaintiff was embarrassed that this debt collector contacted his mother, disrupted her day, lied to her about Plaintiff only having a week to handle this matter, and demanded payment from her for this debt. Plaintiff is also hurt and embarrassed that his elderly mother was verbally harassed by Defendant for this debt. Plaintiff's mother was not a cosigner or obligor on this auto loan and Plaintiff did not give Defendant permission to discuss this matter with her. Plaintiff was very upset and rattled by Defendant's conduct toward his mother and toward him in attempting to collect this stale debt which was well beyond the statute of limitations. Plaintiff was intimidated by the threats that Defendant made to sue him and thereby damage his credit. The threats of a lawsuit by Defendant's employees were scary and confusing to Plaintiff and he did not know whether or not he should possibly pay this stale debt or risk being sued. Plaintiff was worried that a lawsuit against him would ruin his credit and subject him to the loss of his home and/or vehicles and he became physically ill from the experience. B.Kelly Decl. ¶¶33-42.

The deposition of Defendant's corporate officer, Mr. Michael Martinez, was taken on March 30, 2023. Declaration of Peter F. Barry, ¶4; Exhibit A. Mr. Martinez is an officer of the Defendant and a 50% shareholder of Defendant ("UPC"):

```
 9  Q. And so you own UPC 50/50? Or what's the stocks
10  split?
11  A. 50/50.
12  Q. Okay. So you own 50 percent of the shares of
13  UPC, and your mother, Ms. Martinez, owns the other
14  50 percent?
15  A. Correct.
```

Martinez Depo. p. 27. And,

```
25 Q. And you own the agency, right? You own the
1  United Payment Center, right? You're a part owner?
2  A. Yes.
```

Martinez Depo. pages 64-65.

Mr. Martinez is the Chief Financial Officer and a Corporate Director of Defendant United Payment Center, Inc. according to the California Secretary of State. Barry Decl. ¶4, Exhibit B. The Federal Rules of Civil Procedure 32(a)(3) provides that an adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, or managing agent. *See Kelly Services, Inc. v. Creative Harbor, LLC*, 846 F. 3d 857, 867 (6th Cir. 2017) (Deposition testimony of plaintiff's founder, owner, sole manager, and chief executive officer (CEO) was binding on plaintiff, and thus district court could consider it in ruling on defendant's motion for summary judgment, despite plaintiff's contention that deposition testimony was inadmissible hearsay, where testimony was within scope of his employment.)

## ARGUMENT

### I.    LEGAL STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for

either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To establish that a fact is genuinely disputed, the nonmoving party must "submit affidavits, depositions, answers to interrogatories, or admissions on file and designate specific facts" in support of that assertion. *Gander Mountain Co. v. Cabela's, Inc.,* 540 F. 3d 827, 831-32 (8th Cir. 2008). A nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur,* 47 F. 3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted).

## II. SUMMARY JUDGMENT AS TO LIABILITY IS APPROPRIATE AGAINST THIS DEFENDANT.

The evidence in this case is uncontested and constitutes clear violations of each of the claims asserted by Plaintiff here. Namely, Defendant is unable to provide a scintilla of evidence refuting Plaintiff's claims nor Plaintiff's factual assertions. There exists no genuine issue of material fact that would allow a jury to find for the Defendant on any of Plaintiff's claims.

Instead, the existing and undisputed evidence establishes that Plaintiff is entitled to judgment as a matter of law for Plaintiff's claims for (1) Fair Debt Collection Practices

Act; (2) Fraud; (3) Unauthorized Practice of Law; (4) Driver's Privacy Protection Act; (5) Fair Credit Reporting Act; and, (6) Invasion of Privacy.

### 1. Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act is a federal consumer protection law enacted in 1977. In enacting the FDCPA, Congress found abundant evidence of abusive, deceptive, and unfair debt collection practices and that these sharp practices contributed to the number of personal bankruptcies, marital instability, loss of jobs, and invasions of privacy. 15 U.S.C. § 1692(a). The purpose of the FDCPA is to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive collection practices are not competitively disadvantaged, and to promote consistent state action to protect consumers against debt collection abuses. 15 U.S.C. § 1692(e). Even consumers who owe the debt are protected by the FDCPA. 15 U.S.C. § 1692a(3).

The FDCPA prohibits conduct that is harassing, false or misleading, or abusive. *See generally* 15 U.S.C. §§ 1692d-1692f. The FDCPA creates a private civil right of action against a debt collector who violates the Act, 15 U.S.C. § 1692k(a), and is generally a strict liability statute. *See, e.g., Picht v. Hawks*, 236 F.3d 446, 451 (8th Cir. 2001).

A successful FDCPA plaintiff is entitled to statutory damages in an amount up to $1,000. 15 U.S.C. § 1692k(a)(2)(A). The FDCPA does not require proof of actual damages as a precursor to the recovery of statutory damages. *See Keele v. Wexler*, 149 F.3d 589, 593 (7th Cir. 1998). Even so, an FDCPA plaintiff that can prove he suffered actual damages, resulting from a collector's violation, is entitled to those damages under the

FDCPA. 15 U.S.C. § 1692k(1). Emotional distress is recoverable as actual damages. *See, e.g., Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1042 (D. Minn. 2010) (a consumer who has suffered emotional distress has suffered actual damages). Finally, the FDCPA provides a fee-shifting provision that requires the debt collector to pay a victorious consumer's reasonable attorney's fees and costs. 15 U.S.C. § 1692k(3).

### A.  The undisputed facts establish that Plaintiff is a "consumer," that the stale auto loan is a "debt," and that Defendant is a "debt collector."

The threshold requirement for a claim under the FDCPA is establishing the existence of: (1) a "consumer," (2) a "debt," and (3) a "debt collector." 15 U.S.C. 1692; *Gonzalez v. Law Office of Allen Robert King*, 195 F. Supp. 3d 1118, 1126 (C.D. Cal. 2016). The undisputed evidence shows that Plaintiff is a consumer, that the time-barred auto loan is a debt, and that Defendant is a debt collector. The FDCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3). Because anyone "allegedly obligated" to pay a debt is included in this definition, even a person incorrectly pursued for a debt he does not owe falls within the definition of "consumer."  Moreover, under the FDCPA, the account in question must be a "debt." The FDCPA defines a debt as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

In the instant case, it is undisputed that Plaintiff is a natural person who was alleged to owe a debt; therefore, Plaintiff is a consumer as defined by the FDCPA. B.Kelly Decl. ¶¶ 1, 5.

It is further undisputed that Defendant admits it is a debt collector whose principal purpose is the collection of debts:

```
6  Q. Okay. And how long has -- so United Payment
7  Center has been around as a debt collector for,
   what,
8  11 years?
9  A. Yes.
10 Q. And tell me about your professional history
   in
11 the collection world. Prior to -- well, let's
   start from
12 the beginning.
13 A. I'm sorry. It's not 11 years; it's 9 years.
14 Q. Nine years. Okay. Fair enough. So since
15 roughly 2014, United Payment Center has been in
   the debt
16 collection business?
17 A. 2015. We opened in January of 2015.
18 Q. Okay. And was -- did United Payment Center
   do
19 anything before that or was that the first time
   it ever
20 kind of came to light? 2015.
21 A. First time it came to light.
22 Q. Okay. All right. So prior to -- prior to
23 running UPC, the UPC collection agency, what
   did you do
24 in the collection business?
25 A. I was a collector.
```

Martinez Depo. p. 34.

A debt collector is defined as a person who "regularly collects or attempts to collect, directly or indirectly, debts owed or asserted to be owed or due another." 15 U.S.C. § 1692a(6). In the present case, the undisputed evidence and Mr. Martinez's testimony above establishes that Defendant regularly attempts to collect debts asserted to be owed to another:

```
13 Q. And United Payment Center, do you purchase
   your
14 own accounts for collection?
15 A. Yes.
16 Q. Tell me about that process.
17 A. Well, that's what United Payment Center is.
18 We -- we purchased debt and assigned it to
   collectors.
```

Martinez Depo. p. 20.

Finally, it is undisputed that the debt being collected was for Plaintiff's personal, family, and household use. B. Kelly Decl. ¶ 4 ("I had an old debt to Citibank from around 2005 for a car loan I defaulted on because of poor financial circumstances."); *see also*, Amended Complaint ¶17 (Dkt. #16) as verified by Decl. of B. Kelly ¶3. A car is for personal and family use and therefore the car loan is a debt as defined by the FDCPA. *Micks v. Gurstel Law Firm, P.C.*, 365 F. Supp. 3d 961, 971-72 (D. Minn. 2019) ("[t]he Eight Circuit has likewise held that § 1692a(5) 'broadly defines debt as "any obligation" to pay arising out of a consumer transaction.'") *quoting Duffy v. Landberg*, 133 F. 3d 1120, 1123 (8th Cir. 1998).

- 12 -

Plaintiff has met all of the necessary elements not only for standing to bring his claim under the FDCPA, but for summary judgment as to liability.

**B. Defendant violated the FDCPA in numerous ways in collecting from Plaintiff and has admitted to it.**

A plaintiff "can prevail on [his] FDCPA claim only if [the Defendant] undertook its challenged activities in connection with an attempt to collect a 'debt.'" *Micks v. Gurstel Law Firm, P.C.*, 365 F. Supp. 3d 961, 970 (D. Minn. 2019) *citing* 15 U.S.C. § 1692e. Here, Plaintiff's FDCPA claims are premised on the following provisions and uncontroverted evidence:

**15 U.S.C. § 1692b(1): Collector failed to accurately identify themselves, or failed to state that collector is confirming or correcting location information to a third-party.** Plaintiff's verified amended complaint and the declarations of Plaintiff Brian Kelly and Nancy Kelly establish this fact. Rather than seeking location information about Plaintiff, Defendant instead harassed Mrs. Kelly and attempted to collect the debt from her.

**15 U.S.C. § 1692b(2): Collector stated that the consumer owes any debt to a third-party.** Mrs. Kelly's declaration filed herein establishes that Defendant's collector told her about Plaintiff's alleged debt.

**15 U.S.C. § 1692c(a)(1): Collector communicated at any unusual time, unusual place, or unusual time or place known to be inconvenient to the consumer.** Calling Mrs. Kelly and harassing her for the Plaintiff's alleged debt was unfair, unusual, and inconvenient to Plaintiff.

**15 U.S.C. § 1692c(b): Collector communicated with anyone except consumer, consumer's attorney, or credit bureau concerning the debt.** Mrs. Kelly's declaration filed herein establishes that Defendant's collector told her about Plaintiff's alleged debt.

**15 U.S.C. § 1692d: Collector engaged in any conduct the natural consequence of which is to harass, oppress, or abuse any person.** Calling Plaintiff's elderly mother and demanding payment of this alleged debt from her was harassing, oppressive, and abusive to Plaintiff as established by his sworn declaration.

**15 U.S.C. § 1692e: Collector used any other false, deceptive, or misleading representation or means in connection with the debt collection.** According to Plaintiff's uncontroverted declaration, Defendant called themselves a law firm, told Plaintiff that they had a judgment against him, and threatened to place liens on his home and automobiles. All of these representations were materially false in an effort to collect this debt.

**15 U.S.C. § 1692e(2): Collector misrepresented the character, amount, or legal status of the alleged debt.** Plaintiff's declaration details how Defendant claimed to have a judgment against him for this debt when it did not. That is a clear misrepresentation of the alleged status of this debt.

**15 U.S.C. § 1692e(3): Collector misrepresented that any individual is an attorney or that any communication is from an attorney.** Plaintiff's declaration describes how the Defendant called themselves "Bradford and Associates" and suggested that they were a law firm that could place liens on his home and automobiles, and obtain judgments. That violates this provision of the FDCPA.

**15 U.S.C. § 1692e(5): Collector threatened to take any action that cannot legally be taken or that is not intended to be taken.** Defendant falsely told Plaintiff it could place liens and judgments against him when it could not according to Plaintiff's uncontroverted declaration.

**15 U.S.C. § 1692e(7): Collector engaged in other conduct in order to disgrace the consumer.** Plaintiff has stated under oath that he was humiliated by Defendant's call to his elderly mother to collect this stale debt. This satisfies the requirement of disgracing conduct by a debt collector.

**15 U.S.C. § 1692e(9): Collector represented documents as authorized, issued or approved by any court, official, or agency of the United States or state.** Plaintiff's declaration states that Defendant falsely claimed to have a judgment against Plaintiff for this debt when in fact no such judgment ever existed. This collection conduct violates the FDCPA.

**15 U.S.C. § 1692e(10): Collector used any false representation or deceptive means to collect a debt or obtain information about a consumer.** The collection conduct, as further described in the Amended Complaint, as well as the declarations of Plaintiff Brian Kelly and Nancy Kelly, unambiguously establishes that Defendant used false and deceptive means to collect this debt, repeatedly.

**15 U.S.C. § 1692f: Collector used any unfair or unconscionable means to collect or attempt to collect the alleged debt.** Plaintiff's declaration establishes by clear and convincing evidence that Defendant's pretension as a law firm, its threats of liens and

judgment, and its use of false names like "Bradford and Associates," "Process Service Dispatch," and "firm" are fundamentally unfair and unconscionable means to collect a consumer debt because they are expressly prohibited by law.

**15 U.S.C. § 1692f(1): Collector attempted to collect any amount not authorized by the agreement creating the debt or permitted by law.** Defendant violated this provision because it had no right to collect any debts in Minnesota since it was unlicensed and operating illegally. Moreover, Defendant's owner admitted that Defendant was unlicensed:

```
13 Q. And to be clear for the record, you have not
14 filed an application for a collection agency
   license in
15 the State of California as we sit here today,
   correct?
16 A. Correct.
17 Q. Because I can check that on the Department
   of
18 National Protection and Innovation website, and
   I can see
19 that -- that there's -- at least as of
   yesterday, there
20 was no application pending with DFPI and for
   United
21 Payment Center, so that their -- their records
   are
22 accurate, correct?
23 A. Yes.
24 Q. And likewise, have you -- I think you
   indicated
25 earlier you're not licensed in any of the 50
   states in
1  the United States, correct?
```

```
2  A. Correct.
3  Q. Have you filed an application to be licensed
   in
4  any other state other than -- or have you filed
   an
5  application to be licensed in any of the 50
   states?
6  A. Not yet.
7  Q. Have you filed an application to be licensed
   as
8  a debt collector in Minnesota?
9  A. Not yet.
```

Martinez Depo. p. 80-81.

In effect, what is before this Court is a rogue Defendant who has done nothing whatsoever to comply with either California licensing laws, where it resides, or Minnesota licensing laws, where it collects. The uncontroverted evidence shows that Defendant has taken an approach to debt collection which is absolutely contrary to even feigned compliance with any collection law that might regulate its conduct toward consumers like Plaintiff:

```
20 It does -- it doesn't sound to me like you've
21 invested anything in compliance under the Fair
   Debt
22 Collection Practices Act, the Rosenthal Fair
   Debt
23 Collection Practices Act, the Drivers Privacy
   Protection
24 Act, the Fair Credit Reporting Act or
   otherwise. Am I
25 right or am I wrong?
1  A. You're right.
2  Q. Okay. And you haven't expended any money at
```

```
3   this point in obtaining a licensure in any
    jurisdiction,
4   California or Minnesota, correct?
5   A. Correct.
```

Martinez Depo. pp.197-198.

### 2. Fraud

The Minnesota Court of Appeals has held that:

> A contract is voidable if a party's assent is induced by either a fraudulent or a material misrepresentation by the other party, and is an assertion on which the recipient is justified in relying. Restatement of Contracts (Second) § 164(1) (1981).

> A misrepresentation is fraudulent if it is intended to induce a contract and either is known to be false or made without knowledge of whether it is true or false. *Id.* at § 162(1). …

> A misrepresentation is material if it would be likely to induce a reasonable person to manifest his or her assent or the maker knows that for some special reason it is likely to induce the particular recipient to manifest such assent. *Id.* at § 162(2); *see also Pasko v. Trela,* 153 Neb. 759, 763, 46 N.W.2d 139, 143 (1951).

*Carpenter v. Vreeman*, 409 N.W. 2d 258, 260–61 (Minn. Ct. App. 1987).

A claim for fraud requires the plaintiff to prove five elements:

> (1) a false representation [by the defendant] of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [the plaintiff] to act in reliance thereon; (4) that the representation caused [the plaintiff] to act in reliance thereon; and (5) that [the plaintiff] suffered pecuniary damages as a result of the reliance.

*Sorchaga v. Ride Auto, LLC*, 893 N.W. 2d 360, 369 (Minn. App. 2017) *quoting Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W. 2d 359, 368 (Minn. 2009).

During the collection communications on and around June 29, 2022, Defendant repeatedly and falsely represented to Plaintiff that he was obligated to pay this time-barred debt when Plaintiff was not. Plaintiff no longer had any legal obligation whatsoever to pay any amount of his expired debt as the Plaintiff had not made any payments on the debt for more than 15 years, far surpassing the six-year statute of limitations. *See* Minn. Stat. § 541.05(1)(1). Defendant knew that the alleged debt was beyond the statute of limitations and that Plaintiff in fact had no legal obligation to pay it:

```
10 Q. How can you collect on a debt which is 15 years
11 old?
12 A. Well, I don't collect it. I assign it to
13 collectors. So I think that's a question you have to
   ask
14 them.
15 Q. Well, I'm asking you since you apparently own
16 this debt or purchased this debt. How is it that UPC
   can
17 collect a debt that's 15 years old?
18 A. We assign it to collectors. They collect it.
19 Q. Okay. Are there any legal constraints on
20 collecting a debt that you're aware of, not as a
   lawyer,
21 but just as a lay person, are there any legal
   constraints
22 on collecting a debt which is 15 years old?
23 A. Not that I'm aware of.
```

Martinez Depo. p. 112. Defendant intentionally withheld from Plaintiff the fact that Plaintiff had no legal obligation to pay. Likewise, Defendant made repeated false statements that Defendant was a law firm, a process server, and that Defendant would

obtain a lien against Plaintiff's home and automobiles. Defendant claimed it had a

judgment against Plaintiff for the expired debt. One voicemail Defendant left makes the

point:

```
2  "Attention, this call is intended for Brian
3  Kelly. My name is Mary with the Process Service
4  Dispatch."
5  Have you ever heard that phrase, "Process
6  Service Dispatch"?
7  A. Yes.
8  Q. And who uses that phrase, "Process Service
9  Dispatch"?
10 A. I've heard collectors use it.
11 Q. Okay. Collectors working at UPC?
12 A. Yes.
13 Q. And why did they use that phrase, "Process
14 Service Dispatch"?
15 A. I don't know.
16 Q. Have you ever told them, "Hey, don't use
   that
17 phrase"?
18 A. I personally have not.
19 Q. Has any -- to your knowledge, have any of
   your
20 collection managers, or any other person in
   authority at
21 UPC, ever told the collectors, "Don't use that
   phrase,
22 Process Service Dispatch"?
23 A. Yes.
24 Q. Okay. Who has told collectors not to use
   that
25 phrase, "Process Service Dispatch"?
1  A. Managers.
2  Q. Managers. And do you know whether or not --
```

3  well, I'll represent to you that this recording occurred
4  on or about June 29, 2022.
5  So who would have been the manager on June 29th,
6  2022?
**7  A. I would have to check.**
8  Q. It would either be Chris Galvez or Aaron Gestl?
**9  A. Correct.**
10 Q. I'm going to continue Exhibit 2.
11 "Notifying the residences and owners of the
12 property we have legal documents requiring a signature
13 today."
14 Okay. Have you ever heard that phrase, that --
15 that Process Server Dispatch had legal documents that
16 required attention that day?
**17 A. Yes.**
18 Q. Okay. And who -- who has used those words?
**19 A. Collectors.**
20 Q. And have you ever told a collector, "Hey, don't
21 use that phrase"?
**22 A. Not me personally.**
23 Q. Well, you've heard the phrase, correct?
**24 A. Yes.**
25 Q. And you own the agency, right? You own the
1  United Payment Center, right? You're a part owner?
**2  A. Yes.**
3  Q. Why wouldn't you tell the collectors not to use
4  that phrase?
**5  A. I have not heard that phrase in my agency.**
6  Q. Where have you heard that phrase?

```
7  A. In the industry.
8  Q. I see. So you never heard any of your
9  collectors use that phrase?
10 A. Throughout the ten years? Yes.
11 Q. Throughout the ten years what? You have
   heard
12 that phrase used?
13 A. Yes.
14 Q. At UPC?
15 A. Yes.
```

Martinez Depo., pp. 63-65. And this:

```
13 Q. It's possible he was using that name, Bradford
14 and Associates?
15 A. Yes.
16 Q. Okay. Is it -- is it possible he said that
   they
17 were a law firm?
18 A. I don't know.
19 MR. BREES: Objection. Calls for speculation.
20 BY MR. BARRY:
21 Q. Well, I don't want you to speculate. I want
   you
22  to tell me. Have you ever heard any of your
   collectors
23 say that they were calling from a law firm? You're
   under
24 oath.
25 A. I have heard that, and we don't allow that.
1  Q. Okay. So you've heard it at your agency. At
2   UPC, you've heard your collectors claim to a
   consumer
3  that they were calling from a law firm, correct?
4  A. Yes.
5  Q. And you don't allow it. How do you not allow
6  it? What do you do to stop that?
```

```
7    A. We have the managers let them know not to be
8    saying that or we're going to have to part ways.
```

Martinez Depo., pp. 95-96. Defendant was well aware that it was not a law firm and certainly aware that Defendant had not obtained any lien on Plaintiff's home or judgment against Plaintiff. *See* Defendant's Answer to Amended Complaint ¶ 96 ("UPC admits . . . that it is not a law firm entity.")  Defendant's corporate officer, Mr. Martinez admits that his collectors use "DBA" names, call themselves process servers, and pretend to be law firms when they are collecting consumer debt.  All of this conduct is consistent with the collection abuse directed at Plaintiff by this Defendant and it warrants summary judgment as to liability for these claims. Each of Defendant's fraudulent misrepresentations were made in an attempt to induce payments from Plaintiff on the stale debt.

Irrefutably, Defendant made its egregious threats and groundless statements to Plaintiff because Defendant hoped its misrepresentations would put Plaintiff into a state of fear and anxiety. Defendant's tactics were directly aimed toward squeezing Plaintiff for payment on a time-barred debt. Plaintiff was put in a state of extreme distress from Defendant's fraudulent statements. In fact, Plaintiff was "frightened, intimidated, and worried sick about what might happen to [him] and to [his] financial situation because of Defendant's efforts to collect" the debt. B. Kelly Dec. ¶32. In reliance on Defendant's misrepresentations, and in direct pecuniary loss to Plaintiff, Plaintiff took time off of work to handle, assess, and work out the financial risks Defendant represented and to determine his course of action in response to Defendant's assertions. B. Kelly Dec. ¶42. These are all direct and compensable pecuniary damages for a jury to assess and award.

The evidence is uncontested and reveals that each of the elements for Plaintiff's fraud claim are satisfied. Judgment as a matter of law is proper here as Defendant repeatedly attempted to defraud Plaintiff by inducing him to pay a time-barred debt while pretending to be a law firm with a judgment, rather than actually being an unlicensed collector with a fiction.

### 3. Unauthorized Practice of Law

Minnesota Statute § 481.02 states in pertinent part:

> **481.02 UNAUTHORIZED PRACTICE OF LAW.**
>
> Subdivision 1. Prohibitions. **It shall be unlawful for any person or association of persons, except members of the bar of Minnesota admitted and licensed to practice as attorneys at law, to** appear as attorney or counselor at law in any action or proceeding in any court in this state to maintain, conduct, or defend the same, except personally as a party thereto in other than a representative capacity, or, **by word, sign, letter, or advertisement, to hold out as competent or qualified to give legal advice or counsel, or to prepare legal documents, or as being engaged in advising or counseling in law or acting as attorney or counselor at law**, or in furnishing to others the services of a lawyer or lawyers, or, for a fee or any consideration, to give legal advice or counsel, perform for or furnish to another legal services, or, for or without a fee or any consideration, to prepare, directly or through another, for another person, firm, or corporation, any will or testamentary disposition or instrument of trust serving purposes similar to those of a will, or, for a fee or any consideration, to prepare for another person, firm, or corporation, any other legal document, except as provided in subdivision 3.
>
> Subdivision. 2. Corporations. No corporation, organized for pecuniary profit, **except an attorney's professional firm organized under chapter 319B**, by or through its officers or employees or any one else … shall to any extent engage in, or hold itself out as being engaged in, the business of supplying services of a lawyer or lawyers; …

[Bold emphasis added.]

Minnesota courts have consistently held that representations of the legal status and rights of another constitutes the practice of law. *See Fitchette v. Taylor*, 191 Minn 582, 584 (1934). In *State v. Hillbrant*, No. A05-820, 2006 WL 2052872, at *1 (Minn. App. Jul. 25, 2006), the appellate court considered whether the defendant's conviction for the unauthorized practice of law and mandatory restitution for the victims of the defendant's conduct was an abuse of discretion. There, the defendant, an out-of-state lawyer, had never obtained a Minnesota license to practice law but nonetheless sent demands attempting to settle a dispute between the victim and a third party–thereby misrepresenting the legal status and rights of another. *Id*. The appellate court affirmed the convictions and restitutionary judgment against the defendant for the defendant's unlawful representation of the legal status and rights of another. *Id*. at *3. In the instant case, we have a Defendant that not only made a legal demand to settle a debt and lied about being a lawyer--they were not even an unlicensed out-of-state lawyer.

Defendant falsely misrepresented the legal status of the extinguished debt of Plaintiff, but further, impersonated a law firm with the ability to bring legal action against Plaintiff, to execute judgments, and to obtain liens. Specifically, the collection voicemail to Plaintiff on June 29, 2022, represented that that (1) the caller was a "Process Service Dispatch" on behalf of the Defendant; (2) that Defendant was the issuing law firm; and (3) that Defendant had obtained a lien on Plaintiff's home with a corresponding case number

of "2022-413072." B. Kelly Decl. ¶¶ 26-29. When questioned about this voicemail, Defendant's corporate officer, Mr. Martinez, admitted that Defendant violated the FDCPA:

3  Q. Okay. But when you say "that voicemail," you're
4  referring to Exhibit 2, which was the voicemail that Mary
5  left at the 800 number -- with the 800 number, right?
6  **A. Correct.**
7  Q. Okay. You think that that -- you think
8  Exhibit 2 is evidence of noncompliance with the FDCPA?
9  **A. Correct.**
10  Q. And what do you -- and what about that call --
11  and I'm happy to play it again for you. Let's listen to
12  it again. It's not very long. I think it's only, maybe,
13  30 seconds.
14  "Attention, this call is intended for Brian
15  Kelly. My name is Mary with the Process Service
16  Dispatch. We are notifying the residents and owners of
17  the property we have legal documents requiring a
18  signature today. If you will be unavailable to sign or
19  have any questions regarding the pending lien on 226
20  Galaxy Drive, Circle Pines, Minnesota, contact issuing
21  firm immediately at phone number (866) 709-8145, and case
22  number 2022413072."
23  Okay. So what about that call -- that voicemail

24 that was left do you think is -- violates the
FDCPA?

**25 A. It has a lot of parts to it.**

1 Q. Okay. So tell me what the first part is.

2 What -- what's the first part that you think
violates the

3 FDCPA?

**4 A. I mean, I'd -- I'd have to take notes to --
to**

**5 digest the whole message. I can't -- I can't
memorize**

**6 the whole message.**

7 Q. No. I understand. I don't want you to
memorize

8 it. I just want you to tell me, with your 18
years of

9 collection experience -- is that what we've
got? 2001?

10 Is that right? I don't want to misstate.

**11 A. Yes.**

12 Q. Okay. So roughly, 18 years of collection

13 experience. So with your 18 years of collection

14 experience, what's wrong with that voicemail?
What

15 violates the FDCPA in that voicemail? The use
of the

16 word "lien"?

**17 A. Yes. The use of service or process server,**

**18 whatever she said, case -- case number and
firm. Those**

**19 four things.**

Martinez Depo., pp. 130-131. Defendant admitted that its collectors have left identical

voicemails to debtors in the past, and does not refute that this voicemail was left for

Plaintiff by one of Defendant's employees. *See* Martinez Depo., p. 63 ("I've heard [United Payment Center, Inc.] collectors use [the phrase "Process Service Dispatch].").

Defendant has no employees who are licensed to practice law in the State of Minnesota. Defendant is not a registered law firm entity with the Minnesota Secretary of State. Nevertheless, Defendant held itself out to Plaintiff as a law firm which inherently has the capacity to practice law. Furthermore, Defendant fraudulently represented the legal status and rights of Plaintiff by falsely asserting that Defendant had obtained a lien against Plaintiff's property, subjecting Plaintiff to substantial fear of legal action and potential loss of his home. The evidence is clear and undisputed: Defendant falsely held themselves out to Plaintiff as a law firm capable of preparing and pursuing legal action against Plaintiff, all without being licensed to practice law in the State of Minnesota.

There exists no genuine issues of material fact that Defendant engaged in the unauthorized practice of law here and Plaintiff is entitled to judgment as a matter of law for this claim against Defendant.

### 4. Drivers Privacy Protection Act

The Drivers Privacy Protection Act ("DPPA") was enacted in response to growing concerns over the ease with which stalkers and other criminals could obtain personal information from state departments of motor vehicles. *Reno v. Condon*, 528 U.S. 141, 143–44 (2000). Liability arises under the DPPA where "[a] person . . . knowingly obtains, discloses or uses personal information from a motor vehicle record, for a purpose not permitted under this chapter . . . ." 18 U.S.C. § 2724(a). The DPPA specifically provides:

"[i]t shall be unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record." 18 U.S.C. § 2722(b). To establish a violation of the DPPA, a plaintiff must show that a defendant (1) knowingly (2) obtained, disclosed or used personal information, (3) from a motor vehicle record, (4) for a purpose not permitted. *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015).

The DPPA defines protected "personal information" to include "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address [and] telephone number." 18 U.S.C. § 2725(3). A "motor vehicle record" means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles. 18 U.S.C. § 2725(1).

Defendant accessed Plaintiff's motor vehicle record information via a database called TLO. Martinez Depo. p.71, lines 14-22. The Subscriber Agreement for TransUnion's TLO platform expressly states that a user may only obtain information for one of the following DPPA permissible uses: (1) use by a government agency; (2) use by a business to verify the accuracy of personal information submitted by the individual to the business; (3) use by an insurer; (4) use in connection with a legal proceeding; (5) use by a private investigative agency or licensed security service; and (6) use by an employer to verify a commercial driver's license. P. Barry Dec. ¶7, Exhibit E; 18 U.S.C. § 2721(b). Simply stated, Defendant regularly makes use of TransUnion's TLOxp database for the *impermissible purpose* of illegally collecting debts.

Trans Union describes its TLOxp skip-tracing database:

> Uncover the unexpected with the Address Report, from TLOxp®. Better addresses aid your ability to find and contact the right party with less stress. To support your business, our data scientists have developed an advanced, analytics-based model that provides exceptional rankings—helping you **locate your subject quickly and affordably**. Leveraging TLOxp's massive data repository, our Address Report provides all known current and historical details associated to a specific address including:
> …
> **Assets**
>
> - **Current and Past Vehicles**
> - Aircraft Records
> - Properties associated with the Address
> - Property Assessments
>
> **Licenses**
>
> - **Driver's License Information**
> - Professional Licenses
> - Voter Registrations
> - Weapon Permits
> - Professional Affiliations

https://www.tlo.com/address, last accessed April 25, 2023 (bold underlined added).

> Easily access the travel history and **last known locations of road-bound vehicles** in the United States, when available, with direct access via TLOxp®. What's more, **you can plot multiple sightings for the same vehicle** on a single user-friendly map — an innovative way to draw meaningful insights with far less effort. Be sure to add this breakthrough search to your list of investigative tools.

https://www.tlo.com/vehicle-sightings, last accessed April 25, 2023 (bold underlined added). This TLOxp information is clearly protected motor vehicle records and drivers license under the DPPA.

It is undisputed that Defendant is not a government agency, an insurer, or a private investigative agency, but is a common debt collector. Furthermore, Defendant was clearly not obtaining Plaintiff's information for the purpose of verifying information provided by Plaintiff, verifying a commercial driver's license of Plaintiff's, or obtaining information in connection with a legal proceeding. Therefore, in accessing the TLOxp database and looking up Plaintiff's protected DPPA driver's data, Defendant necessarily made false representations to TransUnion. Defendant misrepresented that it had a permissible use in obtaining Plaintiff's motor vehicle and driver's license data when it did not. Instead, Defendant used the Plaintiff's protected DPPA data to collect a time-barred debt that it was legally prohibited from collecting, because it was an unlicensed collector pretending to be a law firm. Defendant therefore made a false representation in connection with its use of the TLOxp database to obtain Plaintiff's protected driver's information in violation of the DPPA.

Furthermore, Defendant admits that TLOxp indisputably contains "motor vehicle record[s]." "[Y]eah, I know it contains motor vehicle information." Martinez Depo. p.186, lines 24-25. Likewise, Defendant used TLOxp to obtain consumers' personal information to collect debts. *See* Martinez Depo. p. 74 lines 6 - 10 ("And you're trying to identify where they live, where they work, what they own?" "Yes." "And that's to assist you in collecting debts?" "Yes."). An individual's physical address is squarely within the definition of "personal information" pursuant to the DPPA, as are the myriad other types of motor vehicle record data that TLOxp also provides to subscribers.

There is no genuine issue of material fact that would permit a jury to find in favor of Defendant here. Defendant knowingly used a motor vehicle record database, TLOxp, to obtain Plaintiff's protected motor vehicle information, for the impermissible purpose of attempting to illegally collect Plaintiff's expired debt. Defendant's use of TLOxp was enabled by its false representation to TransUnion of its true purpose in violation of the DPPA. Judgment as a matter of law is proper for Plaintiff's DPPA claim here.

## 5. Fair Credit Reporting Act ("FCRA")

"The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995). Congress intended to promote efficiency in the nation's banking system and to protect consumer privacy. *TRW Inc. v. Andrews*, 534 U.S. 19, 24, 122 S. Ct. 441(2001) (citing 15 U.S.C. § 1681(a)). "These consumer oriented objectives support a liberal construction of the FCRA" and any interpretation of this remedial statute must reflect those objectives. *Guimond*, 45 F.3d at 1333.

### A. The FCRA is Applicable Here

The threshold requirements for the application of the FCRA are: (1) plaintiff is a "consumer," as defined in 15 U.S.C. § 1681a(c); (2) defendant is a "person" or "user" as defined in 15 U.S.C. § 1681a(b); and (3) a "consumer report" as defined in 15 U.S.C. § 1681a(d) was obtained from a "consumer reporting agency" as defined in 15 U.S.C. §

1681a(f). "The term 'consumer' means an individual." 15 U.S.C. § 1681a(c). "The term 'person' means any individual, partnership, corporation . . . or other entity." 15 U.S.C. § 1681a(b). "The definition of a 'consumer report' therefore includes those reports needed to assess a consumer's eligibility for a benefit, as well as other predictable needs–such as collecting money owed under an agreement and assessing a particular consumer's credit or insurance risk." *Smith v. Bob Smith Chevrolet, Inc.*, 275 F. Supp. 2d 808, 817 (2003) *citing Washington State Department of Social and Health Services v. Guardianship Estate of Keffeler*, 537 U.S. 371 (2003). Lastly, a "consumer reporting agency" is defined as: "any person which . . . regularly engages . . . in the practice of assembling or evaluating consumer credit information . . . for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f).

Irrefutably, Plaintiff is a "consumer" under the FCRA because Plaintiff is a natural person. Defendant is a "person" under the FCRA because it is a registered "Corporation" in the state of California. *See* P. Barry Dec. ¶4, Exhibit B. Furthermore, Defendant obtained a "consumer report" through Experian, a "consumer reporting agency," at the time it was collecting this time-barred debt. *See* B. Kelly Dec. ¶ 41, Exhibit A. To wit:

UNITED
PAYMENT
CENTER
Inquired on
06/22/2022

222 N
MOUNTAIN AVE
STE 215,
UPLAND CA
91786

There exists no genuine issue of material fact that the FCRA applies here because each of the threshold requirements are satisfied.

### B. Defendant Violated the FCRA by Obtaining and Using Plaintiff's Consumer Credit Report for an Impermissible Purpose

Under 15 U.S.C. § 1681b(f) of the FCRA: "A person shall not use or obtain a consumer report for any purpose unless– (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section." "[C]ourts have found that a plaintiff must establish three elements in order to sustain a claim of improper use or acquisition of a credit report: (i) that there was a "consumer report" within

the meaning of the statute (ii) that the defendant used or obtained it; and (iii) that the defendant did so without a permissible statutory purpose." Godby v. Wells Fargo Bank, N.A., 599 F. Supp. 2d 934, 938 (S.D. Ohio 2008). The permissible purposes allowed under the FCRA are when the user "[1] intends to use the information in connection with credit (§ 1681b(3)(A)), [2] employment (§ 1681b(3)(B)), [3] insurance (§ 1681b(3)(C), [4] licensing (§ 1681b(3)(D)), or [5] 'has a legitimate business need for the information in connection with a business transaction involving the consumer,' 15 U.S.C. § 1681b(3)(E)." Boothe v. TRW Credit Data, 557 F. Supp. 66, 70 (S.D.N.Y. 1982).

Out of the enumerated permissible purposes above, the only colorable permissible purpose that Defendant may contend it obtained Plaintiff's consumer credit report for is the purpose of collecting upon a credit transaction, namely, Plaintiff's time-barred debt. However, the relevant authority makes clear that a debt collector's use of a consumer credit report, in connection with a debt which is no longer collectible, constitutes an impermissible purpose under the FCRA. *See Godby*, *supra*, 599 F. Supp. 2d 934, 942 ("Defendant would have been unable to collect any debt since it had been discharged in the bankruptcy proceedings. Therefore, Defendant did not have a permissible purpose under section 1681b(a)(3)(F).")

In short, Defendant obtained a consumer report about Plaintiff through Experian on June 22, 2022. Defendant's only conceivable purpose for obtaining this consumer report on Plaintiff was to collect on Plaintiff's expired debt. Nonetheless, Defendant could no longer legally collect on Plaintiff's debt as Plaintiff had not made a payment for

approximately 15 years–far beyond the expiration of the statute of limitations and it was illegal for Defendant to even be collecting debts in Minnesota because it was unlicensed. *See* Minn. Stat. § 541.05(1)(1) (six year statute of limitations for collecting a debt on a written contract). As illustrated by *Godby*, a debt-collector's use or procurement of a consumer report, when the debt is no longer collectible, constitutes an impermissible use and procurement under the FCRA. Defendant's conduct demonstrates that it was attempting to collect on the expired debt. Furthermore, the inquiry on Plaintiff's Experian report clearly shows that it pulled an Experian consumer report on Plaintiff on June 22, 2022. The evidence is indisputable: Defendant impermissibly obtained a consumer report of Plaintiff in violation of the FCRA.

Worse yet, by impermissibly pulling Plaintiff's Experian credit report, Defendant, in effect, added negative information to that report--beyond the seven-year strictures for negative consumer reporting information on a credit report under the FCRA--as shown by the credit inquiry that will remain for at least a year. 15 U.S.C. § 1681c(c); 15 U.S.C. § 1681g(a)(5). In addition, because Defendant failed to send Plaintiff an initial "g" notice and a notice that this debt had been assigned to it, Defendant further lacked the lawful right to collect this debt in the first place--let alone have a permissible purpose to pull his credit report. 15 U.S.C. 1692e(5) and e(8); Martinez Depo. p.69 line 29 to p.70 line 14.

## C. Defendant Willfully Violated the FCRA

A defendant can be held liable for punitive damages if it is determined that it willfully failed to comply with any portion of the FCRA. 15 U.S.C § 1681n. In *Safeco*

*Insurance Co. of America v. Burr*, the Supreme Court held that "willfulness" included not only knowing violations, but also those which are reckless or committed with reckless disregard of the law. 551 U.S. 47, 57 (2007). While the *Safeco* Court ultimately concluded that the defendants had not acted willfully because their conduct was based upon an objectively reasonable reading of the FCRA at the time, the same cannot be said of Defendant in this case. 551 U.S. at 69-70. Although the issue of willfulness is generally a question of fact for the jury, the Court may determine willfulness as a matter of law if it concludes that there is no genuine issue of material fact that Defendant's conduct created "a risk [of an FCRA violation] substantially greater than that which is necessary to make [its] conduct negligent. *Safeco*, 127 S.Ct. at 2215.

The crux of Defendant's misconduct here is the fact that Defendant's egregious collection attempts were premised on a 17-year old debt. *See* Martinez Depo. p. 112, lines 4-9 ("I knew that it was older debt . . . it was at least 15 years old"). Despite Defendant's knowledge that Plaintiff's debt was exceptionally old, Defendant obtained Plaintiff's consumer report in reckless disregard of the law. *See* Martinez Depo. p. 197 - 198, lines 17 - 1 (When Plaintiff's counsel pointed out that Defendant had not spent a penny on compliance under the FDCPA, the California Rosenthal FDCPA, the DPPA, or the FCRA, corporate owner simply responded, "You're right.").

It's simply indisputable that Defendant's violation of the FCRA was willful here. The evidence makes clear that Defendant acted in reckless disregard for the requirements

of the FCRA. Therefore, judgment as a matter of law is proper for Plaintiff's FCRA claim as there exists no genuine issue of material fact as to Defendant's FCRA violation.

### 6. Invasion of Privacy

Minnesota recognizes the tort of invasion of privacy on three alternative theories: intrusion of seclusion, appropriation of a name or likeness of another, and publication of private facts. *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn. 2003). Moreover, under the intrusion upon seclusion prong that Plaintiff pursues in this case, the invasion must be highly offensive to a reasonable person. *See Lake v. Wal–Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn.1998). "[T]he question of what kinds of conduct will be regarded as a highly offensive intrusion is largely a matter of social conventions and expectations." *Bauer v. Ford Motor Credit Co.*, 149 F Supp. 2d 1106, 1110 (D. Minn. 2001) (citation and internal quotation marks omitted).

This right to privacy applies in the context of consumer credit cases, including those involving abusive debt collection practices. *See generally, Bauer*. We need look no further than the congressional preamble to the Fair Debt Collection Practices Act to find that abusive collection practices can lead to invasions of privacy: "[a]busive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to ***invasions of individual privacy***." 15 U.S.C. § 1692(a) (emphasis added). Furthermore, Minnesota law prohibits abusive debt collection practices under the state's Consumer Fraud Act. See Minn. Stat. § 325F.69. This includes practices such as harassing or threatening a debtor, using obscene language, or disclosing information about

the debt to third parties without the debtor's consent. Minnesota law also specifically prohibits abusive and invasive collection conduct like that engaged in by Defendant. Minn. Stat. § 332.37:

(a) No collection agency, debt buyer, or collector shall:

(1) in collection letters or publications, or in any communication, oral or written **threaten wage garnishment or legal suit** by a particular lawyer, unless it has actually retained the lawyer;

…

(3) **use or threaten to use methods of collection which violate Minnesota law**;

(4) furnish legal advice or otherwise **engage in the practice of law or represent that it is competent to do so**;

…

(6) **exercise authority on behalf of a client to employ the services of lawyers** unless the client has specifically authorized the agency in writing to do so and the agency's course of conduct is at all times consistent with a true relationship of attorney and client between the lawyer and the client;

(7) publish or cause to be published any list of debtors except for credit reporting purposes, use shame cards or shame automobiles, advertise or threaten to advertise for sale any claim as a means of forcing payment thereof, or **use similar devices or methods of intimidation**;

…

(9) **operate under a name or in a manner which implies that the collection agency or debt buyer is a branch of or associated with any department of federal, state, county or local government or an agency** thereof;

…

(12) **violate any of the provisions of the Fair Debt Collection Practices Act** of 1977, Public Law 95-109, while attempting to collect on any account, bill or other indebtedness;

…

(15) when a debtor has a listed telephone number, **enlist the aid of a neighbor or third party to request that the debtor contact the licensee or collector**, except a person who resides with the debtor or a third party with whom the debtor has authorized the licensee or collector to place the request. …

(16) when attempting to collect a debt, **fail to provide the debtor with the full name of the collection agency or debt buyer as it appears on its license** or as listed on any "doing business as" or "d/b/a" registered with the Department of Commerce;

…

(20) **attempt to collect any amount, including any interest, fee, charge, or expense incidental to the charge-off obligation, from a debtor unless the amount is expressly authorized by the agreement creating the debt or is otherwise permitted by law**;

…

(23) **when initially contacting a Minnesota debtor by mail, fail to include a disclosure** on the contact notice, in a type size or font which is equal to or larger than the largest other type of type size or font used in the text of the notice. The disclosure must state: **"This collection agency is licensed by the Minnesota Department of Commerce" or "This debt buyer is licensed by the Minnesota Department of Commerce"** as applicable; or

(24) **commence legal action to collect a debt outside the limitations period** set forth in section 541.053.

In other words, Defendant violated at least 12 of the 24 prohibited debt collection practices under Minnesota law in collecting this debt from Plaintiff.

Many of these prohibitions specifically implicate a consumer's right to privacy, truthfulness, fairness, and dignity in the collection process. The uncontroverted facts alleged in the verified and amended complaint, the admissions of Defendant's owner, and the uncontroverted evidence in this case demonstrate that Defendant violated every one of these enumerated provisions. This is highly offensive conduct that invaded Plaintiff's privacy.

The contacts with Plaintiff's elderly mother, the misuse of DPPA and FCRA reporting databases, and the threats of judgments and liens against Plaintiff rise to the level

of highly offensive collection conduct that supports not only a claim for the invasion of Plaintiff's privacy by intrusion upon seclusion, but it also justifies punitive damages. Defendant did not have a right to see anything in Plaintiff's credit reports or his motor vehicle records and its conduct in tricking these companies into providing this information was a further invasion of Plaintiff's privacy.

What is clear from these facts is that Plaintiff has shown by clear and convincing evidence Defendant's deliberate disregard for Plaintiff's right to truth, fairness, dignity, and respect as required by the FDCPA. Defendant was unlicensed to collect debts in Minnesota and in its home state of California. Defendant held itself out as a law firm when it was nothing more than a boiler-room collection operation, thumbing its nose at state and federal law. The nature, substance, and tenor of the collection calls were beyond the pale. The Defendant's owner even admitted to hearing those very illegal tactics used by his collectors in the past. Finally, this alleged debt was so far beyond the statute of limitations that no reasonable person would have thought it was collectible.

For these and all of the foregoing reasons, summary judgment as to liability on all counts is warranted.

## III.  DEFENDANT'S UNTENABLE POSITIONS

### 1.  Defendant Failed To Undertake Any Investigation Of The Claims Before Denying Plaintiff's Claims

It is a curiosity how Defendant was able to, not once but twice, deny the material allegations made in the Complaint and the Amended Complaint given the requirements of

Rule 11. For example, the Amended Answer denies the use of any DPPA databases, but Defendant's owner admitted at deposition that Defendant regularly uses a DPPA-regulated database, TLOxp, for the Defendant's debt collection practices and did so on Plaintiff's collection account.

```
14 Q. Okay. And when I say, "What databases do you
15 use," what I'm referring to is, do you use any
   skip trace
16 type databases to collect on debts?
17 A. Yes. I use TLO.
18 Q. TLO. So is that TLOXP?
19 A. Yes.
20 Q. And at that's a product from TransUnion,
21 correct?
22 A. Yes.
23 Q. And that would have been a database that you
24 used to collect on Mr. Kelly's account?
25 A. Yeah. For skip tracing purposes.
```

Martinez Depo., p. 71. Comparing Mr. Martinez's candid deposition answer the denial in the Amended Answer filed in this case--192 days after this case had been filed:

**Amended Complaint (Dkt. #16)**

```
106. In connection with Defendant's effort to collect an
alleged debt from Plaintiff, Defendant and its employees
obtained and used personal information regarding
Plaintiff from various internet skip-tracing databases,
such as LexisNexis Risk Management, Inc. (Accurint),
TransUnion Risk and Alternative Data Solutions,
Inc.(TLO), UDT Group, LLC (Delvepointe), Experian or
Interactive Data, LLC, and others.
```

**Amended Answer (Dkt. #33)**

```
106. UPC is without sufficient information to admit or
deny the allegations of Paragraph 106 and therefore
denies the same.
```

Even after more than six months of time, Defendant was apparently still without sufficient

information, maybe because it failed to undertake any investigation whatsoever of the

allegations made in the Complaint or Amended Complaint.

    In its answers filed herein, Defendant denied virtually all of the Complaint's

material allegations. In fact, Mr. Martinez later testified in his deposition that *no one at*

*Defendant United Payment Center, Inc. ever investigated these allegations in any manner*:

```
13 Q. Have you investigated any of the allegations
14 made in this lawsuit against UPC?
15 A. No, not particularly.
16 Q. Well, when you say "not particularly," tell
   me
17 what do you mean by that.
18 A. The only thing I have investigated is who the
19 collector was.
20 Q. All right.
21 A. That's it.
```

Martinez Depo., p. 16. And then this:

```
 3 Q. Did you investigate any of the allegations that
 4 Mr. Kelly has made in his lawsuit against UPC?
 5 A. No.
 6 Q. Who there at UPC, if anyone, has investigated
 7 the allegations that Mr. Kelly made in his lawsuit
 8 against UPC?
 9 A. No one. Jose Rico is gone. It's hard to do
10 that.
11 Q. Well, prior to him leaving, did you investigate
12 any of the allegations?
```

```
13 A. I think when I got wind of the loss, he was
14 already gone.
15 Q. Have you tried to reach out to Mr. Rico to
16 investigate the allegations?
17 A. No.
18 Q. And why is that?
19 A. Well, he no longer works with us.
20 Q. Okay. Well, weren't you interested -- I'm
21 sorry?
22 A. It seems inappropriate for me to reach out to
23 him.
24 Q. I see. Do you know whether or not your
25 attorneys have reached out to him?
1  A. I don't think so.
```

Martinez Depo., p. 52-53.

It defies credulity to believe Defendant was somehow able to deny the allegations at the pleading stage--let alone at the amended pleading stage--when it filed its Amended Answer (Dkt. #33) more than six months later. Defendant clearly failed to undertake even a cursory good-faith investigation into the allegations of the Amended Complaint before answering.

## 2. Defendant's Liability with Respect to its "Independent Contractor" Debt Collectors

In Minnesota, for "determining whether the relationship is one of employee or independent contractor, the most important factor is the right of the employer to control the means and manner of performance. Other factors to be considered are mode of payment, furnishing of materials or tools, control of the premises where the work is to be done, and the right of the employer to discharge the employee-contractor." *Farnam v. Linden Hills*

*Congregational Church*, 276 Minn. 84, 91 (1967) (internal quotations and citations omitted). Under California law, the determination of whether a worker is an employee or an independent contractor is whether the entity retains all necessary control over the relevant portions of its operations. *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1076 (N.D. Cal. 2015). Likewise, the "right to terminate at will" is strong evidence to support the existence of an employment relationship. *Id*.

   Circuit courts have "held debt collectors liable for violations of the Fair Debt Collection Practices Act committed by others acting on their behalf." *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F. 3d 317, 325 (7th Cir. 2016); *See also Fox v. Citicorp Credit Services, Inc.*, 15 F. 3d 1507, 1516 (9th Cir. 1994); *Pollice v. National Tax Funding, L.P*, 225 F. 3d 379, 404-06 (3rd Cir. 2000) (abrogated on other grounds by *Tepper v. Amos Financial, LLC*, 898 F. 3d 364 (3rd Cir. 2018)).

   Defendant may attempt to disclaim liability for the acts of its debt collectors as Defendant only now claims that its debt collectors are "independent contractors." Martinez Depo. p.167, lines 11-15. This argument is without merit under both California and Minnesota law. Defendant's self-serving testimony that all of its debt collectors are independent contractors is contradicted by Mr. Martinez's own testimony. *See* Martinez Depo. p.39, lines 3-8. Moreover, Defendant has produced nothing in the way of admissible evidence, of documents, contracts, or testimony that would demonstrate the existence of a purported independent contractor relationship. For example, Defendant admits that these debt collectors have no written independent contractor agreements (Martinez Depo. p. 108,

lines 4 - 6), perform their functions under the purview of Defendant's managers (Martinez Depo. p. 126, lines 13 - 20), and use Defendant's offices, desks, computers, and telephones to collect Defendant's accounts (Martinez Depo. p. 23 - 25, lines 19 - 14). Likewise, Defendant retained the right to terminate its debt collectors at will. Martinez Depo. p. 51, lines 12 - 15.

The indisputable testimony provided by Defendant's officer clearly shows that each of Defendant's debt collectors are employees and not independent contractors. Defendant cannot shield itself from its debt collectors misconduct through the baseless, 11th-hour, defense that there was a mythical independent contractor relationship with its employees, under either Minnesota or California law.

## CONCLUSION

Plaintiff's motion for summary judgment as to liability must be granted because the undisputed facts demonstrate that Defendant acted in an absolutely reckless manner in its attempts to collect this time-barred consumer debt from Plaintiff. Notwithstanding Defendant's denials in its Answers, the uncontroverted evidence shows that Defendant engaged in false statements to Plaintiff and his mother in attempting to collect a time-barred debt; made misrepresentations to Experian in fraudulently obtaining Plaintiff's credit report; and, made misrepresentations to Trans Union to misuse its TLOxp motor vehicle database. Defendant engaged in trickery by lying about being a law firm; by lying about attaching liens to Plaintiff's home and automobiles; by calling itself Process Service

Dispatch and Bradford and Associates; by spoofing its telephone numbers; and, by collecting without a license.

Summary judgment is appropriate as to all counts herein.

Respectfully submitted,

Dated: April 25, 2022                      **THE BARRY LAW OFFICE, LTD**

By:  <u>s/ Peter F. Barry</u>
Peter F. Barry, Esq.
Attorney I.D.#0266577
333 Washington Ave No, Suite 300-9038
Minneapolis, MN 55401-1353
Telephone:  (612) 379-8800
pbarry@lawpoint.com

**SWIGART LAW GROUP, APC**

Joshua B. Swigart, Esq.
*Admitted Pro Hac Vice*
California SBN 225557
2221 Camino del Rio S, Ste 308
San Diego, CA 92108
P: 866-219-3343
Josh@SwigartLawGroup.com

***Attorneys for Plaintiff***