# EXHIBIT A

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF MINNESOTA

3                         -  -  -

4

  Brian Kelly,                      )

5                                    )

       Plaintiff,                    )

6                                    )

       vs.                           )   No:

7                                    )   0:22-cv-1799-ECT-JFD

  United Payment Center, Inc.,       )

8                                    )

       Defendant.                    )

9    _____ )

10

11

12

13

14          REMOTE DEPOSITION OF MICHAEL MARTINEZ

15                    Cancùn, Mexico

16                Thursday, March 30, 2023

17

18

19

20

21          REPORTED BY:  NATALIA AGUIRRE, RPR

22

23

24

25

                                        Page 1

**Page 2**

```
 1         UNITED STATES DISTRICT COURT
 2            DISTRICT OF MINNESOTA
 3                  - - -
 4
 5
   Brian Kelly,              )
 6                           )
     Plaintiff,              )
 7                           )
     vs.                     )  No:
 8                           )  0:22-cv-1799-ECT-JFD
   United Payment Center, Inc.,   )
 9                           )
     Defendant.              )
10  _____  )
11
12
13
14     Remote deposition of MICHAEL MARTINEZ, taken on
15  behalf of Plaintiff, Cancùn, Mexico, commencing at
16  8:04 a.m., Thursday, March 30, 2023, before NATALIA
17  AGUIRRE, RPR.
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1        A P P E A R A N C E S
 2  FOR PLAINTIFF:
 3  THE BARRY LAW OFFICE, LTD
     BY:  PETER F  BARRY, ESQ
 4   333 WASHINGTON AVE NO
     SUITE 300-9038
 5   MINNEAPOLIS, MN 55401-1353
     612-379-880
 6   PBARRY@LAWPOINT COM
 7
     FOR PLAINTIFF:
 8
     SWIGART LAW GROUP, APC
 9   BY:  JOSHUA B  SWIGART, ESQ
     2221 CAMINO DEL RIO S
10   SUITE 308
     SAN DIEGO, CA 92108
11   866-219-3343
     JOSH@SWIGARTLAWGROUP COM
12
13  FOR DEFENDANT:
14  GORDON REESE SCULLY MANSUKHANI LLP
     BY:  DANIEL BREES, ESQ
15   100 S  5TH STREET
     SUITE 1900
16   MINNEAPOLIS, MN 55402
     DBREES@GRSM COM
17
18  ALSO PRESENT: Matt Hausie, Videographer
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    INDEX
 2  WITNESS:
 3  EXAMINATION BY:                      PAGE
 4  BY MR  BARRY                         7
 5
 6  EXHIBITS
 7  NUMBER         DESCRIPTION          PAGE
 8
    Exhibit 1   Defendant United Payment   57
 9              Center Inc's Answer to
                Amended Complaint and
10              Affirmative Defenses
11  Exhibit 2   Phone recording          61
12  Exhibit 3   Allstate Insurance Policy  70
                signed 3/21/2023
13
    Exhibit 4   Michael Martinez Twitter  133
14
    Exhibit 5   Caller ID Screenshots     144
15
    Exhibit 6   Video of Michael Martinez  148
16
    Exhibit 7   Video of Michael Martinez and  151
17              Vic Diaz
18  Exhibit 8   Video of Michael Martinez and  156
                his Operations Manager
19
    Exhibit 9   Video of Michael Martinez  160
20
    Exhibit 10  Video of Michael Martinez  162
21
    Exhibit 11  Video of Michael Martinez  168
22
    Exhibit 12  Video of Michael Martinez  170
23
    Exhibit 13  Video of Michael Martinez  173
24
    Exhibit 14  Video of Michael Martinez  179
25  Exhibit 15  Video of Michael Martinez  183
```

**Page 5**

```
 1
    Exhibit 16  Video of Michael Martinez  187
 2
    Exhibit 17  Video of Michael Martinez  191
 3
    Exhibit 18  Video of Michael Martinez  195
 4
    Exhibit 19  Video of Michael Martinez  198
 5
    Exhibit 21  Video of Michael Martinez  202
 6
    Exhibit 22  Video of Michael Martinez  205
 7
 8
 9
    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
10
              PAGE   LINE
11
                (None)
12
13
14
    INFORMATION TO BE SUPPLIED:
15
              PAGE   LINE
16
                (None)
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

1      THE VIDEOGRAPHER:  Good morning.  We're on the
2  video record at 8:04 a.m. on March 30th, 2023.  Please
3  note, that this deposition is being conducted virtually.
4  Quality of recording depends on the quality of camera and
5  internet connection of participants.  What is seen from     08:04:48
6  the witness and heard on screen is what will be recorded.
7  Audio and video recording will continue to take place
8  unless all parties agree to go off the record.
9      This is media unit one of the video recorded
10  deposition of Michael Martinez taken by counsel for the     08:05:03
11  plaintiff in the matter of Brian Kelly versus United
12  Payment Center, Inc., filed in the United States District
13  Court District of Minnesota, case number
14  0:22-cv-1799-ECT-JFD.  This deposition is being conducted
15  remotely using virtual technology.                08:05:31
16      My name is Matthew Hausie from the Veritext, and
17  I'm the videographer, along with our court reporter
18  Natalia Aguirre also from Veritext.  I'm not related to
19  any party in this case action, nor am I financially
20  interested in the outcome.                  08:05:46
21      If there are any objections to proceeding,
22  please state them at the time of your appearance.
23  Counsel, please state your appearance for the record.
24      MR. BARRY:  Good morning.  Attorney Pete Barry
25  for the plaintiff Brian Kelly.  Also, my co-counsel Josh   08:05:58

Page 6

1  Swigart is off camera right now in another hearing, but
2  he'll be joining us shortly.
3      MR. BREES:  Good morning.  This is Dan Brees on
4  behalf of United Payment Center and on behalf of the
5  witness, Michael Martinez.                 08:06:17
6      THE VIDEOGRAPHER:  Thank you.  And will the
7  court reporter please swear in the witness.
8
9          MICHAEL MARTINEZ,
10  having first been duly sworn, was
11  examined and testified as follows:
12
13          EXAMINATION
14  BY MR. BARRY:
15  Q.  Good morning, Mr. Martinez, how are you?      08:06:40
16  A.  Good morning.  I'm doing well.  Yourself?
17  Q.  Good.  If you could for me, if you could state
18  your full legal name, including your middle name, and
19  spell it for the record.
20  A.  Michael Steven Martinez.  M-i-c-h-a-e-l.  Steven  08:06:54
21  is S-t-e-v-e-n.  Martinez is M-a-r-t-i-n-e-z.
22  Q.  And what is your date of birth, Mr. Martinez?
23  A.  ████████████
24  Q.  Where do you currently live?
25  A.  Rancho Cucamonga, California.          08:07:18

Page 7

1  Q.  What's your home address?
2  A.  12150 Casper Court, Rancho Cucamonga, California
3  91739
4  Q.  Where were you born?
5  A.  Los Angeles, California.             08:07:31
6  Q.  And where else have you lived other than Rancho
7  Cucamonga and Los Angeles?
8  A.  State wise?  Or city wise?
9  Q.  Well, let's start with state
10  A.  Nowhere else                08:07:47
11  Q.  You've been in California your whole life?
12  A.  Correct
13  Q.  What other cities have you lived in other than
14  Los Angeles and Rancho Cucamonga?
15  A.  Baldwin Park                08:08:00
16  Q.  Baldwin Park?
17  A.  Chino, California
18  Q.  All right
19  A.  Ontario, California, and Victorville,
20  California                  08 08:19
21  Q.  And I think I heard you say before we went on
22  the record that you were in Cancún, Mexico  is that
23  correct?
24  A.  Yes, that's correct
25  Q.  And how long have you been in Cancún, Mexico?   08:08:28

Page 8

1  A.  I'm going on five days.
2  Q.  I'm sorry.  I missed that.
3  A.  Five days.  I'm going on five days.
4  Q.  And how long do you intend to stay in Cancún?
5  A.  Another three days.             08:08:50
6  Q.  Okay.  And then, when you are done in Cancún,
7  are you coming back to Rancho Cucamonga?
8  A.  Correct.
9  Q.  And do you have a cell phone with you today?
10  A.  I do.                   08:09:03
11  Q.  Do you have any other electronic devices other
12  than the laptop -- or excuse me -- let me withdraw that
13  question.
14      Other than a cell phone, do you have any other
15  devices other than the computer you're using to do the   08:09:15
16  Zoom session with?
17  A.  No.
18  Q.  And are you communicating with anybody else
19  during the course of this deposition on your cell phone,
20  like text --                 08:09:31
21  A.  No.
22  Q.  -- or e-mail or other means?  Okay.
23  A.  No.
24  Q.  And I'm going to ask you at the end of the
25  deposition for the identifies of anyone you've      08:09:37

Page 9

3 (Pages 6 - 9)

1 communicated with throughout this deposition
2      Do you understand that?
3   A  Yes
4   Q  Okay   And the rules prohibit you from having
5 outside communications other than with your counsel   You   08:09:48
6 may have some communication, but if you do communicate
7 with anybody else during the course of the deposition on
8 your cell phone or any other device, I'm going to
9 question you about that   Okay?
10   A  Okay                                 08:10:02
11   Q  Great   Have you had your deposition taken
12 before, Mr Martinez?
13   A  Yes
14   Q  When is the -- how many times have had you your
15 deposition taken?                          08:10:16
16   A  Twice
17   Q  And -- twice   So this would be your third
18 deposition   Is that correct?
19   A  Correct
20   Q  And tell me about the first instance when you   08:10:27
21 had your deposition   When was that?
22   A  About a year ago
23   Q  And do you remember the name of the case?
24   A  No, I don't
25   Q  Who was representing you in that matter?  Was   08:10:42

Page 10

1 that Mr Brees's law firm?
2   A  No
3   Q  Who -- were you represented during that
4 deposition?
5   A  Yes                                  08:10:56
6   Q  Okay   Who was your attorney?  Who was your
7 attorney?
8   A  I don't remember his name   I would have to look
9 at -- look that up
10   Q  Okay   So you can find -- you have info -- you   08:11:14
11 have that information some where?
12   A  I'd have to look through my e-mails   Yes
13   Q  Okay   All right   But -- but you can locate
14 that information if you need to   Maybe not today, but
15 going forward?                            08:11:28
16   A  Yeah, of course
17   Q  Okay   And tell me what that deposition
18 involved
19   A  It was for a trucking company I used to own
20   Q  Okay   And were you sued by somebody or did you   08:11:39
21 sue someone?
22   A  Both
23   Q  Okay   So it was -- did you initially sue
24 someone and then they counter-claimed?
25   A  Correct                              08:11:54

Page 11

1   Q  Or -- okay.  And what did you sue them for?
2   A  For loss of my truck.
3   Q  And what was the name of that defendant that you
4 sued?
5   A  I don't remember if it was Munoz or Anaya.        08:12:10
6 There was two individuals involved.  So I don't remember
7 which one my attorney filed against.  It was either Munoz
8 or Anaya, one -- one of those.
9   Q  Was that in state court or was that in federal
10 court?                                     08:12:31
11   A  I'm not sure.
12   Q  How did that matter get resolved, if at all?
13   A  It got settled.
14   Q  Okay.  And the second deposition that you had
15 given, tell me about that.  Who represented you in that   08:12:54
16 deposition?
17   A  My attorney, Jeff Poindexter.
18   Q  And Mr. Poindexter, is he with the same firm
19 that Mr. Brees is with, Gordon Rees?
20   A  No.                                    08:13:11
21   Q  Okay.  And that second deposition, Mr. Martinez,
22 what was that related to?
23   A  It was a lawsuit that I filed against a business
24 partner in real estate for a real estate project.
25   Q  Okay.  So it's some kind of dispute, business   08:13:33

Page 12

1 dispute, related to your real estate practice, your real
2 estate business?
3   A  Correct.
4   Q  And what kind of real estate business do you
5 have?                                      08:13:47
6   A  Well, it's my wife's business.  We flip houses.
7   Q  Okay.  You're doing a great job so far.  And I
8 just want to make sure that, just so we have a clean
9 record and we don't stress the court reporter out, I will
10 endeavor to not speak over you.  Okay?        08:14:10
11   A  Okay.
12   Q  And -- and if you'll provide me that same
13 courtesy, that would be great.  If you need a break at
14 any point, so long as there isn't a question pending,
15 we'll -- we'll take a break.  All right?        08:14:28
16   A  Okay.
17   Q  If you don't understand a question I've asked
18 you or if I'm unclear, let me know and I'll try to reask
19 that question so it's -- it's more clear for you.  All
20 right?                                     08:14:44
21   A  Okay.
22   Q  And you'll let me know if you don't understand a
23 question?
24   A  Yes.
25   Q  Okay.  Have you taken any drugs or alcohol that   08:14:49

Page 13

4 (Pages 10 - 13)

1 would impair your ability to tell me the truth today?

2 A No

3 Q Do you -- have you taken any drugs or alcohol

4 which would impair your ability to remember things today?

5 A No                    08:15:07

6 Q Do you have any medical conditions that would

7 impair your ability to tell the truth or would impair

8 your memory?

9 A No

10 Q So other than the two instances when you had    08:15:19

11 your deposition taken that we've already talked about,

12 have there been any other lawsuits that you've been

13 involved in where you had your deposition taken or you

14 gave sworn testimony?

15 A No                    08:15:44

16 Q Did you give any sworn testimony in Harris

17 versus United Payment Center back in 2022 or any other

18 time?

19 A Not that I remember

20 Q Do you remember the Harris versus United Payment  08:16:04

21 Center lawsuit that was brought against your company back

22 in 2022?

23 A Not in detail

24 Q But you do remember it?  You're aware of it?

25 A Yes                    08:16:21

Page 14

---

1 Q. And what was the -- what was the -- the basis of

2 that lawsuit?  Harris sued you -- your company rather.

3 When you say "you," I may be referencing you, but if I

4 say "UPC," you'll understand that to mean United Payment

5 Center, Incorporated.  Okay?            08:16:45

6 A. Okay.

7 Q. So what was the subject matter of that Harris

8 versus UPC lawsuit?

9 A. I don't remember the subject matter.  I believe

10 we settled that pretty quickly.          08:16:58

11 Q. Do you know what Harris was complaining about?

12 A. No.  I don't even get deep into the -- into

13 complaints like that, to be honest.  I let my attorneys

14 deal with it.

15 Q. How about the Darwin Strong versus United    08:17:15

16 Payment Center?  What can you tell me about that case?

17 A. Same thing.  I don't get deep into the -- the

18 allegations.  My attorneys deal with all that for the

19 most part.

20 Q. Who have you discussed this case with other than  08:17:31

21 your attorneys at Gordon Rees?

22 A. I haven't discussed this case with anyone other

23 than my attorneys.

24 Q. Have you talked about this case with any of

25 the -- the-- any of your employees?        08:17:58

Page 15

---

1 A. No.

2 Q. Have you discussed this case with any of your

3 managers at UPC?

4 A. I discussed it with my administration manager

5 very, very briefly.  Just --            08:18:17

6 Q. And what -- pardon me.  If I can just follow up,

7 Mr. Martinez.  What's that person's name?  Your

8 administration manager.

9 A. Pedro Valencia.

10 Q. Pedro Valencia.  Okay.  And what did you discuss  08:18:36

11 with Pedro Valencia with regard to this case?

12 A. Just that we are dealing with a lawsuit.

13 Q. Have you investigated any of the allegations

14 made in this lawsuit against UPC?

15 A. No, not particularly.            08:19:04

16 Q. Well, when you say "not particularly," tell me

17 what do you mean by that.

18 A. The only thing I have investigated is who the

19 collector was.

20 Q. All right.                08:19:16

21 A. That's it.

22 Q. And who was the collector on Brian Kelly's

23 account?

24 A. His name is Jose Rico.

25 Q. Jose Rico.  And --            08:19:29

Page 16

---

1 A. This is why I had to involve my administration

2 manager.  I had to track that information down.

3 Q. All right.  And -- and Jose, where does Jose

4 live?

5 A. I -- I don't know.            08:19:47

6 Q. Well, is Jose there in -- in -- let -- let me

7 back up for a minute.

8 United Payment Center, your office is in Baldwin

9 Park?

10 A. No.  I'm in Upland.            08:19:57

11 Q. You're in Upland.  Okay.  And so, UPC's offices

12 are in Upland.  Jose Rico, does he work in that office in

13 Upland?

14 A. No.

15 Q. Where -- where does Mr. Rico work?      08:20:15

16 A. I don't know where he works.

17 Q. Well, he's your -- he's your collector, right?

18 A. No.  Not any more.

19 Q. Oh, he's not.  Has he been terminated?

20 A. He was an independent contractor.  We parted    08:20:28

21 ways about six months ago.

22 Q. Okay.  So Mr. Rico was an independent contractor

23 of UPC, and you -- when you say "you parted ways about

24 six months ago," you terminated that independent

25 contractor relationship?                08:20:52

Page 17

---

5 (Pages 14 - 17)

1    A. It was mutual.
2    Q. Okay. And what precipitated that mutual
3 decision to part ways with Mr. Rico six months ago?
4    A. He wanted to explore his options working with
5 another company.                    08:21:09
6    Q. Okay. And to be clear, I want to -- your --
7 your audio isn't perfect. I think I heard you say, "He
8 wanted to explore his options with another company"?
9    A. Correct.
10    Q. And what other company is that?        08:21:23
11    A. I don't know the name of the company.
12    Q. Okay. Do you have Mr. Rico's phone number?
13    A. I do not.
14    Q. Okay. If -- if you went back to your office in
15 Upland, could you find Mr. Rico's phone number?    08:21:42
16    A. Most likely, yes.
17    Q. Could you find his address?
18    A. Most likely, yes.
19    Q. Okay. And so presumably, Mr. Rico was being
20 paid for the work he did at UPC?          08:22:01
21    A. Correct.
22    Q. And so would you -- is it your business practice
23 to mail out checks to Mr. Rico or to electronically
24 transfer funds to him? How -- how did he get paid?
25    A. We would hand him a check at the office.

Page 18

1    Q. Okay. So he must be somewhere physically near
2 Upland I would assume; is that correct?
3    A. Yes.
4    Q. Okay. And while you don't know as you sit there
5 today exactly where he lives, you must have a record    08:22:38
6 some where there of where he lives, correct?
7    A. Most likely his W9 form or his 1099 form.
8    Q. Okay. So you issue a 1099 form for Mr. Rico?
9    A. Correct. To his business.
10    Q. Okay. And what's the name of Mr. Rico's    08:22:58
11 business?
12    A. I don't have that information in front of me.
13    Q. Okay. Could you get that information if you
14 needed to?
15    A. Most likely, yes.            08:23:12
16    Q. Okay. And so, just in a kind of a -- in a
17 general -- as a general proposition, it sounds to me like
18 Mr. Rico would get a periodic payment check for the work
19 he did for UPC; is that correct?
20    A. Yes.                    08:23:31
21    Q. Is he paid every two weeks? Is he paid every
22 month? Every six months? How often?
23    A. Every two weeks.
24    Q. Was he paid a salary? Or -- or what was his
25 compensation structure?              08:23:51

Page 19

1    A. No. He was paid strictly commission for
2 whatever he would collect.
3    Q. All right. So he -- Mr. Rico earned a
4 percentage of what he collected?
5    A. Correct.                    08:24:07
6    Q. And what percent would he earn? Or was it
7 stair-stepped compensation? Or if you don't --
8    A. It was 33 -- 33 percent commission on accounts
9 owned by United Payment Center. Excuse me.
10    Q. 33 percent on accounts owned by United Payment    08:24:27
11 Center. Is that what I heard you say?
12    A. Yes.
13    Q. And United Payment Center, do you purchase your
14 own accounts for collection?
15    A. Yes.                    08:24:46
16    Q. Tell me about that process.
17    A. Well, that's what United Payment Center is.
18 We -- we purchased debt and assigned it to collectors.
19    Q. So in the case of Mr. Kelly's debt, as I
20 understand it, it was a deficiency balance on an auto    08:25:04
21 loan with CitiBank. Is that your understanding?
22    A. I'm not sure. I haven't looked into the details
23 of it.
24    Q. Okay. Well, tell me -- let's try this.
25    Tell me everything you know about Mr. Kelly's    08:25:22

Page 20

1 account.
2    A. All I know is that we purchased it, and I
3 assigned it to Jose Rico.
4    Q. Okay. And so does Mr. Rico work at home or in
5 another office? Where does he physically do his work?    08:25:43
6    A. I don't know where he works at.
7    Q. Okay. And so have -- have you ever been to
8 where he works -- where Mr. Rico works?
9    A. No.
10    Q. Has anyone at United Payment Center ever been to    08:26:01
11 where Mr. Rico works?
12    A. I don't know.
13    Q. What's your general business practice with
14 regard to an employee like Mr. Rico? How -- how do you
15 know where they're working and when you working.    08:26:22
16    MR. BREES: Objection to the extent that he --
17 you reference him as an employee.
18 BY MR. BARRY:
19    Q. Okay. Contractor. You called him an
20 independent contractor, Mr. Rico.        08:26:36
21    What's your business practice with an off-site
22 contractor like Mr. Rico? Do you -- does someone from
23 UPC do a, like, a site visit to where they're going to be
24 doing work?
25    A. So Mr. Barry, I think you're confused. When    08:26:52

Page 21

6 (Pages 18 - 21)

**Page 22**

1 Mr Rico was with me, he would he come into our office

2 You're asking where he works at  I don't know where he

3 works at

4    Q  Okay  Understood  So Mr  Rico -- I am

5 confused  Thank you for the clarification  Mr  Rico    08:27:09

6 worked physically in your office up until six months ago

7 is that correct?

8    A  Yes

9    Q  Okay  Now we're getting somewhere  All right

10 Now he no longer works in your office because you parted    08:27:22

11 ways six months ago, right?

12    A  Yes

13    Q  So did you ever have an opportunity to talk with

14 Mr  Rico when he was working in your office?

15    A  Yes  We would speak occasionally    08:27:38

16    Q  Okay  And were -- were you friends with Mr

17 Rico?

18    A  I wouldn't determine us friends

19    Q  Had you previously known Mr  Rico before he came

20 to work at UPC in Upland in that office?    08:27:59

21    A  No

22    Q  Okay  And were you responsible for engaging

23 Mr  Rico when he did come to work at UPC in Upland?

24    A  No

25    Q  Do you know who was?    08:28:18

**Page 23**

1    A  I don't remember the specifics, but I do believe

2 he was a referral.

3    Q  Okay.  But -- so when you're bringing in a

4 person like Mr. Rico to work in the UPC office, as you

5 call it, an independent contractor -- when you bring him    08:28:41

6 in, what's that process like?  Tell me about that.

7    A  Most of the people that work with our

8 organization are referrals.  They're already experienced

9 in the business.  So we basically give them access.  We

10 set them up on our software -- on our collection    08:29:10

11 software.  We give them access.  We get a 1099 or a W9

12 filled out, and they're off to the races.  We start

13 assigning accounts to them.

14    Q.  Okay.  So do they use -- do you supply them with

15 a telephone to make calls on?    08:29:28

16    A.  The ones that work from the office, yes.

17 There's also a few that work from home in their own

18 offices.

19    Q.  Okay.  But Mr. Rico worked at the UPC offices in

20 Upland, correct?    08:29:44

21    A.  Correct.

22    Q.  Okay.  So you would have supplied Mr. Rico with

23 a telephone to make calls from?

24    A.  Yes.

25    Q.  And you also supplied him with a computer to    08:29:52

**Page 24**

1 work from?

2    A.  Yes.

3    Q.  And that computer has some kind of, like, CRM

4 type software?

5    A.  Yes.    08:30:09

6    Q.  Okay.  And what's your understanding of what CRM

7 software is?

8    A.  It's where we house our accounts.

9    Q.  Okay.  Customer relations, management software?

10    A.  Correct.    08:30:27

11    Q.  And so you would keep track of the collection

12 accounts that you were collecting on at UPC in your CRM

13 software?

14    A.  Yes.

15    Q.  And Mr. Rico, presumably, would come in to do    08:30:40

16 his work there at UPC, and part of that work would be

17 logging into that computer to access the accounts which

18 were assigned to him to collect?

19    A.  Correct.

20    Q.  What other office equipment would you supply    08:30:58

21 besides a telephone and a computer to Mr. Rico?

22    A.  A chair.

23    Q.  Okay.  Does he -- did he have a cube?

24    A.  Yes.  Cubicle.

25    Q.  Cubicle.  All right.  And was he the only one    08:31:25

**Page 25**

1 that used that cubicle in that space or did other people

2 use that?

3    A  No  No  He was the only one

4    Q  Okay  All right  You didn't do hot racking,

5 right?  You know what hot racking is?    08:31:39

6    A  I don't know what that is

7    Q  Well, hot racking is where you have multiple

8 people using one desk throughout a shift or throughout

9 the workweek  But in the case of Mr  Rico, he was

10 assigned a desk and kept it in the same spot?    08:31:55

11    A  Correct

12    Q  And no one used that desk other than Mr  Rico

13 when he was working there?

14    A  Correct

15    Q  Did you review any documents before coming here    08:32:06

16 today to -- to have your deposition taken?

17    A  No

18    Q  Is there anybody else there in your -- well, let

19 me withdraw the question

20    Are -- are you in a hotel room right there now    08:32:29

21 in Cancún?

22    A  Yes

23    Q  Okay  Is there anyone else there in that hotel

24 room with you?

25    A  Not right now    08:32:39

Veritext Legal Solutions
866 299-5127

1  Q. Okay. Has there been anyone else in that hotel
2  room with you since we started this deposition?
3  A. Yes.
4  Q. Okay. And who is that?
5  A. My 14-year old son.                08:32:51
6  Q. Okay. And your 14-year old son is not currently
7  in the room with you, is he?
8  A. No.
9  Q. And can we agree that if anybody else comes into
10 that room, you'll let me know that somebody else is in  08:33:07
11 that room?
12 A. Of course.
13 Q. Who owns United Payment Center?
14 A. Me and my mother.
15 Q. You and your mother. And what's your mother's  08:33:25
16 name?
17 A. Maria Martinez.
18 Q. Maria Martinez?
19 A. Yes.
20 Q. And what's Ms. Martinez -- or I'm sorry -- is it  08:33:36
21 Mrs. Martinez?
22 A. Yeah, Mrs. Martinez.
23 Q. Ms. Who -- what is Ms. Martinez, your mother's,
24 middle name?
25 A. Delaluz.                08:33:51

Page 26

1  Q. Can you say that one more time?
2  A. De, D-e, la, l-a, luz, l-u-z.
3  Q. And does -- does Ms. Martinez -- does she live
4  somewhere near Upland? Where does she live?
5  A. Baldwin Park.                08:34:12
6  Q. And what's her address in Baldwin Park?
7  A. 13715 Frazier Street, that's with a Z, Baldwin
8  Park, California 91706.
9  Q. And so you own UPC 50/50? Or what's the stocks
10 split?                08:34:34
11 A. 50/50.
12 Q. Okay. So you own 50 percent of the shares of
13 UPC, and your mother, Ms. Martinez, owns the other
14 50 percent?
15 A. Correct.                08:34:45
16 Q. Do you have any managers there at UPC?
17 A. Yes.
18 Q. Okay. Who are the managers at UPC?
19 A. So I have Pedro Valencia. He's my
20 administration manager. And then I have Julia Barcelona.  08:35:08
21 She's my vice president.
22 Q. And was that -- I'm sorry -- Julia Barcelona?
23 A. Yes.
24 Q. And I'm sorry, Mr. Valencia's title?
25 A. Administration manager.                08:35:33

Page 27

1  Q. And Ms. Barcelona's title is vice president?
2  A. Executive vice president.
3  Q. Any other managers?
4  A. I have Marina. I don't know her last name. She
5  just started with us not too long ago. She's a  08:35:55
6  collection manager.
7  Q. You said Marina?
8  A. Yes.
9  Q. Okay. And who's -- who was the collection
10 manager at the time this account was being collected from  08:36:11
11 Mr. Kelly back in June of 2022?
12 A. I would have to check if my general manager was
13 still with us, Aaron Gestl. He was running my whole
14 operation for me.
15 Q. Aaron?                08:36:29
16 A. Yeah. Aaron Gestl.
17 Q. Aaron Gestl. How do you spell his last name?
18 A. G-e-s-t-l.
19 Q. G-e-s-t-e-l or just --
20 A. No. G-e-s-t-l.                08:36:44
21 Q. T-l. Okay. No E. And he was running your
22 collections operation?
23 A. Yes.
24 Q. And where did Mr. -- where is Mr. Gestl now?
25 A. He left and started his own company.                08:37:01

Page 28

1  Q. And do you know where that company is?
2  A. I think it's in Montclair, California.
3  Q. Okay. Have you been to see his operation?
4  A. No.
5  Q. When is the last time you talked with Mr. Gestl?  08:37:20
6  A. I'd say about a year.
7  Q. So he would have been the -- he would have been
8  the -- the personnel received collections during the time
9  you -- that Mr. Rico was collecting this debt from
10 Mr. Kelly?                08:37:47
11 A. That's what I have to check. I'm not sure if he
12 was already gone or if he was still with me.
13 Q. So if he was gone, Mr. Martinez, who would have
14 been in his place?
15 A. Christopher Galvez.                08:38:00
16 Q. Christopher Galvez?
17 A. The new general manager.
18 Q. Is he still with you? Mr. Galvez?
19 A. No.
20 Q. Where is Mr. Galvez?                08:38:14
21 A. He left to start his own company.
22 Q. And where -- so he was the -- he was collection
23 operations then?
24 A. He was the general manager after Aaron left.
25 Q. I'm sorry. After who left?                08:38:36

Page 29

8 (Pages 26 - 29)

| | |
|---|---|
| 1 A. Aaron. | 1 Q. Okay. So who decides what debt to buy at UPC? |
| 2 Q. Oh, Aaron. And so Christopher Galvez, you | 2 A. I do. |
| 3 parted ways with him. Do you know when? | 3 Q. Okay. So you set the -- you set the corporate |
| 4 A. That was a month ago. | 4 policy with respect to debt purchases; is that correct? |
| 5 Q. A month ago. Okay. And was that -- did he 08:39:12 | 5 A. Yes. 08:42:27 |
| 6 resign? Was he fired? | 6 Q. With Mr. Kelly's debt, did you buy that from |
| 7 A. Yeah. He resigned. | 7 CitiBank directly? |
| 8 Q. Did he give you notice? | 8 A. No. |
| 9 A. No. We were no longer aligned. So we thought | 9 Q. Who did you buy Mr. Kelly's debt from? |
| 10 it would be best. It was mutual, but it -- it -- it was 08:39:33 | 10 A. Pro Recovery Systems. 08:42:38 |
| 11 started from him. | 11 Q. Pro Recovery Systems? |
| 12 Q. So he -- he left, really, immediately? | 12 A. Yes. |
| 13 A. Yes, he did. | 13 Q. Have you talked to anybody at Pro Recovery |
| 14 Q. He didn't give three weeks notice or two weeks | 14 Systems about this lawsuit? |
| 15 notice or anything like that? 08:39:49 | 15 A. No. 08:42:56 |
| 16 A. Same day resignation. | 16 Q. Do you know whether or not Pro Recovery Systems |
| 17 Q. Okay. Any other managers that we haven't talked | 17 is aware of this lawsuit? And when I say "this lawsuit," |
| 18 about? | 18 I'm referring to Kelly versus United Payment Center. |
| 19 A. No. | 19 A. No. |
| 20 Q. So you don't know Marina's name. She's your new 08:40:03 | 20 Q. Have you ever purchased debt directly from 08:43:09 |
| 21 collection manager? | 21 CitiBank? |
| 22 A. Yes. | 22 A. No. |
| 23 Q. You don't know her last name? | 23 Q. Why not? |
| 24 A. I don't know her last name. Correct. | 24 A. I don't have those connections. |
| 25 Q. So we've get Pedro Valencia; he's still with 08:40:15 | 25 Q. Do you have a bill of sale for the purchase of 08:43:30 |
| Page 30 | Page 32 |

| | |
|---|---|
| 1 you? | 1 Mr. Kelly's alleged debt with CitiBank? |
| 2 A. Yes. | 2 A. I don't think so. I don't think so. |
| 3 Q. And Julia Barcelona, she is your executive vice | 3 Q. So describe the process of acquiring a debt from |
| 4 president. She is still with you? | 4 Pro Recovery Systems like Mr. Kelly's alleged debt to |
| 5 A. Yes. 08:40:29 | 5 CitiBank. 08:44:00 |
| 6 Q. Marina, the collection manager, she is still | 6 A. Well, I would call my buddy, which is the owner |
| 7 with you? | 7 of Pro Recovery and ask him what he has for sale. Once |
| 8 A. Yes. | 8 we agree on a price and product, I would wire him the |
| 9 Q. Aaron Gestl and Christopher Galvez have both | 9 money and I'll have a file within a week. |
| 10 left UPC? 08:40:41 | 10 Q. And how does that file get transmitted to you? 08:44:20 |
| 11 A. Yes. | 11 Is that -- |
| 12 Q. How many employees do you have at UPC? | 12 A. Through DropBox. |
| 13 A. I'm not sure the exact count. | 13 Q. -- electronically? |
| 14 Q. Give me an estimate. 500? | 14 A. Yes, electronically through DropBox. |
| 15 A. No. 08:41:27 | 15 Q. Okay. And what's in -- what's in that file? 08:44:32 |
| 16 Q. 10? | 16 What information? |
| 17 A. 15. | 17 A. An Excel spreadsheet. |
| 18 Q. 15? | 18 Q. And what data is within that spreadsheet? What |
| 19 A. Yes. | 19 categories? |
| 20 Q. Who -- who sets your corporate policy at UPC? 08:41:36 | 20 A. Right off the top of my head, I know first name, 08:44:46 |
| 21 MR. BREES: I'm going object to the extent that | 21 last name, social security number, original account |
| 22 he's not the corporate representative of UPC, but you can | 22 number, originated date, charged off date. That's all I |
| 23 testify to what you know. | 23 know right off the top of my head. |
| 24 THE WITNESS: I don't even know what that means. | 24 Q. How long -- how long has UPC been in business -- |
| 25 BY MR. BARRY: 08:42:06 | 25 in the collections business? 08:45:14 |
| Page 31 | Page 33 |

9 (Pages 30 - 33)

| | Page 34 |
|---|---|
| 1 | A 11 years |
| 2 | Q And did you -- tell me about your -- your |
| 3 | professional history in the debt collection business |
| 4 | Have you spent your entire career in debt collection? |
| 5 | A For the most part, yes          08:45:43 |
| 6 | Q Okay And how long has -- so United Payment |
| 7 | Center has been around as a debt collector for, what, |
| 8 | 11 years? |
| 9 | A Yes |
| 10 | Q And tell me about your professional history in    08:45:55 |
| 11 | the collection world  Prior to -- well, let's start from |
| 12 | the beginning |
| 13 | A I'm sorry  It's not 11 years  it's 9 years |
| 14 | Q Nine years  Okay  Fair enough  So since |
| 15 | roughly 2014, United Payment Center has been in the debt    08:46:18 |
| 16 | collection business? |
| 17 | A 2015  We opened in January of 2015 |
| 18 | Q Okay  And was -- did United Payment Center do |
| 19 | anything before that or was that the first time it ever |
| 20 | kind of came to light?  2015          08:46:35 |
| 21 | A First time it came to light |
| 22 | Q Okay  All right  So prior to -- prior to |
| 23 | running UPC, the UPC collection agency, what did you do |
| 24 | in the collection business? |
| 25 | A I was a collector          08:46:52 |

| | Page 35 |
|---|---|
| 1 | Q. Okay. When is the first position you held as a |
| 2 | collector?  What year? |
| 3 | A. 2005. |
| 4 | Q. And where -- where did you work in 2005 as a |
| 5 | collector?          08:47:10 |
| 6 | A. Roger's Acceptance Corporation. |
| 7 | Q. I'm sorry.  Could you say that again?  Rogers? |
| 8 | A. Acceptance Corporation. |
| 9 | Q. And where is Roger's Acceptance Corporation |
| 10 | located?          08:47:27 |
| 11 | A. Hacienda Heights. |
| 12 | Q. And what did you do for Rogers? |
| 13 | A. I was a collector. |
| 14 | Q. And was that first-party or third-party |
| 15 | collection, Mr. Martinez?          08:47:42 |
| 16 | A. First party. |
| 17 | Q. Okay.  So did Roger's Acceptance lend money to |
| 18 | people directly? |
| 19 | A. They financed credit for furniture -- for |
| 20 | furniture.          08:48:00 |
| 21 | Q. Okay.  Got you.  And so how long did you work |
| 22 | for Rogers Acceptance Corp? |
| 23 | A. About six months. |
| 24 | Q. After Rogers, where else did you work in |
| 25 | collections?          08:48:18 |

| | Page 36 |
|---|---|
| 1 | A. Reliant Recovery Services. |
| 2 | Q. Okay.  And where is Reliant Recovery Services |
| 3 | located? |
| 4 | A. Glendora, California. |
| 5 | Q. How long did you work for Reliant Recovery    08:48:31 |
| 6 | Services? |
| 7 | A. Five years. |
| 8 | Q. So roughly 2006 to 2011? |
| 9 | A. Yes. |
| 10 | Q. And where's the next place you worked in the    08:48:51 |
| 11 | collection industry? |
| 12 | A. I don't remember the name of the other company. |
| 13 | It draws a blank.  They had several offices, and they |
| 14 | transferred me to different locations.  That was the |
| 15 | beginning of 2011.          08:49:22 |
| 16 | Q. Okay.  Were you working as a -- you were working |
| 17 | as a collector then, in -- at that time, 2011? |
| 18 | A. Yes. |
| 19 | Q. And how long did you work for that unknown |
| 20 | organization?          08:49:37 |
| 21 | A. Until 2012, so about two years. |
| 22 | Q. Okay.  After 2012, what's the next position you |
| 23 | held in the collections industry? |
| 24 | A. So I was a business partner with a gentleman |
| 25 | that owned RPA and Associates.          08:49:58 |

| | Page 37 |
|---|---|
| 1 | Q. What does RPA stand for? |
| 2 | A. It's just -- it doesn't stand for anything. |
| 3 | It's just his initials, RPA. |
| 4 | Q. Okay.  And that's a -- was a collection agency? |
| 5 | A. Yes.          08:50:19 |
| 6 | Q. And you worked there as a collector? |
| 7 | A. Well, I was a business partner.  So I was a |
| 8 | minority owner.  I helped him launch his agency. |
| 9 | Q. Okay.  And how long did you work with him? |
| 10 | A. Two years.          08:50:32 |
| 11 | Q. So 2012 to 2014? |
| 12 | A. Yes. |
| 13 | Q. Do you have a resume? |
| 14 | A. No. |
| 15 | Q. Okay.  Do you have a CV, a curriculum vitae,    08:50:52 |
| 16 | kind of like a professional resume, professional |
| 17 | business? |
| 18 | A. No. |
| 19 | Q. Okay.  So that takes us 2014.  So then, do I |
| 20 | take it, then, after you left this RPA and Associates,    08:51:12 |
| 21 | you then started UPC? |
| 22 | A. Correct. |
| 23 | Q. And that's kind of the 2014, '15 time frame to |
| 24 | the present? |
| 25 | A. Yes.          08:51:33 |

10 (Pages 34 - 37)

Page 38

1  Q. Okay. At UPC -- your current position at UPC is
2 what?
3  A. Operations manager.
4  Q. Operations manager?
5  A. Yes.                                08:51:51
6  Q. Is your mom, Ms. Martinez, is she the CEO?
7  A. President.
8  Q. Who's the CEO?
9  A. We don't have a CEO.
10  Q. No CEO. Okay. Do you use -- do you use a    08:52:08
11 selection software of any kind there at UPC other than
12 the CRM that you discussed?
13  A. No.
14  Q. What's the brand -- or what -- what -- what
15 version of CRM do you use?                  08:52:30
16  A. Simplicity Collect.
17  Q. Simplicity Collect. Okay. So with respect to
18 UPC, UPC collects on its own accounts?
19  A. Yeah. UPC collects -- well, no. Yes and no. I
20 have a team collectors that will collect our in-house,  08:53:26
21 but 80 percent of my stuff is out sourced to collectors.
22  Q. Okay. So when you say 80 percent is out
23 sourced, meaning 80 percent of what you collect is
24 somebody else's debt that you're collecting at UPC?
25  A. No. No. Meaning that our in-house collectors  08:53:51

Page 39

1 don't collect it. We assign it to collectors like Jose
2 Rico.
3  Q. Okay. So you have some in-house collectors that
4 are employees of UPC, correct?
5  A. Yes.                                08:54:07
6  Q. And then have you some independent contractors
7 like Pedro Rico?
8  A. Jose Rico. Yes.
9  Q. I'm sorry. Jose Rico. Excuse me. Like Jose
10 Rico that collects UPC debts?              08:54:26
11  A. Correct.
12  Q. And --
13  A. It sounds to me like you're asking if I buy all
14 my debt. Yes, I buy all my debt.
15  Q. Okay. You buy all your debt. Do you collect  08:54:47
16 any debts -- do you collect anybody else's debts and
17 charge a commission, a fee?
18  A. I used to. Not at the moment.
19  Q. Okay. When is the last time you collected
20 somebody else's debts?                     08:54:59
21  A. It's been about three or four months.
22  Q. Okay. Three or four months. And -- and why did
23 you stop collecting other people's debts?
24  A. It's not profitable.
25  Q. Do you train the collectors on how to collect?  08:55:19

Page 40

1  A. No.
2  Q. Does someone there at -- at UPC train the
3 collectors in how to collect?
4  A. In some occasions, we coach them. But we look
5 for people with experience.                08:56:06
6  Q. Okay. So as I understand it, you bring in
7 experienced people so you really don't have an extensive
8 training program there. Or you don't have any kind of
9 training program at UPC; is that correct?
10  A. Yes.                               08:56:25
11  Q. Do you give the collectors a compliance test of
12 any kind?
13  A. No.
14  Q. And do you test them to determine whether or not
15 they're aware of the rules and regulations or the laws  08:56:46
16 that might apply to their collection activities?
17  A. No.
18  Q. Do you have a policy and procedure manual for
19 how to collect a debt there at UPC?
20  A. No.                                08:57:09
21  Q. Do you train the collectors in compliance with
22 the Fair Debt Collection Practices Act?
23  A. No.
24  Q. Do you train collectors in compliance with the
25 Rosenthal California Debt Collection Practices Act?  08:57:42

Page 41

1  A. No.
2  Q. Are you licensed to collect debts in the State
3 of California?
4  A. Not yet.
5  Q. Have you applied to be licensed to collect debts  08:58:55
6 in California?
7  A. I'm working with a company, yes.
8  Q. Okay. What's the name of the company you're
9 working with?
10  A. I have to look up the name.            08:59:09
11  Q. Okay. But you're not currently licensed in
12 California to collect debts at UPC?
13  A. No.
14  Q. Are you licensed to collect debts in the state
15 of Minnesota?                             08:59:23
16  A. No.
17  Q. Are you licensed to collect debts anywhere in
18 the United States?
19  A. No.
20     MR. BARRY: Okay. Mr. Brees, I just want to --  09:00:30
21 I just want to let you know I did -- I'm trying to
22 introduce this insurance policy as Exhibit 1, and I'm
23 getting an error with Veritext. It says -- let's see.
24 Let me try -- I'm trying it again to see if maybe this --
25 I get an error that says, "The file couldn't be uploaded.  09:00:51

1 Our file storage server is experiencing an outage.
2 Please try again later."
3      So I'm going to introduce that as Exhibit 1.
4 That's the insurance policy, but I don't think it's going
5 to be in Exhibit Share.                          09:01:10
6      MR. BREES: Okay. Can you share it on
7 your screen here?
8      MR. BARRY: Yeah. I'm just going to -- I may be
9 able to --
10 BY MR. BARRY:                                    09:01:34
11   Q. Mr. Martinez, do you know whether or not have
12 you an insurance policy that covers you in this lawsuit?
13   A. So I -- I do have insurance. We just got
14 notified that it was not covering.
15   Q. You do have insurance. And who's that insurance 09:01:48
16 with?
17   A. I don't remember the carrier.
18   Q. Would it be Allstate?
19   A. I believe it is.
20   Q. And have you -- have you looked at your Allstate 09:02:06
21 insurance policy?
22   A. No.
23   Q. Who told that you it wouldn't be covered?
24      MR. BREES: Objection to the extent that -- I
25 don't want to you share any attorney-client privileged 09:02:30

Page 42

1 communications  If you received a letter from somebody
2 else, you can testify to that
3 BY MR BARRY:
4    Q So Mr Martinez, just to be real clear  I don't
5 want to trip you up, and I -- I don't seek to -- to hear  09:02:40
6 anything that you and your attorney have discussed  So
7 if I ask a question which inadvertently steps on that
8 attorney-client privilege, your attorney will probably
9 make an objection  But I don't want you to tell me
10 anything you and your attorneys have talked about  Okay?  09:03:00
11      My question, and I'll repeat the question,
12 answer if you can without violating the attorney-client
13 privilege that have you with Mr Brees and the others
14 attorneys at Gordon Rees: Who told you that this
15 Allstate insurance policy was not covering the claim made  09:03:17
16 in Kelly versus United Payment Center, Inc ?
17    A I received an e-mail from them yesterday
18    Q You received an e-mail from them yesterday?
19    A Yes
20    Q And it came from Allstate?                09:03:34
21    A It came from my insurance, from the
22 underwriters  Yes
23    Q Do you have a copy of that e-mail?
24    A In my inbox, yes
25    Q Okay  I want you to be sure to hold on that  09:03:48

Page 43

1 because I'm going to be asking your attorney to produce
2 that e-mail. Okay?
3    A. Okay.
4    Q. Is that the first time that you learned that
5 this claim wouldn't be covered by Allstate?        09:04:05
6    A. Yes.
7    Q. Do you know whether or not Allstate has agreed
8 to defend you in this manner with a reservation of your
9 rights -- or reservation of their rights rather?
10   A. I don't know.                               09:04:43
11   Q. Do you know who the name of the person who sent
12 you that e-mail at Allstate?
13   A. No.
14   Q. How much -- how much revenue does UPC generate
15 each month?                                       09:05:19
16   A. On average?
17   Q. Sure.
18   A. I would say probably about 100 to 150,000 a
19 month.
20   Q. In total revenue?                           09:05:43
21   A. Yes.
22   Q. And how long has that -- has that always been
23 true or --
24   A. Yeah, for the most part. We've had some -- some
25 bad years, very bad years.                        09:05:58

Page 44

1    Q  Okay  And so -- but your revenue has -- your
2 revenue has stuck at 150,000 a month for a long time?
3    A  I mean, I'm giving you an average throughout --
4 throughout our -- our life, our business life
5    Q  How about -- how about the average over the past  09:06:20
6 two years?
7    A  I'd have it look at it  I'm just giving you a
8 ballpark of what I think
9    Q  Okay  Well, what's your -- what's your best
10 ballpark over the past two years?  Your monthly revenue  09:06:39
11   A  100,000
12   Q  And is that your -- your net income from UPC?
13   A  No  That's gross
14   Q  Okay  That's gross  All the revenue that you
15 think UPC generates a month, you think, is around 100,000  09:07:06
16 a month?
17   A  Correct
18   Q  Do you -- does UPC file a corporate tax return?
19   A  Yes
20   Q  Who's your CPA?                             09:07:15
21   A  Carmen Hernandez
22   Q  And where is Carmen Hernandez located?
23   A  In Pomona, California
24   Q  And what firm is she with?
25   A  Elite Business, I think is the name of her  09:07:29

Page 45

12 (Pages 42 - 45)

1 company.

2   Q. And is she a CPA?

3   A. She's not a CPA. She's more of a bookkeeper.

4   Q. Do you use a CPA?

5   A. No.          09:07:54

6   Q. Have you ever produced financial statements for

7 a bank or anybody else?

8   A. Carmen has, yes.

9   Q. Does Ms. Hernandez, does she issue checks for

10 UPC or is -- you said she was a bookkeeper?   09:08:20

11   A. She does not issue checks for UPC.

12   Q. Who maintains the books at UPC?

13   A. I'm sorry. What was your question?

14   Q. Who maintains the books? Who's the bookkeeper

15 at UPC?          09:08:38

16   A. Carmen.

17   Q. Okay. So Carmen, she's not an employee of UPC.

18 She's with Elite Business?

19   A. Correct.

20   Q. So Carmen doesn't cut the checks, but she does   09:08:52

21 maintain the books?

22   A. Correct.

23   Q. Where does UPC bank?

24   A. Chino Commercial Bank.

25   Q. Chino Commercial Bank?   09:09:04

Page 46

1   A. Yes.

2   Q. Where else?

3   A. CitiBank.

4   Q. And where's that CitiBank branch located?

5   A. There's -- there's one on Foothill in Upland.   09:09:17

6   Q. Is that the one that you bank with or do you

7 have a relationship with a banker at CitiBank?

8   A. No.

9   Q. Okay. Where else does UPC do it's banking

10 business?          09:09:41

11   A. That's it.

12   Q. So Chino Commercial Bank in Chino, California,

13 and CitiBank in, it sounds like, in Upland?

14   A. Yes.

15   Q. Are you familiar with the concept of punitive   09:09:53

16 damages?

17   A. No.

18   Q. Do you understand, in this case, that the court

19 has given Mr. Kelly the right to argue punitive damages

20 to a jury?          09:10:37

21   A. No.

22   Q. Other than your attorneys, have you ever

23 discussed the concept of punitive damages with anybody?

24   A. No.

25   Q. Do you have any plan to sue Allstate Insurance   09:10:54

Page 47

1 for not covering this claim?

2   A. I have no.

3   Q. Other than this Allstate policy, are you aware

4 of any other insurance policies that UPC has that would

5 cover this claim, Kelly versus United Payment Center,   09:11:33

6 Inc.?

7   A. No.

8   MR. BARRY: Okay. Mr. Brees, I'm still having

9 that same error on Veritext. So when we get to a break,

10 we'll -- we'll see whether or not we can resolve that   09:12:46

11 with Veritext.

12   MR. BREES: Okay.

13   MR. BARRY: But they're not -- I don't think

14 it's that significant.

15   MR. BREES: Sorry to cut you off. Is that the   09:13:00

16 only exhibit you've tried to upload?

17   MR. BARRY: Yeah. We -- we tested some earlier,

18 and they uploaded this morning before we went live,

19 but -- so I don't know if this is -- you know, I'm not

20 sure what's causing, but it's -- I'm just getting an   09:13:15

21 error that says it can't be uploaded, the file server --

22 service vendor is experiencing an outage, please try

23 again later.

24   So we'll have to figure that out. What we can

25 do is -- I'll just have to number these manually and then   09:13:29

Page 48

1 screen share them.

2   MR. BREES: Fair enough.

3 BY MR. BARRY:

4   Q. How long did Mr. Rico work at UPC?

5   A. He worked with us for about two years.   09:14:06

6   Q. And before I forget, I'm thinking this: So just

7 to be clear, Ms. Hernandez, she prepares the corporate

8 tax returns for UPC?

9   A. Yes.

10   Q. Okay. And -- all right. Thank you.   09:14:29

11   And so to go back to Mr. Rico, do you know where

12 Mr. Rico worked before he came to work at UPC?

13   A. No.

14   Q. What kinds of -- what -- tell me about the

15 on-boarding process there at UPC for somebody like   09:15:05

16 Mr. Rico. Do -- do you get a job application?

17   A. No. They're mainly referrals.

18   Q. Okay.

19   A. We have them fill out a W-99 or a 1099 9 and we

20 give them a desk, and they're off to the races. We start   09:15:25

21 sending them accounts.

22   Q. Okay. And did Mr. Rico, did he fill out a W9 or

23 a 1099? Or a W9, I guess it's the same thing.

24   A. I believe he did.

25   Q. Okay. Do you keep an employment file on -- did   09:15:42

Page 49

13 (Pages 46 - 49)

1 you -- did you keep an employment file on Mr. Rico?
2    A. I would have to ask my administration manager
3 that.
4    Q. And that administration manager would be Pedro
5 Valencia?                                        09:16:06
6    A. Correct.
7    Q. Do you require any of your collectors to get
8 collector licenses?
9    A. No.
10    Q. Do you require any of your collectors to get any  09:16:15
11 kind of specialized collection training?
12    A. No.
13    Q. Do you require collectors to get any collection
14 training before they start working?
15    A. No.                                        09:16:32
16    Q. Do you perform background checks of your debt
17 collectors before they start collecting for UPC?
18    A. No.
19    Q. Do you do criminal history checks of your
20 collectors there at UPC before they begin collecting?  09:16:48
21    A. No.
22    Q. Do you record collection calls of your
23 collectors there at UPC?
24    A. No.
25    Q. Does the Simplicity Collect system, does that  09:17:05
                                                   Page 50

1 have the ability to record phone calls?
2    A. No.
3    Q. Do the phones that your collectors use, they
4 have the ability to record phone calls?
5    A. No.                                        09:17:26
6    Q. To your knowledge, do you record any collection
7 calls there at UPC?
8    A. No.
9    Q. And when you say "no," do you mean no, you don't
10 record the calls or, no, you don't know?          09:17:44
11    A. No, we don't record any calls.
12    Q. What's the disciplinary policy for collectors
13 there at UPC?
14    A. If a manager hears that they're off the wall, we
15 just terminate them.                             09:18:07
16    Q. What do you consider off the wall?
17    A. I leave that up to my managers.
18    Q. Okay. And that manager would be Marina right
19 now?
20    A. Yes.                                       09:18:26
21    Q. And previously, that manager would have been
22 Aaron Gestl?
23    A. Well, Christopher Galvez and then, previously to
24 him, Aaron Gestl.
25    Q. Right. So Christopher Galvez, Aaron Gestl and  09:18:40
                                                   Page 51

1 Marina?
2    A. Yes.
3    Q. Did you investigate any of the allegations that
4 Mr. Kelly has made in his lawsuit against UPC?
5    A. No.                                         09:19:02
6    Q. Who there at UPC, if anyone, has investigated
7 the allegations that Mr. Kelly made in his lawsuit
8 against UPC?
9    A. No one. Jose Rico is gone. It's hard to do
10 that.                                            09:19:20
11    Q. Well, prior to him leaving, did you investigate
12 any of the allegations?
13    A. I think when I got wind of the loss, he was
14 already gone.
15    Q. Have you tried to reach out to Mr. Rico to  09:19:35
16 investigate the allegations?
17    A. No.
18    Q. And why is that?
19    A. Well, he no longer works with us.
20    Q. Okay. Well, weren't you interested -- I'm  09:19:58
21 sorry?
22    A. It seems inappropriate for me to reach out to
23 him.
24    Q. I see. Do you know whether or not your
25 attorneys have reached out to him?               09:20:09
                                                   Page 52

1    A. I don't think so.
2    Q. Well, I guess my question for you is: Do you
3 know what date Mr. Rico left UPC?
4    A. I'm sorry. Can you repeat that?
5    Q. Sure. What day did Mr. Rico leave UPC?      09:20:30
6    A. I don't have the exact --
7    Q. When was his last day?
8    A. I don't have the exact date right off the top of
9 my head.
10    Q. Can you give me an approximate date?        09:20:42
11    A. I don't have an approximate date.
12    Q. Was it before this lawsuit or after this lawsuit
13 was served on you?
14    A. That's what I don't know.
15    Q. Did he leave because of this lawsuit?       09:20:55
16    A. No.
17    Q. Well, why did he leave?
18       MR. BREES: Objection. Calls for speculation.
19 If you know the answer, you can answer.
20       THE WITNESS: Okay. I'm sorry. What was --  09:21:17
21 what was your last question?
22 BY MR. BARRY:
23    Q. Well, I'm not asking to you speculate. I don't
24 want to you get inside Mr. Rico's head because I don't --
25 presumably, you don't have any special ability to  09:21:25
                                                   Page 53

                                        14 (Pages 50 - 53)

1 understand what he was thinking. I want to you testify
2 as to your own knowledge. Okay? Do you understand?
3    A. Yes.
4    Q. What was your understanding about why Mr. Rico
5 left?                                    09:21:41
6    A. So I've already answered this earlier. Because
7 he wanted to explore other options working for another
8 company.
9    Q. You don't know what company that is though,
10 correct?                                09:21:53
11    A. I believe he's working for Aaron Gestl, my old
12 general manager, but I can't be sure.
13    Q. Okay. And what makes you think that? What
14 makes you think that Jose Rico is now working for Aaron
15 Gestl?                                  09:22:14
16    A. Rumors throughout the offices.
17    Q. And things you've heard?
18    A. Yes.
19    Q. And what's the name of Aaron Gestl's new
20 company?                               09:22:39
21    A. I don't know the name of his company.
22    Q. But it's in Montclair?
23    A. Yes.
24    Q. Okay. So, I think it's fair to say, since you
25 don't have call recordings and you have not investigated  09:23:45

Page 54

1 the allegations made against UPC in this lawsuit, that
2 you don't really have any way of denying what happened.
3        MR. BREES: Object to the form.
4 BY MR. BARRY:
5    Q. Is that correct?                   09:24:12
6    A. Can I answer that, Dan?
7        MR. BREES: Yes.
8 BY MR. BARRY:
9    Q. Yes. It's a deposition.
10    A. Yeah, that's correct.              09:24:25
11    Q. Okay. So -- all right. So just to be clear,
12 I'm going to answer the question again, subject to the
13 objection.
14       You haven't independently investigated this, the
15 allegations in the lawsuit brought by Mr. Kelly, correct?  09:24:37
16    A. Correct.
17    Q. And you haven't talked with Jose Rico about the
18 allegations in the lawsuit, correct?
19    A. Correct.
20    Q. And you don't have any call recordings of any of  09:24:53
21 the conversations that Mr. Kelly may have had with
22 Mr. Rico that gave rise to this lawsuit, correct?
23    A. Correct.
24    Q. And you don't have any account notes that you
25 can make reference to that would detail those            09:25:11

Page 55

1 conversations, correct?
2    A. I have account notes, but I don't think that's
3 going to give -- give me a definite understanding of
4 what's at place in that conversation.
5    Q. Okay. So -- fair enough. So the account        09:25:32
6 notes -- the accounts notes might contain some
7 information, but then they're not going to be a
8 transcript of the conversations that Mr. Rico had with
9 Mr. Kelly; is that correct?
10    A. Correct.                          09:25:52
11    Q. And have you looked at those account notes?
12    A. Very briefly.
13    Q. Okay. And did those account notes reflect any
14 of the conversations which were alleged in the lawsuit?
15    A. I don't remember.                  09:26:05
16    Q. But UPC doesn't have any way really of denying
17 the allegations that were made in the lawsuit; is that
18 fair?
19       MR. BREES: Same objections.
20 BY MR. BARRY:                          09:26:32
21    Q. And your answer again?
22    A. Yes.
23    Q. So, yes, UPC doesn't have any basis to deny the
24 allegations in the lawsuit?
25    A. Correct.                          09:26:47

Page 56

1    Q. So can you tell me, if you can, did -- did you
2 review the answer to this lawsuit that was filed by your
3 lawyers?
4    A. Briefly.
5    Q. I'm sorry?                         09:27:03
6    A. Briefly.
7    Q. Did you review the amended answer in the lawsuit
8 that was filed by your lawyers?
9    A. Very briefly.
10    Q. Okay.                            09:27:15
11    A. I'm not a trained legal mind, so a lot of this
12 stuff is very foreign to me.
13    Q. Sure. Fair enough. Fair enough.
14       So I'm going to -- I'm going to screen share
15 this with you. We'll introduce this as Exhibit 1. Okay?  09:27:32
16       (Plaintiff's Exhibit 1 was marked
17       for identification.)
18 BY MR. BARRY:
19    Q. So let me just -- all right.
20       Can you see that exhibit there?      09:28:26
21    A. Yes.
22    Q. Okay. And that should be, probably, about
23 three-quarters of the screen, and then you should be in a
24 smaller box next to it.
25    A. Yes.                             09:28:37

Page 57

15 (Pages 54 - 57)

**Page 58**

1  Q.  Okay.  All right.  So have you seen this
2  document before?
3  A.  Yes.
4  Q.  Okay.  And it's 29 pages.  I'll just represent
5  to you it's the amended answering filed in this lawsuit.  09:28:51
6  Okay?  I'll -- I'll hit all the pages quickly for you.
7      And do you know -- did you have an opportunity
8  to review this before it was filed?
9  A.  Again, I reviewed it but not in detail.
10  That's -- that's a lot of verbiage there.  09:29:20
11  Q.  Sure.  Understood.  Okay.  Let me just -- let me
12  just make my point, then I'll move on.
13     So in Exhibit 1, I'm going to do a find here,
14  and I'm going to search on the word -- the word "denies"
15  appears 190 times in this amended answer.  The word  09:29:39
16  "deny" appears 145 times.  I don't know if you can see
17  that.  And the word "denied" appears once.
18     So my question for you, and you can kind of see
19  as we sort of go through the 190 denials in this
20  answer -- you see all those.  I won't go through all of  09:30:02
21  them with you, but suffice it to say, it looks like
22  there's about 340 denials.
23     You can see it over and over and over, right?
24  You see all those?
25  A.  Yeah.  09:30:25

**Page 59**

1  Q.  Okay.  Pretty much everything in this lawsuit
2  was denied, and there's some legal denials.
3     So my question for you is:  Given the fact that
4  you've got no basis to deny anything that happened in
5  this lawsuit, do you know why there would have been, you  09:30:45
6  know, 300 -- let's say 340 denials in the amended answer?
7     MR. BREES:  Objection to the extent that it
8  invades the attorney-client privilege.  If you can answer
9  the question without sharing any discussions you've had
10  with your attorneys, then you can.  If you cannot, then  09:31:20
11  don't answer the question.
12     THE WITNESS:  Well, the only thing that comes to
13  mind is that I don't have a way of confirming it either
14  That's why it's denied
15  BY MR. BARRY:  09:31:36
16  Q.  Okay.  So this lawsuit was originally filed, I
17  believe, in -- I don't want to misstate.  I believe it's
18  was in July of 2022.  And so -- and the -- the answer
19  was -- amended answer was filed on January 23rd, 2023
20  It doesn't sound like you learned anything new or learned  09:32:10
21  anything about the circumstances of the case that would
22  give you a basis to deny everything in the complaint, did
23  you?
24  A.  No
25  Q.  Do you have anybody who worked for you named  09:32:25

**Page 60**

1  Mary?
2  A.  Not that I'm aware of.
3  Q.  Do any of your collectors used alias names,
4  names other than their own true names?
5  A.  I believe some of them do.  09:33:23
6  Q.  Okay.  Do any of them use alias Mary?
7  A.  I don't know.
8  Q.  Have you ever heard anyone use the name Mary?
9  A.  No.
10  Q.  Are you familiar with the toll free number (866)  09:33:36
11  709-8145?
12  A.  I'm not familiar with our toll free number.
13  Q.  Do you know whether or not that toll free number
14  is owned by UPC or controlled by UPC?
15  A.  I don't know.  09:34:07
16  Q.  Do you have a list of the toll free numbers that
17  UPC owns and controls?
18  A.  I personally do not.
19  Q.  Who does?
20  A.  Probably one of my managers.  09:34:18
21  Q.  And in that case, right now, it would be Marina
22  or maybe Pedro Valencia?
23  A.  Correct.  Maybe one of them would.
24  Q.  Okay.  So if somebody called that (866) 709-8145
25  number and the person at the other end of the phone said  09:34:56

**Page 61**

1  they worked at UPC, would that surprise you?
2     MR. BREES:  Objection.  Foundation.
3  BY MR. BARRY:
4  Q.  Say it again?
5  A.  I don't know how I would take that.  09:35:07
6  Q.  All right.  I'm going to play a recording for
7  you.  We'll introduce this as Exhibit 2.
8     (Plaintiff's Exhibit 2 was marked
9     for identification.)
10     MR. BARRY:  I'll provide you with a copy of the  09:35:36
11  recording, Mr. Brees.  Let me just mark this.
12     MR. BREES:  It's fine.  After this recording or
13  at least this line of questioning, can we take a short
14  recess to take a restroom break?  It's been about an hour
15  and a half, so --  09:35:53
16     MR. BARRY:  Sure.  No problem.
17  BY MR. BARRY:
18  Q.  Okay.  So just back to my -- just that earlier
19  line of questioning.  So -- I'm going to withdraw that
20  question.  Let me -- let me play this recording for you,  09:36:20
21  if I could.  This will be Exhibit 2.
22     "Attention, this call is intended for Brian
23  Kelly.  My name is Mary with the Process Service
24  Dispatch.  We are notifying the residents and owners of
25  the property that we have legal documents requiring a  09:36:47

1 signature today. If you will be unavailable to sign or
2 have any questions regarding the pending lien on 226
3 Galaxy Drive, Circle Pines, Minnesota, contact issuing
4 firm immediately at phone number (866) 709-8145, and case
5 number 2022413072."                    09:37:08
6        Okay. Were you able to hear that recording,
7 Exhibit 2?
8    A. Yes.
9    Q. Do you recognize the voice in that recording?
10   A. No.                          09:37:28
11   Q. Would it help you to hear it again?
12   A. I'm not familiar with the employees, Mr. Barry.
13   Q. Okay. So you're not familiar with the
14 individual collectors that worked there at UPC?
15   A. Correct.                       09:37:47
16   Q. So that voicemail, Exhibit 2, does that sound
17 like the kind of voicemail that you would leave at UPC
18 for a consumer?
19   A. That's probably a question for a manager.
20   Q. Okay. That would be a question for Marina or    09:38:06
21 Christopher Galvez or Aaron Gestl --
22   A. Correct.
23   Q. -- who would have been the managers? Okay. I'm
24 going -- I'm going to start it again, and then --
25 Exhibit 2, and then I'll pause it to ask you some      09:38:26
                                              Page 62

1 questions.
2        "Attention, this call is intended for Brian
3 Kelly. My name is Mary with the Process Service
4 Dispatch."
5        Have you ever heard that phrase, "Process     09:38:40
6 Service Dispatch"?
7    A. Yes.
8    Q. And who uses that phrase, "Process Service
9 Dispatch"?
10   A. I've heard collectors use it.            09:38:52
11   Q. Okay. Collectors working at UPC?
12   A. Yes.
13   Q. And why did they use that phrase, "Process
14 Service Dispatch"?
15   A. I don't know.                    09:39:11
16   Q. Have you ever told them, "Hey, don't use that
17 phrase"?
18   A. I personally have not.
19   Q. Has any -- to your knowledge, have any of your
20 collection managers, or any other person in authority at  09:39:27
21 UPC, ever told the collectors, "Don't use that phrase,
22 Process Service Dispatch"?
23   A. Yes.
24   Q. Okay. Who has told collectors not to use that
25 phrase, "Process Service Dispatch"?              09:39:41
                                              Page 63

1    A. Managers.
2    Q. Managers. And do you know whether or not --
3 well, I'll represent to you that this recording occurred
4 on or about June 29, 2022.
5        So who would have been the manager on June 29th,  09:40:01
6 2022?
7    A. I would have to check.
8    Q. It would either be Chris Galvez or Aaron Gestl?
9    A. Correct.
10   Q. I'm going to continue Exhibit 2.           09:40:20
11      "Notifying the residences and owners of the
12 property we have legal documents requiring a signature
13 today."
14      Okay. Have you ever heard that phrase, that --
15 that Process Server Dispatch had legal documents that    09:40:34
16 required attention that day?
17   A. Yes.
18   Q. Okay. And who -- who has used those words?
19   A. Collectors.
20   Q. And have you ever told a collector, "Hey, don't  09:40:51
21 use that phrase"?
22   A. Not me personally.
23   Q. Well, you've heard the phrase, correct?
24   A. Yes.
25   Q. And you own the agency, right? You own the      09:41:08
                                              Page 64

1 United Payment Center, right? You're a part owner?
2    A. Yes.
3    Q. Why wouldn't you tell the collectors not to use
4 that phrase?
5    A. I have not heard that phrase in my agency.     09:41:21
6    Q. Where have you heard that phrase?
7    A. In the industry.
8    Q. I see. So you never heard any of your
9 collectors use that phrase?
10   A. Throughout the ten years? Yes.          09:41:36
11   Q. Throughout the ten years what? You have heard
12 that phrase used?
13   A. Yes.
14   Q. At UPC?
15   A. Yes.                          09:41:48
16   Q. Did you ever tell the collectors, "Hey don't use
17 that phrase"?
18   A. When I was managing my staff directly, yes.
19   Q. Why would a collector at UPC use that phrase?
20   A. We have to ask the collector that, Mr. Barry.   09:42:07
21   Q. Okay. Well, I'm asking you. I don't have the
22 collector that made that statement. I'm asking you. Why
23 would a collector want to use that phrase?
24      MR. BREES: Objection. Calls for speculation.
25 Asked and answered.                    09:42:23
                                              Page 65

17 (Pages 62 - 65)

1    THE WITNESS: I'm not the collector. I can't
2 answer that.
3 BY MR. BARRY:
4    Q. But you do own the collection agency, right?
5    A. Correct.                                    09:42:33
6    Q. Do you have any objection to a collector using
7 that phrase?
8    A. Yes.
9    Q. Are you in any way, shape or form concerned that
10 a collector would use that phrase in a collection    09:42:47
11 voicemail?
12    A. Absolutely.
13    Q. Okay. Tell me why.
14    A. Because that's a violation.
15    Q. A violation of what?                         09:42:58
16    A. The FDCPA.
17    Q. Okay. And presumably, you -- you don't want to
18 violate the FDCPA?
19    A. Correct.
20    Q. Why not?                                     09:43:09
21    A. Because it's wrong.
22    Q. Well, do you understand that you have legal
23 liability for violating the FDCPA?
24    A. I do.
25    Q. So if you heard your collector -- one of your    09:43:27

Page 66

1 collectors there at UPC use that phrase talking about,
2 you know, important legal documents, how would you handle
3 that? Would you fire them?
4    A. I would actually address their manager.
5    Q. How would you address their manager?          09:43:48
6    A. I would let the manager know that that's
7 unacceptable, and I would question them as to why they're
8 letting them say that on the phones.
9    Q. Would you document that -- that conversation
10 with the manager somewhere?                          09:44:08
11    A. Probably not the first time, but if it happens
12 repeatedly, yes.
13    Q. Okay. I'm going to continue Exhibit 2.
14    "Unavailable to sign or have any questions
15 regarding the pending lien on 226."                  09:44:25
16    Okay. So now she's mentioning a pending lien.
17 Have you heard that phrase before at UPC?
18    A. No.
19    Q. Do you know what means, the pending lien?
20    A. No.                                          09:44:45
21    Q. Do you train collectors to say that phrase,
22 "pending lien"?
23    A. I don't train my collectors at all.
24    Q. Okay. I'm going to continue Exhibit 2.
25    "Galaxy Drive, Circle Pines, Minnesota. Contact    09:45:06

Page 67

1 issuing firm immediately at phone number (866)709-8145,
2 and case number 2022413072."
3    Okay. So how about that phrase, "issuing firm
4 and case number"? Do you -- do you train your collectors
5 to use those phrases?                                09:45:32
6    A. I don't train my collectors at all, Mr. Barry.
7    Q. Okay. If you heard those phrases at your
8 agency, would you be concerned with the use of the word
9 "lien," and the use of the word -- rather the use of the
10 word firm -- "issuing firm" and/or "case number"?    09:45:50
11    A. Yes, I would be concerned.
12    Q. Why would you be concerned?
13    A. It just doesn't seem like a clean voicemail.
14    Q. And when you say "a clean voicemail," what do
15 you mean by a clean voicemail?                       09:46:10
16    A. Compliant voicemail.
17    Q. So that voicemail violates the FDCPA, in other
18 words?
19    MR. BREES: Objection. Calls for a legal
20 conclusion.                                          09:46:24
21    THE WITNESS: I would assume yes.
22    MR. BARRY: Okay. I'm done with Exhibit 2. We
23 were going to take a break. You want to take five
24 minutes?
25    MR. BREES: That would be fine. Will that work    09:46:49

Page 68

1 for you, Mr. Martinez?
2    THE WITNESS: Yeah.
3    THE VIDEOGRAPHER: The time 9:46 a.m. Going off
4 the record.
5    (Discussion held off the record.)                09:46:59
6    THE VIDEOGRAPHER: The time is 9:57 a.m. We're
7 back on the record.
8 BY MR. BARRY:
9    Q. All right. Thank you, Mr. Martinez. You had an
10 opportunity to take a break. You're still under oath.    09:57:48
11    So let me ask you about this -- this debt. You
12 indicated, I think, that you did not have any bill of
13 sale for Mr. Kelly's debt from CitiBank; is that correct?
14    A. Yes. I don't think I do.
15    Q. And do you know if you have any notice of       09:58:08
16 assignment of any kind that you would have gotten from --
17 excuse me -- Pro Recovery Systems?
18    A. No. We have a very good relationship. So if I
19 needed to get a bill of sale at any time, he would
20 provide it for me.                                   09:58:37
21    Q. Do you know whether or not you provided
22 Mr. Kelly with anything in writing?
23    A. I don't think so.
24    Q. Okay. Would you have sent out a notice of
25 assignment to your agency of that debt or a purchase of    09:58:50

Page 69

18 (Pages 66 - 69)

1 that debt to Mr. Kelly?
2     MR. BREES:  I'm going to object just to the
3 extent that he's not the designated -- this isn't a
4 corporate representative deposition.  This is the
5 deposition of Mr. Martinez in his individual capacity.    09:59:04
6     MR. BARRY:  Sure.
7     MR. BREES:  But you can testify to what you
8 know.
9 BY MR. BARRY:
10    Q. So do you send out notices of assignments of    09:59:10
11 debts?  When you buy the debts, do you send the consumer
12 notice to let them know, "Hey, we've now purchased your
13 debt"?
14    A. No.
15    Q. Now that I've got the Exhibit Share working, I    09:59:25
16 think, I am going to go back in.  I'm going to introduce
17 this insurance policy, and I'll try to -- I'll keep the
18 markings.
19    MR. BARRY:  This is going to be Exhibit 3,
20 Mr. Brees.  So I'll try to -- so I did introduce that,    10:00:11
21 but I've also got it here, and I'm going to screen share
22 it.
23    (Plaintiff's Exhibit 3 was marked
24    for identification.)
25    MR. BARRY:  Sorry for whatever happened.  I    10:02:28

Page 70

1 apologize.  I got muted.
2 BY MR. BARRY:
3    Q. Have you seen that Exhibit 3 before,
4 Mr. Martinez?
5    A. No.                10:02:35
6    Q. What databases do you use there at UPC in order
7 to collect debts?
8    A. Simplicity Collect.
9    Q. Simplicity Collect.  Okay.  And tell me, what
10 information does Simplicity Collect give you about a    10:03:15
11 debtor when you're collecting the debt?
12    A. Well, that's where my debt gets imported, and
13 then that's how I assign it to collectors.
14    Q. Okay.  And when I say, "What databases do you
15 use," what I'm referring to is, do you use any skip trace    10:03:37
16 type databases to collect on debts?
17    A. Yes.  I use TLO.
18    Q. TLO.  So is that TLOXP?
19    A. Yes.
20    Q. And at that's a product from TransUnion,    10:03:53
21 correct?
22    A. Yes.
23    Q. And that would have been a database that you
24 used to collect on Mr. Kelly's account?
25    A. Yeah.  For skip tracing purposes.    10:04:13

Page 71

1    Q. Sure.  And do you also use credit reporting
2 systems?  Credit reporting databases, Experian?
3    A. No.  I don't use Experian.
4    Q. Do you use Equifax?
5    A. No.                10:04:34
6    Q. Do you use TransUnion?
7    A. No.
8    Q. Okay.  So the -- what other databases, besides
9 TLOXP, do you use to skip trace consumers?
10    A. That's the only one.            10:04:45
11    Q. Okay.  And when I say "skip trace," just for
12 clarification on the record, I know what it means, but
13 will you explain what skip tracing is?
14    A. Skip tracing is locating the debtor or
15 consumers.                10:05:03
16    Q. All right.  And as I understand it, you -- you
17 own -- do you -- do you, in fact, own a skip trace
18 company, Dataskip.Io?
19    A. Yes.
20    Q. Okay.  And does Dataskip.io, does that use    10:05:15
21 TransUnion?
22    A. Yes.
23    Q. Experian?
24    A. No.
25    Q. Equifax?            10:05:26

Page 72

1    Are you there?  You froze?
2    MR. SWIGART:  He froze on my side, too.
3    THE WITNESS:  You froze up for a minute.
4    MR. BARRY:  Okay.  All right.  We'll -- we'll go
5 back to that.                10:05:50
6 BY MR. BARRY:
7    Q. Let -- let me restart the questioning.  I
8 apologize, but I'm not sure at what we froze.
9    Do you use -- with your Dataskip.Io company, dot
10 io company, do you use Equifax?        10:06:00
11    A. No.
12    Q. Do you use Experian?
13    A. No.
14    Q. Do you use TransUnion?
15    A. No.                10:06:12
16    Q. Do you use TLOXP in that business?
17    A. Yes.
18    Q. Okay.  All right.  On the UPC side, on your UPC
19 business, you use TLOXP, correct?
20    A. Yes.                10:06:31
21    Q. Okay.  Tell me everything you know about DPPA.
22    A. I don't know what that is.
23    Q. The Drivers Privacy Protection Act?
24    A. I don't know what that is.
25    Q. When you call from telephone numbers at UPC --    10:07:05

Page 73

19 (Pages 70 - 73)

**Page 74**

1 let me circle back and ask a follow-up question on the
2 DPPA.
3        So you obtain skip trace information on
4 consumers out of TLOXP, correct?
5    A. Yes.                              10:07:40
6    Q. And you're trying to identify where they live,
7 where they work, what they own?
8    A. Yes.
9    Q. And that's to assist you in collecting debts?
10    A. Yes.                             10:07:58
11    Q. Is there a central phone number there at UPC
12 that gets used to make outbound phone calls?
13    A. I don't know how they have that set up. I don't
14 know how my managers have that set up. I think
15 there's -- there is.                   10:08:33
16    Q. Okay. And do you ever -- and do you know what
17 spoofing is? Spoofing a phone number?
18    A. No.
19    Q. Have you ever heard that phrase, "spoofing"?
20    A. I've heard it.                   10:08:46
21    Q. Okay. Well, what -- what do you think spoofing
22 means? What does that mean to you?
23    A. I think I had heard that spoofing was calling
24 them from like a phone number that they recognize, but
25 I'm not sure. I'm not sure what it means.    10:09:02

**Page 75**

1    Q Okay And so, do you -- does UPC use spoofing
2 to collect debts?
3    A I don't know what that is
4    Q Okay Well, I thought you just said that you
5 thought it meant changing your phone number to make it    10:09:23
6 look like a phone number that the consumer would
7 recognize?
8    A That's what I think spoofing is Or that's what
9 I -- at least I've heard We don't call from numbers
10 that they recognize No                 10:09:34
11    Q Okay So what -- do you call from -- do you
12 localize the phone number that appears on the consumer's
13 caller ID?
14    A Localize? Meaning, like, their area codes?
15    Q Yes                              10:09:54
16    A Yes
17    Q Okay So you have a way of -- of -- of making
18 the caller ID that the consumer sees on their end look
19 like a local phone number to get them to answer the
20 phone?                                 10:10:07
21    A Correct
22    Q Those aren't really true phone numbers for UPC
23 They're spoofed numbers or they're -- they're -- they're
24 altered phone numbers that, essentially, localize to that
25 consumer's area code?                  10:10:24

**Page 76**

1    A. Well, no. They are real numbers. They lead
2 back to our office.
3    Q. Oh, they do? Okay.
4    A. They are real numbers.
5    Q. Okay. Do you buy those numbers or do you rent    10:10:32
6 those numbers or how does that work?
7    A. The company that handles our phone system,
8 they -- they sell us all that stuff.
9    Q. Is that Simplicity Connect?
10    A. No.                             10:10:48
11    Q. Who is that? Who sells you your service?
12    A. U.S. Telephones.
13    Q. U.S. Telephones. So U.S. Telephones, they must
14 sell some kind of localizer package that allows the --
15 the the -- when you make a phone call, it changes the caller    10:11:03
16 ID to the -- that -- the consumer's local area code?
17    A. Yeah. I'm not sure how it works, Mr. Barry, but
18 we buy phone numbers.
19    Q. Okay. And those phone numbers, they all lead
20 back to UPC, but they're -- you -- you must have -- you    10:11:20
21 must have a couple different phone numbers in every area
22 code around the country; is that how it works?
23    A. Correct. They are real phone numbers, and it's
24 very expensive. That's correct.
25    Q. Okay. What does that cost you a month?    10:11:40

**Page 77**

1    A I'd have to look at my phone bill, but it is
2 expensive
3    Q Why do you do it?
4    A It's effective
5    Q Effective at what?                 10:11:49
6    A At collecting
7    Q Okay So tricking the consumer into thinking
8 somebody is local who's calling them, you're more --
9 they're more likely to pick up the phone and talk with
10 you, then if you used an 800 number or a California phone    10:11:58
11 number, right?
12       MR BREES: Object to the form
13       THE WITNESS: Yeah I wouldn't use the word
14 tricking
15 BY MR BARRY:                           10:12:08
16    Q What word would you use?
17    A I would use localizing
18    Q Oh, there you go You like my word -- you like
19 my, better, huh? You like localizing better than
20 spoofing or tricking?                  10:12:24
21    A Well, that's what they're called They're
22 called local numbers
23    Q Okay But you'd agree with me that you're --
24 you're misrepresenting where that call is coming from,
25 right?                                 10:12:36

20 (Pages 74 - 77)

1    MR. BREES: Object to the form.

2    THE WITNESS: Yeah. I don't know how I feel

3 about that.

4 BY MR. BARRY:

5    Q. Well, tell me how you feel about it. I want to    10:12:42

6 hear. Do you agree with me that you're misrepresenting

7 the origin of that call to get the consumer to answer the

8 call?

9    A. I see it as a collection tactic. Not only

10 collections, but every other industry as well. It's --    10:12:59

11 it's a sales tactic. That's what I see it as.

12    Q. Okay. So it's a collection tactic. You don't

13 think it's a misrepresentation to say you're calling from

14 Minneapolis when you're not in Minneapolis, do you?

15    A. In my personal -- my personal opinion is no, I    10:13:17

16 don't see that as misrepresentation.

17    Q. Okay. Have you ever been to Minneapolis?

18    A. No.

19    Q. Okay. It's cold here. There's more snow. Of

20 course, you guys have had a lot of snow, too. So...    10:13:36

21    A. We have.

22    Q. Who -- who works in Pennsylvania there at your

23 collection agency at UPC?

24    A. No one that I'm aware of.

25    Q. Okay. And are there any -- do you have any    10:13:53

Page 78

1 collectors that are outside of California?

2    A. No.

3    Q. Is everybody in -- in sort of the Riverside, Los

4 Angeles area that collects for UPC?

5    A. Correct.    10:14:11

6    Q. And have you met -- and I -- I don't -- I won't

7 hold you to this. I'm just trying to get a sense. Do

8 you -- do you have any collectors that you've never met

9 that work at UPC?

10    A. Yes.    10:14:28

11    Q. Okay. And are they remote collectors or are

12 they ones that you just have not met because they haven't

13 been there that long or --

14    A. Both.

15    Q. Okay. So tell me about the status of your --    10:14:40

16 your -- your application for a collection license? I

17 want to go back to that. Have you filed an application

18 with the State of California for a debt collector

19 license?

20    A. Not yet. We are in the process of doing all    10:15:15

21 that.

22    Q. Okay. And -- well, you've been in the

23 collection business now for nine years, right?

24    A. Yes.

25    Q. Okay.    10:15:28

Page 79

1    A. California just started requiring a license, by

2 the way.

3    Q. Yeah, I know.

4    A. And there's -- so -- yeah, there's a nine-month

5 waiting period.    10:15:46

6    Q. There's what?

7    A. There's a -- there's a waiting list.

8    Q. A waiting list to get a collection license?

9    A. To get approved and processed. Yes.

10    Q. Sure. But if you haven't filed it, it can't be    10:15:57

11 approved or processed, can it?

12    A. Absolutely right.

13    Q. And to be clear for the record, you have not

14 filed an application for a collection agency license in

15 the State of California as we sit here today, correct?    10:16:12

16    A. Correct.

17    Q. Because I can check that on the Department of

18 National Protection and Innovation website, and I can see

19 that -- that there's -- at least as of yesterday, there

20 was no application pending with DFPI and for United    10:16:30

21 Payment Center, so that their -- their records are

22 accurate, correct?

23    A. Yes.

24    Q. And likewise, have you -- I think you indicated

25 earlier you're not licensed in any of the 50 states in    10:16:48

Page 80

1 the United States, correct?

2    A. Correct.

3    Q. Have you filed an application to be licensed in

4 any other state other than -- or have you filed an

5 application to be licensed in any of the 50 states?    10:17:05

6    A. Not yet.

7    Q. Have you filed an application to be licensed as

8 a debt collector in Minnesota?

9    A. Not yet.

10    Q. Up to this point, Mr. Martinez, who's been    10:17:16

11 paying your lawyer? Who's paying your lawyer, Mr. Brees?

12 Are you paying him?

13    A. United Payment Center is paying him.

14    Q. Okay. And has Allstate paid any of those legal

15 fees?    10:17:35

16    A. No.

17    Q. Are you aware of the penalties in the State of

18 Minnesota for un-licensed debt collection?

19    A. I'm not.

20    Q. Other than United Payment Center, do you have    10:18:09

21 any other collection agencies that you own?

22    A. I do.

23    Q. Okay. Well, let's start with the first one.

24 How many -- how many do you own other than United Payment

25 Center?    10:18:37

Page 81

21 (Pages 78 - 81)

1    A. Just two.
2    Q. Okay. And tell me about the first one. What's
3 the name of that agency?
4    A. MSM Portfolio Management.
5    Q. MSN?        10:18:45
6    A. MSM, Michael Steven Michael, Portfolio
7 Management.
8    Q. Okay. So -- just so I'm clear, M as in Mary, S
9 as in Sam, M as in Mary, Portfolio Management?
10    A. Correct.        10:19:05
11    Q. And where is MSM Portfolio Management located?
12    A. It's also in Upland.
13    Q. In Upland?
14    A. Yes.
15    Q. And is it at the same address as UPC?    10:19:16
16    A. Yes.
17    Q. And what kind of business does MSN -- MSM do?
18    A. It does debt collection, and it also does real
19 estate.
20    Q. Well, what kind of debt collection does it do?    10:19:43
21    A. It does the same thing. We buy debt and
22 outsource it.
23    Q. Is MSM licensed to collect debts anywhere in the
24 United States?
25    A. No.        10:19:58

Page 82

1    Q. Does MSM have any pending applications to be
2 licensed to collect debt in the United States?
3    A. No.
4    Q. And who owns MSM?
5    A. Michael Martinez.        10:20:22
6    Q. You?
7    A. Yes.
8    Q. Ms. Martinez -- is your mother involved in MSM?
9    A. No.
10    Q. What's the -- the third collection agency that    10:20:37
11 you own?
12    A. There is no third. What I meant by two is
13 United Payment Center and MSM.
14    Q. Got it. Understood. Okay.
15    Why do you own two collection agencies, as    10:20:51
16 opposed to just one?
17    A. Because MSM is more virtual. We outsource
18 pretty much everything to collectors in other countries
19 and things like that.
20    Q. And is MSM, what are they collecting? Are they    10:21:11
21 collecting first-party debt?
22    A. No.
23    Q. Or just debts -- third parties?
24    Correct. Purchased.
25    Q. Okay. So do they collect any third-party debt    10:21:20

Page 83

1 or is it all purchased debt?
2    A. No, no. It's all purchased.
3    Q. But UPC collected on third-party debt up until
4 about three or four months ago, correct?
5    A. Correct.        10:21:40
6    Q. And Mr. Kelly's debt was being collected on by
7 UPC, not MSM?
8    A. Correct.
9    Q. And so the debt that MSM collects, that's, in
10 fact, consumer debt?        10:22:11
11    A. Yes.
12    Q. Okay. So primarily for personal, family or
13 household purposes, that debt?
14    A. Correct.
15    Q. Same with UPC. Primarily, they collect debt    10:22:23
16 which is primarily for personal, family or household
17 purposes?
18    A. Yes.
19    Q. Do you use social media?
20    A. I do.        10:22:50
21    Q. Okay. What -- what forms of social media do you
22 use? Do you use LinkedIn?
23    A. I have a LinkedIn account, but I'm not very
24 active on it.
25    Q. Okay. Do you know what your name is on    10:23:03

Page 84

1 LinkedIn?
2    A. I don't. Probably Michael Martinez. Not very
3 active, like I said.
4    Q. Do you use Instagram?
5    A. Yes.        10:23:20
6    Q. And what's your -- do you know what your account
7 name is for Instagram?
8    A. Yes. It's FKN Michael Martinez.
9    Q. FKN Michael Martinez. What's the FKN stand for?
10    A. It stands for fuckin.        10:23:47
11    Q. Okay. So fuckin Michael Martinez?
12    A. Yup.
13    Q. Do you use a -- do you use Twitter?
14    A. Yes.
15    Q. And do you know what your Twitter handle is?    10:24:08
16    A. I think it's FKN Mike Martinez.
17    Q. And again, the FKN stands for?
18    A. For fuckin.
19    Q. Do you use TikTok?
20    A. Yes.        10:24:24
21    Q. Do you know what your account name or handle is
22 on TikTok?
23    A. It's going to be FKN Michael Martinez or FKN
24 Mike Martinez, one of those. I don't remember.
25    Q. And again, the FKN means?    10:24:50

Page 85

22 (Pages 82 - 85)

| | |
|---|---|
| 1 | A. Fuckin. It's all the same. |
| 2 | Q. I missed that. |
| 3 | A. It's fuckin. It's all the same on all |
| 4 | platforms. |
| 5 | Q. And do you use Facebook?          10:25:06 |
| 6 | A. Yes. |
| 7 | Q. Do you know what your account name is on |
| 8 | Facebook? |
| 9 | A. I think it's Michael Martinez. |
| 10 | Q. No FKN?          10:25:18 |
| 11 | A. I don't remember. |
| 12 | Q. Okay. I was going to ask you this earlier and |
| 13 | I -- I missed it, so let me circle back. |
| 14 | Do you have any -- have you ever been arrested? |
| 15 | A. Yes.          10:25:58 |
| 16 | Q. Okay. When was the last time you were arrested? |
| 17 | A. I don't even remember. |
| 18 | Q. Okay. Have you ever been convicted of a crime? |
| 19 | A. Yes. |
| 20 | Q. Okay. What were you convicted of?          10:26:14 |
| 21 | A. I've been convicted of a DUI. |
| 22 | Q. Can you tell me where that was and what -- what |
| 23 | time frame that was? What year, if you know? |
| 24 | A. 2007. |
| 25 | Q. Was that in California?          10:26:37 |

Page 86

| | |
|---|---|
| 1 | A. House arrest. |
| 2 | Q. House arrest? |
| 3 | A. Yes. |
| 4 | Q. How long? |
| 5 | A. I think it was 45 days.          10:28:28 |
| 6 | Q. Anything else? Any other crimes you've been |
| 7 | convicted of that you haven't mentioned? |
| 8 | A. No. |
| 9 | Q. Have you been arrested or convicted in any other |
| 10 | states for any other crimes?          10:28:56 |
| 11 | A. No. |
| 12 | Q. Who is Brandon Pinata? Pinata maybe. I'm sorry |
| 13 | if I'm mispronouncing that. |
| 14 | A. That's my brother. |
| 15 | Q. That's your brother. Okay. And does he          10:29:25 |
| 16 | currently work for UPC? |
| 17 | A. No. |
| 18 | Q. Okay. Am I pronouncing his name correctly? |
| 19 | It's Pinata? |
| 20 | A. Pinata.          10:29:38 |
| 21 | Q. All right. Mr. Pinata, when did he leave UPC? |
| 22 | A. I don't remember. |
| 23 | Q. How long did he work for UPC? |
| 24 | A. For a few months. |
| 25 | Q. And is he -- are you -- do you currently work          10:29:56 |

Page 88

| | |
|---|---|
| 1 | A. In California. |
| 2 | Q. Riverside County? |
| 3 | A. Los Angeles. |
| 4 | Q. Los Angeles. Okay. What other things have you |
| 5 | been convicted of?          10:26:57 |
| 6 | A. I was arrested for possession when I was 18, |
| 7 | possession of narcotics at 18 years old. |
| 8 | Q. Were you charged with anything or convicted? |
| 9 | A. Misdemeanor. |
| 10 | Q. Misdemeanor? And you said you were 18?          10:27:26 |
| 11 | A. Yeah. So I'm trying to remember the year. I |
| 12 | think it was 2001. I don't remember the exact year. |
| 13 | Q. Was that Los Angeles as well? |
| 14 | A. Yes. |
| 15 | Q. Los Angeles County, right?          10:27:43 |
| 16 | A. Yes. |
| 17 | Q. Okay. What else? |
| 18 | A. That's it. |
| 19 | Q. Okay. Just those two criminal convictions? |
| 20 | A. Yes.          10:27:59 |
| 21 | Q. Did you serve any time on the DUI? |
| 22 | A. Yes. |
| 23 | Q. How long? |
| 24 | A. Two weeks. |
| 25 | Q. And how about on the possession of 2001?          10:28:09 |

Page 87

| | |
|---|---|
| 1 | with him in any of the other companies? |
| 2 | A No |
| 3 | Q He doesn't work for Dataskip io? |
| 4 | A No |
| 5 | Q He doesn't work for your real estate company?          10:30:08 |
| 6 | A No |
| 7 | Q And he doesn't work for MSN -- or MSM Portfolio |
| 8 | Management? |
| 9 | A Doesn't work for any of my companies |
| 10 | Q Okay How about Cameron Lopez? How do you know  10:30:26 |
| 11 | Cameron Lopez? |
| 12 | A I don't know a Cameron Lopez |
| 13 | Q Did you ever have an employee named Cameron |
| 14 | Lopez that worked at United Payment Center? |
| 15 | A No At least not that I'm aware I've had lots  10:30:47 |
| 16 | of people come and go |
| 17 | Q Okay Who has -- who has a list of the former |
| 18 | employees at UPC? |
| 19 | A We can probably access that through ADP |
| 20 | Q Okay So you don't have a human resources          10:31:09 |
| 21 | department or anything that handles all the employee |
| 22 | stuff It's mainly done through ADP? |
| 23 | A Peter or Pedro Valencia, he works with ADP on |
| 24 | that stuff |
| 25 | Q Okay So -- so Mr Valencia might be the guy to  10:31:25 |

Page 89

23 (Pages 86 - 89)

1 ask those questions of related to former employees?

2   A. Correct.

3   Q. He would be kind of the closest thing to a human

4 resources person you have at UPC?

5   A. We have human resources through ADP.    10:31:45

6   Q. I see. But you're -- in terms of human

7 resources within UPC, an employee of UPC, it would be

8 Mr. Valencia who would be closest person to ask?

9   A. Correct.

10   Q. How do you know Krystal Stewart?    10:32:05

11   A. I don't know that person either.

12   Q. Do you know Janice Moreno?

13   A. No.

14   Q. Doesn't ring a bell?

15   A. No.           10:32:34

16   Q. How about Suzy Domenech? Domenech.

17   A. I don't recognize that name either.

18   Q. D-o-m-e-n-e-c-h.

19   A. I don't recognize that name.

20   Q. We could -- I assume then we could -- some of --  10:32:57

21 Mr. Valencia's could access the ADP system to determine

22 if these folks previously worked for UPC?

23   A. Correct.

24   Q. How about Sterling Morris? Do you know Sterling

25 Morris?           10:33:25

Page 90

---

1   A. I don't recognize that name either.

2   Q. I think you answered this earlier, but I want to

3 be clear about what the answer was. Do you have job

4 applications that these folks that are working for you

5 fill out and that Mr. Valencia or someone else at UPC  10:33:44

6 maintains in an employment file?

7   A. No. There is -- there is a small number of

8 employees that work directly for us in-house as W-2

9 employees. Yes, we do on them.

10   Q. Okay.      10:34:06

11   A. But 1099's, no, not at all.

12   Q. Okay. So you don't have any -- you don't have

13 any human resources info related to Jose Rico?

14   A. No. He was a 1099 independent contractor.

15   Q. And who is Bradford and Associates?    10:34:24

16   A. Probably one of our DBA's.

17   Q. Okay. What -- what's a DBA? Tell me -- tell me

18 about that.

19   A. Doing business as.

20   Q. Okay. And who's doing business as? UPC is   10:34:41

21 doing business as Bradford and Associates?

22   A. Well, it could be one of the contractors. They

23 have their own entities. So the contractors have DBA's

24 as well.

25   Q. Okay. So contractors have DBA's, correct?   10:35:01

Page 91

---

1   A. Yes.

2   Q. And do you know who Bradford and Associates is?

3   A. No.

4   Q. Okay. I'm going to direct your attention back

5 to Exhibit 1 for a minute because I want to ask you a   10:36:08

6 question about it, if I could. Okay.

7      So we're back on Exhibit 1. I'm looking at --

8 can you see that okay, Mr. Martinez?

9   A. Yes.

10   Q. Okay. So I'm looking at this paragraph 20, I've  10:36:22

11 highlighted it for you, can you read that for me? Just

12 read it to yourself, and then let me know when you've had

13 a chance to read it.

14   A. Yes.

15   Q. Okay. Now I'm going to -- I'm going to read it.  10:36:55

16 It says "UPC is currently investigating the nature of its

17 relationship with other parties potentially involved in

18 the actions complained of in plaintiff's amended

19 complaint, and UPC reserves its right to the file

20 cross-claims under third-party claims against said    10:37:17

21 parties once such investigation is complete, if it is

22 determined that said parties are or may be liable to UPC

23 for all or part of a claim asserted in this action

24 against UPC." Okay?

25   A. Okay.         10:37:35

Page 92

---

1   Q. I think you testified earlier that you haven't

2 done any investigation about the facts or circumstances

3 in this lawsuit because Mr. Rico had left the company and

4 you didn't think it was appropriate to talk to him,

5 correct?         10:38:00

6   A. Yes.

7   Q. Have you done an investigation into the nature

8 of the relationship you had with any other parties in

9 this case?

10   A. I don't have a relationship with any of the   10:38:13

11 parties in this case.

12   Q. Okay. Well, I'm going to screen share this

13 again with you because I'm trying to understand what this

14 means. So this paragraph 20, can you tell me what it

15 means? It's okay if you can't. I just want to know if  10:38:29

16 you have any insight into that statement.

17   A. Well, I mean my attorneys drafted this up, and

18 what it means to me is that we're still working on this,

19 on looking into what happened here.

20   Q. Okay. All right. So this thing was filed on   10:38:46

21 January 23rd; it's now March 30th, so it's been a couple

22 months, two months and a week. Have you learned anything

23 new that you can add to this that would help me

24 understand what third parties might have been responsible

25 for what happened in this case?     10:39:05

Page 93

24 (Pages 90 - 93)

```
 1    A.  One thing that I did find out is Jose Rico's
 2  company -- we looked into that.  So I shared that
 3  information with my attorneys, so I think that's
 4  client --
 5        MR. BREES:  Hold on.  Don't -- don't -- I'm    10:39:22
 6  going to -- don't say anything about what have you shared
 7  or what's been communicated with your attorneys.
 8        THE WITNESS:  Okay.
 9        MR. BREES:  But you can still testify to --
10  still answer his question, just don't --    10:39:34
11        MR. BARRY:  Okay.  Well, I'm going to -- I'm
12  going to -- I'm going to object to the coaching,
13  Mr. Brees.
14  BY MR. BARRY:
15    Q.  But I understand your attorneys made an    10:39:42
16  objection as to attorney-client privilege, and I don't
17  want to you discuss any communications that you had to or
18  from your attorneys.  But I do want you to testify about
19  what you know.
20        And so what I'm asking you is:  Have you learned    10:39:57
21  anything new that would supplement that defense that was
22  pled in Exhibit 1?
23    A.  What I have learned is that Jose Rico has the
24  company that we were paying -- that we were doing
25  business with that we were assigning our debt to.    10:40:22
                                        Page 94
```

```
 1    Q.  Okay.  You were assigning your debt to Jose
 2  Rico's company?
 3    A.  Correct.
 4    Q.  Is that Bradford and Associates?
 5    A.  That doesn't sound like the name.  I don't    10:40:34
 6  recall the name, but that doesn't sound like it.
 7    Q.  Okay.  So would you be surprised if somebody
 8  told my client and my client's mother and/or -- and/or my
 9  client's mother that they were calling from Bradford and
10  Associates?    10:40:50
11    A.  It's possible that he's using a DBA.  That's
12  what I was trying to explain.
13    Q.  It's possible he was using that name, Bradford
14  and Associates?
15    A.  Yes.    10:41:02
16    Q.  Okay.  Is it -- is it possible he said that they
17  were a law firm?
18    A.  I don't know.
19        MR. BREES:  Objection.  Calls for speculation.
20  BY MR. BARRY:    10:41:12
21    Q.  Well, I don't want you to speculate.  I want you
22  to tell me.  Have you ever heard any of your collectors
23  say that they were calling from a law firm?  You're under
24  oath.
25    A.  I have heard that, and we don't allow that.    10:41:26
                                        Page 95
```

```
 1    Q.  Okay.  So you've heard it at your agency.  At
 2  UPC, you've heard your collectors claim to a consumer
 3  that they were calling from a law firm, correct?
 4    A.  Yes.
 5    Q.  And you don't allow it.  How do you not allow    10:41:42
 6  it?  What do you do to stop that?
 7    A.  We have the managers let them know not to be
 8  saying that or we're going to have to part ways.
 9    Q.  Other than the two depositions that we've
10  already talked about, the one in the trucking case and    10:42:08
11  the one in the -- I believe, it was a real estate dispute
12  case; is that correct?
13    A.  Yes.
14    Q.  Have you ever given sworn testimony in any other
15  case, other than those two depositions and today?    10:42:26
16    A.  No.
17    Q.  Have you ever appeared in court other than in
18  this deposition today?  Ever gone to court and testified?
19    A.  Not testified, no.  I've gone to court, not
20  testified.    10:42:49
21    Q.  You presumably had to go to court on the DUI in
22  2007, right?
23    A.  Correct.
24    Q.  And the possession charge in 2001?
25    A.  Correct.    10:43:02
                                        Page 96
```

```
 1    Q.  And so other than the three depositions,
 2  today's, trucking case, the real estate case and your
 3  two -- your two court appearances, have you ever had to
 4  appear in court in -- in anything other than those cases,
 5  if at all?    10:43:29
 6    A.  Traffic tickets.
 7    Q.  Okay.  Other than traffic tickets?
 8    A.  No.
 9    Q.  Do you ever do collections?
10    A.  No.    10:43:48
11    Q.  Do you ever get on the phone with a consumer and
12  try to close a case?
13    A.  No, I don't.
14    Q.  When is the last time you did any collections,
15  live collections, with consumers?    10:44:03
16    A.  About 12 years.
17    Q.  Do you have the ability to listen in from your
18  phone or from, you know, a headset or something to the
19  collection calls that are going on in your collection
20  center there in Upland?    10:44:24
21    A.  No, I don't.
22    Q.  Are you familiar with that concept?
23    A.  Yes.
24    Q.  Okay.  And you've seen that used in other
25  collection agencies you worked at previously?    10:44:35
                                        Page 97
```

25 (Pages 94 - 97)

1    A.  Yes.

2    Q.  But you don't use that sort of drop-in

3  technology at United Payment Center?

4    A.  We do not.  Our phone system's very old and

5  outdated.  So we don't have a lot of this new technology.    10:44:49

6    Q.  I think you mentioned it earlier, and I don't

7  want to miss anything.  Okay?  And I'm going to -- I'm

8  going to preface my question, this line of questioning,

9  with this:  I understand you're -- you're -- let me --

10  let me lay some foundation.    10:45:23

11      Tell me about your -- did you graduate from high

12  school?

13    A.  Yes.

14    Q.  What high school did you graduate from?

15    A.  Mountain View High School in El Monte.    10:45:33

16    Q.  And after you graduated from Mountain View, did

17  you go -- did you attend -- attend any secondary

18  education?  College?  Community college?  Anything?

19    A.  Yes.

20    Q.  Okay.  And where did you go to school after    10:45:50

21  that?

22    A.  Mt. San Antonio College.

23    Q.  Where's that located?

24    A.  It's in Walnut, California.

25    Q.  And anywhere else?    10:46:00

Page 98

1    A  No

2    Q  Did you complete a degree or a certificate

3  program of any kind?

4    A  No

5    Q  Okay  What was your -- what was your major when    10:46:15

6  you were there?

7    A  Paralegal

8    Q  Paralegal?

9    A  Yes

10    Q  And how long did you go to school in    10:46:25

11  post-secondary?

12    A  For about a year

13    Q  Did you -- okay  So I'm going to ask you some

14  questions and -- and -- related to the Fair Debt

15  Collection Practices Act  All right?    10:46:53

16    A  Okay

17    Q  I don't want you to answer as a lawyer because I

18  understand you're not an attorney, correct?

19    A  Yes

20    Q  So are you familiar with the Fair Debt    10:47:01

21  Collection Practices Act?

22    A  I am familiar with it

23    Q  I'm going to refer to it as the FDCPA  All

24  right?

25    A  Okay    10:47:16

Page 99

1    Q.  Tell me what you know about the FDCPA.

2    A.  I haven't brushed up to it, and I'm not up to

3  speed with the current FDCPA.  It's been over -- it's

4  been about 15 years since I last remember interacting

5  with the FDCPA.    10:47:40

6    Q.  Do you know who the -- pardon me.  I didn't mean

7  to interrupt.

8    A.  Yeah.  So I do remember that there's certain

9  rules and guidelines that we are to do our best to abide

10  by.    10:47:58

11    Q.  And what are those rules that you have to do

12  your best to abide by?

13    A.  The Mini-Miranda, for example, being courteous

14  and professional to the consumers on the phone, things of

15  that nature.    10:48:22

16    Q.  Can you lie when you're collecting a debt?

17    A.  No.

18    Q.  Can you say you're law firm when you're

19  collecting a debt when you're not a law firm?

20    A.  No.    10:48:40

21    Q.  Can you call yourself Process Service Dispatch

22  when you're just a collection agency?

23    A.  No.

24    Q.  Can you threaten a lien on somebody's home if

25  you don't have the legal ability to do it?    10:48:53

Page 100

1    A.  No.

2    Q.  Can you spoof phone numbers?

3    A.  I don't know.  I -- I don't know if we're able

4  to use local presence or not.  I have not heard any rules

5  against that.  So there, I'm not sure.    10:49:14

6    Q.  Well, I can't give you legal advice because I'm

7  not your attorney, but that's probably the kind of thing

8  you want to check with your lawyer on.

9      MR. BREES:  Objection.

10      THE WITNESS:  Right.  You're probably right.    10:49:30

11  BY MR. BARRY:

12    Q.  Are you aware that there's case law here at this

13  district in Minnesota that says that spoofing a phone

14  number violates the FDCPA?

15    A.  I was not aware of that, no.    10:49:44

16    Q.  Okay.  Are you a member of any professional

17  trade groups, collection agency trade groups?

18    A.  No.

19    Q.  Are you a member of the American Collectors

20  Association?    10:50:08

21    A.  No.

22    Q.  Do you have insurance through the American

23  Collectors Association?

24    A.  No.

25    Q.  Are you a member of the California Associations    10:50:13

Page 101

26 (Pages 98 - 101)

1  of Debt Collectors?

2      A.  No.

3      Q.  Do you attend any professional conferences of

4  any kind?

5      A.  In debt collections?  No.            10:50:28

6      Q.  Okay.  I think we sort of talked about some

7  previous lawsuits that have been brought against UPC,

8  but, to your knowledge, how many times has UPC been sued

9  for violations of the Fair Debt Collection Practices Act?

10     A.  In the last nine years, probably about seven.    10:51:11

11     Q.  And how many times in the past, let's say, two

12  years has UPC been sued under the FDCPA?

13     A.  About three.

14     Q.  Were all those suits settled?

15     A.  Yes.                        10:51:48

16     Q.  Why are you fighting this suit?

17         MR. BREES:  Objection to the form.

18         THE WITNESS:  For two reasons.  Number one, the

19  settlement amount that was initially requested was, in my

20  opinion, and my -- my previous attorney's opinion, just    10:52:07

21  ridiculous.  That's the answer.

22  BY MR. BARRY:

23     Q.  Okay.  So when you say "just ridiculous," tell

24  me what you mean by that.

25     A.  It means that the amount was very, very and we    10:52:24

Page 102

1  could not understand why.  So my previous attorney that's

2  no longer with Gordon and Reese, it was our mutual

3  decision to fight it.

4      Q.  Okay.  And I don't want to you tell me anything.

5  I'm going to kind of caution you not to tell me anything    10:52:53

6  about --

7         MR. BREES:  Maybe you should be cautious on this

8  line of questioning.  Period.

9         MR. BARRY:  Yeah.  I guess your -- is that an

10  objection, Dan?  Are you referencing me?        10:53:00

11         MR. BREES:  I'm -- I'm talking about -- yeah.

12  You're -- you're -- you're getting into questions about

13  strategy in this litigation, which is clearly going to

14  invoke the attorney-client privilege.  So I would caution

15  you on this -- this line of questioning.  Period.    10:53:15

16         MR. BARRY:  Yeah.  I appreciate your -- your --

17  your learned guidance, but I'm going to ask my questions,

18  and if have you an objection, you can make your

19  objection, not coaching and not -- not -- not a speaking

20  objection.                        10:53:28

21  BY MR. BARRY:

22     Q.  So my question for you is:  -- and I'm going to

23  just say this to you with this caveat, Mr. Martinez, I

24  don't want you to tell me anything that you discussed

25  with your attorney.  Okay?  I'm not seeking to invade the    10:53:39

Page 103

1  attorney-client privilege.  I don't want to do that.

2  I -- I -- frankly, I don't care, and it's not going to be

3  helpful to anybody.

4         My question for you is:  From your own thought

5  process, when I ask you, why are you fighting this case,    10:53:56

6  did you understand that if you're found liable for a

7  violation of the Fair Debt Collection Practices Act that

8  the plaintiff in this case, Mr. Kelly, is going to be

9  awarded his attorney's fees?

10         MR. BREES:  Object to the form.        10:54:26

11         THE WITNESS:  I understand that.

12  BY MR. BARRY:

13     Q.  Okay.  And do you understand that, as we're

14  sitting here today, I'm billing at $600 an hour, and then

15  Mr. Swigart is billing at $795 an hour.        10:54:47

16     A.  I was not aware of that.

17     Q.  Okay.  Have -- have you seen the -- have you

18  seen the -- the -- my time sheets?

19     A.  I've seen them.  I glanced through them.  Yes.

20     Q.  Okay.  But you saw my time and billing that I    10:55:10

21  think -- I'm trying to ask this in a -- in a -- have you

22  seen it recently, I guess, is my question?

23     A.  Yes.

24     Q.  Okay.  All right.  And you've seen Mr. Swigart's

25  time and billing recently?                10:55:26

Page 104

1      A.  I've seen some billing.  I don't know who's is

2  whose, but yes, I have seen some billing.

3      Q.  Got it.  Okay.  And were you aware that I was

4  awarded $550 an hour in an FDCPA case here in Minneapolis

5  three years ago?                    10:55:48

6      A.  No.

7      Q.  Okay.  And were you aware that I was awarded

8  $745 an hour in a consumer case in California in the last

9  year?

10     A.  No.                        10:56:05

11     Q.  Okay.  All right.  Do you want to settle this

12  case?

13     A.  Absolutely.

14     Q.  Are you prepared to come to Minneapolis for a

15  trial?                        10:56:43

16     A.  Absolutely.

17     Q.  And I presume that you would bring Mr. Rico with

18  you or have him -- arrange him to have him travel out for

19  trial?

20     A.  I don't have a relationship with Mr. Rico like    10:57:07

21  that, Mr. Barry.  He no longer works with our

22  organization.

23     Q.  Okay.

24     A.  I'm not defending Mr. Rico.

25     Q.  Have you ever received any written complaints    10:57:26

Page 105

27 (Pages 102 - 105)

1 from consumers other than the lawsuits that were filed
2 that we've talked about already? Have you already
3 received written complaints from consumers about the way
4 UPC was collecting debts?
5    A. Not that I'm aware of.                10:58:06
6    Q. Have you received a Better Business Bureau
7 complaint about the way UPC collected debts?
8    A. My managers handle all that, those types of
9 complaints if they do come in. They don't get to me.
10    Q. Okay. Yeah, no. I understand somebody else may    10:58:2
11 handle them.
12        What I'm asking is: As to your knowledge, have
13 you ever been made aware that there was a Better Business
14 Bureau complaint made against UPC?
15    A. Not recently. Several years ago, yes.    10:58:35
16    Q. Okay. Have you ever received any Federal Trade
17 Commission complaints about the way UPC collects debts?
18    A. No.
19    Q. Have you ever received any attorney general
20 complaints from either the State of California or any    10:59:07
21 other attorney general's office about the way UPC
22 collects debts?
23    A. Not recently, but, yes.
24    Q. You have? And what attorney's general provided
25 you with a complaint about the way you were collecting    10:59:2

Page 106

1 debts?
2    A California
3    Q And when was that?
4    A I couldn't tell you My old manager handled all
5 that                            10:59:39
6    Q Okay Is there a file that contains those
7 complaints somewhere there at UPC? You keep track of
8 them? Keep a record of them?
9    A No, I wouldn't have that
10    Q You don't keep a record of the complaints that    10:59:52
11 are made by the attorney's general?
12    A I would ask to ask my managers if we do
13    Q Okay So there may be a record, but you'd have
14 to search?
15    A Correct                        11:00:06
16    Q Were you aware that written discovery had been
17 served in this case, interrogatories, request for
18 production and documents, et cetera?
19    A No I'm not too sure what all that means
20    Q Okay Fair enough So is there a -- is there a    11:00:23
21 record of which collectors use which aliases there at
22 UPC?
23    A No The way our independent contractors work
24 is, they're pretty much on their own We just assign
25 debt to them and they collect We don't manage them like    11:00:47

Page 107

1 that.
2    Q. I'm sorry?
3    A. We don't manage them in that fashion.
4    Q. So do you have a written agreement with them
5 between UPC and the independent contractor?    11:01:07
6    A. Not as of yet. That's something that we're
7 working on.
8    Q. Okay. So it's pretty much a W9 and a handshake
9 with these folks, these independent contractors?
10    A. Correct.                    11:01:29
11    Q. And I think you said earlier -- you testified
12 earlier they get -- they get paid 33-and-a-third percent
13 of what they collect, the independent contractors?
14    A. 33 percent commission, correct.
15    Q. 33 percent commission. Do you withhold taxes    11:01:54
16 from the commission?
17    A. No.
18    Q. Do you know whether or not the alias names that
19 the collectors use there at UPC, do you know if they're
20 registered with any of the states?        11:02:13
21    A. I -- I wouldn't know that, but I wouldn't think
22 so.
23    Q. Have you ever been licensed as the debt
24 collector anywhere?
25    A. No.                        11:02:31

Page 108

1    Q How many collection accounts does UPC carry at
2 any given time? Can you give me an estimate?
3    A I think that question needs to be more detailed
4 because -- are you asking me how many accounts we buy a
5 month?                            11:03:41
6    Q Fair enough Let -- let me -- let me lay some
7 additional foundation You purchase -- you purchase
8 accounts for collection there at UPC, correct?
9    A Yes
10    Q Do you know how many accounts you currently have    11:03:52
11 in your inventory of accounts to be collected that would
12 be in the Simplicity system?
13    A I wouldn't know that right off the top of my
14 head
15    Q Who would know that?            11:04:11
16    A Right of the top of their heads? No one
17    Q Okay I don't want to you speculate about what
18 anybody's got off the top of their head What I'm
19 looking for -- I asked in my question, and it's
20 inartfully worded I apologize So let me re-ask it    11:04:33
21        Does anybody keep track of collection statistics
22 there at UPC?
23    A No
24    Q Okay So when you purchase this debt from Pro
25 Recovery Systems and they send it over to in DropBox, I    11:04:55

Page 109

28 (Pages 106 - 109)

1 think you said it had a spreadsheet, correct?
2    A. Yes.
3    Q. And then you -- you ex-filtrate that data, you
4 import that data out the spreadsheet into the CRM
5 Simplicity Connect, correct?                    11:05:16
6    A. Yes.
7    Q. So can you give me a sense, do you get 5,000
8 accounts a month? Do you get 200?
9    A. Probably around 15,000.
10   Q. Per month?                                11:05:35
11   A. Yes.
12   Q. And do you -- are all of these purchased through
13 Pro Recovery Systems or is it -- do you work with
14 different debt sellers?
15   A. No. Only Pro Recovery Systems.           11:05:45
16   Q. And Pro Recovery Systems, where are they located
17 again?
18   A. In Massachusetts.
19   Q. Okay. Boston?
20   A. I don't think it's Boston. I don't -- I don't   11:05:58
21 know the name of the town, but I -- it's not Boston.
22   Q. Who's your contact there at Pro Recovery
23 Systems?
24   A. Patrick Wilson.
25   Q. Have you met Mr. Wilson face-to-face?     11:06:11
Page 110

1    A. Yes.
2    Q. There in Massachusetts or in Upland?
3    A. I've met Patrick a few times in a few different
4 places.
5    Q. Okay. What times and what places?        11:06:31
6    A. I've seen him in Vegas a few times, and in
7 Massachusetts just a few months ago.
8    Q. Okay. You went to see him in Massachusetts?
9    A. I went on business, and I took the opportunity
10 to have breakfast with him while I was out there. I   11:06:56
11 didn't fly to Massachusetts just to meet with him, no.
12   Q. I understand. Okay. Are you on business there
13 in Cancún or is this vacation?
14   A. No. It's my kids' spring break vacation.
15   Q. Got it. I understand that. I'm sorry to    11:07:12
16 interrupt your vacation. I apologize.
17      How long have you been working with Pro Recovery
18 Systems in buying debt from them?
19   A. Ten years.
20   Q. And when you purchased this debt from Pro   11:07:33
21 Recovery Systems, like in a case of Mr. Kelly, you
22 understand his -- his debt was from back in 2005? Did
23 you know that?
24   A. I had not paid attention to that factor, no.
25   Q. Okay. Well, we alleged in the -- we alleged in   11:08:02
Page 111

1 the -- the amended complaint -- the complaint and the
2 amended complaint that was about 17 years old. Are you
3 aware of that?
4    A. I knew that it was older debt, but I never
5 thought about the exact age of it.              11:08:30
6    Q. Okay. All right. But suffice to say --
7 let's -- we'll -- we'll call it -- let's say it was at
8 least -- it was at least 15 years old. Okay?
9    A. Okay.
10   Q. How can you collect on a debt which is 15 years   11:08:41
11 old?
12   A. Well, I don't collect it. I assign it to
13 collectors. So I think that's a question you have to ask
14 them.
15   Q. Well, I'm asking you since you apparently own   11:08:59
16 this debt or purchased this debt. How is it that UPC can
17 collect a debt that's 15 years old?
18   A. We assign it to collectors. They collect it.
19   Q. Okay. Are there any legal constraints on
20 collecting a debt that you're aware of, not as a lawyer,   11:09:20
21 but just as a lay person, are there any legal constraints
22 on collecting a debt which is 15 years old?
23   A. Not that I'm aware of.
24   Q. What kind of notes are kept in the Simplicity
25 Connect system about the activities taken during a   11:10:00
Page 112

1 collection effort on a consumer debt?
2    A. They're all different depending on the
3 collectors. Some are more detailed. Some are very
4 vague.
5    Q. Okay. And I think you said that you briefly   11:10:16
6 reviewed the notes on Mr. Kelly's account in your
7 Simplicity CRM system; is that correct?
8    A. Not recently. It was when the lawsuit first
9 came to my attention.
10   Q. Do you know whether or not --              11:10:33
11   A. Go ahead.
12   Q. I'm sorry. Excuse me to interrupt you. Do you
13 know whether or not --
14   A. I just wanted to know who the collector was, but
15 go -- go ahead.                                 11:10:43
16   Q. I'm sorry. Go ahead. Finish your -- your
17 statement.
18   A. I just wanted to see who the collector was when
19 the lawsuit initially came in, and to see what
20 information I could get from the CRM.           11:10:54
21   Q. Okay. And the information that's in your CRM,
22 has that been provided to your attorneys?
23   A. I don't think so.
24   Q. Okay.
25      MR. BARRY: Mr. Brees, we're going to be   11:11:09
Page 113

29 (Pages 110 - 113)

1 requesting that information.

2       MR. BREES: Do you want to make a document

3 request?

4       MR. BARRY: No. We're -- we're timing -- the

5 federal court ordered you guys to produce it at the       11:11:19

6 inception of the case, but we'll -- we'll be sending a

7 meet and confer letter following this deposition.

8       MR. BREES: Okay. We'll address this later

9 then.

10 BY MR. BARRY:                               11:11:33

11    Q. Is there -- is there a shorthand that gets used

12 in these collection notes, Mr. Martinez?

13    A. I'm sorry. Is there a what now?

14    Q. Is there a shorthand, abbreviations that are

15 used in the collection notes and entered into the       11:11:57

16 Simplicity system?

17    A. Some collectors use certain notes, you can say.

18    Q. Okay. Do you know if Mr. Rico used certain

19 notes or shorthand?

20    A. I don't know.                          11:12:19

21    Q. Do you have a standard set of shorthand that you

22 used at UPC or is it just kind of ad hoc to whatever

23 collector is on an account uses their own shorthand?

24    A. Yeah. We don't have a standard. Everybody is

25 free to utilize the notes as they please.       11:12:43

1    Q. Does -- does the CRM track when a call is made,

2 an outbound phone call is made to a consumer?

3    A. No

4    Q. Okay. So you could make three phone calls, but

5 if you only notated one phone call on the records, that's       11:13:05

6 all it would have, the one phone call?

7    A. Correct

8    Q. Okay. So it's not an automated system where

9 every phone that's dialed gets a record, a note line in

10 the CRM?                                   11:13:22

11    A. Correct. Our CRM is not our phone system

12    Q. Does your phone system track outbound calls?

13    A. It -- it might. If we request those records, we

14 might be able to get them. It's not something that we've

15 requested ever                             11:13:44

16    Q. Did you request it in this, Brian Kelly versus

17 United Payment Center?

18    A. No. I'm not sure I'm understanding what you're

19 asking me. You're asking me if -- if we have a record

20 sheet of the calls that are being made, outgoing calls?       11:14:16

21    Q. Yes

22    A. Yeah. We don't have anything like that, but we

23 can possibly request it from the phone people

24    Q. Okay. So you don't maintain records of every

25 outbound or inbound phone call in your CRM system?       11:14:34

1    A. No. Absolutely not.

2    Q. Why not?

3    A. I've never heard of that before. It's never

4 crossed my mind. I don't see a reason to do that.

5    Q. Okay. Are you familiar with systems that do       11:14:49

6 that?

7    A. No.

8    Q. And just to make sure I'm clear on this issue

9 and clean this up, you didn't send any -- you didn't send

10 letters out to Mr. Kelly before you started collecting?       11:16:07

11    A. Correct.

12       MR. BREES: Object to the form.

13 BY MR. BARRY:

14    Q. I'll -- I'll restate the question because we

15 kind of crossed over.                       11:16:18

16       Did you send any collection letters out to

17 Mr. Kelly before you started collecting the debt?

18    A. No.

19    Q. Did you send any collection letters out, or any

20 letters, any communication of any kind, out to Mr. Kelly       11:16:30

21 after you began collecting the debt?

22    A. No.

23       MR. BREES: Are you asking about UPC or

24 Mr. Martinez himself?

25 ///                                       11:16:43

1 BY MR. BARRY:

2    Q. Let me restate the question. I -- presumably --

3 you indicated earlier, Mr. Martinez, that you did not --

4 you yourself don't collect debt there at UPC, correct?

5    A. Yes. Correct.                        11:16:57

6    Q. Okay. And my question for you is -- and when I

7 say "you," I mean UPC in this context. I'll try to be

8 more clear. I apologize.

9       Did UPC, or anyone employed by UPC, send out a

10 letter to Mr. Kelly before they began collecting this       11:17:17

11 debt?

12    A. No.

13    Q. Did anyone at UPC, or employed by UPC, send any

14 written correspondence of any kind to Mr. Kelly during

15 the course of collecting this debt?       11:17:31

16    A. I don't know if Jose Rico's company did, but UPC

17 did not.

18    Q. Okay. So you think that Jose Rico's company --

19 what's the name of his company?

20    A. I don't know. I don't know it off the top of my       11:17:46

21 head.

22    Q. Okay. You think that Jose Rico may have sent

23 something in writing to Mr. Kelly about this debt?

24       MR. BREES: Objection. Misstates his testimony.

25 ///                                       11:17:59

1 BY MR. BARRY:

2   Q. Well, I'm not trying to misstate your testimony,

3 and -- and -- and if there's an objection, the

4 objection's noted. I'll re-ask my question. I don't

5 want to misstate your testimony. You understand that,    11:18:10

6 right?

7      So if you feel like I am, you stop me and

8 correct me and say, "That isn't what I said," because I

9 want this to be your testimony. I'm not -- you're a very

10 intelligent man. You're not going to be tricked into    11:18:22

11 saying something that isn't so, and I don't want you feel

12 like I'm trying to trick you into saying something that

13 isn't so. All right, Mr. Martinez?

14   A. Okay.

15   Q. Okay. So my question for you is: Do you know    11:18:33

16 whether or not Mr. Rico or Mr. Rico's company or someone

17 employed by his company sent anything out to Mr. Kelly in

18 writing?

19   A. I don't know.

20   Q. Okay. Do you have any reason to believe they    11:18:52

21 might have sent something out in writing to Mr. Kelly?

22   A. If they were negotiating paying off his debt,

23 then it's possible.

24   Q. Okay. And so, what would have come out to    11:19:17

25 Mr. Kelly in that event from Mr. Rico?

Page 118

1   A. I don't know. It would have been up to Mr. Rico

2 to send that.

3   Q. Okay. Does he send that from his computer there

4 at UPC?

5   A. Yes.    11:19:33

6   Q. Do you provide internet access for those

7 computers?

8   A. Yes.

9   Q. Are they are on a computer network there at UPC,

10 those computers?    11:19:45

11   A. (Witness shakes head.)

12   Q. Oh. They're not on a network?

13   A. Not a network.

14   Q. So those computers are all sort of independent

15 computers?    11:19:57

16   A. Correct.

17   Q. And so, when they get the accounting from the

18 Simplicity CRM Connect software, they get that, what,

19 over the internet?

20   A. Correct.    11:20:07

21   Q. Okay. So Simplicity Connect, that sounds like

22 it's sort of an Internet based, a web browser based

23 system; is that correct?

24   A. Yes.

25   Q. Does the computer that -- does UPC own the    11:20:19

Page 119

1 computers?

2   A. Yes.

3   Q. Did Mr. Rico take that computer with him when he

4 left his employment six months ago?

5   A. No.    11:20:38

6   Q. Is that computer still there at United Payment

7 Center?

8   A. Probably. I would have to ask my admin manager.

9   Q. That would be Mr. Valencia?

10   A. Yes.    11:20:47

11   Q. When is it appropriate for a debt collector to

12 contact a third-party in an effort to collect a debt?

13      MR. BREES: Object to the form. Vague.

14      THE WITNESS: I don't understand that question

15 either.    11:21:19

16 BY MR. BARRY:

17   Q. Okay. So can a debt collector contact a

18 third-party in an effort to collect a debt, someone other

19 than the consumer?

20   A. For -- to collect on their debt? I would assume    11:21:31

21 not.

22   Q. Okay. So why did Mr. Rico contact Brian Kelly's

23 mother?

24      MR. BREES: Objection. Calls for speculation.

25      THE WITNESS: I have no idea, Mr. Barry.    11:21:49

Page 120

1 BY MR. BARRY:

2   Q. Okay. Well -- and you haven't asked Mr. Rico

3 why he might have called Mrs. Kelly, have you?

4   A. I have not spoken to Mr. Rico about this at all.

5   Q. And are you aware that -- that -- that    11:22:10

6 Mrs. Kelly has her own claim under the Fair Debt

7 Collection Practices Act against United Payment Center?

8   A. I was not aware of that.

9   Q. Did you know that, under the Fair Debt

10 Collection Practices Act, that not only the consumer    11:22:30

11 debtor can bring a claim, but any other person affected

12 by a violation of the Fair Debt Collection Practices Act

13 has a right to bring a claim as well? Were you aware of

14 that?

15   A. No.    11:22:41

16   Q. Prior to our meeting today by Zoom, have you and

17 I ever met?

18   A. I don't think so.

19   Q. Okay. Have we -- we've -- have we ever spoken?

20   A. I don't think so.    11:23:12

21   Q. Okay. And have we ever been involved in a prior

22 litigation of -- of any kind that you're aware of?

23   A. I don't -- I don't think so, but I'm not sure.

24   Q. Okay. Have you personally ever been sued under

25 the Fair Debt Collection Practices Act?    11:23:41

Page 121

31 (Pages 118 - 121)

| | |
|---|---|
| 1   A. I don't think so. | 1 I'm being quite -- quite honest with you. I'm exhausted |
| 2   Q. Have you ever had a claim made against you or | 2 with this industry already. |
| 3 against somebody that you worked with under the Fair Debt | 3   Q. You're looking to shutdown your collection |
| 4 Collection Practices Act, other than the cases we've | 4 agency? |
| 5 already talked about here today with UPC?   11:23:57 | 5   A. Yeah. I'm -- had about enough of this industry   11:26:48 |
| 6   A. No. | 6 already. I'm -- I'm ready to move on to other |
| 7   Q. In the previous -- your previous employment with | 7 industries. |
| 8 Roger's Acceptance Corp, are you aware of any lawsuits | 8   Q. And -- and when you say you've had enough of |
| 9 that were ever brought against them that involved you | 9 this industry, what -- tell me what you mean by that. |
| 10 under the FDCPA?   11:24:19 | 10   A. Just all of the regulations that they keep   11:27:04 |
| 11   A. No. | 11 throwing at the industry. I can't even keep up with it. |
| 12   Q. Are you aware of any FDCPA lawsuits that were | 12 So, you know, I'm looking to -- to exit here in the -- in |
| 13 brought either against you or that you -- for which you | 13 the next year or two. |
| 14 were involved in with Reliant Recovery Services? | 14   Q. Okay. But you're not complying with any of |
| 15   A. No.   11:24:40 | 15 those regulations, are you?   11:27:21 |
| 16   Q. There was an unknown organization that you | 16   MR. BREES: Object to the form. |
| 17 worked for between 2011 and 2012 that did debt | 17 BY MR. BARRY: |
| 18 collections. Were there any cases brought against you or | 18   Q. You're not licensed anywhere, correct? |
| 19 that you were a party to or a participate in at any level | 19   A. No, I'm not. |
| 20 related to the Fair Debt Collection Practices Act?   11:24:54 | 20   Q. Okay. So that -- so -- so licensure hasn't been   11:27:30 |
| 21   A. No. Not that I'm aware of. | 21 a burden for you because you're not licensed anywhere, |
| 22   Q. And are you aware of any claims that were ever | 22 right? |
| 23 made against you or against any person where you were -- | 23   A. Right. But it gets tiring dealing with |
| 24 you were related or connected when you worked for RPA & | 24 lawsuits, so... |
| 25 Associates related to the FDCPA?   11:25:17 | 25   Q. Okay. So it's less about the -- the regulation   11:27:45 |
| <div align="right">Page 122</div> | <div align="right">Page 124</div> |
| 1   A. No. | 1 and more about the lawsuits. The lawsuits are tiring? |
| 2   Q. How far is Mr. Rico's cube from your office at | 2   A. Yeah. And I was actually considering getting my |
| 3 UPC? | 3 agencies all fully licensed for compliancy, and it's -- |
| 4   A. His cubicle is upstairs. My office is | 4 it's -- it's just a lot of -- yeah. It's a lot of work. |
| 5 downstairs.   11:25:39 | 5 It's a lot of work and very expensive.   11:28:10 |
| 6   Q. His is -- I'm sorry -- upstairs or downstairs? | 6   Q. But you managed to avoid that expense and all |
| 7   A. His is upstairs in the building. My -- my | 7 that work for the last nine years, right? |
| 8 office is downstairs. | 8   A. Yes. |
| 9   Q. How many floors is your building? | 9   Q. And so what's pushing you to suddenly think |
| 10   A. Two.   11:25:50 | 10 about, "Hey, I got to get licensed. I got to do all this   11:28:27 |
| 11   Q. Do you own the building? | 11 work to get licensed and spend all this money"? |
| 12   A. No. | 12   What's making you think I should do that now? |
| 13   Q. You lease? | 13   A. Well, there's a lot of lawsuits I've had to deal |
| 14   A. Yes. | 14 with in the last nine years. And from what I hear, |
| 15   Q. Who's your landlord?   11:26:00 | 15 purchasing debt is starting to become more difficult as   11:28:45 |
| 16   A. Babloo. | 16 well. So it's just this industry, to me, just doesn't |
| 17   Q. I'm sorry? | 17 seem very practical anymore. |
| 18   A. Babloo, B-a-b-l-o-o. | 18   Q. Did you ever have occasion to observe Mr. Rico's |
| 19   Q. And how long have you been in that building in | 19 collection activities? |
| 20 Upland?   11:26:21 | 20   A. No. I -- I'm somewhat of an absentee owner in a   11:29:22 |
| 21   A. Nine years. | 21 sense. |
| 22   Q. Any plans to move? | 22   Q. Okay. So who's watching -- so when you say |
| 23   A. I haven't gotten that far yet. | 23 an -- |
| 24   Q. Are you looking to expand? | 24   A. I've relied on managers for -- for several |
| 25   A. I'm actually looking to shutdown, Mr. Barry, if   11:26:36 | 25 years.   11:29:38 |
| <div align="right">Page 123</div> | <div align="right">Page 125</div> |

<div align="right">32 (Pages 122 - 125)</div>

1    Q.  Okay.  So are -- do you -- do you -- do you
2  typically go into the office in Upland at the UPC
3  collection center?  Do you go in every day?
4    A.  I go into my office, not the UPC offices.
5    Q.  Okay.  And you're -- but you're -- you go into      11:29:56
6  your office, but that's -- that's the office of UPC,
7  right?  It's in that location in Upland?
8    A.  It's at that location, but it's not the same
9  office.  It's not the same suites.
10    Q.  Okay.  So they're upstairs on the second floor,    11:30:11
11  and you're downstairs on the first floor?
12    A.  Correct.
13    Q.  Okay.  And when you say you're an absentee
14  owner, it -- it sounds like you're not engaged in the
15  day-to-day operation and supervision of the collections    11:30:27
16  agents?
17    A.  That's correct.
18    Q.  Why not?
19    A.  Because I pay managers to do that, and I run
20  other businesses as well.                                11:30:41
21    Q.  Okay.  But you're -- you're telling me that
22  you've been -- you're getting sued all the time, and I
23  guess my question to you is -- is:  If you're getting
24  sued all the time for the collection activities that your
25  collectors are engaged in, why aren't you more involved    11:30:57

Page 126

1  in the collection agency and its management?
2      MR BREES:  Asked and answered
3      THE WITNESS:  Because I have managers for that
4  So I share my concerns with them and I expect them to
5  implement whatever we need to do to avoid these lawsuits    11:31:17
6  BY MR BARRY:
7    Q.  Okay  And have they done that?
8    A  I see they're trying, but they're not being
9  effective as of last year  That's why I change out
10  managers all the time, because we're no longer aligned    11:31:33
11    Q.  Okay  Well, when -- when you -- when you do
12  got -- when you got the demand in this case, I guess it
13  was, maybe, last November roughly, did you understand
14  that you were going to be paying attorneys' fees for your
15  attorneys?                                               11:32:00
16    A  Yes
17    Q  And -- and you were aware that -- that they
18  brought a motion to dismiss the punitive damages claim in
19  this case?
20    A  Yeah  I'm not sure what all that means         11:32:15
21    Q  Okay  Well, it -- I'll represent to you that
22  your lawyers brought a motion to dismiss a punitive
23  damages claim in this case  All right?
24    A  Okay
25    Q  Okay  And that -- that they lost that motion    11:32:33

Page 127

1  Do you understand that?
2    A  Okay
3    Q  Okay  And so, what that now means is that
4  Mr Kelly, through his attorneys, has the right to ask a
5  jury to award punitive damages against United Payment    11:32:56
6  Center in this case
7      MR  BREES:  Is there a question?
8  BY MR BARRY:
9    Q  Do you understand that?
10    A  Yes                                            11:33:10
11    Q  Okay  And now it sounds like you've got a
12  dispute with your insurance company over whether or not
13  they're going to provide you coverage in the case, right?
14    A  Okay
15    Q  Is that right?  Your insurance company,         11:33:33
16  Allstate, has said,  We're not covering this case  We're
17  not covering this claim  ?
18    A  Well, it's not a dispute  They made their
19  decision  What am I going to dispute, Mr Barry?
20  There's nothing to dispute  They made their decision    11:33:49
21    Q  Okay  So you're going to accept their decision
22  that they're not covering it?
23    A  Of course
24    Q  You don't have any plan to -- you don't have any
25  plan to -- I'll withdraw that question                  11:34:01

Page 128

1      MR. BREES:  That's been asked and answered
2  anyway.
3      MR. BARRY:  Is there an objection?
4      MR. BREES:  Yes.  I said that's been asked and
5  answered anyway.                                         11:34:18
6      MR. BARRY:  What has?
7      MR. BREES:  The question you were going to ask.
8      MR. BARRY:  Well, then it hasn't been asked.
9      MR. BREES:  Hasn't been asked again, correct.
10      MR. BARRY:  Do you have an objection or is this    11:34:38
11  just coaching your witness, Mr. Brees?
12      MR. BREES:  I was objecting to the question that
13  you were about to ask.
14  BY MR. BARRY:
15    Q.  Was Mr. Rico ever disciplined, to your         11:35:00
16  knowledge, while working at United Payment Center?
17    A.  Not to my knowledge.
18    Q.  Can you tell me what facts you're aware of, you
19  personally, are aware of that UPC is relying upon in
20  support of its bona fide error defense?                  11:36:05
21    A.  I don't know what -- I don't know what that
22  means.
23    Q.  Fair enough.  Do you think that -- do you think
24  that anybody did anything wrong in this case?  I
25    A.  I think that voicemail was in compliance.  I    11:36:17

Page 129

33 (Pages 126 - 129)

1 don't know the conversation that Mr. Rico had with the
2 debtor, so I -- I can't answer that.
3    Q. Okay. But when you say "that voicemail," you're
4 referring to Exhibit 2, which was the voicemail that Mary
5 left at the 800 number -- with the 800 number, right?    11:36:43
6    A. Correct.
7    Q. Okay. You think that that -- you think
8 Exhibit 2 is evidence of noncompliance with the FDCPA?
9    A. Correct.
10    Q. And what do you -- and what about that call --    11:37:01
11 and I'm happy to play it again for you. Let's listen to
12 it again. It's not very long. I think it's only, maybe,
13 30 seconds.
14       "Attention, this call is intended for Brian
15 Kelly. My name is Mary with the Process Service
16 Dispatch. We are notifying the residents and owners of
17 the property we have legal documents requiring a
18 signature today. If you will be unavailable to sign or
19 have any questions regarding the pending lien on 226
20 Galaxy Drive, Circle Pines, Minnesota, contact issuing
21 firm immediately at phone number (866) 709-8145, and case
22 number 2022413072."
23       Okay. So what about that call -- that voicemail
24 that was left do you think is -- violates the FDCPA?
25    A. It has a lot of parts to it.    11:38:28

Page 130

1    Q. Okay. So tell me what the first part is.
2 What -- what's the first part that you think violates the
3 FDCPA?
4    A. I mean, I'd -- I'd have to take notes to -- to
5 digest the whole message. I can't -- I can't memorize    11:38:50
6 the whole message.
7    Q. No. I understand. I don't want you to memorize
8 it. I just want you to tell me, with your 18 years of
9 collection experience -- is that what we've got? 2001?
10 Is that right? I don't want to misstate.    11:39:08
11    A. Yes.
12    Q. Okay. So roughly, 18 years of collection
13 experience. So with your 18 years of collection
14 experience, what's wrong with that voicemail? What
15 violates the FDCPA in that voicemail? The use of the    11:39:24
16 word "lien"?
17    A. Yes. The use of service or process server,
18 whatever she said, case -- case number and firm. Those
19 four things.
20    Q. So that all -- do you think that suggests to the    11:39:38
21 person receiving that message that it's the law firm
22 calling them?
23       MR. BREES: Objection. Calls for speculation.
24       THE WITNESS: Yeah. I don't know.
25 ///    11:39:54

Page 131

1 BY MR. BARRY:
2    Q. Well, no, I -- I don't want you speculate. You
3 said that there was something wrong with the use of the
4 word "firm." What's wrong with the use of the word
5 "firm"?    11:40:05
6    A. It's confusing.
7    Q. Confusing. Okay. How about the use of the word
8 "lien"?
9    A. Also confusing.
10    Q. Confusing. How so?    11:40:16
11    A. Somebody on the -- somebody hearing that message
12 is not going to understand what they mean.
13    Q. Well, how about "process service dispatch"?
14    A. Another confusing.
15    Q. I see. So you think that consumers don't know    11:40:35
16 what the word "lien" means or the word "process service
17 dispatch," what that suggests. Do you think it suggests
18 anything to use the word lien?
19    A. Yes.
20    Q. What does it suggest?    11:40:51
21    A. It suggests a lien.
22    Q. Okay. Some kind of legal activity on the file?
23    A. Yeah, if the consumer knows what it means. Some
24 do some don't. I don't know.
25    Q. Okay. Okay. Well, if they -- why -- why else    11:41:04

Page 132

1 would it have been used?
2    A. Mr. Barry, I'm not the one that used it. I
3 don't know what that collector was thinking. I've
4 already explained that.
5    Q. Sure. But it's your company.    11:41:17
6    A. I don't -- I don't condone that.
7    Q. Okay. You don't condone it, but it's your
8 company that's getting sued for it, right?
9    A. Correct.
10    Q. I think you previously testified that you us a    11:41:28
11 Twitter account, correct?
12    A. Yes.
13    Q. Okay. All right. I am going pull this up on --
14 I'm going to pull this up on my other screen here. Give
15 me a second.    11:45:27
16       Okay. Mr. Martinez, I'm showing you what's been
17 previously marked as Exhibit 4.
18       MR. BARRY: That's in the share file, Mr. Brees.
19       (Plaintiff's Exhibit 4 was marked
20        for identification.)    11:45:53
21 BY MR. BARRY:
22    Q. Can you take a look at this first page of this
23 document? Tell me if you recognize it.
24    A. I don't recognize that. So I have a social
25 media team that posts for me, by the way. I don't do    11:46:22

Page 133

Veritext Legal Solutions
866 299-5127

1 my --

2    Q. Oh, you have a -- you have a social media team

3 that posts for you?

4    A. Yeah.

5    Q. Okay. Let me ask you a few questions.    11:46:29

6    Is this your Twitter account, FKN Michael

7 Martinez?

8    A. Yes.

9    Q. And FKN stands for?

10    MR. BREES: Asked and answered.    11:46:38

11 BY MR. BARRY:

12    Q. In this context? Go ahead.

13    A. Fuckin.

14    MR. BREES: You can answer him again.

15 BY MR. BARRY:    11:46:57

16    Q. Okay. All right. So you have a social media

17 team that posts for you under this Twitter account; is

18 that right?

19    A. Correct. I've never posted on this Twitter

20 account myself.    11:47:07

21    Q. I see. Okay. All right. So are -- but are --

22 did you authorize these words that are on here?

23    A. No.

24    Q. I'll read it.

25    A. They don't need -- they don't need my    11:47:13

Page 134

1 authorization. They just post.

2    Q. Oh, I see. Well, are -- do you manage the

3 posts? Are you -- I mean, what if they --

4    A. No.

5    Q. Can they -- they post anything they want?    11:47:22

6    A. No. I'm completely hands-free.

7    Q. Okay. So even though this is your Twitter

8 account, somebody else posts these words for you?

9    A. I have a social media team, correct.

10    Q. Well, I'm asking -- I'm -- I'm not asking if you    11:47:39

11 have a social media team. I'm asking whether or not you

12 authorized them to post these words?

13    A. I -- it's not about authorizing. I don't check

14 this stuff. It just gets posted. I didn't even know

15 this was posted.    11:47:56

16    Q. I see. Okay. So somebody else posts for you

17 under your account, but you don't know what they post or

18 what they say and you don't authorize it; is that

19 correct?

20    A. That's correct.    11:48:07

21    Q. Okay. All right.

22    So where it says, "A professional skip tracer

23 may even contact current or past acquaintances if they

24 are not able to find the information they are looking for

25 from public sources," those aren't your words?    11:48:19

Page 135

1    A. Those are not my words, no.

2    Q. All right. This next one, "I don't have an" --

3 it says -- on the second page of Exhibit 4, it says "I

4 don't have an LLC. I have a corporation. Let me tell

5 you something, LLC's are old school incorporation.    11:48:36

6 There's no liability. You shut it down and walk away

7 from the business. They can't come after you because

8 it's a corporation. It's its own entity completely."

9    Are those your words?

10    A. No, they're not.    11:48:53

11    Q. Somebody else's words?

12    A. My social media's team, once again.

13    Q. Who's on your social media team? What are their

14 names?

15    A. Danny Figueroa.    11:49:04

16    Q. Okay.

17    A. And then Marlon Womack, Patrick Crosby.

18    Q. I'm sorry. Marlon Womack?

19    A. Womack. Womack.

20    Q. How do you spell -- how do you -- Marlin, like    11:49:18

21 the fish? Marlin?

22    A. M-a-r-l-o-n, and then is W-o-m-a-c-k. And then

23 Patrick Crosby, C-r-o-s-b-y, and then they also have

24 employees themselves, so I don't know their names.

25    Q. Okay. So are these three, Danny Figueroa,    11:49:42

Page 136

1 Marlon Womack and Patrick Crosby, are these employees of

2 UPC?

3    A No They're employees of Michael Martinez

4 They're my social media team

5    Q Okay And -- but are they employees of -- of    11:50:01

6 yours personally?

7    A They're not employees They're independent

8 contractors

9    Q I see Are they there in Upland?

10    A No    11:50:14

11    Q Where are they?

12    A So Danny and Patrick are in Phoenix, Arizona,

13 and Marlon is in Anaheim, California

14    Q Okay Do they work for a separate company or is

15 it all Michael Martinez?    11:50:28

16    A No They -- they're all -- they're all

17 independent They're service providers, and they -- they

18 work -- they work with me directly, Michael Martinez

19    Q Okay Do you tell them what to post or do you

20 describe kind of the general idea of what you want posted    11:50:42

21 on --

22    A No

23    Q -- your Twitter account?

24    A No

25    Q Okay    11:50:47

Page 137

35 (Pages 134 - 137)

1    A. They post what -- they post whatever's popular,
2  whatever they think is a good fit for my persona or my --
3  my Instagram brand, my social media brand.
4    Q. So these statements about a corporation,
5  "there's no liability, you shut it down and move on,"    11:51:03
6  that's not you? That's not your thoughts? That was
7  theirs?
8    A. Yeah.
9    Q. They're all --
10    A. Yeah. They probably heard me mention that at a    11:51:14
11  conference or talking to somebody about me. I have a
12  videographer, I mean, that's always recording me. So
13  they probably heard me say that that -- at some point.
14    Q. The next tweet on page three there of Exhibit 4,
15  did you post this or did somebody else?    11:51:34
16    A. Again, I've never posted anything on Twitter.
17  My team does that.
18    Q. Okay. So this says, "One thing I hate the most
19  is when they don't take responsibility for when they F
20  up. If you make a mistake, just admit it and move on."    11:51:53
21    Do you endorse that concept, those words?
22    A. Yeah. They probably heard me say that, again,
23  on social media or on recording and probably transcribed
24  it. That's prop -- I mean, I'm assuming that's what they
25  did. I don't remember saying that.    11:52:11

Page 138

1    Q. Sure.
2    A. I definitely didn't post it. But that's the
3  personality that they want to give off --
4    Q. Okay.
5    A. -- on social media.    11:52:23
6    Q. Okay. And why do they want to give that
7  personality off on social media? What --
8    A. They're the professionals, sir, not me. They're
9  the --
10    Q. I understand that, Mr. Martinez. We got to be    11:52:32
11  careful about talking over each other. I'm sorry.
12    I guess my question for you is: Why do you need
13  a social media presence or personality at all?
14    A. Because I want one.
15    Q. Okay. It's just a hobby thing or do you --    11:52:50
16    A. Sure. It's a hobby.
17    Q. Okay.
18    A. Call it a hobby.
19    Q. Okay. You don't get business from it? It
20  doesn't financially benefit you?    11:53:04
21    A. I can. I have.
22    Q. Has it financially benefitted you?
23    A. Sure.
24    Q. Okay. How so?
25    A. I can't think -- I can't think of every little    11:53:16

Page 139

1  detail right now on how it's made me money, but social
2  media is a financial benefit. Yes.
3    Q. Okay. Has it assisted you in your collection
4  business?
5    A. Not really.    11:53:30
6    Q. Okay. Okay. So this fourth page of Exhibit 4,
7  "I'm willing to do what most people are not willing to do
8  to be massively successful."
9    Are those your words or somebody else's?
10    A. Probably mine. I don't remember saying that.    11:53:54
11    Q. Okay. And you didn't post this?
12    A. I did not post it, for the fourth time. No.
13    Q. Well, I'm asking for -- as to each of these.
14  Okay? So I just want a clear record. I understand your
15  position, but I --    11:54:11
16    A. I never posted anything on Twitter, so it feels
17  like you're asking the same question.
18    Q. Okay. Well, I'm going to ask it for every one
19  of these, so -- I want a clear record. So -- okay.
20    So this -- this next one, you didn't post this?    11:54:25
21  "Real men know that only lazy girls are excited by a man
22  with money. 100 percent. Queens who work hard for what
23  they have can't be moved by cheap thrills. What kind of
24  woman are you trying to be?"
25    You didn't write that?    11:54:43

Page 140

1    A. That, no. Absolutely not.
2    Q. All right. And do -- do you know whether or not
3  this is a quotation from you at some conference or
4  something that somebody who would have put up here, your
5  social media team?    11:54:56
6    A. I don't recognize that at all. That must have
7  been my social media team 100 percent.
8    Q. Okay. Now this last one says, "I went from
9  using crystal meth in my early 20's to becoming a
10  multi-millionaire."    11:55:06
11    Did you post that?
12    A. No.
13    Q. Okay. Were you aware that your social media
14  team says that you used crystal meth?
15    A. They probably put -- took that from a YouTube    11:55:27
16  interview that I did about a year ago.
17    Q. All right. Is that a true statement, though,
18  that you used crystal meth, then became a millionaire?
19    A. It is.
20    Q. Okay.    11:55:40
21    MR. BARRY: Why don't we -- it's coming up on
22  2:00 here, Mr. Brees. Should we take a -- take maybe a
23  half hour and then finish up?
24    MR. BREES: Yeah. How much longer do you think
25  you have?    11:55:53

Page 141

36 (Pages 138 - 141)

1      MR. BARRY:  I'd say I have at least an hour.

2      MR. BREES:  I'll -- I'll leave that up to Mike

3 to see what his -- his wishes are.

4      MR. BARRY:  All right.  I'll go ahead -- I'm

5 going to go ahead and -- and close this is, and then        11:56:10

6 we'll --

7      THE WITNESS:  What's the -- what's the question?

8      MR. BREES:  Mr. Barry says he has about another

9 hour left.  Would you like to take a 30-minute break,

10 grab something to eat, or would you just like to take a     11:56:29

11 quick bathroom break and then come back?  Or how would

12 you like to proceed?

13      THE WITNESS:  So if it's going to be an hour,

14 I'm okay with just a quick break, but if it's going to

15 longer than that, I'd like to take a lunch.                 11:56:44

16      MR. BARRY:  Yeah.  Why don't you go ahead and

17 take lunch?  It's going go longer than that.  So I'll go

18 ahead and -- let's take a break here.

19      Now, Mr. Court Reporter -- Madam Court Reporter,

20 and then we'll -- how long do we want to take?  Half        11:56:51

21 hour?

22      MR. BREES:  30 minutes is fine.

23      MR. BARRY:  30?

24      MR. BREES:  30 minutes, yeah.  So we'll be back

25 at 2:30?                                    11:57:00

Page 142

1      MR BARRY:  All right  Sounds good  See you in

2 30

3      THE VIDEOGRAPHER:  The time is 11:57 a m  We're

4 going off the record

5      (At the hour of 11:57 a m , the luncheon recess    11:57:11

6 was taken  The proceedings to be resumed at 12:30 p m )

7      (At the hour of 12:38 p m  the following

8 proceedings were had at the same place with the same

9 persons present:)

10      THE VIDEOGRAPHER:  The time is 12:38 p m  We're   12:38:41

11 back on the record

12 BY MR BARRY:

13      Q  All right  Thank you, Mr Martinez  Welcome

14 back  You're still under oath  One second here

15      Okay  Mr Martinez, when we last left, we were     12:39:32

16 looking at Exhibit 4, and I believe page six of

17 Exhibit 4, and this particular sentence:  I went from

18 using crystal meth in my early 20's to becoming a

19 multimillionaire

20      And -- and I think I heard you say -- you kind    12:39:50

21 of cut out, but I think I heard you say that that's a

22 true statement, that did you use crystal methamphetamine

23 in your early 20's?

24      A  Yes, I did

25      Q  Okay  And you're clean now?               12:40:09

Page 143

1      A.  Yes, I am.

2      Q.  Okay.  You don't smoke any drugs?

3      A.  I don't do anything except drink alcohol.

4      Q.  Okay.  You don't -- you don't smoke any drugs,

5 though?                                    12:40:21

6      A.  No, I don't.

7      Q.  You don't snort any drugs?

8      A.  I do not.

9      Q.  You don't inject any drugs?

10      A.  I do not.                           12:40:33

11      Q.  You don't swallow any drugs?

12      A.  I do not.

13      Q.  And you're not on drugs today, legal or illegal?

14      A.  I am not.

15      Q.  Okay.  I'm going to direct your attention now to   12:40:46

16 Exhibit 5, if I could.

17      (Plaintiff's Exhibit 5 was marked

18      for identification.)

19 BY MR. BARRY:

20      Q.  And Exhibit 5 are are -- I'll represent to you are  12:40:54

21 screen shots of caller ID's taken from both my client, as

22 well as his mother's phones, Mr. Brian Kelly and Mrs.

23 Kelly's phone, and I want to ask you whether or not you

24 recognize the phone number here; this phone number,

25 (651) 243-6645?                              12:41:18

Page 144

1      A.  No, I don't recognize that number.

2      Q.  You do not?

3      A.  I do not.

4      Q.  And this -- this number, (866) 709-8145, do you

5 recognize that number?                        12:41:39

6      A.  No, I do not.

7      Q.  And likewise, I'm showing you page two of

8 Exhibit 5.  Again, I assume you do not recognize this

9 phone number, (866) 709-8145?

10      A.  Yeah.  I do not.                       12:42:04

11      Q.  I'm sorry.  I was on -- I thought I moved on

12 pages.  Let me -- let me ask you:  On page three of

13 Exhibit 5, do you recognize this number, (651) 243-6645?

14      A.  No, I do not.

15      Q.  And --                             12:42:28

16      MR. BREES:  Mr. Barry?

17      MR. BARRY:  Yes.

18      MR. BREES:  The Exhibit 5 that is in the

19 Veritext shared folder doesn't look to be the same.

20 It -- it looks to only be one page instead of multiple    12:42:42

21 pages.

22      MR. BARRY:  Okay.  Let me take a look and see.

23      MR. BREES:  It's just that first page that is a

24 picture of a phone.

25      MR. BARRY:  Sure.  All right.  Let me -- it      12:42:54

Page 145

37 (Pages 142 - 145)

1 wasn't saved, so let me re -- let's see here.  I'll --
2 I'll re-introduce this as Exhibit 5.  I think it'll let
3 me know, but we're about to find out.  Yeah.  I don't
4 think it will allow me to -- let me -- let me -- let me
5 see if I can rename it.  Okay.           12:44:04
6      I re-named it "old."  I'm going to re-introduce
7 a new one, the other two.  Sorry.
8 It's just the file didn't get saved before I -- before I
9 published it.
10      All right.  So I think that's the correct one.   12:44:30
11 Okay.  Okay.  This one appears to have all three pages.
12 Let me try to re-introduce it here.  I'll call this one
13 "new Exhibit 5."
14      MR. BREES:  Okay.
15      MR. BARRY:  Let me try that.  All right.  I    12:45:26
16 think that one should work.
17      MR. BREES:  Yes.  I see there's multiple pages
18 in this one.  Thanks.
19      MR. BARRY:  Okay.  Sorry about that.  I
20 apologize, Mr. Brees.                  12:45:44
21      MR. BREES:  No problem.
22 BY MR. BARRY:
23   Q.  Okay.  So back to Exhibit 5, Mr. Martinez.  Do
24 you recognize the phone number that appears on this
25 caller ID, (651) 362-2653?            12:45:58
Page 146

1      (Plaintiff's Exhibit 6 was marked
2      for identification.)
3      "I started learning about real estate
4      and I started applying it to my
5      collection businesses.  I went from       12:47:45
6      300,000 -- collecting 300,000 a month
7      to collecting a million a month 'cause
8      I started looking at my KPI's.  I
9      starting managing my team.  Everything
10      I learned in wholesaling, running real      12:47:56
11      estate, I looked a my collection
12      business, and I'm like fuck.  I just --
13      I can hire VAs.  I could do text.  I
14      started texting debtors, People that
15      own money.  You don't pay your debt,      12:48:04
16      you're fucking going to court, bitch.
17      So I started doing that.  People
18      started calling, "I want to pay my
19      bill."  I'm like, "Oh, shit."  My
20      office was like, "Damn, what are you      12:48:08
21      doing?  The phones are ringing."  I
22      started applying real estate tactics to
23      my debt collection business.  We went
24      from 300,000 a month, which is
25      horrible.  I know there's agencies out    12:48:18
Page 148

1 A  No, I don't
2   Q  Okay  So -- and I think -- I want to just be
3 clear  I thought in your earlier testimony you indicated
4 that Mr Valencia would likely know which phone numbers
5 were associated with the localizing package, as you     12:46:15
6 referred to it?
7 A  Well, I said he would have to look into that
8   Q  Okay  He'd have to look into it  But if
9 anybody -- if I -- if -- if you were to give me the name
10 at any person at UPC that might know the answer to     12:46:33
11 whether or not those phone numbers belong to UPC, that
12 would be Mr Valencia, correct?
13 A  Yes  Correct
14   Q  Okay  All right
15      MR BARRY:  Okay  So now -- and I've numbered   12:46:49
16 these videos, Mr Brees  I've got some videos I want to
17 show, and I've numbered them as exhibits  Exhibit Share
18 does not allow me to upload them  If I try to upload
19 them, it gives an error  So I will transmit to you after
20 the deposition  Okay?                  12:47:08
21      MR BREES:  No problem
22      MR BARRY:  Some of them are large files
23 BY MR BARRY:
24   Q  All right  This is Exhibit 6, and I'll go ahead
25 and play that video for you        12:47:41
Page 147

1      there that they think they're doing it
2      big, 300K a month.  Motherfuckers ain't
3      doing shit."
4 BY MR. BARRY:
5   Q.  All right.  Were you able to see that video,    12:48:26
6 Mr. Martinez?
7 A.  Yes.
8   Q.  Okay.  Is that you in the video?
9 A.  Yes, it is.
10   Q.  And are those your words?           12:48:32
11 A.  They are.
12   Q.  Okay.  Do you know who recorded that video?
13 A.  My videographer.
14   Q.  And that -- that videographer -- these videos
15 are variously posted to your social media accounts?   12:48:49
16 A.  Yes.
17   Q.  Okay.  And does video that fairly and accurately
18 depict the words you used -- the -- the statements you
19 made that day?
20 A.  It's not -- well, what do you mean by "depict"?   12:49:03
21   Q.  Well, is it an accurate depiction of what you
22 said on that day?
23 A.  I mean, yeah, it's clear.  It's clear what I
24 said right there.  Yes.
25   Q.  Okay.  All right.  Anything in that video that's   12:49:20
Page 149

38 (Pages 146 - 149)

1 untrue that you want to correct?

2    A. A lot of it is untrue. It's social media.

3    Q. Okay. What part of that video is untrue?

4    A. So like text blasting, the numbers, things like

5 that. Those numbers are inaccurate. We don't -- the          12:49:39

6 numbers are inaccurate, and so is the -- the strategies.

7 I did use some strategies like that during COVID, which I

8 don't anymore. I was explaining -- in that video, I was

9 explaining 2020 and other years.

10    Q. Okay. So -- so you're explaining, but -- so          12:50:02

11 when you say some of it's not true, you're saying it was

12 true at the time but it's not true now? Is that what

13 you're saying?

14    A. I'm saying it's an inflated reality.

15    Q. Okay. Help me understand what "inflated realty"          12:50:21

16 is. Is it -- so you're embellishing?

17    A. Correct.

18    Q. Okay. You -- you some parts of that video are

19 made up and aren't true?

20    A. Correct.                          12:50:37

21    Q. Okay. How about the part about doing a million

22 dollars a month? Is that true?

23    A. No.

24    Q. Okay. What's the truth?

25    A. Well, the truth is I have several businesses and          12:50:46

Page 150

1 combined, we're putting up big numbers, but not -- not

2 one business by itself.

3    Q. Okay. So you're -- in this video, you were

4 talking about your collection business. And you were

5 saying you were doing a million a month in your          12:51:07

6 collection business. That was a lie in that video?

7    A. Yes.

8    Q. Okay. Okay. All right. I'm showing you now

9 what's been marked as Exhibit 7. I'll go ahead and play

10 that for you.                          12:51:47

11    (Plaintiff's Exhibit 7 was marked

12    for identification.)

13    "Hey guys. I'm here with Vic Diaz. I

14 just met him at Wholesaling Live here

15 in San Antonio, Texas. This is a real          12:51:52

16 estate event. It's for wholesaling and

17 flipping for people that are getting

18 started. I did my presentation up

19 there. I shared that I own a

20 collection agency. He just approached          12:51:59

21 me and asked me about my collection

22 agency. Turns out he also owns a

23 collection agency. Let me ask you a

24 question, bro, because people don't

25 understand on social media.          12:52:07

Page 151

1    Threatening to sue somebody for not

2    paying their debt, is that illegal?

3    MR. DIAZ: Yes and no. If you threaten

4    somebody and the intent is you're not

5    backed by the law, meaning that the

6    account isn't within the parameters,

7    what they call statute, that's illegal.

8    That's a violation of the law. But if

9    the accounts within legal statute, I

10    wouldn't necessarily go and tell          12:52:24

11    somebody, "I'm going to sue you,"

12    because now I'm making an implied

13    threat and I'm not an attorney, But I'd

14    say, Hey, check this out. This is the

15    situation. You're within the legal          12:52:31

16    statute. This is what the law permits

17    in your state. If you don't pay the

18    bill, I'm going to go ahead and forward

19    this to our legal department, and I'm

20    going to recommend that they pursue to          12:52:40

21    the full extent of the law.

22    There's nothing wrong.

23    MR. MARTINEZ: So in other words, it's

24    a gray area but it's not legal.

25    Because if your account is either

Page 152

1    within statute of limitations or if

2    you've renewed the statues by making a

3    payment recently, you better bet that

4    they could sue your sweet candy ass for

5    not paying. Let's get it."          12:52:58

6 BY MR. BARRY:

7    Q. Okay. So is that you in the video?

8    A. It is.

9    Q. Okay. And you're with this other person at a

10 conference?          12:53:07

11    A. Yes.

12    Q. Okay. Are those -- were those your words in

13 that video?

14    A. (Witness nods head.)

15    Q. And your videographer recorded that?          12:53:15

16    A. Yes.

17    Q. What's that videographer's name?

18    A. Marlon.

19    Q. Okay. That's Marlon Womack? Okay.

20    And does that video fairly and accurately depict          12:53:31

21 your thoughts on collecting debt, whether it's in or out

22 of statute?

23    A. Yes and no. Again, it's social media. So

24 there's a lot of embellishing there.

25    Q. Okay. So what in that video in Exhibit 7 -- I'm          12:53:53

Page 153

39 (Pages 150 - 153)

1 sorry -- in Exhibit 7, what was embellished in that
2 video?
3     A. I mean, I'd have to go back and look at it,
4 but -- and I don't really remember exactly how that whole
5 conversation played out when they were recording it. I     12:54:14
6 had just met this person. So, you know, some of the
7 stuff with -- the -- with suing accounts and things like
8 that, some it may or may not be true. We -- we don't
9 know. We have to analyze the situation.
10    Q. Okay. Let's play it again and see what you can     12:54:31
11 pick up.
12    (Video played into the record.)
13 BY MR. BARRY:
14    Q. Okay. So now that you've had a chance to watch
15 it again --     12:55:46
16    A. Yeah. So --
17    Q. -- is there anything you can --
18    A. Yeah. The editor messed up. They put it's not
19 legal. They were supposed to put it's not illegal.
20    Q. Okay. All right. So it's not illegal to     12:56:01
21 threaten to sue somebody on an out-of-statute debt,
22 correct?
23    A. No. That's not what was said in the video.
24    Q. Okay. Well, what are you saying? You said
25 there was an error in the -- the --     12:56:11

Page 154

1     A. That it's legal. That it's legal. If it's in
2 statutes or if somebody's made a payment.
3     Q. I see. So if somebody makes a payment on a
4 debt, if you can get them convinced to make a payment,
5 then you restart the statute of limitation. Is that     12:56:26
6 right?
7     A. Yeah.
8     Q. Is that your understanding?
9     A. Yes.
10    Q. Okay. Okay.     12:56:34
11    A. That's to my understanding.
12    Q. Okay. That's your understanding. Where did you
13 get that understanding? And again, don't tell me if it
14 came from a lawyer.
15    A. No. From my experience.     12:56:46
16    Q. Okay. From your experience. Would it surprise
17 you to know that there's case law in the State of
18 Minnesota and elsewhere that says that restarting a
19 statute of limitations isn't a thing, that you can't
20 restart it with a payment? Would that surprise you?     12:56:57
21    A. It would surprise me.
22    Q. Okay. I'm showing you now, via screen share,
23 what's been marked as Exhibit 8. I'll go ahead and play
24 this for you.
25 ///     12:57:17

Page 155

1     (Plaintiff's Exhibit 8 was marked
2     for identification.)
3     "Hey guys. I'm here standing with my
4     operations manager. She runs my whole
5     debt collection organization. And I'm     12:57:24
6     going to walk you really quickly
7     through the debt collection process so
8     you guys get a real understanding of
9     how it works. After six months of
10    being with a creditor, they charge off     12:57:31
11    your account. What that means is that
12    the bank or the creditor, they gave up.
13    They tap out and they gave up on you.
14    It doesn't mean that you don't have to
15    pay the bill. It just means that they     12:57:40
16    get to write it off in their taxes and
17    they sell your debt. Then a debt buyer
18    like ourselves or like one of my
19    clients, buys it and assigns it to our
20    office. It goes on your credit report     12:57:49
21    as a collection account and serious
22    debt collection efforts are made to try
23    to get you to pay off that collection
24    account. It's already shown on your
25    credit that you were behind with the     12:57:55

Page 156

1     creditor, and now you're charged off in
2     collections on your credit report. The
3     next step, the next remedying
4     collections is a lawsuit. If you
5     haven't paid, most creditors will sue     12:58:05
6     you. So be careful. Let's get it."
7 BY MR. BARRY:
8     Q. Were you able to hear that video --
9     A. Yes.
10    Q. -- Exhibit 8? Is that you in the video     12:58:18
11 speaking?
12    A. Yes.
13    Q. Are those your words?
14    A. Yes.
15    Q. Okay. And that was -- that was recorded by your     12:58:24
16 videographer?
17    A. Yes.
18    Q. Okay. And is there anything in that statement
19 which you wish to correct or that you think is
20 inaccurate?     12:58:39
21    A. Well, I think there's a lot more detail that
22 goes into that process, but that's kind of my summarizing
23 how an account goes delinquent.
24    Q. Okay. And in summarizing how somebody could get
25 sued for a debt?     12:58:59

Page 157

| | |
|---|---|
| 1 A Yes | 1 going to get sued on a 17-year old debt, that would |
| 2 Q Who's your intended audience for these videos | 2 violate the Fair Debt Collection Practices Act, wouldn't |
| 3 when you put them on social media? | 3 it? |
| 4 A There's not an intended audience I just talk | 4 A. Yes. |
| 5 about topics that my social media team recommends So   12:59:13 | 5      MR. BREES: Objection. Calls for a legal        13:03:00 |
| 6 they'll say something along the lines of, Talk more | 6 conclusion. |
| 7 about collections Talk about the collection process | 7 BY MR. BARRY: |
| 8 Things like that | 8 Q. Your answer? |
| 9 Q Okay But with respect to Exhibit 8, the one I | 9 A. Yes. |
| 10 just showed you, there isn't anything in that video that   12:59:44 | 10 Q. Why would that violate the Fair Debt Collection    13:03:04 |
| 11 you think is inaccurate? | 11 Practices Act? |
| 12 A I mean, it's not -- it's social media Again, | 12 A. I don't know why it would violate it. |
| 13 it's not -- it doesn't have to be accurate I don't | 13 Q. Well, I mean -- let me ask you it this way: Do |
| 14 think it's 100 percent accurate, but it's a brief | 14 you think lying to a consumer to collect a debt violates |
| 15 explanation of how I see the process It's my opinion   13:00:06 | 15 the Fair Debt Collection Practices Act?                13:03:24 |
| 16 Q Sure And I understand that it's -- I | 16 A. Yes. |
| 17 understand that it's not going it explain every detail | 17 Q. I'm showing what's been previously marked as |
| 18 and nuance in the collection process, but my question for | 18 Exhibit 9. And I'll go ahead and play that video. |
| 19 you is: Is there anything in that video 8 that you just | 19      (Plaintiff's Exhibit 9 was marked |
| 20 listened to and, I can queue it up again if you need me   13:00:23 | 20      for identification.)                             13:03:38 |
| 21 to, that you think was inaccurate? | 21      "What happens after you get sued for |
| 22 A I don't know | 22      not paying your debt collection |
| 23 Q Want to hear it again? Let's hear it again | 23      account? Well, there's this beautiful |
| 24 A No I -- I -- I don't really understand your | 24      thing called post-judgment remedy. |
| 25 question Do I think it's accurate? Probably not     13:00:42 | 25      When you lose a lawsuit, a judge places   13:03:49 |
| Page 158 | Page 160 |

| | |
|---|---|
| 1 100 percent But do I think there's some truth to that | 1      what's called a judgment on your public |
| 2 process? Yes | 2      record reflecting on your credit |
| 3 Q Okay But -- that's fair That's a fair | 3      report. Now, post-judgment remedy is |
| 4 statement Let me bring it back up and let's watch it | 4      how they enforce that lawsuit, how they |
| 5 again, and then we'll --                            13:00:56 | 5      extract the money from you. When I       13:04:00 |
| 6      (Video played into the record ) | 6      worked in the legal department, this |
| 7 BY MR BARRY: | 7      was part of my job. So what we do is, |
| 8 Q Okay I think you indicated, and I don't want | 8      number one, we put a lien on your |
| 9 to put words in your mouth, but you thought that there | 9      property. Number two, they'll levee |
| 10 was something that might be inaccurate in Exhibit 8, what   13:01:54 | 10      your bank accounts. And number three,    13:04:02 |
| 11 I just showed you | 11      they'll enforce a wage garnishment. |
| 12      Can you tell me, now that you've seen it again, | 12      They'll make your life a fucking living |
| 13 is there anything that -- that you saw that you thought | 13      hell to get this money extracted from |
| 14 was inaccurate about the statement you were making? I | 14      you through post-judgment remedy in a |
| 15 understand it might not be complete explanations of the   13:02:09 | 15      legal department at a collection law      13:04:19 |
| 16 collection process, but is there anything that you | 16      firm where they sue people for not |
| 17 believe to be inaccurate in that Exhibit 8? | 17      paying their bills. Let's get it." |
| 18 A Yeah There's a lot of inaccuracies there | 18 BY MR. BARRY: |
| 19 Q Okay Tell me What are -- what's the first | 19 Q. Okay. Was that you in the video in Exhibit 9? |
| 20 inaccuracy?                                         13:02:26 | 20 A. Yes.                                   13:04:32 |
| 21 A I mean, not all creditors will sue you | 21 Q. And were those your words? |
| 22 Q Okay And how -- how about on a 17-year old | 22 A. (Witness nods head.) |
| 23 debt? Can a creditor sue you on a 17-year-old debt? | 23 Q. Is there anything in that video which you think |
| 24 A No | 24 is inaccurate? |
| 25 Q Okay So if somebody told my client that he was   13:02:48 | 25 A. No.                                    13:04:49 |
| Page 159 | Page 161 |

1    Q   With respect to -- just a follow-up on
2  Exhibit 8  Exhibit 8 was the video you're standing next
3  to a gentleman in kind of a pinkish shirt, kind of a
4  salmon shirt, standing in your office  You said,  I'm
5  here with my collection manager   Was that Christopher     13:05:17
6  Galvez?
7    A  Yes
8    Q  Okay   And with respect to what we just watched
9  in Exhibit 9, that video was made by your videographer?
10   A  Yes                                        13:05:40
11   Q  Is it a true and correct copy of the video that
12  you posted on social media?
13   A  Yes
14   Q  I'm going to show you what's been previously
15  marked as Exhibit 10                            13:05:55
16     (Plaintiff's Exhibit 10 was marked
17     for identification )
18     I'm here in my debt collection
19     organization's closers' bullpen   This
20     is where my guys extract the money from     13:06 07
21     those people that don't like to pay
22     their bills  I remember ten years ago,
23     I worked at a debt collectin law firm
24     in the legal department   We had an
25     interesting situation where a doctor        13:06:16

Page 162

1      owed $150,000 and didn't pay his
2      fucking bill.  He refused to pay it.
3      It was all fun and games until we filed
4      a lawsuit, got a judgement and our
5      attorney's legal department put a boot      13:06:28
6      on his brand new Mercedes.  When he
7      came out the ER the next morning, he
8      couldn't move his Mercedes.  Called our
9      office, irate, very hysterical and he
10     was not getting that boot off until he      13:06:36
11     paid the debt.  What do you think he
12     did?  He paid the fucking debt.  Let's
13     get it."
14  BY MR. BARRY:
15   Q.  Okay.  So is that you Exhibit 10 in that video?     13:06:47
16   A.  Yes.
17   Q.  Okay.  And are those your words?
18   A.  Yes.
19   Q.  All right.  And can you tell me -- that was --
20  that was made by your videographer?                      13:07:05
21   A.  Yes.
22   Q.  Okay.  And that's a -- that's a true and
23  accurate depiction of what was -- what was filmed?
24   A.  Yes.
25   Q.  Is there anything in -- in that Exhibit 10 that     13:07:16

Page 163

1  you believe to be inaccurate that you want to correct?
2    A.  Yes.  Again, this is social media.  A lot of it
3  is embellishment.
4    Q.  Okay.  Have you -- have you ever filed a lawsuit
5  against a consumer to collect a debt while at UPC?       13:07:38
6    A.  No.
7    Q.  Okay.  And have you ever placed a lien on a
8  consumer at UPC in order to collect a debt?
9    A.  No.
10   Q.  Have you ever put a boot on a car, a Mercedes?     13:07:52
11   A.  No.
12   Q.  Have you ever booted any kind of car to collect
13  a debt or otherwise?
14   A.  No.
15   Q.  So is your social media -- is your social media    13:08:09
16  presence, is that public?
17   A.  Yes.
18   Q.  Your Instagram account is public?
19   A.  Yes.
20   Q.  Your TikTok account is public?                     13:08:25
21   A.  Yes.
22   Q.  Your Twitter account is public?
23   A.  Yes.
24   Q.  Your LinkedIn account is public?
25   A.  Yes.                                               13:08:38

Page 164

1    Q.  Your Facebook account is public?
2    A.  Yes.
3    Q.  Do you use Snapchat?
4    A.  No.
5    Q.  So who were these social media videos intended    13:08:53
6  for?  Who is your intended audience?
7      MR. BREES:  Objection.  Asked and answered.
8      THE WITNESS:  There is no intended audience.
9  BY MR. BARRY:
10   Q.  Okay.  So Exhibit 10, where you're talking about   13:09:20
11  debt collection activities, you -- you don't intend for
12  consumers to watch that video or for anybody in
13  particular to watch it?
14   A.  That's correct.
15   Q.  What's a closers' bullpen?  What is that?          13:09:36
16   A.  That's where all the contractors work at.
17   Q.  Okay.  Would Mr. Rico -- Jose Rico, would he
18  work in the closers' bullpen?
19   A.  Yes.
20   Q.  All right.  So I think I know what the answer      13:10:01
21  is, but I want to you tell me, what is a closers'
22  bullpen?  What -- what does that mean, the phrase
23  "closers' bullpen"?
24   A.  It's an office where all the contractors work
25  at.                                                     13:10:18

Page 165

42 (Pages 162 - 165)

1    Q.  Okay.  I understand it's an office where they
2  work, but why is it called closers' bullpen instead of
3  contractors office?
4    A.  Well, that's social media.  That's social media.
5  An embellishment of what we call it.            13:10:28
6    Q.  Okay.  But help me understand.  When you say
7  "closers," what do you mean by closers?  Somebody is
8  closing a deal?
9    A.  Sure.  Closing a deal.
10    Q.  Okay.  They're you're words.  So I don't want      13:10:41
11  to -- I don't want to assume anything.  So when you say
12  "closers' bullpen," are you sort of -- well, you tell me.
13  Tell me what it means, as opposed to -- why you call it a
14  closers bullpen as opposed to, you know, just contractors
15  office?                                      13:11:02
16    A.  So you -- I did sales when I was younger, and a
17  closer is someone that closes deals.
18    Q.  I see.  Kind of like in that Glengarry Glen Ross
19  movie, Coffee for Closers, right?
20    A.  I suppose, yes.                         13:11:20
21    Q.  Okay.  Have you seen that movie?
22    A.  It's been a very long time.  I don't remember
23  it.
24    Q.  Sure.  Okay.  Well, in that movie, it's sort of
25  a high-pressure sales office where only the closers,      13:11:37

1 like their client.
2    Q.  I see.  I see.  You assign the debt to them.
3  You don't tell them how to collect it?
4    A.  Correct.
5    Q.  Okay.  They come to your office to collect it,      13:13:11
6  right?
7    A.  Yes.
8    Q.  And they use your phones to collect it, right?
9    A.  Yes.
10    Q.  And they use your computer systems to collect      13:13:22
11  it?
12    A.  Yes.
13    Q.  Right?  And on your software, right?
14    A.  Yes.
15    Q.  Collecting on your accounts?              13:13:28
16    A.  Yes.
17    Q.  And they're up on the second floor doing that
18  while you're down in your office on the first floor,
19  right?
20    A.  Correct.                                13:13:46
21    Q.  I'm showing you now what's been previously
22  marked as Exhibit 11.
23        (Plaintiff's Exhibit 11 was marked
24        for identification.)
25        "Let's talk debt collections and what      13:14:10

1  the -- the -- the sales people who close deals, get
2  rewarded.  Everyone else is punished.  Is that the kind
3  of closing bullpen you have, where -- where the people
4  who close deals are rewarded, and the people who don't
5  close deals are punished?                      13:11:57
6    A.  No.
7        MR. BREES:  I'll object to the form.  Go ahead
8  and answer.
9        THE WITNESS:  No.  That's not what we have.
10  BY MR. BARRY:                                13:12:10
11    Q.  Describe the work environment in a closers'
12  bullpen at United Payment Center.  What's that like?
13    A.  They're all independent contractors.  So
14  everybody comes and goes as they please.  They kind of do
15  what they want.  Very laid back, and they're --      13:12:25
16    Q.  Kind of like -- when they -- when you say they
17  do want they want, it's kind of like what -- what
18  Mr. Rico did with my client, right?
19    A.  That's correct.
20    Q.  Kind of did what he wanted?              13:12:39
21    A.  Correct.
22    Q.  But in -- in the -- in the closers' bullpen, do
23  they have any policy of procedure manuals?
24    A.  No.  Because everyone's independent contractors
25  with their own business.  I assign debt to them.  I'm      13:13:00

1        happens when you don't pay your bills.
2        The first thing that a creditor is
3        going to do is he's going to put it on
4        your credit report as a derogatory
5        collection account that screws up your      13:14:21
6        credit, and it buries your credit score
7        all the way to the ground.  Another
8        thing to be careful with is that you
9        can actually get sued.  A lot of the
10        banks, especially on auto loans,      13:14:32
11        mortgage loans, big credit card
12        balances that are left unpaid, they
13        will file a lawsuit against you, get a
14        judgment and enforce it to get their
15        money back from you.  Let's get it."      13:14:42
16  BY MR. BARRY:
17    Q.  Mr. Martinez, Exhibit 11, was that you in the
18  video?
19    A.  Yes.
20    Q.  Are those your words?                    13:14:53
21    A.  Yes.
22    Q.  Did your videographer record that video,
23  Exhibit 11?
24    A.  Yes.
25    Q.  Does that video fairly and accurately depict      13:15:03

1 your thoughts on debt collection?

2    A. Yes.

3    Q. All right. Mr. Martinez, I'm showing you what's

4 been marked previously as Exhibit 12.

5    (Plaintiff's Exhibit 12 was marked        13:15:29

6    for identification.)

7    "Can you be sued for not paying your

8    debt collection account?

9    Abso-fucking-lutely. That's what I did

10    in my early years when I started on my      13:15:37

11    debt collection journey. I worked in

12    the legal department at a law firm that

13    specialized in suing people for

14    nonpayment, collection accounts. My

15    job was to inform the debtor or the        13:15:48

16    consumer that we were getting ready to

17    take legal action if they didn't pay.

18    Most of them thought we were bluffing,

19    they thought we were playing games.

20    Our attorney would file a lawsuit, and     13:15:57

21    they'd get that same person calling me

22    back asking if I could stop the wage

23    garnishment and how we can settle the

24    account. But those are my early days.

25    A lot of people think that you can not      13:16:05

Page 170

1    be sued for not paying your bill or

2    having a debt collection account.

3    That's absolutely false. They will sue

4    your ass. So make sure you guys pay

5    your bills. Let's get it."          13:16:14

6 BY MR. BARRY:

7    Q. All right. Mr. Martinez, is that you in the

8 video?

9    A. Yes.

10    Q. Exhibit 11 -- or I'm sorry -- that was     13:16:21

11 Exhibit 12. Is that you in --

12    A. And --

13    Q. -- is that you in Exhibit 12?

14    A. Yes.

15    Q. And are those your words?          13:16:32

16    A. Yes.

17    Q. And did your videographer record that video?

18    A. Yes.

19    Q. Does that fairly and accurately depict your

20 thoughts on debt collection with respect to Exhibit 12?   13:16:45

21    A. Yes.

22    Q. So with respect to Exhibit 12, you indicated in

23 there that a person could be sued for nonpayment of the

24 debt right?

25    A. Yes.              13:17:11

Page 171

1    Q. But I think you just testified just within the

2 last five minutes that you've never sued anybody to

3 collect debt, right, at UPC?

4    A. Right.

5    Q. And -- and you're not authorized to sue people     13:17:25

6 to collect debts, right?

7    A. Not an out-of-statute debt, but if I have

8 in-statute debt and I buy it and I have a bill of sale, I

9 can sue them.

10    Q. I see. But you told me you don't have the bill     13:17:40

11 of sale for the debts that you collect that you get from

12 Pro Recovery Systems, right?

13    A. I'm sorry. What was your question?

14    Q. Yeah. I -- you -- you told me earlier that you

15 don't get the bill of sale from the debts you buy from     13:17:54

16 Pro Recovery Systems, do you?

17    A. I don't. But I have -- I can get access to it

18 if I need it.

19    Q. Okay. Have you ever tried to get access to

20 them?              13:18:08

21    A. I used to get them when I first opened my

22 company. But since I have such a good relationship with

23 them, I just stopped asking for it.

24    Q. But you don't sue anybody to collect debts that

25 UPC buys, correct?              13:18:22

Page 172

1    A. Correct. That's not our model.

2    Q. And -- and you're not a -- you're not a law

3 firm, correct?

4    A. Correct.

5    Q. And you don't have any attorneys working on your   13:18:32

6 staff there at UPC, do you?

7    A. No, I don't.

8    Q. Okay. Other than Gordon and Reese, Mr. Brees,

9 those are the only attorneys you have working for you

10 right now?              13:18:46

11    A. Correct.

12    Q. I'm showing you what's been previously marked as

13 Exhibit 13.

14    (Plaintiff's Exhibit 13 was marked

15    for identification.)          13:19:04

16    "Complacency. Complacency got me. So

17    I caught a huge lawsuit. Now, I own a

18    collection agency at this time, right.

19    I caught a lawsuit by Navy Federal

20    Credit Union. We caught a lawsuit      13:19:12

21    because we pushed a little bit too

22    hard. I caught a fat lawsuit. It was

23    pretty scary. I was being sued for a

24    million dollars. And back then, I

25    wasn't a millionaire. I didn't know      13:19:22

Page 173

44 (Pages 170 - 173)

Page 174

1    what that felt like, so it was pretty
2    scary and stressful. So 2019, it's New
3    Year's, and I'm seeing my business
4    literally, literally, literally in
5    jeopardy of being done. I'm thinking          13:19:33
6    I'm going to have sell my house. I'm
7    going to pull out equity. What am I
8    going to do? This is my business. It
9    was really, really scary, right?
10   There's a little demon; it's called          13:19:41
11   complacency."
12   BY MR. BARRY:
13   Q. Is that you in Exhibit 13?
14   A. Yes.
15   Q. Did you record that video or have your    13:19:54
16   videographer record it?
17   A. I had a videographer record it, yes.
18   Q. Okay. And are those your words in that video?
19   A. Yes.
20   Q. And does that video fairly and accurately depict   13:20:04
21   the subject that you were discussing?
22   A. Yes.
23   Q. That video, Exhibit 13, was posted on social
24   media?
25   A. Yes.                                      13:20:22

Page 175

1    Q. Tell me about this lawsuit that -- that you got
2    brought into with respect to Navy Federal Credit Union.
3    A. So it really had nothing to do with me. I was
4    only in on the lawsuit -- our company was in on the
5    lawsuit because we had the account assigned to our office   13:20:45
6    at the time. But the lawsuit was really between Navy
7    Federal and who they sold it to, and everybody on the
8    team that's had it.
9    Q. Okay. What was the name of that lawsuit?
10   A. I -- I don't remember.                    13:21:03
11   Q. Well, how long was it?
12   A. 2019.
13   Q. 2019?
14   A. Yes
15   Q. Okay. Who would know the name of that lawsuit?   13:21:14
16   Who's got that information?
17   A. Bayview was my client that actually was sued,
18   and I got pulled into it.
19   Q. Okay. Bayview. And who is Bayview?
20   A. Bayview was one of my old clients.        13:21:34
21   Q. And does -- are they a debt collector? Debt
22   buyer? Creditor?
23   A. Yeah. They're a --
24   Q. Bank?
25   A. -- debt buyer. They're a debt buyer.      13:21:44

Page 176

1    Q. And so did Bayview assign this debt to you to
2    collect?
3    A. Yes
4    Q. And then Navy Federal Credit Union, they got
5    sued -- by a consumer or by Navy Federal Credit Union   13:22:01
6    sued Bayview?
7    A. Navy Federal Credit Union sued the original debt
8    buyer that they sold it to, along with everyone else on
9    the chain. And since that account had been sitting in my
10   office, we got pulled into it                13:22:21
11   Q. Okay. Had you collected on that account?
12   A. No
13   Q. Okay. Well, in the video -- again, I don't want
14   to put words in your mouth, but it sounded like you
15   said -- I mean, I think you referred to this as a fat    13:22:36
16   loss suit, a million dollar lawsuit. What were the
17   claims made against United Payment Center?
18   A. There was none. You got to keep in mind,
19   Mr. Barry, this was social media. So not everything in
20   detail is true                              13:22:54
21   Q. Okay. No. I understand. What's that?
22   A. That's one thing to remember. Social media, not
23   everything is true
24   Q. Sure. Sure. My kids have told me that. I know
25   that. Not everything on social media is true. But        13:23:09

Page 177

1    during this deposition, everything better be true. Okay?
2    So I'm asking you, and I don't know -- I don't know
3    what's true and what's not true from what you've told me
4    and what I see in the video.
5    The video says that you got hit with a -- a --   13:23:26
6    what you called a fat lawsuit for a million dollars. So
7    is -- that's not true? You didn't get hit for a million
8    dollar lawsuit by Navy Federal Credit Union?
9    A. I was involved in a lawsuit --
10   Q. Okay.                                     13:23:41
11   A. -- with Navy Federal Credit Union, and that's
12   the amount that they were requesting, a million dollars.
13   Q. Who was requesting the million dollars?
14   A. Navy Federal Credit Union.
15   Q. Okay. They were suing Bayview or -- or        13:24:00
16   somebody --
17   A. I don't know the name of the company that they
18   were suing, but they were suing them along with everybody
19   on the chain.
20   Q. Okay. And it wasn't that -- that case wasn't --   13:24:08
21   was it about collection harassment or collection abuse?
22   A. No, it was not.
23   Q. Okay. All right. So you -- you called that
24   lawsuit scary, right?
25   A. Yes.                                      13:24:21

45 (Pages 174 - 177)

1    Q    How -- how did -- how did that lawsuit get
2  resolved?
3    A    I didn't really understand how it got resolved
4  but at the end, we were all dismissed of the lawsuit on
5  the chain                                      13:24:37
6    Q    All right   Did you pay anything to get
7  dismissed?
8    A    I did not
9    Q    Okay   So that -- that, to me, Exhibit 13,
10  sounds more of like kind of a tall tale told at a        13:24:50
11  conference by you?
12    A    Yes
13    Q    Okay   Does that lawsuit -- when you said it was
14  scary -- now again, I understand not everything is true
15  on social media and you may have embellished some stuff   13:25:08
16      But my question for you is:  Was that lawsuit
17  more scary than this lawsuit?
18    A    Yes
19    Q    Okay   So the Navy Federal Credit Union one was
20  more scary then this lawsuit?                    13:25:24
21    A    Yes
22    Q    Okay   You did -- it doesn't sound like you had
23  to pay anything out in Navy Federal Credit Union, right?
24    A    Right
25    Q    Okay   Because you were talking in the video --   13:25:34

Page 178

1  as I recall, you were talking about -- worrying about
2  whether or not would you were going to have to get a
3  second mortgage on your house and, you know, et cetera,
4  et cetera.
5      None of that was true?  Or was part of it true?   13:25:45
6  Little bits?
7    A    Part of it was true.  It was scary.
8    Q    Okay.  All right.  Okay.  I'm showing you what's
9  been previously marked as Exhibit 14.
10      (Plaintiff's Exhibit 14 was marked       13:26:10
11      for identification.)
12      "I buy debt and I also have the biggest
13      debt buyers in the country.  They're my
14      clients.  They assign debt to me.  It's
15      contingency.  I'm expensive, bro.  Like      13:26:25
16      other agencies charge 30 percent.  I
17      charge 50 to 60 my way because we're
18      fucking badass.  So I charge them 50
19      percent.  Let's say I collect a million
20      dollars for them, they get 500K, I get       13:26:35
21      500K.  Or in some cases, I'll get 600K,
22      they got 400K.  I get more of a piece
23      because I'm paying for their skip
24      tracing.  I'm using my merchant
25      account, so there's merchant fees.        13:26:40

Page 179

1      There's a lot involved.  So I tell
2      them, "If you want this shit collected,
3      you need to pay me 60 percent my way."
4  BY MR. BARRY:
5    Q.   Okay.  Were you able to hear Exhibit 14?       13:26:56
6    A.   Yes.
7    Q.   Okay.  And was in a you in the video?
8    A.   Yes.
9    Q.   Are those your words?
10    A.   Yes.                                13:27:06
11    Q.   And was this something posted to social media?
12    A.   Yes.
13    Q.   Do those words fairly and accurately depict your
14  thoughts on that subject matter in the video,
15  Exhibit 14.                                13:27:18
16    A.   Yes.
17    Q.   Okay.  So when you say -- and it's -- I -- I --
18  these are your words, when you say, "We're fucking
19  badass," what does that mean?
20    A.   It means that my collectors are good at       13:27:31
21  collecting.
22    Q.   That your collectors are collecting?  And -- and
23  why do you -- why did you pick that particular phrase to
24  describe the way your debt collectors collect?
25    A.   Because I'm Mexican and that's how we speak.   13:27:49

Page 180

1    Q.   Say that one more time.
2    A.   Because I'm Mexican, and that's how we express
3  ourselves.
4    Q.   Okay.  Okay.  But I guess more to the point,
5  what about your collectors makes them badass?       13:28:13
6    A.   That's my opinion.
7    Q.   Okay.  So that's -- that, again, is kind of a --
8  maybe an exaggeration, maybe an embellishment?
9    A.   Sure.
10    Q.   What's that opinion based on though, I guess, is   13:28:37
11  my question?
12    A.   My experience.
13    Q.   Okay.  So when I played that recording for you
14  earlier with Mary saying she was from Process Service
15  Dispatch and going to put a lien on my client's house,   13:28:53
16  would you call that badass?
17    A.   No.  Not at all.
18    Q.   Okay.  What would you call that?
19    A.   I call it stupid.
20    Q.   Okay.  Stupid because it violates the FDCPA,   13:29:04
21  right?
22    A.   Yes.
23    Q.   It's false, right?
24    A.   Correct.
25    Q.   It's deceptive, right?                13:29:14

Page 181

46 (Pages 178 - 181)

| | |
|---|---|
| 1      MR BREES: Objection | 1    Q. And that was publically posted on social media? |
| 2 BY MR BARRY: | 2    A. Yes. |
| 3    Q  It's deceptive, right? | 3    Q. And it was videotaped -- or rather it was |
| 4    A  Yes | 4 video-recorded by your videographer? |
| 5    Q  It's harassing?                    13:29:27 | 5    A. Yes.                          13:31:55 |
| 6      MR BREES: Objection | 6    Q. Does that truly and accurately depict your |
| 7 BY MR BARRY: | 7 thoughts on that subject matter? |
| 8    Q  Right? | 8    A. No. |
| 9    A  Yes | 9    Q. Okay. What part of Exhibit 15 do you find |
| 10    Q  It's abusive?                    13:29:35 | 10 inaccurate?                       13:32:11 |
| 11      MR BREES: Objection | 11    A. So that's strong embellishment for marketing |
| 12      THE WITNESS: Okay | 12 purposes. |
| 13 BY MR BARRY: | 13    Q. Okay. So do you -- you -- I think we |
| 14    Q  Do you think any rules apply to your conduct -- | 14 established earlier that you used TLOXP, which is |
| 15 your company's conduct in the way it collects debts?    13:30:00 | 15 TransUnion's database product to skip trace consumers,    13:32:31 |
| 16    A  Well, the FDCPA does | 16 including my client Mr. Kelly, correct? |
| 17    Q  Okay  Anything else? | 17    A. Correct. |
| 18    A  Not that I can think of right off the top of my | 18    Q. And it sounds like you are -- in this video, in |
| 19 head | 19 Exhibit 15, it sounds like you are giving a lecture to an |
| 20    Q  What do you know about the FCRA, the Fair Credit   13:30:19 | 20 audience; is that correct?              13:32:51 |
| 21 Reporting Act? | 21    A. It's not a lecture, no. |
| 22    A  I don't know anything about that | 22    Q. Okay. Like a presentation? |
| 23    Q  All right  Mr Martinez, I'm showing you what's | 23    A. I was just a guest speaker to talk about |
| 24 been previously marked as Exhibit 15 | 24 wholesaling. |
| 25    ///                              13:30:50 | 25    Q. Okay. And you're a guest speaker to talk about   13:33:01 |
|                                    Page 182 |                                    Page 184 |

| | |
|---|---|
| 1      (Plaintiff's Exhibit 15 was marked | 1 wholesaling real estate properties? |
| 2      for identification.) | 2    A. Correct. |
| 3      "When it comes to real estate, I got | 3    Q. And so your -- your discussion of Dataskip.Io, |
| 4      back into wholesaling in 2020. I | 4 your skip tracing company, sort of bled into that |
| 5      noticed how weak my competitors were.    13:30:57 | 5 presentation?                      13:33:21 |
| 6      So what I noticed -- doing some | 6    A. Correct. |
| 7      research, I noticed that a lot of their | 7    Q. And can you tell me what you thought was |
| 8      data or their skip tracing was | 8 embellishment in Exhibit 15 at that -- at that guest |
| 9      recycled. It was outdated and they're | 9 speaking conference? |
| 10      getting their information from public    13:31:06 | 10    A. Well, being licensed with the three credit    13:33:37 |
| 11      resources like White Pages, Yellow | 11 bureaus. I did have an account with Experian, and |
| 12      Pages, old school stuff. I said no one | 12 TransUnion does own TLO, but I don't have any account |
| 13      is pulling realtime data from credit | 13 with Equifax, and I don't use them for skip tracing with |
| 14      bureaus like I'm doing in debt | 14 my clients. |
| 15      collections. So I'm licensed through    13:31:15 | 15    Q. Okay. So it sounds to me like -- so you    13:33:55 |
| 16      three credit bureaus. All of my stuff | 16 don't -- you may have an account with one of the bureaus, |
| 17      is fresh. I'm like the new household | 17 but you really don't use any of the three bureaus to do |
| 18      name brand for skip tracing and real | 18 skip tracing. You only use TLOXP; that's a product of |
| 19      estate." | 19 Trans Union? |
| 20 BY MR. BARRY:                       13:31:26 | 20    A. Correct.                      13:34:17 |
| 21    Q. Now Mr. Martinez, Exhibit 15, is that you in the | 21    Q. Do you understand TLOXP contains protective |
| 22 video? | 22 drivers' and motor vehicle record information? |
| 23    A. Yes. | 23    A. I know it contains -- yes. I don't know what |
| 24    Q. Are those your words? | 24 you mean by "protected," but, yeah, I know it contains |
| 25    A. Yes.                          13:31:39 | 25 motor vehicle information. Yes.          13:34:36 |
|                                    Page 183 |                                    Page 185 |

Veritext Legal Solutions
866 299-5127

1    Q. Okay. Yeah. And I'm not -- this isn't a quiz
2  on the Drivers Privacy Protection Act. I'm just
3  wondering -- I was wondering, you understand that the
4  TLOXP contains motor vehicle record information, amongst
5  other things?                          13:34:54
6    A. Yeah, I understand that.
7    Q. Okay. It contains -- is there somebody else in
8  the room with you?
9    A. Yeah. One of my cousins just came in and out to
10 use the restroom.                        13:35:04
11   Q. All right. Are they gone now?
12   A. Yes.
13   Q. So the TLOXP also has licensure information for
14 professional licensure, understand it, correct?
15   A. I'm not sure all those functionalities. We      13:35:26
16 don't use them.
17   Q. Okay. All right. But you've got -- but you do
18 have a subscription, and you do use parts of it to
19 identify houses, real estate property owned?
20   A. Correct.                          13:35:43
21   Q. Correct?
22   A. Yeah.
23   Q. And vehicles that are owned, correct?
24   A. Yes. Yes.
25   Q. And boats which are owned?              13:35:50

Page 186

1    A. Yeah. I don't -- I don't know about boats. We
2  don't use it for that.
3    Q. Okay. Okay. But you use it for the motor
4  vehicle part, right?
5    A. Yeah. I mean, I assume -- I assume the          13:36:07
6  collectors use it. I -- I don't use it for that. I
7  don't know how deep, you know, the collectors use TLO.
8    Q. Sure. Fair enough. And I'm not suggesting you
9  necessarily use it, because I think you've told me before
10 you don't do collections, but your collectors use TLOXP   13:36:22
11 to skip trace consumers, correct?
12   A. That's correct.
13   Q. I'm showing you, Mr. Martinez, what's been
14 previously marked as Exhibit 16. I'll play that for you.
15   (Plaintiff's Exhibit 16 was marked          13:36:45
16   for identification.)
17   "I'm not knocking any of my
18   competitors, but I'll blow them out of
19   the water any day. Because they're not
20   licensed through the credit bureaus.       13:36:54
21   We're peeking into people's credit
22   reports and were pulling their phone
23   numbers and anything else we want to
24   get. Once I started skip tracing my
25   own stuff, I started getting a lot of      13:37:03

Page 187

1  more success. And then I started
2  sharing this information with my
3  buddies, started skip tracing for them.
4  A year later, I got everybody telling
5  me, just launch your company, bro. I       13:37:12
6  did at the beginning of this year. And
7  I consider myself now to be the
8  household name brand in skip tracing in
9  the real estate investing industry.
10 Thank you. Appreciate it. So I'm not       13:37:22
11 the most expensive. I'm not the
12 cheapest. But I consider myself the
13 best in the business. Okay? As of
14 right now. Maybe somebody can come in
15 and take me out, but good luck with        13:37:31
16 that."
17 BY MR. BARRY:
18   Q. Okay. Is that you in the video?
19   A. Yes.
20   Q. Are those your words?                13:37:41
21   A. Yes.
22   Q. And did your videographer record that and post
23 it to social media publically?
24   A. Yes.
25   Q. And does Exhibit 16 fairly and accurately depict  13:37:53

Page 188

1  the -- your thoughts on the subject discussed in
2  Exhibit 16?
3    A. No.
4    Q. Okay. What about Exhibit 16 do you take issue
5  with?                               13:38:13
6    A. We're not looking at people's credit reports.
7    Q. Okay. So you said you were peeking at people's
8  credit reports, right?
9    A. Yes.
10   Q. And do you know whether or not you looked at      13:38:21
11 Mr. Kelly's credit record?
12   A. I did not look at his credit report. We don't
13 look at consumers' credit reports.
14   Q. I see. And would it surprise you to learn that
15 there's an inquiring on Mr. Kelly's credit report from    13:38:48
16 United Payment Center?
17   A. It would surprise me.
18   Q. Okay. Well, I'll represent to that you there is
19 an inquiry on his consumer credit report from United
20 Payment Center.                        13:39:03
21   A. When I used to pull credit reports through
22 Experian, I was aware of that, but not through TLO.
23   Q. And so you're saying that when you pull on TLO,
24 you don't -- there isn't an inquiry that shows up, right?
25   A. Correct.                         13:39:28

Page 189

48 (Pages 186 - 189)

1  Q. And why would that be, do you think?
2  A. I don't know. That's something that we have to
3  get with TLO. I have to check though, Mr. Barry, when I
4  stopped using Experian. If we skip traced your client
5  through Experian, then that would make perfect sense.    13:40:00
6  But it's been a long time since I've used Experian, as I
7  think about it.
8  Q. Do you know whether or not -- I'll withdraw the
9  question.
10      Does UPC credit report accounts?    13:42:37
11  A. We do not.
12  Q. You do not?
13  A. We do not.
14  Q. Why not?
15  A. It's expensive, for one.    13:42:48
16  Q. Did you just say expensive?
17  A. Yeah. It's expensive to do that, and I don't
18  find it practical. I don't find it a good business
19  model.
20  Q. To credit report?    13:43:11
21  A. Correct.
22  Q. How much -- can you give me a sense of how much
23  it costs to place a trade line on a credit report for a
24  consumer on an account like Mr. Kelly's?
25  A. I don't know right off the top of my head.    13:43:24

Page 190

1  Q. Is it $1, a nickel, $3?
2  A. I don't know, but I know that it's expensive
3  when I inquired a long time ago.
4  Q. Okay. So its just your sense it's expensive.
5  You don't know specifically how expensive that is.    13:43:39
6      Do you have a sense of how many -- what
7  percentage of accounts you do collect -- if you buy a
8  million dollars worth of accounts, what you typically
9  yield on that set of accounts is? 3 percent? 9 percent?
10  A. I wouldn't know of the top of my head. All    13:43:58
11  files are different. We can have a performing file. We
12  can have a file where we lose a lot of money on it.
13  Q. I'm showing you now what's been marked as
14  Exhibit 17.
15      (Plaintiff's Exhibit 17 was marked    13:44:25
16      for identification.)
17  "Do you have it? Integrity is doing
18  the right thing even when no one is
19  looking. When you're tempted to cheat,
20  to lie or to deceive in order to gain    13:44:36
21  and to win, that's lacking integrity.
22  I run into this lot with my debt
23  collection business, and I have many,
24  many years of experience witnessing
25  good and bad integrity. If you don't    13:44:47

Page 191

1  pay your debts, if you owe a debt
2  collection agency or a creditor and
3  you're dodging to try to have them find
4  you or just, in general, not paying
5  them because you're making excuses to    13:45:00
6  yourself to justify your not paying
7  your debts, then you lack integrity.
8  And I can tell you that integrity will
9  hold you back if you lack it or you
10  will elevate you to places that you    13:45:11
11  could not even imagine were possible if
12  you have it. Let's get it."
13 BY MR. BARRY:
14  Q. Okay. Is that you in that video, Exhibit 17?
15  A. Yes.    13:45:28
16  Q. Are those your words?
17  A. Yes.
18  Q. And did your videographer record that?
19  A. Yes.
20  Q. Was that posted to your social media?    13:45:37
21  A. Yes.
22  Q. Does it fairly and accurately depict your
23  thoughts of the subject discussed in Exhibit 17?
24  A. Yes.
25  Q. Tell me about -- tell me about your -- how you    13:45:49

Page 192

1  implement -- or let me back up.
2      Your discussion of integrity in that video, tell
3  me about how, if at all, you deploy that philosophy at
4  United Payment Center?
5  A. Well, we try to as much as possible with our    13:46:21
6  managers, with our contractors. I admit that we let them
7  kind of do their own thing because we're relying on their
8  experience. Everyone that comes into our organization as
9  a contractor is supposed to be experienced and is
10  supposed to know what they're doing.    13:46:48
11  Q. Do you think that part of your role as the -- as
12  sort of the -- the -- the head of UPC, as the leader of
13  UPC, do you have any responsibility for your contractors
14  and how they collect debts?
15  A. Yes.    13:47:18
16  Q. What do you think your responsibility is with
17  respect to how they collect debts?
18  A. Well, to do my best to make sure they're doing
19  things the right way, of course.
20  Q. Well, how do you accomplish that if you're on    13:47:42
21  the first floor and they're up on the second floor?
22  A. It's difficult.
23  Q. Okay. I understand it's --
24  A. It's nearly impossible.
25  Q. Okay. You said it's almost merely impossible,    13:47:59

Page 193

49 (Pages 190 - 193)

1 but my question for you is: How many steps is it from
2 the first floor to the second floor? 12? 15?
3    A. I wouldn't know -- I wouldn't know the number.
4    Q. Is there an elevator or is it a staircase
5 between those floors?                    13:48:16
6    A. Staircase.
7    Q. Okay. And do you go up to see what's going on
8 in the closers' bullpen from time to time?
9    A. Occasionally, yes.
10    Q. Okay. And did you ever have an opportunity to    13:48:25
11 observe Mr. Rico, Jose Rico, in how he collected debts?
12    A. No.
13       MR. BREES: Objection. Asked and answered.
14 BY MR. BARRY:
15    Q. Go ahead.                    13:48:44
16    A. No.
17    Q. And I think you earlier testified that you don't
18 recognize the voice of Mary from the 866 number, correct?
19    A. Correct.
20    Q. Did you ever -- as the -- leader of United    13:49:03
21 Payment Center, did you ever go up to the second floor
22 and sit with any of the collectors and listen to the way
23 they collected?
24    A. No.
25    Q. All right. Ms. Martinez, I'm showing you what's    13:49:26

Page 194

1 been previously mark add Exhibit 18.
2       (Plaintiff's Exhibit 18 was marked
3       for identification.)
4       "PepsiCo is the leader in building
5       successful CEOs. They're a breeding    13:49:58
6       house badass CEOs. Did you know that
7       there are 16 PepsiCo trained CEOs
8       running Fortune 500 companies right
9       now? How did they do it? They did it
10       by investing into their teams and into    13:50:12
11       their employees. I'm going to run my
12       companies the same way. I've already
13       began to invest as much as I can into
14       my people to make the best damn
15       employees, partners, leaders, managers    13:50:24
16       that we possibly can. So we can blow
17       the fuck up this year, and I hope you
18       do the same. Let's get it."
19 BY MR. BARRY:
20    Q. Okay. So is that you in Exhibit 18?    13:50:37
21    A. Yes.
22    Q. And are those your words?
23    A. Yes.
24    Q. And did your videographer record that
25 Exhibit 18?    13:50:51

Page 195

1    A. Yes.
2    Q. And do those words in Exhibit 18 fairly and
3 accurately depict your thoughts and feelings on the
4 subject matter discussed in Exhibit 18?
5    A. Yes.                    13:51:04
6    Q. Okay. Tell me -- tell me how you've invested in
7 making my employees at United Payment Center and your
8 contractors the best collectors they can possibly be.
9    A. So first and foremost, Mr. Barry, I'm not
10 only -- I'm not only talking about that business in that    13:51:24
11 video. I'm talking about all my businesses.
12    Q. Okay.
13    A. So specifically United Payment Center, I sent my
14 managers to leadership workshops, people workshops. I'm
15 spending a lot of money investing in Cardone Ventures    13:51:4
16 to -- to try and be more compliant because I understand
17 that it's an issue. I recognize the issues within my
18 organizations, and I'm working on fixing them. Right
19 now, I have not decided if I'm going to shut collections
20 down or if we're going to be making some serious    13:51:59
21 adjustments to be a lot more compliant. That's my
22 response.
23    Q. Or to be compliant at all, right?
24    A. Sure.
25    Q. Okay. So I guess my question is -- you know, in    13:52:12

Page 196

1 that video, you -- it was your words and your video it,
2 you know, it had employees. I think it had partners. It
3 had managers, and -- et cetera. And I thought the top
4 one was employees. And my question for you is: With
5 respect to the collectors that are doing this work for    13:52:36
6 you, it doesn't sound to me like you've invested anything
7 in compliance with the Fair Debt Collection Practices
8 Act, with the various licensure requirements in
9 California, in Minnesota and/or with respect to
10 compliance with the -- the Drivers Privacy Protection    13:52:57
11 Act, Fair Credit Reporting Act or otherwise.
12       MR. BREES: Object to the form.
13 BY MR. BARRY:
14    Q. Am I missing something?
15    A. Well, I don't understand if you're asking me a    13:53:12
16 question or -- or what.
17    Q. Yeah. I'll ask -- let me re-ask it so it's --
18 that's -- that's a fair criticism. Let me -- let me
19 recalibrate.
20       It does -- it doesn't sound to me like you've    13:53:25
21 invested anything in compliance under the Fair Debt
22 Collection Practices Act, the Rosenthal Fair Debt
23 Collection Practices Act, the Drivers Privacy Protection
24 Act, the Fair Credit Reporting Act or otherwise. Am I
25 right or am I wrong?    13:53:44

Page 197

50 (Pages 194 - 197)

1    A. You're right.

2    Q. Okay. And you haven't expended any money at

3 this point in obtaining a licensure in any jurisdiction,

4 California or Minnesota, correct?

5    A. Correct.                          13:53:58

6    Q. Mr. Martinez, I'm showing you what's been

7 previously marked as Exhibit 19.

8        (Plaintiff's Exhibit 19 was marked

9        for identification.)

10    "Let's talk debt collections real          13:54:11

11    quick. Very controversial topic.

12    Everyone's entitled to their opinion,

13    but take it from somebody that's been

14    in the business for over 16 years. I

15    run multiple successful agencies on the    13:54:22

16    west coast. How does it work when your

17    debt is sold? It does not mean that

18    you don't owe the debt anymore. It

19    just means that the debt buyer is now

20    entitled to legally collect on that       13:54:33

21    debt. By what means? By putting it on

22    your credit report as a derogatory, bad

23    collection account. And also by filing

24    a lawsuit. There's a lot of people out

25    there that think that once it goes to      13:54:45

Page 198

1    collections, you no longer have to pay

2    it. That's absolutely false. There's

3    some serious consequences by not taking

4    care of it right then and there, before

5    it goes to collections. And once it's      13:54:55

6    in collections, it just gets worse.

7    Let's get it."

8 BY MR. BARRY:

9    Q. Okay. So that last phrase -- let me ask you,

10 Exhibit 19, is that you in the video?          13:55:08

11    A. Yes.

12    Q. Are those your words?

13    A. Yes.

14    Q. Did your videographer record that for posting to

15 social media?                                 13:55:20

16    A. Yes.

17    Q. And does that -- does that truly and accurately

18 reflect your thoughts and feelings on the subject matter

19 discussed in Exhibit 19?

20    A. Yes.                                    13:55:36

21    Q. Okay. So let me ask you this: Why are things

22 going to get -- I -- I think you said, and I don't want

23 to put words in your mouth. We can go and I'll -- let me

24 just go back quick and hear it again.

25        (Video was played into the record.)     13:55:57

Page 199

1 BY MR. BARRY:

2    Q. When you say, "Once it goes to collections, it

3 just gets worse," first I think you talked about

4 derogatory credit reporting. Then you talked to -- about

5 lawsuits, nand then you talked about collections where it   13:56:09

6 just gets worse.

7    Why does it just get worse in collections?

8    A. In my opinion, from my experience, you start

9 having a bunch of collection efforts, and you're

10 jeopardizing a lawsuit if it's in statutes and it's a     13:56:27

11 large balance and a creditor has a appetite for it, they

12 will sue.

13    Q. But now you, you don't sue, right?

14    A. No, I don't sue. That's not my model. Doesn't

15 mean it doesn't happen though.                13:56:47

16    Q. Sure. But it's helpful to paint a picture for

17 consumers that it might happen, right?

18        MR. BREES: Object to the form.

19 BY MR. BARRY:

20    Q. I'm sorry. Your answer was?             13:57:01

21    A. On social media, yes, I suppose. It's -- it's

22 good entertainment.

23    Q. I see. It's entertainment on social media. How

24 about in a phone call? Is it entertainment in a phone

25 call?                                         13:57:20

Page 200

1    A. I wouldn't know.

2    Q. Well, you heard that -- you heard that call in

3 Exhibit 2. You listened to that call. It was left by

4 Mary.

5    And my question for you is: When you heard that    13:57:32

6 call that your employee, Mary, left for my client at his

7 house talking about Process Service Dispatch, liens, case

8 numbers, firm, do you think that was entertainment,

9 social media entertainment for my client?

10    A. I personally would not post that as       13:57:54

11 entertainment, but that's a matter of opinion.

12    Q. What do you think a jury's going to think about

13 a call like that?

14        MR. BREES: Object. Calls for speculation.

15        THE WITNESS: I don't know. I'm not the jury,   13:58:09

16 Mr. Barry.

17 BY MR. BARRY:

18    Q. Okay. Well, you're going to meet the jury.

19 What do you think they're going to think about that when

20 they meet you?                                13:58:19

21    A. I don't know what they're going to think. I

22 don't want to assume what they're going to think.

23    Q. That's probably true.

24    Okay. Mr. Martinez, I'm showing you what's been

25 previously marked as Exhibit 21.              13:58:48

Page 201

51 (Pages 198 - 201)

| | Page 202 |
|---|---|
| 1 | (Plaintiff's Exhibit 21 was marked |
| 2 | for identification.) |
| 3 | "Which creditors will sell your |
| 4 | collection account and which ones |
| 5 | won't? Most of them will depending on    13:58:56 |
| 6 | how old the debt is. If the debt is |
| 7 | past four years to seven years, to even |
| 8 | ten years, most likely they will settle |
| 9 | the debt, and most of it is credit |
| 10 | cards, auto deficiencies, overdraft    13:59:08 |
| 11 | checking accounts. I mean, the list |
| 12 | goes on. Which ones won't? Typically, |
| 13 | it's going to be medical bills and |
| 14 | student loans. Typically, those are |
| 15 | the ones that will not settle.    13:59:17 |
| 16 | Although now, the government is |
| 17 | starting to forgive some of the student |
| 18 | loans. How's that going to work? I |
| 19 | have no fucking idea. Is it a good |
| 20 | idea? Probably not. But are they    13:59:25 |
| 21 | doing it? Yes. Let's get it." |
| 22 | BY MR. BARRY: |
| 23 | Q. All right. Mr. Martinez, with respect to |
| 24 | Exhibit 21, is that you in Exhibit 21? |
| 25 | A. Yes.    13:59:39 |

| | Page 203 |
|---|---|
| 1 | Q. Are those your words? |
| 2 | A. Yes. |
| 3 | Q. Was that a video recorded by your videographer |
| 4 | for posting to social media? |
| 5 | A. Yes.    13:59:48 |
| 6 | Q. Does Exhibit 21 fairly and accurately reflect |
| 7 | your thoughts and feelings on the subject matter |
| 8 | discussed in Exhibit 21? |
| 9 | A. Yes. |
| 10 | Q. I want to ask you, you make -- there was some    14:00:02 |
| 11 | discussion about student loan forgiveness in that Exhibit |
| 12 | 21, correct? |
| 13 | A. Yes. |
| 14 | Q. And you seem to express some dismay that student |
| 15 | loans might be for given.    14:00:22 |
| 16 | MR. BREES: Object to the form. |
| 17 | BY MR. BARRY: |
| 18 | Q. You seem to express some dismay over the fact |
| 19 | that student loans might be forgiven; is that correct? |
| 20 | A. Yes.    14:00:37 |
| 21 | Q. Okay. And why do you feel like student loans |
| 22 | shouldn't be forgiven? |
| 23 | A. That's my opinion. |
| 24 | Q. Generally speaking, do you think that -- do you |
| 25 | think that any debt should ever been forgiven?    14:00:50 |

| | Page 204 |
|---|---|
| 1 | A No |
| 2 | Q And what is your thought then -- or what's |
| 3 | your -- what's your philosophy on that, on debt |
| 4 | forgiveness? Why shouldn't debts ever be forgiven? |
| 5 | A Well, Mr Barry, I had bad credit and a lot of    14:01:14 |
| 6 | debt at one paint, and I had to pay off all my debts So |
| 7 | why shouldn't everyone else? |
| 8 | Q Okay Fair enough And how about in a |
| 9 | situation where the debt is 17 years old? Should that |
| 10 | debt be forgiven or -- or uncollectible?    14:01:34 |
| 11 | A No |
| 12 | Q So in your mind there is -- how about a debt |
| 13 | that's 100 years old? Should that be forgiven? |
| 14 | A Sure |
| 15 | Q Okay So somewhere there is some number between    14:01:50 |
| 16 | 17 years and 100 years that a debt should be forgiven? |
| 17 | A Sure |
| 18 | Q What is that number? |
| 19 | A Let's say death That's my opinion |
| 20 | Q I'm sorry?    14:02:06 |
| 21 | A Maybe at the point of death Maybe debt should |
| 22 | no longer be valid |
| 23 | Q Okay So as long as you die before you pay it, |
| 24 | that's okay? |
| 25 | A Or bankruptcy    14:02:31 |

| | Page 205 |
|---|---|
| 1 | Q. Okay. But barring a bankruptcy, you think that |
| 2 | debt should be collected -- collectable against a |
| 3 | consumer until they die? |
| 4 | A. Sure. It's my opinion. |
| 5 | Q. And you kind of cut out there. Let me ask the    14:02:44 |
| 6 | question again. |
| 7 | You think debt should be collectible until a |
| 8 | consumer dies? |
| 9 | A. If they don't file bankruptcy, yes, that's my |
| 10 | opinion.    14:03:00 |
| 11 | Q. All right. Mr. Martinez, I'm showing what's |
| 12 | been previously marked as Exhibit 22. |
| 13 | (Plaintiff's Exhibit 22 was marked |
| 14 | for identification.) |
| 15 | "Once you pull your list, my company,    14:03:31 |
| 16 | Dataskip.Io, skip traces it. How did I |
| 17 | start this company? Well, my strong |
| 18 | background in debt collections. I've |
| 19 | been skip tracing for 18 years in any |
| 20 | industry. I'm what you call a skip    14:03:40 |
| 21 | trace master. I can get your cell |
| 22 | phone number. I can get your |
| 23 | voice-over IP number, your landline, |
| 24 | your social, your date of birth, your |
| 25 | shoe size. I can get everything on    14:03:49 |

52 (Pages 202 - 205)

1    you. That's what I do. So I notice
2    when I got into this business and I
3    started pulling lists, I started hiring
4    mentors, going to seminars like this,
5    taking courses, doing all this stuff,        14:03:56
6    and I learned how to pull lists, and I
7    started skip tracing them with real
8    estate skip tracing companies out
9    there. Now mind you, I'm licensed
10   through the credit bureaus. Im         14:04:07
11   licensed through Experian, TransUnion.
12   TransUnion is partnered up with Equifax
13   now, so I have all three bureaus. So
14   normally, these skip tracing companies
15   in real estate, they're not licensed to      14:04:15
16   credit bureaus. They're not giving you
17   credit bureau data. They're giving you
18   free data, like White Pages. On
19   occasion, I say, What do you get when
20   you get when you pay inexpensive data?      14:04:24
21   You get cheap data. What's worse than
22   that? Free. Free. You're losing
23   money. You're bleeding money. White
24   Pages is free. Don't use White Pages
25   unless you want to chase your tail."      14:04:32

Page 206

1 BY MR. BARRY:
2    Q. All right. Mr. Martinez, were you able to see
3 and hear Exhibit 20 (sic)?
4    A. Yes.
5    Q. Is that you in Exhibit 22?        14:04:49
6    A. Yes.
7    Q. Are those your words in Exhibit 22?
8    A. Yes.
9    Q. And was that video made by your videographer for
10 posting to public social media?        14:05:03
11   A. Yes.
12   Q. So does that video fairly and accurately depict
13 your thoughts and feelings on the subject discussed?
14   A. Not entirely.
15   Q. Okay. What in Exhibit 22 do you take issue      14:05:14
16 with?
17   A. The credit bureau part. Again, that's a
18 marketing strategy that's not necessarily true.
19   Q. Okay. So the part about -- the part about you
20 being a member of all three credit bureaus was not true?      14:05:32
21   A. Correct.
22   Q. So who are you lying to when you're telling this
23 at these presentations? Who's the crowd that you're
24 making this stuff up and telling?
25   A. They're all real estate people.      14:05:50

Page 207

1    Q. Okay. Real estate --
2    A. They're learning marketing.
3    Q. So it's real estate people you're lying to about
4 your skip tracing ability, right?
5    A. Correct.        14:05:59
6    Q. And what's the purpose of lying to them about
7 that?
8        MR. BREES: Object to the form.
9        THE WITNESS: There's a lot of skip trace
10 companies in real estate that are selling recycled data,      14:06:12
11 and they claim to have access to credit bureau data,
12 which they don't either. And since TLO is the closest
13 thing to it, that's why I advertise that way. TLO is the
14 closest thing to credit bureau data.
15 BY MR. BARRY:        14:06:36
16   Q. So this TLOXP that you use, why don't you just
17 say "I use TLOXP," to these groups?
18   A. Because they don't know what that is.
19   Q. Well, why don't you explain what it is?
20   A. It's more powerful for marketing purposes by      14:06:57
21 using the -- the word -- the terminology "credit bureau"
22 knowing that TLO is owned by TransUnion. And I used to
23 use Experian. So a lot of these videos are older videos.
24 I used to use Experian as well.
25   Q. Okay. But -- but you just told me in this video      14:07:25

Page 208

1 that -- that you -- you lied about the fact that you were
2 using Experian, that all you use for this skip tracing
3 Dataskip.io is TLOXP, right?
4    A. Correct. Yes.
5    Q. Okay.        14:07:40
6    A. That -- that doesn't mean though, Mr. Barry,
7 that I don't have access to Experian. I did have access
8 to Experian.
9    Q. Okay. When? When did you -- when did you --
10 I'm sorry?        14:07:56
11   A. If -- if I needed access to Experian, I still
12 have access to it. I still have my Experian account. I
13 just don't use it anymore. It's too expensive.
14   Q. You have a subscriber account with Experian?
15   A. I have a collection account with Experian.      14:08:12
16   Q. When you say "collection account," you're
17 authorized to -- to access Experian credit reports?
18   A. Correct. I am.
19   Q. For skip tracing or to pull the full credit
20 report?        14:08:27
21   A. For both.
22   Q. Okay. Do you ever pull full credit reports?
23   A. Not anymore.
24   Q. And why not?
25   A. It's too expensive.      14:08:36

Page 209

53 (Pages 206 - 209)

**Page 210**

1  Q  Well, how much does it cost to pull a full
2  credit report from Experian?
3    A  I don't remember the exact amount, but I
4  remember it's pricey
5    Q  Okay  And you're trying to keep your costs    14:08:48
6  down, I assume?
7    A  Correct
8    Q  Tell me what your total training budget was for
9  last year, if you know, for legal compliance, you know,
10  Fair Debt Collection Practices, Rosenthal, TCPA, DPPA,    14:09:03
11  any other clause that you're trying to comply with?
12    A  I apologize, but you got caught off  I just
13  heard -- tell me what's your budget, and then FDCPA
14    Q  Okay  I'll try it again
15      Tell me what your total budget was last year for    14:09:24
16  compliance training for your employees?
17    A  I had no budget for that
18    MR BARRY:  It's ten after four here
19  Mr Brees, why don't we take a break?  Let everybody --
20  maybe like a five-minute break, and I think I'm pretty    14:09:47
21  close  Okay?
22    MR BREES:  Okay
23    THE VIDEOGRAPHER:  Okay  The time is 2:09 p m
24  We're going off the record
25    (Discussion held off the record )    14:10:01

**Page 211**

1    THE VIDEOGRAPHER:  The time is 2:28 p.m. We're
2  back on the record.
3  BY MR. BARRY:
4    Q.  Thank you, Mr. Martinez.  You're back on the
5  record.  You're still under oath.    14:28:12
6      During the course of the deposition today, have
7  you texted with anybody?
8    A.  Yes.
9    Q.  Who have you texted with?
10    A.  My wife and one of my business partners.    14:28:24
11    Q.  Okay.  And did anything texted to your wife
12  relate to this deposition?
13    A.  No.
14    Q.  Okay.  Did anything that you texted to your
15  business partner -- what business partner was that, that    14:28:40
16  you texted to?
17    A.  For real estate and for Solar.
18    Q.  Oh, I'm sorry.  Real estate and Solar?
19    A.  Correct.
20    Q.  Okay.  And what -- what's that person's name?    14:28:54
21    A.  Vic Heredia.
22    Q.  Okay.  Vic Heredia.  And I'm sorry, your -- I
23  didn't get your wife's name.
24    A.  Natalie Martinez.
25    Q.  What's Natalie's middle name?    14:29:15

**Page 212**

1    A  Esperanza
2    Q  Besides any of the things that we've already
3  discussed, is there anything else that you can recall
4  about this case that you can tell me today?
5    A  No    14:29:47
6    Q  Is there anything else can you think of that
7  might help to refresh your memory about this case that we
8  haven't already discussed in terms of documents?
9    A  No
10    Q  I think you indicated earlier that your -- your    14:30:03
11  attorneys had identified where Mr  -- where they believe
12  Mr Rico worked, Jose Rico is that correct?
13    A  No  I never said that
14    Q  I thought you told me he -- he, maybe, worked
15  for Aaron Gestl?    14:30:27
16    A  Yeah  My attorneys didn't identify that,
17  though  I -- I think that that's where he may be
18  working
19    Q  Okay  All right  I'm sorry  That was
20  something you identified, and that was because of rumors    14:30:39
21  around the collection agency there at UPC?
22    A  Correct
23    Q  And you don't know Aaron Gestl's company name,
24  but you know that it's in Montclair, California, correct?
25    A  Correct    14:30:54

**Page 213**

1    Q.  If you think of anything or remember anything
2  else about this case, will you be sure to let your lawyer
3  know so they can pass that information along to me?
4    A.  Of course.
5    Q.  Mr. Galvez's first name is Christopher, correct?    14:31:08
6    A.  Yes.
7    MR. BARRY:  Okay.  That's all I got.  I'll pass
8  the witness.  Mr. Brees?
9    MR. BREES:  I need a couple of minutes here, if
10  that's all right.    14:32:26
11    MR. BARRY:  Sure.
12    THE VIDEOGRAPHER:  Off the record then, Counsel?
13    MR. BREES:  Yeah.  Just three minutes, please.
14    THE VIDEOGRAPHER:  Time is 2:32 p.m. We're going
15  off the record.    14:32:37
16    THE VIDEOGRAPHER:  The time is 2:36 p.m. We're
17  back on the record.
18    MR. BREES:  I don't have any questions of the
19  witness.  We will read and sign.
20    MR. BARRY:  Okay.  Thank you, Mr. Martinez.    14:36:28
21    THE WITNESS:  Thank you.
22    (The deposition proceedings
23      were concluded at 2:37 p.m..)
24
25

54 (Pages 210 - 213)

1 STATE OF CALIFORNIA )
               ) SS.
2 COUNTY OF LOS ANGELES )
3
4
5
6
7     I, the undersigned, declare under penalty of perjury
8 that I have read the foregoing transcript, and I have
9 made any corrections, additions or deletions that I was
10 desirous of making; that the foregoing is a true and
11 correct transcript of my testimony contained therein.
12
13     EXECUTED this     day of     , 2023,
14 at         ,      .
      (City)         (State)
15
16
17
18
    _____
      MICHAEL MARTINEZ
19
20
21
22
23
24
25
                        Page 214

1 DANIEL BREES, ESQ.
2 DBREES@GRSM.COM
3            April 10, 2023
4 RE: Brian Kelly vs. United Payment Center, Inc.
5 March 30, 2023, MICHAEL MARTINEZ, JOB NO. 5815674
6 The above-referenced transcript has been
7 completed by Veritext Legal Solutions and
8 review of the transcript is being handled as follows:
9 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, notating the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25
                        Page 216

1     REPORTER'S CERTIFICATE
2
3
4     I, NATALIA AGUIRRE, RPR, a Registered Professional
5 Reporter, certify;
6     That the foregoing proceedings were taken before me
7 at the time and place therein set forth, at which time
8 the witness was put under oath by me;
9     That the testimony of the witness, the questions
10 propounded, and all objections and statements made at the
11 time of the examination were recorded stenographically by
12 me and were thereafter transcribed;
13     That before completing of the proceedings, review of
14 the transcript was requested;
15     That the foregoing is a true and correct transcript
16 of my shorthand notes so taken.
17     I further certify that I am not a relative or
18 employee of any attorney of the parties, nor financially.
19 Interested in the action.
20     I declare under penalty of perjury under the laws of
21 California that the foregoing is true and correct.
22     Dated April 10, 2023.
23
24     *Natalia Aguirre*
25     NATALIA AGUIRRE, RPR
                        Page 215

1 _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2   Transcript - The witness should review the transcript and
3   make any necessary corrections on the errata pages included
4   below, notating the page and line number of the corrections.
5   The witness should then sign and date the errata and penalty
6   of perjury pages and return the completed pages to all
7   appearing counsel within the period of time determined at
8   the deposition or provided by the Federal Rules.
9 __ Federal R&S Not Requested - Reading & Signature was not
10   requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                        Page 217

55 (Pages 214 - 217)

```
 1  CASE: Brian Kelly vs. United Payment Center, Inc.
 2  WITNESS: MICHAEL MARTINEZ  (#JOB NO 5815674)
 3          E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  WITNESS              Date
25
                              Page 218
```

Veritext Legal Solutions
866 299-5127

**[& - 2023]**

| & |
|---|
| **&** 122:24 216:23 217:9 |

| 0 |
|---|
| **0:22** 1:7 2:8 6:14 |

| 1 |
|---|
| **1** 4:8 41:22 42:3 57:15,16 58:13 92:5,7 94:22 191:1 217:1 |

**10** 4:20 31:16 162:15,16 163:15,25 165:10 215:22 216:3
**100** 3:15 44:18 140:22 141:7 158:14 159:1 204:13,16
**100,000** 45:11 45:15
**1099** 19:7,8 23:11 49:19,23 91:14
**1099's** 91:11
**11** 4:21 34:1,8 34:13 168:22 168:23 169:17 169:23 171:10
**11:57** 143:3,5
**12** 4:22 97:16 170:4,5 171:11

171:13,20,22 194:2
**12150** 8:2
**12:30** 143:6
**12:38** 143:7,10
**13** 4:23 173:13 173:14 174:13 174:23 178:9
**133** 4:13
**13715** 27:7
**14** 4:24 26:5,6 179:9,10 180:5 180:14,15
**144** 4:14
**145** 58:16
**148** 4:15
**15** 4:25 7:23 31:17,18 37:23 100:4 112:8,10 112:17,22 182:24 183:1 183:21 184:9 184:19 185:8 194:2
**15,000** 110:9
**150,000** 44:18 45:2 163:1
**151** 4:16
**156** 4:18
**16** 5:1 187:14 187:15 188:25 189:2,4 195:7 198:14
**160** 4:19

**162** 4:20
**168** 4:21
**17** 5:2 112:2 159:22,23 160:1 191:14 191:15 192:14 192:23 204:9 204:16
**170** 4:22
**173** 4:23
**179** 4:24
**1799** 1:7 2:8 6:14
**18** 5:3 87:6,7 87:10 131:8,12 131:13 195:1,2 195:20,25 196:2,4 205:19
**183** 4:25
**187** 5:1
**19** 5:4 198:7,8 199:10,19
**190** 58:15,19
**1900** 3:15
**191** 5:2
**195** 5:3
**198** 5:4

| 2 |
|---|
| **2** 4:11 61:7,8 61:21 62:7,16 62:25 64:10 67:13,24 68:22 91:8 130:4,8 201:3 |

**20** 92:10 93:14 207:3
**20's** 141:9 143:18,23
**200** 110:8
**2001** 87:12,25 96:24 131:9
**2005** 35:3,4 111:22
**2006** 36:8
**2007** 86:24 96:22
**2011** 36:8,15,17 122:17
**2012** 36:21,22 37:11 122:17
**2014** 34:15 37:11,19,23
**2015** 34:17,17 34:20
**2019** 174:2 175:12,13
**202** 5:5
**2020** 150:9 183:4
**2022** 14:17,22 28:11 59:18 64:4,6
**2022413072** 62:5 68:2 130:22
**2023** 1:16 2:16 6:2 59:19 214:13 215:22 216:3,5

Page 1

**[2025.520 - aaron]**

| | | | |
|---|---|---|---|
| **2025.520** 216:9 216:12 | **300** 59:6 | **550** 105:4 | 159:10,17 162:2,2 |
| **205** 5:6 | **300,000** 148:6,6 148:24 | **55401-1353** 3:5 | **80** 38:21,22,23 |
| **21** 5:5 201:25 202:1,24,24 203:6,8,12 | **300-9038** 3:4 | **55402** 3:16 | **800** 77:10 130:5,5 |
| **22** 5:6 205:12 205:13 207:5,7 207:15 | **300k** 149:2 | **57** 4:8 | **866** 60:10,24 62:4 68:1 130:21 145:4,9 194:18 |
| **2221** 3:9 | **308** 3:10 | **5815674** 216:5 218:2 | |
| **226** 62:2 67:15 130:19 | **30th** 6:2 93:21 | **5th** 3:15 | **866-219-3343** 3:11 |
| **23rd** 59:19 93:21 | **33** 20:8,8,10 108:12,14,15 | **6** | **8:04** 2:16 6:2 |
| **243-6645** 144:25 145:13 | **333** 3:4 | **6** 4:15 147:24 148:1 | **9** |
| **29** 58:4 64:4 | **340** 58:22 59:6 | **60** 179:17 180:3 | **9** 4:19 34:13 49:19 160:18 160:19 161:19 162:9 191:9 |
| **29034** 215:24 | **362-2653** 146:25 | **600** 104:14 | |
| **29th** 64:5 | **4** | **600k** 179:21 | **91706** 27:8 |
| **2:00** 141:22 | **4** 4:13 133:17 133:19 136:3 138:14 140:6 143:16,17 | **61** 4:11 | **91739** 8:3 |
| **2:09** 210:23 | **400k** 179:22 | **612-379-880** 3:5 | **92108** 3:10 |
| **2:28** 211:1 | **45** 88:5 | **651** 144:25 145:13 146:25 | **99** 49:19 |
| **2:30** 142:25 | **5** | **7** | **9:46** 69:3 |
| **2:32** 213:14 | **5** 4:14 144:16 144:17,20 145:8,13,18 146:2,13,23 | **7** 4:4,16 151:9 151:11 153:25 154:1 | **9:57** 69:6 |
| **2:36** 213:16 | **5,000** 110:7 | **70** 4:12 | **a** |
| **2:37** 213:23 | **50** 27:12,14 80:25 81:5 179:17,18 | **709-8145** 60:11 60:24 62:4 68:1 130:21 145:4,9 | **a.m.** 2:16 6:2 69:3,6 143:3,5 |
| **3** | **50/50** 27:9,11 | **745** 105:8 | **aaron** 28:13,15 28:16,17 29:24 30:1,2 31:9 51:22,24,25 54:11,14,19 62:21 64:8 212:15,23 |
| **3** 4:12 70:19,23 71:3 191:1,9 | **500** 31:14 195:8 | **795** 104:15 | |
| **3/21/2023** 4:12 | **500k** 179:20,21 | **8** | |
| **30** 1:16 2:16 130:13 142:9 142:22,23,24 143:2 179:16 216:5 217:1 | | **8** 4:18 155:23 156:1 157:10 158:9,19 | |

[abbreviations - agencies]

abbreviations
    114:14
abide   100:9,12
ability   14:1,4,7
    51:1,4 53:25
    97:17 100:25
    208:4
able   42:9 62:6
    101:3 115:14
    135:24 149:5
    157:8 180:5
    207:2
above   216:6
absentee
    125:20 126:13
abso   170:9
absolutely
    66:12 80:12
    105:13,16
    116:1 141:1
    171:3 199:2
abuse   177:21
abusive   182:10
accept   128:21
acceptance
    35:6,8,9,17,22
    122:8
access   23:9,11
    24:17 89:19
    90:21 119:6
    172:17,19
    208:11 209:7,7
    209:11,12,17
accomplish
    193:20

account   16:23
    21:1 28:10
    33:21 55:24
    56:2,5,11,13
    71:24 84:23
    85:6,21 86:7
    113:6 114:23
    133:11 134:6
    134:17,20
    135:8,17
    137:23 152:6
    152:25 156:11
    156:21,24
    157:23 160:23
    164:18,20,22
    164:24 165:1
    169:5 170:8,24
    171:2 175:5
    176:9,11
    179:25 185:11
    185:12,16
    190:24 198:23
    202:4 209:12
    209:14,15,16
accounting
    119:17
accounts   20:8
    20:10,14 23:13
    24:8,12,17
    38:18 49:21
    56:6 109:1,4,8
    109:10,11
    110:8 149:15
    152:9 154:7
    161:10 168:15

170:14 190:10
    191:7,8,9
    202:11
accurate   80:22
    149:21 158:13
    158:14,25
    163:23
accurately
    149:17 153:20
    169:25 171:19
    174:20 180:13
    184:6 188:25
    192:22 196:3
    199:17 203:6
    207:12
acquaintances
    135:23
acquiring   33:3
act   40:22,25
    73:23 99:15,21
    102:9 104:7
    121:7,10,12,25
    122:4,20 160:2
    160:11,15
    182:21 186:2
    197:8,11,11,22
    197:23,24,24
action   6:19
    92:23 170:17
    215:19
actions   92:18
active   84:24
    85:3
activities   40:16
    112:25 125:19

126:24 165:11
activity   132:22
actually   67:4
    123:25 125:2
    169:9 175:17
ad   114:22
add   93:23
    195:1
additional
    109:7
additions   214:9
address   8:1
    18:17 27:6
    67:4,5 82:15
    114:8
adjustments
    196:21
admin   120:8
administration
    16:4,8 17:1
    27:20,25 50:2
    50:4
admit   138:20
    193:6
adp   89:19,22
    89:23 90:5,21
advertise
    208:13
advice   101:6
affected   121:11
affirmative
    4:10
age   112:5
agencies   81:21
    83:15 97:25

**[agencies - appears]**

125:3 148:25
179:16 198:15
**agency** 34:23
37:4,8 64:25
65:5 66:4 68:8
69:25 78:23
80:14 82:3
83:10 96:1
100:22 101:17
124:4 127:1
151:20,22,23
173:18 192:2
212:21
**agents** 126:16
**ago** 10:22
17:21,24 18:3
22:6,11 28:5
30:4,5 84:4
105:5 106:15
111:7 120:4
141:16 162:22
191:3
**agree** 6:8 26:9
33:8 77:23
78:6
**agreed** 44:7
**agreement**
108:4
**aguirre** 1:20
2:17 6:18
215:4,25
**ahead** 113:11
113:15,16
134:12 142:4,5
142:16,18

147:24 151:9
152:18 155:23
160:18 167:7
194:15
**ain't** 149:2
**alcohol** 13:25
14:3 144:3
**alias** 60:3,6
108:18
**aliases** 107:21
**aligned** 30:9
127:10
**allegations**
15:18 16:13
52:3,7,12,16
55:1,15,18
56:17,24
**alleged** 33:1,4
56:14 111:25
111:25
**allow** 95:25
96:5,5 146:4
147:18
**allows** 76:14
**allstate** 4:12
42:18,20 43:15
43:20 44:5,7
44:12 47:25
48:3 81:14
128:16
**altered** 75:24
**amended** 4:9
57:7 58:5,15
59:6,19 92:18
112:1,2

**american**
101:19,22
**amount** 102:19
102:25 177:12
210:3
**anaheim**
137:13
**analyze** 154:9
**anaya** 12:5,8
**angeles** 8:5,7
8:14 79:4 87:3
87:4,13,15
214:2
**answer** 4:9 5:9
43:12 53:19,19
55:6,12 56:21
57:2,7 58:15
58:20 59:6,8
59:11,18,19
66:2 75:19
78:7 91:3
94:10 99:17
102:21 130:2
134:14 147:10
160:8 165:20
167:8 200:20
**answered** 54:6
65:25 91:2
127:2 129:1,5
134:10 165:7
194:13
**answering** 58:5
**antonio** 98:22
151:15

**anybody** 9:18
10:7 25:18
26:9 32:13
39:16 46:7
47:23 59:25
104:3 109:21
129:24 147:9
165:12 172:2
172:24 211:7
**anybody's**
109:18
**anymore**
125:17 150:8
198:18 209:13
209:23
**anyway** 129:2
129:5
**apc** 3:8
**apologize** 71:1
73:8 109:20
111:16 117:8
146:20 210:12
**apparently**
112:15
**appear** 97:4
**appearance**
6:22,23
**appearances**
97:3
**appeared** 96:17
**appearing**
216:18 217:7
**appears** 58:15
58:16,17 75:12
146:11,24

Page 4

[appetite - automated]

| | | | |
|---|---|---|---|
| **appetite** 200:11 | **asked** 13:17 | **assist** 74:9 | 106:21 152:13 |
| **application** | 65:25 109:19 | **assisted** 140:3 | 170:20 215:18 |
| 49:16 79:16,17 | 121:2 127:2 | **associated** | **attorney's** |
| 80:14,20 81:3 | 129:1,4,8,9 | 147:5 | 102:20 104:9 |
| 81:5,7 | 134:10 151:21 | **associates** | 106:24 107:11 |
| **applications** | 165:7 194:13 | 36:25 37:20 | 163:5 |
| 83:1 91:4 | **asking** 22:2 | 91:15,21 92:2 | **attorneys** 15:13 |
| **applied** 41:5 | 39:13 44:1 | 95:4,10,14 | 15:18,21,23 |
| **apply** 40:16 | 53:23 65:21,22 | 122:25 | 43:10,14 47:22 |
| 182:14 | 94:20 106:12 | **association** | 52:25 59:10 |
| **applying** 148:4 | 109:4 112:15 | 101:20,23 | 93:17 94:3,7 |
| 148:22 | 115:19,19 | **associations** | 94:15,18 |
| **appreciate** | 116:23 135:10 | 101:25 | 113:22 127:14 |
| 103:16 188:10 | 135:10,11 | **assume** 19:2 | 127:15 128:4 |
| **approached** | 140:13,17 | 68:21 90:20 | 173:5,9 212:11 |
| 151:20 | 170:22 172:23 | 120:20 145:8 | 212:16 |
| **appropriate** | 177:2 197:15 | 166:11 187:5,5 | **audience** 158:2 |
| 93:4 120:11 | **ass** 153:4 171:4 | 201:22 210:6 | 158:4 165:6,8 |
| **approved** 80:9 | **asserted** 92:23 | **assuming** | 184:20 |
| 80:11 | **assign** 39:1 | 138:24 | **audio** 6:7 18:7 |
| **approximate** | 71:13 107:24 | **attend** 98:17,17 | **authority** 63:20 |
| 53:10,11 | 112:12,18 | 102:3 | **authorization** |
| **april** 215:22 | 167:25 168:2 | **attention** 61:22 | 135:1 |
| 216:3 | 176:1 179:14 | 63:2 64:16 | **authorize** |
| **area** 75:14,25 | **assigned** 20:18 | 92:4 111:24 | 134:22 135:18 |
| 76:16,21 79:4 | 21:3 24:18 | 113:9 130:14 | **authorized** |
| 152:24 | 25:10 175:5 | 144:15 | 135:12 172:5 |
| **argue** 47:19 | **assigning** 23:13 | **attorney** 6:24 | 209:17 |
| **arizona** 137:12 | 94:25 95:1 | 11:6,7 12:7,17 | **authorizing** |
| **arrange** 105:18 | **assignment** | 42:25 43:6,8,8 | 135:13 |
| **arrest** 88:1,2 | 69:16,25 | 43:12 44:1 | **auto** 20:20 |
| **arrested** 86:14 | **assignments** | 59:8 94:16 | 169:10 202:10 |
| 86:16 87:6 | 70:10 | 99:18 101:7 | **automated** |
| 88:9 | **assigns** 156:19 | 103:1,14,25 | 115:8 |
| | | 104:1 106:19 | |

Page 5

**[ave - bathroom]**

| | | | |
|---|---|---|---|
| **ave** 3:4 | 111:22 142:11 | **banks** 169:10 | 133:21 134:11 |
| **average** 44:16 | 142:24 143:11 | **barcelona** | 134:15 141:21 |
| 45:3,5 | 143:14 146:23 | 27:20,22 31:3 | 142:1,4,8,16,23 |
| **avoid** 125:6 | 154:3 159:4 | **barcelona's** | 143:1,12 |
| 127:5 | 167:15 169:15 | 28:1 | 144:19 145:16 |
| **award** 128:5 | 170:22 173:24 | **barring** 205:1 | 145:17,22,25 |
| **awarded** 104:9 | 183:4 192:9 | **barry** 3:3,3 4:4 | 146:15,19,22 |
| 105:4,7 | 193:1 199:24 | 6:24,24 7:14 | 147:15,22,23 |
| **aware** 14:24 | 211:2,4 213:17 | 21:18,25 31:25 | 149:4 153:6 |
| 32:17 40:15 | **backed** 152:5 | 41:20 42:8,10 | 154:13 157:7 |
| 48:3 60:2 | **background** | 43:3 48:8,13 | 159:7 160:7 |
| 78:24 81:17 | 50:16 205:18 | 48:17 49:3 | 161:18 163:14 |
| 89:15 101:12 | **bad** 44:25,25 | 53:22 55:4,8 | 165:9 167:10 |
| 101:15 104:16 | 191:25 198:22 | 56:20 57:18 | 169:16 171:6 |
| 105:3,7 106:5 | 204:5 | 59:15 61:3,10 | 174:12 176:19 |
| 106:13 107:16 | **badass** 179:18 | 61:16,17 62:12 | 180:4 182:2,7 |
| 112:3,20,23 | 180:19 181:5 | 65:20 66:3 | 182:13 183:20 |
| 121:5,8,13,22 | 181:16 195:6 | 68:6,22 69:8 | 188:17 190:3 |
| 122:8,12,21,22 | **balance** 20:20 | 70:6,9,19,25 | 192:13 194:14 |
| 127:17 129:18 | 200:11 | 71:2 73:4,6 | 195:19 196:9 |
| 129:19 141:13 | **balances** | 76:17 77:15 | 197:13 199:8 |
| 189:22 | 169:12 | 78:4 94:11,14 | 200:1,19 |
| **b** | **baldwin** 8:15 | 95:20 101:11 | 201:16,17 |
| **b** 3:9 123:18,18 | 8:16 17:8 27:5 | 102:22 103:9 | 202:22 203:17 |
| 136:23 217:1 | 27:6,7 | 103:16,21 | 204:5 207:1 |
| **babloo** 123:16 | **ballpark** 45:8 | 104:12 105:21 | 208:15 209:6 |
| 123:18 | 45:10 | 113:25 114:4 | 210:18 211:3 |
| **back** 9:7 14:17 | **bank** 46:7,23 | 114:10 116:13 | 213:7,11,20 |
| 14:21 17:7 | 46:24,25 47:6 | 117:1 118:1 | **based** 119:22 |
| 18:14 28:11 | 47:12 156:12 | 120:16,25 | 119:22 181:10 |
| 49:11 61:18 | 161:10 175:24 | 121:1 123:25 | **basically** 23:9 |
| 69:7 70:16 | **banker** 47:7 | 124:17 127:6 | **basis** 15:1 |
| 73:5 74:1 76:2 | **banking** 47:9 | 128:8,19 129:3 | 56:23 59:4,22 |
| 76:20 79:17 | **bankruptcy** | 129:6,8,10,14 | **bathroom** |
| 86:13 92:4,7 | 204:25 205:1,9 | 132:1 133:2,18 | 142:11 |

Veritext Legal Solutions
866 299-5127

[bayview - brian]

**bayview** 175:17 175:19,19,20 176:1,6 177:15
**beautiful** 160:23
**becoming** 141:9 143:18
**began** 116:21 117:10 195:13
**beginning** 34:12 36:15 188:6
**behalf** 2:15 7:4 7:4
**believe** 15:9 23:1 42:19 49:24 54:11 59:17,17 60:5 96:11 118:20 143:16 159:17 164:1 212:11
**bell** 90:14
**belong** 147:11
**benefit** 139:20 140:2
**benefitted** 139:22
**best** 30:10 45:9 100:9,12 188:13 193:18 195:14 196:8
**bet** 153:3
**better** 77:19,19 106:6,13 153:3 177:1

**big** 149:2 151:1 169:11
**biggest** 179:12
**bill** 32:25 69:12 69:19 77:1 148:19 152:18 156:15 163:2 171:1 172:8,10 172:15
**billing** 104:14 104:15,20,25 105:1,2
**bills** 161:17 162:22 169:1 171:5 202:13
**birth** 7:22 205:24
**bit** 173:21
**bitch** 148:16
**bits** 179:6
**blank** 36:13
**blasting** 150:4
**bled** 185:4
**bleeding** 206:23
**blow** 187:18 195:16
**bluffing** 170:18
**boarding** 49:15
**boats** 186:25 187:1
**bona** 129:20
**bookkeeper** 46:3,10,14

**books** 46:12,14 46:21
**boot** 163:5,10 164:10
**booted** 164:12
**born** 8:4
**boston** 110:19 110:20,21
**box** 57:24
**bradford** 91:15 91:21 92:2 95:4,9,13
**branch** 47:4
**brand** 38:14 138:3,3 163:6 183:18 188:8
**brandon** 88:12
**break** 13:13,15 48:9 61:14 68:23 69:10 111:14 142:9 142:11,14,18 210:19,20
**breakfast** 111:10
**breeding** 195:5
**brees** 3:14 7:3 7:3 12:19 21:16 31:21 41:20 42:6,24 43:13 48:8,12 48:15 49:2 53:18 55:3,7 56:19 59:7 61:2,11,12

65:24 68:19,25 70:2,7,20 77:12 78:1 81:11 94:5,9 94:13 95:19 101:9 102:17 103:7,11 104:10 113:25 114:2,8 116:12 116:23 117:24 120:13,24 124:16 127:2 128:7 129:1,4 129:7,9,11,12 131:23 133:18 134:10,14 141:22,24 142:2,8,22,24 145:16,18,23 146:14,17,20 146:21 147:16 147:21 160:5 165:7 167:7 173:8 182:1,6 182:11 194:13 197:12 200:18 201:14 203:16 208:8 210:19 210:22 213:8,9 213:13,18 216:1
**brees's** 11:1
**brian** 1:4 2:5 6:11,25 16:22 61:22 63:2

Veritext Legal Solutions
866 299-5127

[brian - calls]

115:16 120:22 130:14 144:22 216:4 218:1
**brief** 158:14
**briefly** 16:5 56:12 57:4,6,9 113:5
**bring** 23:5 40:6 105:17 121:11 121:13 159:4
**bringing** 23:3
**bro** 151:24 179:15 188:5
**brother** 88:14 88:15
**brought** 14:21 55:15 102:7 122:9,13,18 127:18,22 175:2
**browser** 119:22
**brushed** 100:2
**buddies** 188:3
**buddy** 33:6
**budget** 210:8 210:13,15,17
**building** 123:7 123:9,11,19 195:4
**bullpen** 162:19 165:15,18,22 165:23 166:2 166:12,14 167:3,12,22 194:8

**bunch** 200:9
**burden** 124:21
**bureau** 106:6 106:14 206:17 207:17 208:11 208:14,21
**bureaus** 183:14 183:16 185:11 185:16,17 187:20 206:10 206:13,16 207:20
**buries** 169:6
**business** 12:23 12:25 13:2,4,6 18:22 19:9,11 21:13,21 23:9 33:24,25 34:3 34:16,24 36:24 37:7,17 45:4 45:25 46:18 47:10 73:16,19 79:23 82:17 91:19,20,21 94:25 106:6,13 111:9,12 136:7 139:19 140:4 148:12,23 151:2,4,6 167:25 174:3,8 188:13 190:18 191:23 196:10 198:14 206:2 211:10,15,15

**businesses** 126:20 148:5 150:25 196:11
**buy** 32:1,6,9 39:13,14,15 70:11 76:5,18 82:21 109:4 172:8,15 179:12 191:7
**buyer** 156:17 175:22,25,25 176:8 198:19
**buyers** 179:13
**buying** 111:18
**buys** 156:19 172:25

**c**

**c** 3:1 7:20 90:18 136:22,23
**ca** 3:10 216:9 216:12,20
**california** 7:25 8:2,5,11,17,19 8:20 27:8 29:2 36:4 40:25 41:3,6,12 45:23 47:12 77:10 79:1,18 80:1,15 86:25 87:1 98:24 101:25 105:8 106:20 107:2 137:13 197:9 198:4 212:24 214:1 215:21

**call** 23:5 33:6 54:25 55:20 61:22 63:2 73:25 75:9,11 76:15 77:24 78:7,8 100:21 112:7 115:1,2 115:5,6,25 130:10,14,23 139:18 146:12 152:7 166:5,13 181:16,18,19 200:24,25 201:2,3,6,13 205:20
**called** 21:19 60:24 77:21,22 121:3 160:24 161:1 163:8 166:2 174:10 177:6,23
**caller** 4:14 75:13,18 76:15 144:21 146:25
**calling** 74:23 77:8 78:13 95:9,23 96:3 131:22 148:18 170:21
**calls** 23:15,23 50:22 51:1,4,7 51:10,11 53:18 65:24 68:19 74:12 95:19 97:19 115:4,12

Veritext Legal Solutions
866 299-5127

**[calls - christopher]**

| | | | |
|---|---|---|---|
| 115:20,20 | 93:9,11,25 | 15:16 17:8 | 218:16,19 |
| 120:24 131:23 | 96:10,12,15 | 20:9,11,13,17 | **changes** 76:15 |
| 160:5 201:14 | 97:2,2,12 | 21:10 26:13 | **changing** 75:5 |
| **camera** 6:4 7:1 | 101:12 104:5,8 | 32:18 34:7,15 | **charge** 39:17 |
| **cameron** 89:10 | 105:4,8,12 | 34:18 43:16 | 96:24 156:10 |
| 89:11,12,13 | 107:17 111:21 | 48:5 65:1 | 179:16,17,18 |
| **camino** 3:9 | 114:6 127:12 | 80:21 81:13,20 | **charged** 33:22 |
| **cancùn** 1:15 | 127:19,23 | 81:25 83:13 | 87:8 157:1 |
| 2:15 | 128:6,13,16 | 89:14 97:20 | **chase** 206:25 |
| **cancún** 8:22,25 | 129:24 130:21 | 98:3 115:17 | **cheap** 140:23 |
| 9:4,6 25:21 | 131:18,18 | 120:7 121:7 | 206:21 |
| 111:13 | 155:17 177:20 | 126:3 128:6 | **cheapest** |
| **candy** 153:4 | 201:7 212:4,7 | 129:16 167:12 | 188:12 |
| **capacity** 70:5 | 213:2 218:1 | 176:17 189:16 | **cheat** 191:19 |
| **car** 164:10,12 | **cases** 97:4 | 189:20 193:4 | **check** 18:25 |
| **card** 169:11 | 122:4,18 | 194:21 196:7 | 19:18 28:12 |
| **cardone** 196:15 | 179:21 | 196:13 216:4 | 29:11 64:7 |
| **cards** 202:10 | **casper** 8:2 | 218:1 | 80:17 101:8 |
| **care** 104:2 | **categories** | **central** 74:11 | 135:13 152:14 |
| 199:4 | 33:19 | **ceo** 38:6,8,9,10 | 190:3 |
| **career** 34:4 | **caught** 173:17 | **ceos** 195:5,6,7 | **checking** |
| **careful** 139:11 | 173:19,20,22 | **certain** 100:8 | 202:11 |
| 157:6 169:8 | 210:12 | 114:17,18 | **checks** 18:23 |
| **carmen** 45:21 | **cause** 148:7 | **certificate** 99:2 | 46:9,11,20 |
| 45:22 46:8,16 | **causing** 48:20 | 215:1 | 50:16,19 |
| 46:17,20 | **caution** 103:5 | **certify** 215:5,17 | **chino** 8:17 |
| **carrier** 42:17 | 103:14 | **cetera** 107:18 | 46:24,25 47:12 |
| **carry** 109:1 | **cautious** 103:7 | 179:3,4 197:3 | 47:12 |
| **case** 6:13,19 | **caveat** 103:23 | **chain** 176:9 | **chris** 64:8 |
| 10:23 15:16,20 | **ccp** 216:9,12 | 177:19 178:5 | **christopher** |
| 15:22,24 16:2 | **cell** 9:9,14,19 | **chair** 24:22 | 29:15,16 30:2 |
| 16:11 20:19 | 10:8 205:21 | **chance** 92:13 | 31:9 51:23,25 |
| 25:9 47:18 | **center** 1:7 2:8 | 154:14 | 62:21 162:5 |
| 59:21 60:21 | 4:9 6:12 7:4 | **change** 127:9 | 213:5 |
| 62:4 68:2,4,10 | 14:17,21 15:5 | 218:4,7,10,13 | |

Veritext Legal Solutions
866 299-5127

[circle - collection]

| | | | |
|---|---|---|---|
| **circle** 62:3 | 149:23 | **code** 75:25 | 194:23 205:2 |
| 67:25 74:1 | **clearly** 103:13 | 76:16,22 216:9 | **collectible** |
| 86:13 130:20 | **client** 42:25 | 216:12,19,20 | 205:7 |
| **circumstances** | 43:8,12 59:8 | **codes** 75:14 | **collectin** |
| 59:21 93:2 | 94:4,16 95:8 | **coffee** 166:19 | 162:23 |
| **citibank** 20:21 | 103:14 104:1 | **cold** 78:19 | **collecting** |
| 32:7,21 33:1,5 | 144:21 159:25 | **collect** 20:2 | 24:12 29:9 |
| 47:3,4,7,13 | 167:18 168:1 | 24:18 38:16,17 | 38:24 39:23 |
| 69:13 | 175:17 184:16 | 38:20,23 39:1 | 50:17,20 71:11 |
| **cities** 8:13 | 190:4 201:6,9 | 39:15,16,25 | 74:9 77:6 |
| **city** 8:8 214:14 | **client's** 95:8,9 | 40:3,19 41:2,5 | 83:20,21 |
| **civil** 216:19,20 | 181:15 | 41:12,14,17 | 100:16,19 |
| **claim** 43:15 | **clients** 156:19 | 50:25 71:7,8,9 | 106:4,25 |
| 44:5 48:1,5 | 175:20 179:14 | 71:10,16,24 | 112:20,22 |
| 92:23 96:2 | 185:14 | 75:2 82:23 | 116:10,17,21 |
| 121:6,11,13 | **close** 97:12 | 83:2,25 84:15 | 117:10,15 |
| 122:2 127:18 | 142:5 167:1,4 | 107:25 108:13 | 148:6,7 153:21 |
| 127:23 128:17 | 167:5 210:21 | 112:10,12,17 | 168:15 180:21 |
| 208:11 | **closer** 166:17 | 112:18 117:4 | 180:22 |
| **claimed** 11:24 | **closers** 162:19 | 120:12,18,20 | **collection** |
| **claims** 92:20,20 | 165:15,18,21 | 160:14 164:5,8 | 20:14 23:10 |
| 122:22 176:17 | 165:23 166:2,7 | 164:12 168:3,5 | 24:11 28:6,9 |
| **clarification** | 166:7,12,14,19 | 168:8,10 172:3 | 29:22 30:21 |
| 22:5 72:12 | 166:25 167:11 | 172:6,11,24 | 31:6 34:3,4,11 |
| **clause** 210:11 | 167:22 194:8 | 176:2 179:19 | 34:16,23,24 |
| **clean** 13:8 | **closes** 166:17 | 180:24 191:7 | 35:15 36:11 |
| 68:13,14,15 | **closest** 90:3,8 | 193:14,17 | 37:4 40:16,22 |
| 116:9 143:25 | 208:12,14 | 198:20 | 40:25 50:11,13 |
| **clear** 13:19 | **closing** 166:8,9 | **collectable** | 50:22 51:6 |
| 18:6 43:4 49:7 | 167:3 | 205:2 | 63:20 66:4,10 |
| 55:11 80:13 | **coach** 40:4 | **collected** 20:4 | 78:9,12,23 |
| 82:8 91:3 | **coaching** 94:12 | 28:10 39:19 | 79:16,23 80:8 |
| 116:8 117:8 | 103:19 129:11 | 84:3,6 106:7 | 80:14 81:18,21 |
| 140:14,19 | **coast** 198:16 | 109:11 176:11 | 82:18,20 83:10 |
| 147:3 149:23 | | 180:2 194:11 | 83:15 97:19,19 |

**[collection - company]**

97:25 99:15,21
100:22 101:17
102:9 104:7
109:1,8,21
113:1 114:12
114:15 116:16
116:19 121:7
121:10,12,25
122:4,20 124:3
125:19 126:3
126:24 127:1
131:9,12,13
140:3 148:5,11
148:23 151:4,6
151:20,21,23
156:5,7,21,22
156:23 158:7
158:18 159:16
160:2,10,15,22
161:15 162:5
162:18 165:11
169:5 170:1,8
170:11,14
171:2,20
173:18 177:21
177:21 191:23
192:2 197:7,22
197:23 198:23
200:9 202:4
209:15,16
210:10 212:21
**collections**
28:22 29:8
33:25 35:25
36:23 78:10

97:9,14,15
102:5 122:18
126:15 157:2,4
158:7 168:25
183:15 187:10
196:19 198:10
199:1,5,6
200:2,5,7
205:18
**collector** 16:19
16:22 17:17
34:7,25 35:2,5
35:13 36:17
37:6 50:8
64:20 65:19,20
65:22,23 66:1
66:6,10,25
79:18 81:8
108:24 113:14
113:18 114:23
120:11,17
133:3 175:21
**collectors**
20:18 38:20,21
38:25 39:1,3
39:25 40:3,11
40:21,24 50:7
50:10,13,17,20
50:23 51:3,12
60:3 62:14
63:10,11,21,24
64:19 65:3,9
65:16 67:1,21
67:23 68:4,6
71:13 79:1,8

79:11 83:18
95:22 96:2
101:19,23
102:1 107:21
108:19 112:13
112:18 113:3
114:17 126:25
180:20,22,24
181:5 187:6,7
187:10 194:22
196:8 197:5
**collects** 38:18
38:19 39:10
79:4 84:9
106:17,22
182:15
**college** 98:18
98:18,22
**combined**
151:1
**come** 22:1,23
24:15 89:16
105:14 106:9
118:24 136:7
142:11 168:5
188:14
**comes** 26:9
59:12 167:14
183:3 193:8
**coming** 9:7
25:15 77:24
141:21
**commencing**
2:15

**commercial**
46:24,25 47:12
**commission**
20:1,8 39:17
106:17 108:14
108:15,16
**communicate**
10:6
**communicated**
10:1 94:7
**communicating**
9:18
**communication**
10:6 116:20
**communicati...**
10:5 43:1
94:17
**community**
98:18
**companies** 89:1
89:9 195:8,12
206:8,14
208:10
**company** 11:19
14:21 15:2
18:5,8,10,11
28:25 29:1,21
36:12 41:7,8
46:1 54:8,9,20
54:21 72:18
73:9,10 76:7
89:5 93:3 94:2
94:24 95:2
117:16,18,19
118:16,17

Veritext Legal Solutions
866 299-5127

**[company - context]**

128:12,15
133:5,8 137:14
172:22 175:4
177:17 185:4
188:5 205:15
205:17 212:23
**company's**
182:15
**compensation**
19:25 20:7
**competitors**
183:5 187:18
**complacency**
173:16,16
174:11
**complained**
92:18
**complaining**
15:11
**complaint** 4:9
59:22 92:19
106:7,14,25
112:1,1,2
**complaints**
15:13 105:25
106:3,9,17,20
107:7,10
**complete** 92:21
99:2 159:15
**completed**
216:7,17 217:6
**completely**
135:6 136:8
**completing**
215:13

**completion**
217:10
**compliance**
40:11,21,24
129:25 197:7
197:10,21
210:9,16
**compliancy**
125:3
**compliant**
68:16 196:16
196:21,23
**comply** 210:11
**complying**
124:14
**computer** 9:15
23:25 24:3,17
24:21 119:3,9
119:25 120:3,6
168:10
**computers**
119:7,10,14,15
120:1
**concept** 47:15
47:23 97:22
138:21
**concerned** 66:9
68:8,11,12
**concerns** 127:4
**concluded**
213:23
**conclusion**
68:20 160:6
**conditions** 14:6

**condone** 133:6
133:7
**conduct** 182:14
182:15
**conducted** 6:3
6:14
**confer** 114:7
**conference**
138:11 141:3
153:10 178:11
185:9
**conferences**
102:3
**confirming**
59:13
**confused** 21:25
22:5
**confusing**
132:6,7,9,10,14
**connect** 76:9
110:5 112:25
119:18,21
**connected**
122:24
**connection** 6:5
**connections**
32:24
**consequences**
199:3
**consider** 51:16
188:7,12
**considering**
125:2
**constraints**
112:19,21

**consumer**
62:18 70:11
75:6,18 77:7
78:7 84:10
96:2 97:11
105:8 113:1
115:2 120:19
121:10 132:23
160:14 164:5,8
170:16 176:5
189:19 190:24
205:3,8
**consumer's**
75:12,25 76:16
**consumers** 72:9
72:15 74:4
97:15 100:14
106:1,3 132:15
165:12 184:15
187:11 189:13
200:17
**contact** 62:3
67:25 110:22
120:12,17,22
130:20 135:23
216:9
**contain** 56:6
**contained**
214:11
**contains** 107:6
185:21,23,24
186:4,7
**context** 117:7
134:12

Page 12

**[contingency - course]**

| | | | |
|---|---|---|---|
| **contingency** 179:15 | **copy** 43:23 61:10 162:11 | 83:24 84:4,5,8 84:14 90:2,9 | 207:21 208:5 209:4,18 210:7 |
| **continue** 6:7 64:10 67:13,24 | **corp** 35:22 122:8 | 90:23 91:25 93:5 95:3 96:3 | 211:19 212:12 212:22,24,25 |
| **contractor** 17:20,22,25 21:19,20,22 23:5 91:14 108:5 193:9 | **corporate** 31:20,22 32:3 45:18 49:7 70:4 | 96:12,23,25 99:18 107:15 108:10,14 109:8 110:1,5 113:7 115:7,11 | 213:5 214:11 215:15,21 **corrections** 214:9 216:14 216:15 217:3,4 |
| **contractors** 39:6 91:22,23 91:25 107:23 108:9,13 137:8 165:16,24 166:3,14 167:13,24 193:6,13 196:8 | **corporation** 35:6,8,9 136:4 136:8 138:4 **correct** 8:12,23 8:24 9:8 10:18 10:19 11:25 13:3 18:9,21 19:2,6,9,19 20:5 22:7 | 116:11 117:4,5 118:8 119:16 119:20,23 124:18 126:12 126:17 129:9 130:6,9 133:9 133:11 134:19 135:9,19,20 146:10 147:12 | **correctly** 88:18 **corresponden...** 117:14 **cost** 76:25 210:1 **costs** 190:23 210:5 **counsel** 6:10,23 6:25 10:5 |
| **controlled** 60:14 **controls** 60:17 **controversial** 198:11 | 23:20,21 24:10 24:19 25:11,14 27:15 30:24 32:4 37:22 | 147:13 150:1 150:17,20 154:22 157:19 162:11 164:1 | 213:12 216:18 216:21 217:7 **count** 31:13 **counter** 11:24 |
| **conversation** 56:4 67:9 130:1 154:5 | 39:4,11 40:9 45:17 46:19,22 50:6 54:10 55:5,10,15,16 | 165:14 167:19 167:21 168:4 168:20 172:25 | **countries** 83:18 **country** 76:22 179:13 |
| **conversations** 55:21 56:1,8 56:14 | 55:18,19,22,23 56:1,9,10,25 60:23 62:15,22 | 173:1,3,4,11 181:24 184:16 184:17,20 | **county** 87:2,15 214:2 **couple** 76:21 |
| **convicted** 86:18,20,21 87:5,8 88:7,9 | 64:9,23 66:5 66:19 69:13 71:21 73:19 | 185:2,6,20 186:14,20,21 186:23 187:11 | 93:21 213:9 **course** 9:19 10:7 11:16 |
| **convictions** 87:19 **convinced** 155:4 | 74:4 75:21 76:23,24 79:5 80:15,16,22 81:1,2 82:10 | 187:12 189:25 190:21 194:18 194:19 198:4,5 203:12,19 | 26:12 78:20 117:15 128:23 193:19 211:6 213:4 |

Veritext Legal Solutions
866 299-5127

[courses - day]

courses 206:5
court 1:1 2:1
  6:13,17 7:7 8:2
  12:9,10 13:9
  47:18 96:17,18
  96:19,21 97:3
  97:4 114:5
  142:19,19
  148:16
courteous
  100:13
courtesy 13:13
cousins 186:9
cover 48:5
coverage
  128:13
covered 42:23
  44:5
covering 42:14
  43:15 48:1
  128:16,17,22
covers 42:12
covid 150:7
cpa 45:20 46:2
  46:3,4
credit 35:19
  72:1,2 156:20
  156:25 157:2
  161:2 169:4,6
  169:6,11
  173:20 175:2
  176:4,5,7
  177:8,11,14
  178:19,23
  182:20 183:13

183:16 185:10
187:20,21
189:6,8,11,12
189:13,15,19
189:21 190:10
190:20,23
197:11,24
198:22 200:4
202:9 204:5
206:10,16,17
207:17,20
208:11,14,21
209:17,19,22
210:2
creditor 156:10
  156:12 157:1
  159:23 169:2
  175:22 192:2
  200:11
creditors 157:5
  159:21 202:3
crime 86:18
crimes 88:6,10
criminal 50:19
  87:19
criticism
  197:18
crm 24:3,6,12
  38:12,15 110:4
  113:7,20,21
  115:1,10,11,25
  119:18
crosby 136:17
  136:23 137:1

cross 92:20
crossed 116:4
  116:15
crowd 207:23
crystal 141:9
  141:14,18
  143:18,22
cube 24:23
  123:2
cubicle 24:24
  24:25 25:1
  123:4
cucamonga
  7:25 8:2,7,14
  9:7
current 38:1
  100:3 135:23
currently 7:24
  26:6 41:11
  88:16,25 92:16
  109:10
curriculum
  37:15
customer 24:9
cut 46:20 48:15
  143:21 205:5
cv 1:7 2:8 6:14
  37:15

d

d 27:2 90:18
damages 47:16
  47:19,23
  127:18,23
  128:5

damn 148:20
  195:14
dan 7:3 55:6
  103:10
daniel 3:14
  216:1
danny 136:15
  136:25 137:12
darwin 15:15
data 33:18
  110:3,4 183:8
  183:13 206:17
  206:18,20,21
  208:10,11,14
database 71:23
  184:15
databases 71:6
  71:14,16 72:2
  72:8
dataskip.io
  72:18,20 73:9
  89:3 185:3
  205:16 209:3
date 7:22 33:22
  33:22 53:3,8
  53:10,11
  205:24 216:16
  217:5 218:24
dated 215:22
day 30:16 53:5
  53:7 64:16
  126:3,15,15
  149:19,22
  187:19 214:13

Veritext Legal Solutions
866 299-5127

**[days - deny]**

| | | | |
|---|---|---|---|
| **days** 9:1,3,3,5 | 104:7 107:25 | 191:22 192:1 | **declare** 214:7 |
| 88:5 170:24 | 108:23 109:24 | 197:7,21,22 | 215:20 |
| **dba** 91:17 | 110:14 111:18 | 198:10,17,18 | **deep** 15:12,17 |
| 95:11 | 111:20,22 | 198:19,21 | 187:7 |
| **dba's** 91:16,23 | 112:4,10,16,16 | 202:6,6,9 | **defend** 44:8 |
| 91:25 | 112:17,20,22 | 203:25 204:3,6 | **defendant** 1:8 |
| **dbrees** 3:16 | 113:1 116:17 | 204:9,10,12,16 | 2:9 3:13 4:8 |
| 216:2 | 116:21 117:4 | 204:21 205:2,7 | 12:3 |
| **de** 27:2 | 117:11,15,23 | 205:18 210:10 | **defending** |
| **deal** 15:14,18 | 118:22 120:11 | **debtor** 71:11 | 105:24 |
| 125:13 166:8,9 | 120:12,17,18 | 72:14 121:11 | **defense** 94:21 |
| **dealing** 16:12 | 120:20 121:6,9 | 130:2 170:15 | 129:20 |
| 124:23 | 121:12,25 | **debtors** 148:14 | **defenses** 4:10 |
| **deals** 166:17 | 122:3,17,20 | **debts** 39:10,16 | **deficiencies** |
| 167:1,4,5 | 125:15 148:15 | 39:16,20,23 | 202:10 |
| **death** 204:19 | 148:23 152:2 | 41:2,5,12,14,17 | **deficiency** |
| 204:21 | 153:21 154:21 | 70:11,11 71:7 | 20:20 |
| **debt** 20:18,19 | 155:4 156:5,7 | 71:16 74:9 | **definite** 56:3 |
| 29:9 32:1,4,6,9 | 156:17,17,22 | 75:2 82:23 | **definitely** 139:2 |
| 32:20 33:1,3,4 | 157:25 159:23 | 83:23 106:4,7 | **degree** 99:2 |
| 34:3,4,7,15 | 159:23 160:1,2 | 106:17,22 | **del** 3:9 |
| 38:24 39:14,14 | 160:10,14,15 | 107:1 172:6,11 | **delaluz** 26:25 |
| 39:15 40:19,22 | 160:22 162:18 | 172:15,24 | **deletions** 214:9 |
| 40:25 50:16 | 162:23 163:11 | 182:15 192:1,7 | **delinquent** |
| 69:11,13,25 | 163:12 164:5,8 | 193:14,17 | 157:23 |
| 70:1,13 71:11 | 164:13 165:11 | 194:11 204:4,6 | **demand** 127:12 |
| 71:12 79:18 | 167:25 168:2 | **deceive** 191:20 | **demon** 174:10 |
| 81:8,18 82:18 | 168:25 170:1,8 | **deceptive** | **denials** 58:19 |
| 82:20,21 83:2 | 170:11 171:2 | 181:25 182:3 | 58:22 59:2,6 |
| 83:21,25 84:1 | 171:20,24 | **decided** 196:19 | **denied** 58:17 |
| 84:3,6,9,10,13 | 172:3,7,8 | **decides** 32:1 | 59:2,14 |
| 84:15 94:25 | 175:21,21,25 | **decision** 18:3 | **denies** 58:14 |
| 95:1 99:14,20 | 175:25 176:1,7 | 103:3 128:19 | **deny** 56:23 |
| 100:16,19 | 179:12,13,14 | 128:20,21 | 58:16 59:4,22 |
| 102:1,5,9 | 180:24 183:14 | | |

**[denying - dodging]**

denying 55:2
  56:16
department
  80:17 89:21
  152:19 161:6
  161:15 162:24
  163:5 170:12
depending
  113:2 202:5
depends 6:4
depict 149:18
  149:20 153:20
  169:25 171:19
  174:20 180:13
  184:6 188:25
  192:22 196:3
  207:12
depiction
  149:21 163:23
deploy 193:3
deposition 1:14
  2:14 6:3,10,14
  9:19,25 10:1,7
  10:11,15,18,21
  11:4,17 12:14
  12:16,21 14:11
  14:13 25:16
  26:2 55:9 70:4
  70:5 96:18
  114:7 147:20
  177:1 211:6,12
  213:22 216:19
  216:22,24
  217:8,10

depositions
  96:9,15 97:1
derogatory
  169:4 198:22
  200:4
describe 33:3
  137:20 167:11
  180:24
description 4:7
designated
  70:3
desirous
  214:10
desk 25:8,10,12
  49:20
detail 14:23
  55:25 58:9
  140:1 157:21
  158:17 176:20
detailed 109:3
  113:3
details 20:22
determine
  22:18 40:14
  90:21
determined
  92:22 216:18
  216:22 217:7
device 10:8
devices 9:11,15
dfpi 80:20
dialed 115:9
diaz 4:17
  151:13 152:3

die 204:23
  205:3
diego 3:10
dies 205:8
different 36:14
  76:21 110:14
  111:3 113:2
  191:11
difficult 125:15
  193:22
digest 131:5
direct 92:4
  144:15
directly 32:7,20
  35:18 65:18
  91:8 137:18
disciplinary
  51:12
disciplined
  129:15
discovery
  107:16
discuss 16:10
  94:17
discussed 15:20
  15:22 16:2,4
  38:12 43:6
  47:23 103:24
  189:1 192:23
  196:4 199:19
  203:8 207:13
  212:3,8
discussing
  174:21

discussion 69:5
  185:3 193:2
  203:11 210:25
discussions
  59:9
dismay 203:14
  203:18
dismiss 127:18
  127:22
dismissed
  178:4,7
dispatch 61:24
  63:4,6,9,14,22
  63:25 64:15
  100:21 130:16
  132:13,17
  181:15 201:7
dispute 12:25
  13:1 96:11
  128:12,18,19
  128:20
district 1:1,2
  2:1,2 6:12,13
  101:13
doctor 162:25
document 58:2
  67:9 114:2
  133:23
documents
  25:15 61:25
  64:12,15 67:2
  107:18 130:17
  212:8
dodging 192:3

Veritext Legal Solutions
866 299-5127

**[doing - entities]**

| | | | |
|---|---|---|---|
| **doing** 7:16 13:7 21:24 79:20 91:19,20,21 94:24 148:17 148:21 149:1,3 150:21 151:5 168:17 183:6 183:14 191:17 193:10,18 197:5 202:21 206:5 | **dropbox** 33:12 33:14 109:25 | **editor** 154:18 | **employed** 117:9,13 118:17 |

doing 7:16 13:7
  21:24 79:20
  91:19,20,21
  94:24 148:17
  148:21 149:1,3
  150:21 151:5
  168:17 183:6
  183:14 191:17
  193:10,18
  197:5 202:21
  206:5
dollar 176:16
  177:8
dollars 150:22
  173:24 177:6
  177:12,13
  179:20 191:8
domenech
  90:16,16
dot 73:9
downstairs
  123:5,6,8
  126:11
dppa 73:21
  74:2 210:10
drafted 93:17
draws 36:13
drink 144:3
drive 62:3
  67:25 130:20
drivers 73:23
  185:22 186:2
  197:10,23
drop 98:2

dropbox 33:12
  33:14 109:25
drugs 13:25
  14:3 144:2,4,7
  144:9,11,13
dui 86:21 87:21
  96:21
duly 7:10

**e**

e 3:1,1 7:20,21
  7:21,21 9:22
  11:12 27:2
  28:18,19,19,20
  28:21 43:17,18
  43:23 44:2,12
  90:18,18 216:9
  216:12 217:1
  218:3,3,3
earlier 48:17
  54:6 61:18
  80:25 86:12
  91:2 93:1 98:6
  108:11,12
  117:3 147:3
  172:14 181:14
  184:14 194:17
  212:10
early 141:9
  143:18,23
  170:10,24
earn 20:6
earned 20:3
eat 142:10
ect 1:7 2:8 6:14

editor 154:18
education
  98:18
effective 77:4,5
  127:9
effort 113:1
  120:12,18
efforts 156:22
  200:9
either 12:7
  59:13 64:8
  90:11,17 91:1
  106:20 120:15
  122:13 152:25
  208:12
el 98:15
electronic 9:11
electronically
  18:23 33:13,14
elevate 192:10
elevator 194:4
elite 45:25
  46:18
else's 38:24
  39:16,20
  136:11 140:9
embellished
  154:1 178:15
embellishing
  150:16 153:24
embellishment
  164:3 166:5
  181:8 184:11
  185:8

employed
  117:9,13
  118:17
employee 21:14
  21:17 46:17
  89:13,21 90:7
  201:6 215:18
employees
  15:25 31:12
  39:4 62:12
  89:18 90:1
  91:8,9 136:24
  137:1,3,5,7
  195:11,15
  196:7 197:2,4
  210:16
employment
  49:25 50:1
  91:6 120:4
  122:7
endeavor 13:10
endorse 138:21
enforce 161:4
  161:11 169:14
engaged 126:14
  126:25
engaging 22:22
entered 114:15
entertainment
  200:22,23,24
  201:8,9,11
entire 34:4
entirely 207:14
entities 91:23

Veritext Legal Solutions
866 299-5127

**[entitled - expand]**

| | | | |
|---|---|---|---|
| **entitled** 198:12 | 207:25 208:1,3 | 69:17 113:12 | 159:10,17 |
| 198:20 | 208:10 211:17 | **excuses** 192:5 | 160:18,19 |
| **entity** 136:8 | 211:18 | **executed** | 161:19 162:2,2 |
| **environment** | **estimate** 31:14 | 214:13 | 162:9,15,16 |
| 167:11 | 109:2 | **executive** 28:2 | 163:15,25 |
| **equifax** 72:4,25 | **et** 107:18 179:3 | 31:3 | 165:10 168:22 |
| 73:10 185:13 | 179:4 197:3 | **exhausted** | 168:23 169:17 |
| 206:12 | **event** 118:25 | 124:1 | 169:23 170:4,5 |
| **equipment** | 151:16 | **exhibit** 4:8,11 | 171:10,11,13 |
| 24:20 | **everybody** 79:3 | 4:12,13,14,15 | 171:20,22 |
| **equity** 174:7 | 114:24 167:14 | 4:16,18,19,20 | 173:13,14 |
| **er** 163:7 | 175:7 177:18 | 4:21,22,23,24 | 174:13,23 |
| **errata** 216:14 | 188:4 210:19 | 4:25 5:1,2,3,4,5 | 178:9 179:9,10 |
| 216:16 217:3,5 | **everyone's** | 5:6 41:22 42:3 | 180:5,15 |
| **error** 41:23,25 | 167:24 198:12 | 42:5 48:16 | 182:24 183:1 |
| 48:9,21 129:20 | **evidence** 130:8 | 57:15,16,20 | 183:21 184:9 |
| 147:19 154:25 | **ex** 110:3 | 58:13 61:7,8 | 184:19 185:8 |
| **especially** | **exact** 31:13 | 61:21 62:7,16 | 187:14,15 |
| 169:10 | 53:6,8 87:12 | 62:25 64:10 | 188:25 189:2,4 |
| **esperanza** | 112:5 210:3 | 67:13,24 68:22 | 191:14,15 |
| 212:1 | **exactly** 19:5 | 70:15,19,23 | 192:14,23 |
| **esq** 3:3,9,14 | 154:4 | 71:3 92:5,7 | 195:1,2,20,25 |
| 216:1 | **exaggeration** | 94:22 130:4,8 | 196:2,4 198:7 |
| **essentially** | 181:8 | 133:17,19 | 198:8 199:10 |
| 75:24 | **examination** | 136:3 138:14 | 199:19 201:3 |
| **established** | 4:3 7:13 | 140:6 143:16 | 201:25 202:1 |
| 184:14 | 215:11 | 143:17 144:16 | 202:24,24 |
| **estate** 12:24,24 | **examined** 7:11 | 144:17,20 | 203:6,8,11 |
| 13:1,2,4 82:19 | **example** | 145:8,13,18 | 205:12,13 |
| 89:5 96:11 | 100:13 | 146:2,13,23 | 207:3,5,7,15 |
| 97:2 148:3,11 | **excel** 33:17 | 147:17,24 | **exhibits** 4:6 |
| 148:22 151:16 | **except** 144:3 | 148:1 151:9,11 | 147:17 |
| 183:3,19 185:1 | **excited** 140:21 | 153:25 154:1 | **exit** 124:12 |
| 186:19 188:9 | **excuse** 9:12 | 155:23 156:1 | **expand** 123:24 |
| 206:8,15 | 20:9 39:9 | 157:10 158:9 | |

Veritext Legal Solutions
866 299-5127

[expect - file]

expect 127:4
expended
  198:2
expense 125:6
expensive
  76:24 77:2
  125:5 179:15
  188:11 190:15
  190:16,17
  191:2,4,5
  209:13,25
experian 72:2,3
  72:23 73:12
  185:11 189:22
  190:4,5,6
  206:11 208:23
  208:24 209:2,7
  209:8,11,12,14
  209:15,17
  210:2
experience 40:5
  131:9,13,14
  155:15,16
  181:12 191:24
  193:8 200:8
experienced
  23:8 40:7
  193:9
experiencing
  42:1 48:22
explain 72:13
  95:12 158:17
  208:19
explained
  133:4

explaining
  150:8,9,10
explanation
  158:15
explanations
  159:15
explore 18:4,8
  54:7
express 181:2
  203:14,18
extensive 40:7
extent 21:16
  31:21 42:24
  59:7 70:3
  152:21
extract 161:5
  162:20
extracted
  161:13

f

f 3:3 138:19
face 110:25,25
facebook 86:5
  86:8 165:1
fact 59:3 72:17
  84:10 203:18
  209:1
factor 111:24
facts 93:2
  129:18
fair 34:14
  40:22 49:2
  54:24 56:5,18
  57:13,13 99:14
  99:20 102:9

104:7 107:20
109:6 121:6,9
121:12,25
122:3,20
129:23 159:3,3
160:2,10,15
182:20 187:8
197:7,11,18,21
197:22,24
204:8 210:10
fairly 149:17
  153:20 169:25
  171:19 174:20
  180:13 188:25
  192:22 196:2
  203:6 207:12
false 171:3
  181:23 199:2
familiar 47:15
  60:10,12 62:12
  62:13 97:22
  99:20,22 116:5
family 84:12,16
far 13:7 123:2
  123:23
fashion 108:3
fat 173:22
  176:15 177:6
fcra 182:20
fdcpa 66:16,18
  66:23 68:17
  99:23 100:1,3
  100:5 101:14
  102:12 105:4
  122:10,12,25

130:8,24 131:3
131:15 181:20
182:16 210:13
federal 12:9
  106:16 114:5
  173:19 175:2,7
  176:4,5,7
  177:8,11,14
  178:19,23
  217:1,8,9
fee 39:17
feel 78:2,5
  118:7,11
  203:21
feelings 196:3
  199:18 203:7
  207:13
feels 140:16
fees 81:15
  104:9 127:14
  179:25
felt 174:1
fide 129:20
fight 103:3
fighting 102:16
  104:5
figueroa
  136:15,25
figure 48:24
file 33:9,10,15
  41:25 42:1
  45:18 48:21
  49:25 50:1
  91:6 92:19
  107:6 132:22

**[file - front]**

133:18 146:8
169:13 170:20
191:11,12
205:9
**filed** 6:12 12:7
12:23 57:2,8
58:5,8 59:16
59:19 79:17
80:10,14 81:3
81:4,7 93:20
106:1 163:3
164:4
**files** 147:22
191:11
**filing** 198:23
**fill** 49:19,22
91:5
**filled** 23:12
**filmed** 163:23
**filtrate** 110:3
**financed** 35:19
**financial** 46:6
140:2
**financially** 6:19
139:20,22
215:18
**find** 11:10
18:15,17 58:13
94:1 135:24
146:3 184:9
190:18,18
192:3
**fine** 61:12
68:25 142:22

**finish** 113:16
141:23
**fire** 67:3
**fired** 30:6
**firm** 11:1 12:18
45:24 62:4
68:1,3,10,10
95:17,23 96:3
100:18,19
130:21 131:18
131:21 132:4,5
161:16 162:23
170:12 173:3
201:8
**first** 7:10 10:20
33:20 34:19,21
35:1,14,16
44:4 67:11
81:23 82:2
83:21 113:8
126:11 131:1,2
133:22 145:23
159:19 168:18
169:2 172:21
193:21 194:2
196:9 200:3
213:5
**fish** 136:21
**fit** 138:2
**five** 9:1,3,3
36:7 68:23
172:2 210:20
**fixing** 196:18
**fkn** 85:8,9,9,16
85:17,23,23,25

86:10 134:6,9
**flip** 13:6
**flipping** 151:17
**floor** 126:10,11
168:17,18
193:21,21
194:2,2,21
**floors** 123:9
194:5
**fly** 111:11
**folder** 145:19
**folks** 90:22
91:4 108:9
**follow** 16:6
74:1 162:1
**following** 114:7
143:7
**follows** 7:11
216:8
**foothill** 47:5
**foregoing**
214:8,10 215:6
215:15,21
**foreign** 57:12
**foremast** 196:9
**forget** 49:6
**forgive** 202:17
**forgiven**
203:19,22,25
204:4,10,13,16
**forgiveness**
203:11 204:4
**form** 19:7,7,8
55:3 66:9
77:12 78:1

102:17 104:10
116:12 120:13
124:16 167:7
197:12 200:18
203:16 208:8
**former** 89:17
90:1
**forms** 84:21
**forth** 215:7
**fortune** 195:8
**forward** 11:15
152:18
**found** 104:6
**foundation**
61:2 98:10
109:7
**four** 39:21,22
84:4 131:19
202:7 210:18
**fourth** 140:6,12
**frame** 37:23
86:23
**frankly** 104:2
**frazier** 27:7
**frcp** 217:1
**free** 60:10,12
60:13,16
114:25 135:6
206:18,22,22
206:24
**fresh** 183:17
**friends** 22:16
22:18
**front** 19:12

Page 20

[froze - going]

| | | | |
|---|---|---|---|
| **froze** 73:1,2,3,8 | **garnishment** | 31:14 40:11 | 199:23,24 |
| **fuck** 148:12 | 161:11 170:23 | 49:20 53:10 | **goes** 156:20 |
| 195:17 | **general** 19:17 | 56:3,3 59:22 | 157:22,23 |
| **fuckin** 85:10,11 | 19:17 21:13 | 71:10 101:6 | 167:14 198:25 |
| 85:18 86:1,3 | 28:12 29:17,24 | 109:2 110:7 | 199:5 200:2 |
| 134:13 | 54:12 106:19 | 133:14 139:3,6 | 202:12 |
| **fucking** 148:16 | 106:24 107:11 | 147:9 190:22 | **going** 9:1,3,24 |
| 161:12 163:2 | 137:20 192:4 | **given** 12:15 | 10:8 11:15 |
| 163:12 170:9 | **general's** | 47:19 59:3 | 21:23 31:21 |
| 179:18 180:18 | 106:21 | 96:14 109:2 | 42:3,4,8 44:1 |
| 202:19 | **generally** | 203:15 | 55:12 56:3,7 |
| **full** 7:18 152:21 | 203:24 | **gives** 147:19 | 57:14,14 58:13 |
| 209:19,22 | **generate** 44:14 | **giving** 45:3,7 | 58:14 61:6,19 |
| 210:1 | **generates** | 184:19 206:16 | 62:24,24 64:10 |
| **fully** 125:3 | 45:15 | 206:17 | 67:13,24 68:23 |
| **fun** 163:3 | **gentleman** | **glanced** 104:19 | 69:3 70:2,16 |
| **functionalities** | 36:24 162:3 | **glen** 166:18 | 70:16,19,21 |
| 186:15 | **gestl** 28:13,16 | **glendora** 36:4 | 85:23 86:12 |
| **funds** 18:24 | 28:17,24 29:5 | **glengarry** | 92:4,15,15 |
| **furniture** 35:19 | 31:9 51:22,24 | 166:18 | 93:12 94:6,11 |
| 35:20 | 51:25 54:11,15 | **go** 6:8 49:11 | 94:12,12 96:8 |
| **further** 215:17 | 62:21 64:8 | 58:19,20 70:16 | 97:19 98:7,8 |
| **g** | 212:15 | 73:4 77:18 | 99:13,23 103:5 |
| **g** 28:18,19,20 | **gestl's** 54:19 | 79:17 89:16 | 103:13,17,22 |
| **gain** 191:20 | 212:23 | 96:21 98:17,20 | 104:2,8 113:25 |
| **galaxy** 62:3 | **getting** 22:9 | 99:10 113:11 | 118:10 127:14 |
| 67:25 130:20 | 41:23 48:20 | 113:15,15,16 | 128:13,19,21 |
| **galvez** 29:15,16 | 103:12 125:2 | 126:2,3,4,5 | 129:7 132:12 |
| 29:18,20 30:2 | 126:22,23 | 134:12 142:4,5 | 133:13,14 |
| 31:9 51:23,25 | 133:8 151:17 | 142:16,17,17 | 140:18 142:5 |
| 62:21 64:8 | 163:10 170:16 | 147:24 151:9 | 142:13,14,17 |
| 162:6 | 183:10 187:25 | 152:10,18 | 143:4 144:15 |
| **galvez's** 213:5 | **girls** 140:21 | 154:3 155:23 | 146:6 148:16 |
| **games** 163:3 | **give** 14:16 23:9 | 160:18 167:7 | 152:11,18,20 |
| 170:19 | 23:11 30:8,14 | 194:7,15,21 | 156:6 158:17 |

**[going - helped]**

160:1 162:14
169:3,3 174:6
174:7,8 179:2
181:15 194:7
195:11 196:19
196:20 199:22
201:12,18,19
201:21,22
202:13,18
206:4 210:24
213:14
**good** 6:1,24 7:3
7:15,16,17
69:18 138:2
143:1 172:22
180:20 188:15
190:18 191:25
200:22 202:19
**gordon** 3:14
12:19 15:21
43:14 103:2
173:8
**gotten** 69:16
123:23
**government**
202:16
**grab** 142:10
**graduate** 98:11
98:14
**graduated**
98:16
**gray** 152:24
**great** 10:11
13:7,13

**gross** 45:13,14
**ground** 169:7
**group** 3:8
**groups** 101:17
101:17 208:17
**grsm.com** 3:16
216:2
**guess** 49:23
53:2 103:9
104:22 126:23
127:12 139:12
181:4,10
196:25
**guest** 184:23,25
185:8
**guidance**
103:17
**guidelines**
100:9
**guy** 89:25
**guys** 78:20
114:5 151:13
156:3,8 162:20
171:4

**h**

**h** 7:20 90:18
218:3
**hacienda** 35:11
**half** 61:15
141:23 142:20
**hand** 18:25
**handle** 67:2
85:15,21 106:8
106:11

**handled** 107:4
216:8
**handles** 76:7
89:21
**hands** 135:6
**handshake**
108:8
**happen** 200:15
200:17
**happened** 55:2
59:4 70:25
93:19,25
**happens** 67:11
160:21 169:1
**happy** 130:11
**harassing**
182:5
**harassment**
177:21
**hard** 52:9
140:22 173:22
**harris** 14:16,20
15:2,7,11
**hate** 138:18
**hausie** 3:18
6:16
**he'll** 7:2
**head** 33:20,23
53:9,24 109:14
109:18 117:21
119:11 153:14
161:22 182:19
190:25 191:10
193:12

**heads** 109:16
**headset** 97:18
**hear** 43:5 62:6
62:11 78:6
125:14 157:8
158:23,23
180:5 199:24
207:3
**heard** 6:6 8:21
18:7 20:11
54:17 60:8
63:5,10 64:14
64:23 65:5,6,8
65:11 66:25
67:17 68:7
74:19,20,23
75:9 95:22,25
96:1,2 101:4
116:3 138:10
138:13,22
143:20,21
201:2,2,5
210:13
**hearing** 7:1
132:11
**hears** 51:14
**heights** 35:11
**held** 35:1 36:23
69:5 210:25
**hell** 161:13
**help** 62:11
93:23 150:15
166:6 212:7
**helped** 37:8

Page 22

[helpful - indicated]

**helpful** 104:3
200:16
**heredia** 211:21
211:22
**hernandez**
45:21,22 46:9
49:7
**hey** 63:16
64:20 65:16
70:12 125:10
151:13 152:14
156:3
**high** 98:11,14
98:15 166:25
**highlighted**
92:11
**hire** 148:13
**hiring** 206:3
**history** 34:3,10
50:19
**hit** 58:6 177:5,7
**hobby** 139:15
139:16,18
**hoc** 114:22
**hold** 43:25 79:7
94:5 192:9
**home** 8:1 21:4
23:17 100:24
**honest** 15:13
124:1
**hope** 195:17
**horrible** 148:25
**hot** 25:4,5,7
**hotel** 25:20,23
26:1

**hour** 61:14
104:14,15
105:4,8 141:23
142:1,9,13,21
143:5,7
**house** 24:8
38:20,25 39:3
88:1,2 91:8
174:6 179:3
181:15 195:6
201:7
**household**
84:13,16
183:17 188:8
**houses** 13:6
186:19
**how's** 202:18
**huge** 173:17
**huh** 77:19
**human** 89:20
90:3,5,6 91:13
**hysterical**
163:9

**i**

**id's** 144:21
**idea** 120:25
137:20 202:19
202:20
**identification**
57:17 61:9
70:24 133:20
144:18 148:2
151:12 156:2
160:20 162:17
168:24 170:6

173:15 179:11
183:2 187:16
191:16 195:3
198:9 202:2
205:14
**identified**
212:11,20
**identifies** 9:25
**identify** 74:6
186:19 212:16
**illegal** 144:13
152:2,7 154:19
154:20
**imagine** 192:11
**immediately**
30:12 62:4
68:1 130:21
**impair** 14:1,4,7
14:7
**implement**
127:5 193:1
**implied** 152:12
**import** 110:4
**important** 67:2
**imported** 71:12
**impossible**
193:24,25
**inaccuracies**
159:18
**inaccuracy**
159:20
**inaccurate**
150:5,6 157:20
158:11,21
159:10,14,17

161:24 164:1
184:10
**inadvertently**
43:7
**inappropriate**
52:22
**inartfully**
109:20
**inbound**
115:25
**inbox** 43:24
**inc's** 4:9
**inception** 114:6
**included**
216:14 217:3
**including** 7:18
184:16
**income** 45:12
**incorporated**
15:5
**incorporation**
136:5
**independent**
17:20,22,24
21:20 23:5
39:6 91:14
107:23 108:5,9
108:13 119:14
137:7,17
167:13,24
**independently**
55:14
**index** 4:1
**indicated** 69:12
80:24 117:3

**[indicated - job]**

| | | | |
|---|---|---|---|
| 147:3 159:8 | **initials** 37:3 | **intent** 152:4 | **investigation** |
| 171:22 212:10 | **inject** 144:9 | **interacting** | 92:21 93:2,7 |
| **individual** | **innovation** | 100:4 | **investing** 188:9 |
| 62:14 70:5 | 80:18 | **interested** 6:20 | 195:10 196:15 |
| **individuals** | **inquired** 191:3 | 52:20 215:19 | **invoke** 103:14 |
| 12:6 | **inquiring** | **interesting** | **involve** 17:1 |
| **industries** | 189:15 | 162:25 | **involved** 11:18 |
| 124:7 | **inquiry** 189:19 | **internet** 6:5 | 12:6 14:13 |
| **industry** 36:11 | 189:24 | 119:6,19,22 | 83:8 92:17 |
| 36:23 65:7 | **inside** 53:24 | **interrogatories** | 121:21 122:9 |
| 78:10 124:2,5 | **insight** 93:16 | 107:17 | 122:14 126:25 |
| 124:9,11 | **instagram** 85:4 | **interrupt** 100:7 | 177:9 180:1 |
| 125:16 188:9 | 85:7 138:3 | 111:16 113:12 | **io** 73:10 |
| 205:20 | 164:18 | **interview** | **ip** 205:23 |
| **inexpensive** | **instance** 10:20 | 141:16 | **irate** 163:9 |
| 206:20 | **instances** 14:10 | **introduce** | **issue** 19:8 46:9 |
| **inflated** 150:14 | **instructed** 5:9 | 41:22 42:3 | 46:11 116:8 |
| 150:15 | **insurance** 4:12 | 57:15 61:7 | 189:4 196:17 |
| **info** 11:10 | 41:22 42:4,12 | 70:16,20 146:2 | 207:15 |
| 91:13 | 42:13,15,15,21 | 146:6,12 | **issues** 196:17 |
| **inform** 170:15 | 43:15,21 47:25 | **invade** 103:25 | **issuing** 62:3 |
| **information** | 48:4 70:17 | **invades** 59:8 | 68:1,3,10 |
| 5:14 11:11,14 | 101:22 128:12 | **inventory** | 130:20 |
| 17:2 19:12,13 | 128:15 | 109:11 | **it'll** 146:2 |
| 33:16 56:7 | **integrity** | **invest** 195:13 | |
| 71:10 74:3 | 191:17,21,25 | **invested** 196:6 | **j** |
| 94:3 113:20,21 | 192:7,8 193:2 | 197:6,21 | |
| 114:1 135:24 | **intelligent** | **investigate** | **janice** 90:12 |
| 175:16 183:10 | 118:10 | 52:3,11,16 | **january** 34:17 |
| 185:22,25 | **intend** 9:4 | **investigated** | 59:19 93:21 |
| 186:4,13 188:2 | 165:11 | 16:13,18 52:6 | **jeff** 12:17 |
| 213:3 | **intended** 61:22 | 54:25 55:14 | **jeopardizing** |
| **initially** 11:23 | 63:2 130:14 | **investigating** | 200:10 |
| 102:19 113:19 | 158:2,4 165:5 | 92:16 | **jeopardy** 174:5 |
| | 165:6,8 | | **jfd** 1:7 2:8 6:14 |
| | | | **job** 13:7 49:16 |
| | | | 91:3 161:7 |

Veritext Legal Solutions
866 299-5127

**[job - know]**

170:15 216:5
218:2
**joining** 7:2
**jose** 16:24,25
17:3,3,6,12
21:3 39:1,8,9,9
52:9 54:14
55:17 91:13
94:1,23 95:1
117:16,18,22
165:17 194:11
212:12
**josh** 3:11 6:25
**joshua** 3:9
**journey** 170:11
**judge** 160:25
**judgement**
163:4
**judgment**
160:24 161:1,3
161:14 169:14
**julia** 27:20,22
31:3
**july** 59:18
**june** 28:11 64:4
64:5
**jurisdiction**
198:3
**jury** 47:20
128:5 201:15
201:18
**jury's** 201:12
**justify** 192:6

**k**

**k** 136:22
**keep** 24:11
49:25 50:1
70:17 107:7,8
107:10 109:21
124:10,11
176:18 210:5
**kelly** 1:4 2:5
6:11,25 28:11
29:10 32:18
43:16 47:19
48:5 52:4,7
55:15,21 56:9
61:23 63:3
69:22 70:1
104:8 111:21
115:16 116:10
116:17,20
117:10,14,23
118:17,21,25
121:3,6 128:4
130:15 144:22
184:16 216:4
218:1
**kelly's** 16:22
20:19,25 32:6
32:9 33:1,4
69:13 71:24
84:6 113:6
120:22 144:23
189:11,15
190:24
**kept** 25:10
112:24

**kids** 111:14
176:24
**kind** 12:25 13:4
19:16 24:3
34:20 37:16,23
38:11 40:8,12
50:11 58:18
62:17 69:16
76:14 82:17,20
90:3 99:3
101:7 102:4
103:5 112:24
114:22 116:15
116:20 117:14
121:22 132:22
137:20 140:23
143:20 157:22
162:3,3 164:12
166:18 167:2
167:14,16,17
167:20 178:10
181:7 193:7
205:5
**kinds** 49:14
**knew** 112:4
**knocking**
187:17
**know** 13:18,22
15:11 17:5,16
18:11 19:4
20:25 21:2,6
21:12,15 22:2
22:25 25:5,6
26:10 28:4
29:1 30:3,20

30:23,24 31:23
31:24 32:16
33:20,23 41:21
42:11 44:7,10
44:11 48:19,19
49:11 51:10
52:24 53:3,14
53:19 54:9,21
58:7,16 59:5,6
60:7,13,15
61:5 63:15
64:2 67:2,6,19
69:15,21 70:8
70:12 72:12
73:21,22,24
74:13,14,16
75:3 78:2 80:3
84:25 85:6,15
85:21 86:7,23
89:10,12 90:10
90:11,12,24
92:2,12 93:15
94:19 95:18
96:7 97:18
100:1,6 101:3
101:3 105:1
108:18,19,21
109:10,13,15
110:21 111:23
113:10,13,14
114:18,20
117:16,20,20
118:15,19
119:1 121:9
124:12 129:21

**[know - legal]**

129:21 130:1
131:24 132:15
132:24 133:3
135:14,17
136:24 140:21
141:2 146:3
147:4,10
148:25 149:12
154:6,9 155:17
158:22 160:12
165:20 166:14
173:25 175:15
176:24 177:2,2
177:17 179:3
182:20,22
185:23,23,24
187:1,7,7
189:10 190:2,8
190:25 191:2,2
191:5,10
193:10 194:3,3
195:6 196:25
197:2 201:1,15
201:21 208:18
210:9,9 212:23
212:24 213:3
**knowing**
208:22
**knowledge**
51:6 54:2
63:19 102:8
106:12 129:16
129:17
**known** 22:19

**knows** 132:23
**kpi's** 148:8
**krystal** 90:10

**l**

**l** 7:20 27:2,2
28:18,19,20,21
123:18 136:22
**la** 27:2
**lack** 192:7,9
**lacking** 191:21
**laid** 167:15
**landline** 205:23
**landlord**
123:15
**laptop** 9:12
**large** 147:22
200:11
**launch** 37:8
188:5
**law** 3:3,8 11:1
95:17,23 96:3
100:18,19
101:12 131:21
152:5,8,16,21
155:17 161:15
162:23 170:12
173:2
**lawpoint.com**
3:6
**laws** 40:15
215:20
**lawsuit** 12:23
14:21 15:2,8
16:12,14 32:14
32:17,17 42:12

52:4,7 53:12
53:12,15 55:1
55:15,18,22
56:14,17,24
57:2,7 58:5
59:1,5,16 93:3
113:8,19 157:4
160:25 161:4
163:4 164:4
169:13 170:20
173:17,19,20
173:22 175:1,4
175:5,6,9,15
176:16 177:6,8
177:9,24 178:1
178:4,13,16,17
178:20 198:24
200:10
**lawsuits** 14:12
102:7 106:1
122:8,12
124:24 125:1,1
125:13 127:5
200:5
**lawyer** 81:11
81:11 99:17
101:8 112:20
155:14 213:2
**lawyers** 57:3,8
127:22
**lay** 98:10 109:6
112:21
**lazy** 140:21
**lead** 76:1,19

**leader** 193:12
194:20 195:4
**leaders** 195:15
**leadership**
196:14
**learn** 189:14
**learned** 44:4
59:20,20 93:22
94:20,23
103:17 148:10
206:6
**learning** 148:3
208:2
**lease** 123:13
**leave** 51:17
53:5,15,17
62:17 88:21
142:2
**leaving** 52:11
**lecture** 184:19
184:21
**left** 28:25 29:21
29:24,25 30:12
31:10 37:20
53:3 54:5 93:3
120:4 130:5,24
142:9 143:15
169:12 201:3,6
**legal** 7:18
57:11 59:2
61:25 64:12,15
66:22 67:2
68:19 81:14
100:25 101:6
112:19,21

**[legal - longer]**

130:17 132:22
144:13 152:9
152:15,19,24
154:19 155:1,1
160:5 161:6,15
162:24 163:5
170:12,17
210:9 216:7
**legally**  198:20
**lend**  35:17
**letter**  43:1
114:7 117:10
**letters**  116:10
116:16,19,20
**letting**  67:8
**levee**  161:9
**level**  122:19
**liability**  66:23
136:6 138:5
**liable**  92:22
104:6
**license**  79:16
79:19 80:1,8
80:14
**licensed**  41:2,5
41:11,14,17
80:25 81:3,5,7
81:18 82:23
83:2 108:23
124:18,21
125:3,10,11
183:15 185:10
187:20 206:9
206:11,15

**licenses**  50:8
**licensure**
124:20 186:13
186:14 197:8
198:3
**lie**  100:16
151:6 191:20
**lied**  209:1
**lien**  62:2 67:15
67:16,19,22
68:9 100:24
130:19 131:16
132:8,16,18,21
161:8 164:7
181:15
**liens**  201:7
**life**  8:11 45:4,4
161:12
**light**  34:20,21
**likely**  18:16,18
19:7,15 77:9
147:4 202:8
**likewise**  80:24
145:7
**limitation**
155:5
**limitations**
153:1 155:19
**line**  5:10,15
61:13,19 98:8
103:8,15 115:9
190:23 216:15
217:4 218:4,7
218:10,13,16
218:19

**lines**  158:6
**linkedin**  84:22
84:23 85:1
164:24
**list**  60:16 80:7
80:8 89:17
202:11 205:15
**listen**  97:17
130:11 194:22
**listened**  158:20
201:3
**lists**  206:3,6
**literally**  174:4
174:4,4
**litigation**
103:13 121:22
**little**  139:25
173:21 174:10
179:6
**live**  7:24 17:4
27:3,4 48:18
74:6 97:15
151:14
**lived**  8:6,13
**lives**  19:5,6
**living**  161:12
**llc**  136:4
**llc's**  136:5
**llp**  3:14
**loan**  20:21
203:11
**loans**  169:10,11
202:14,18
203:15,19,21

**local**  75:19
76:16 77:8,22
101:4
**localize**  75:12
75:14,24
**localizer**  76:14
**localizing**
77:17,19 147:5
**locate**  11:13
**located**  35:10
36:3 45:22
47:4 82:11
98:23 110:16
**locating**  72:14
**location**  126:7
126:8
**locations**  36:14
**locked**  216:12
217:1
**logging**  24:17
**long**  8:25 9:4
13:14 28:5
33:24,24 34:6
35:21 36:5,19
37:9 44:22
45:2 49:4
79:13 87:23
88:4,23 99:10
111:17 123:19
130:12 142:20
166:22 175:11
190:6 191:3
204:23
**longer**  22:10
30:9 52:19

Page 27

**[longer - managing]**

103:2 105:21
127:10 141:24
142:15,17
199:1 204:22
**look** 11:8,9,12
40:4 41:10
45:7 75:6,18
77:1 133:22
145:19,22
147:7,8 154:3
189:12,13
**looked** 20:22
42:20 56:11
94:2 148:11
189:10
**looking** 92:7,10
93:19 109:19
123:24,25
124:3,12
135:24 143:16
148:8 189:6
191:19
**looks** 58:21
145:20
**lopez** 89:10,11
89:12,14
**los** 8:5,7,14
79:3 87:3,4,13
87:15 214:2
**lose** 160:25
191:12
**losing** 206:22
**loss** 12:2 52:13
176:16

**lost** 127:25
**lot** 57:11 58:10
78:20 98:5
125:4,4,5,13
130:25 150:2
153:24 157:21
159:18 164:2
169:9 170:25
180:1 183:7
187:25 191:12
191:22 196:15
196:21 198:24
204:5 208:9,23
**lots** 89:15
**luck** 188:15
**lunch** 142:15
142:17
**luncheon** 143:5
**lutely** 170:9
**luz** 27:2
**lying** 160:14
207:22 208:3,6

**m**

**m** 7:20,21 82:8
82:9 90:18
136:22,22
**madam** 142:19
**made** 16:14
43:15 52:4,7
55:1 56:17
65:22 94:15
106:13,14
107:11 115:1,2
115:20 122:2
122:23 128:18

128:20 140:1
149:19 150:19
155:2 156:22
162:9 163:20
176:17 207:9
214:9 215:10
**mail** 9:22 18:23
43:17,18,23
44:2,12
**mails** 11:12
**maintain** 46:21
115:24
**maintains**
46:12,14 91:6
**major** 99:5
**make** 13:8
23:15,23 43:9
55:25 58:12
74:12 75:5
76:15 103:18
114:2 115:4
116:8 138:20
155:4 161:12
171:4 190:5
193:18 195:14
203:10 216:14
217:3
**makes** 54:13,14
155:3 181:5
**making** 75:17
125:12 152:12
153:2 159:14
192:5 196:7,20
207:24 214:10

**man** 118:10
140:21
**manage** 107:25
108:3 135:2
**managed** 125:6
**management**
24:9 82:4,7,9
82:11 89:8
127:1
**manager** 4:18
16:4,8 17:2
27:20,25 28:6
28:10,12 29:17
29:24 30:21
31:6 38:3,4
50:2,4 51:14
51:18,21 54:12
62:19 64:5
67:4,5,6,10
107:4 120:8
156:4 162:5
**managers** 16:3
27:16,18 28:3
30:17 51:17
60:20 62:23
63:20 64:1,2
74:14 96:7
106:8 107:12
125:24 126:19
127:3,10 193:6
195:15 196:14
197:3
**managing**
65:18 148:9

**[manner - media]**

| | | | |
|---|---|---|---|
| **manner** 44:8 | 205:13 | 146:23 149:6 | 131:4 132:12 |
| **mansukhani** | **marketing** | 152:23 169:17 | 135:3 138:12 |
| 3:14 | 184:11 207:18 | 170:3 171:7 | 138:24 149:20 |
| **manual** 40:18 | 208:2,20 | 182:23 183:21 | 149:23 154:3 |
| **manually** 48:25 | **markings** 70:18 | 187:13 194:25 | 156:14 158:12 |
| **manuals** | **marlin** 136:20 | 198:6 201:24 | 159:21 160:13 |
| 167:23 | 136:21 | 202:23 205:11 | 165:22 166:7 |
| **march** 1:16 | **marlon** 136:17 | 207:2 211:4,24 | 176:15 180:19 |
| 2:16 6:2 93:21 | 136:18 137:1 | 213:20 214:18 | 185:24 187:5 |
| 216:5 | 137:13 153:18 | 216:5 218:2 | 198:17 200:15 |
| **maria** 26:17,18 | 153:19 | **mary** 60:1,6,8 | 202:11 209:6 |
| **marina** 28:4,7 | **martinez** 1:14 | 61:23 63:3 | **meaning** 38:23 |
| 31:6 51:18 | 2:14 4:13,15 | 82:8,9 130:4 | 38:25 75:14 |
| 52:1 60:21 | 4:16,18,19,20 | 130:15 181:14 | 152:5 |
| 62:20 | 4:21,22,23,24 | 194:18 201:4,6 | **means** 9:22 |
| **marina's** 30:20 | 4:25 5:1,2,3,4,5 | **massachusetts** | 31:24 67:19 |
| **mark** 61:11 | 5:6 6:10 7:5,9 | 110:18 111:2,7 | 72:12 74:22,25 |
| 195:1 | 7:15,20,21,22 | 111:8,11 | 85:25 93:14,15 |
| **marked** 57:16 | 10:12 12:21 | **massively** | 93:18 102:25 |
| 61:8 70:23 | 16:7 26:17,18 | 140:8 | 107:19 127:20 |
| 133:17,19 | 26:20,21,22,23 | **master** 205:21 | 128:3 129:22 |
| 144:17 148:1 | 27:3,13 29:13 | **matt** 3:18 | 132:16,23 |
| 151:9,11 | 35:15 38:6 | **matter** 6:11 | 156:11,15 |
| 155:23 156:1 | 42:11 43:4 | 10:25 12:12 | 166:13 180:20 |
| 160:17,19 | 69:1,9 70:5 | 15:7,9 180:14 | 198:19,21 |
| 162:15,16 | 71:4 81:10 | 184:7 196:4 | **meant** 75:5 |
| 168:22,23 | 83:5,8 85:2,8,9 | 199:18 201:11 | 83:12 |
| 170:4,5 173:12 | 85:11,16,23,24 | 203:7 | **media** 6:9 |
| 173:14 179:9 | 86:9 92:8 | **matthew** 6:16 | 84:19,21 |
| 179:10 182:24 | 103:23 114:12 | **mean** 15:4 | 133:25 134:2 |
| 183:1 187:14 | 116:24 117:3 | 16:17 45:3 | 134:16 135:9 |
| 187:15 191:13 | 118:13 133:16 | 51:9 68:15 | 135:11 136:13 |
| 191:15 195:2 | 134:7 137:3,15 | 74:22 93:17 | 137:4 138:3,23 |
| 198:7,8 201:25 | 137:18 139:10 | 100:6 102:24 | 139:5,7,13 |
| 202:1 205:12 | 143:13,15 | 117:7 124:9 | 140:2 141:5,7 |

Veritext Legal Solutions
866 299-5127

[media - monte]

| | | | |
|---|---|---|---|
| 141:13 149:15 150:2 151:25 153:23 158:3,5 158:12 162:12 164:2,15,15 165:5 166:4,4 174:24 176:19 176:22,25 178:15 180:11 184:1 188:23 192:20 199:15 200:21,23 201:9 203:4 207:10 | mentors 206:4 mercedes 163:6 163:8 164:10 merchant 179:24,25 merely 193:25 message 131:5 131:6,21 132:11 messed 154:18 met 79:6,8,12 110:25 111:3 121:17 151:14 154:6 | middle 7:18 26:24 211:25 mike 85:16,24 142:2 million 148:7 150:21 151:5 173:24 176:16 177:6,7,12,13 179:19 191:8 millionaire 141:10,18 173:25 mind 57:11 | miranda 100:13 misdemeanor 87:9,10 mispronounc... 88:13 misrepresent... 78:13,16 misrepresenti... 77:24 78:6 missed 9:2 86:2 86:13 missing 197:14 misstate 59:17 |

**media's** 136:12
**medical** 14:6
  202:13
**meet** 111:11
  114:7 201:18
  201:20
**meeting** 121:16
**member** 101:16
  101:19,25
  207:20
**memorize**
  131:5,7
**memory** 14:8
  212:7
**men** 140:21
**mention** 138:10
**mentioned** 88:7
  98:6
**mentioning**
  67:16

**meth** 141:9,14
  141:18 143:18
**methamphetа...**
  143:22
**mexican**
  180:25 181:2
**mexico** 1:15
  2:15 8:22,25
**michael** 1:14
  2:14 4:13,15
  4:16,18,19,20
  4:21,22,23,24
  4:25 5:1,2,3,4,5
  5:6 6:10 7:5,9
  7:20 82:6,6
  83:5 85:2,8,9
  85:11,23 86:9
  134:6 137:3,15
  137:18 214:18
  216:5 218:2

**mind** 57:11
  59:13 116:4
  176:18 204:12
  206:9
**mine** 140:10
**mini** 100:13
**minneapolis**
  3:5,16 78:14
  78:14,17 105:4
  105:14
**minnesota** 1:2
  2:2 6:13 41:15
  62:3 67:25
  81:8,18 101:13
  130:20 155:18
  197:9 198:4
**minority** 37:8
**minute** 17:7
  73:3 92:5
  142:9 210:20
**minutes** 68:24
  142:22,24
  172:2 213:9,13

**misstates**
  117:24
**mistake** 138:20
**mn** 3:5,16
**model** 173:1
  190:19 200:14
**mom** 38:6
**moment** 39:18
**money** 33:9
  35:17 125:11
  140:1,22
  148:15 161:5
  161:13 162:20
  169:15 191:12
  196:15 198:2
  206:23,23
**montclair** 29:2
  54:22 212:24
**monte** 98:15

[month - never]

**month** 19:22
30:4,5 44:15
44:19 45:2,15
45:16 76:25
80:4 109:5
110:8,10 148:6
148:7,24 149:2
150:22 151:5
**monthly** 45:10
**months** 17:21
17:24 18:3
19:22 22:6,11
35:23 39:21,22
84:4 88:24
93:22,22 111:7
120:4 156:9
**moreno** 90:12
**morning** 6:1,24
7:3,15,16
48:18 163:7
**morris** 90:24
90:25
**mortgage**
169:11 179:3
**mother** 26:14
26:15 27:13
83:8 95:8,9
120:23
**mother's** 26:15
26:23 144:22
**motherfuckers**
149:2
**motion** 127:18
127:22,25

**motor** 185:22
185:25 186:4
187:3
**mountain**
98:15,16
**mouth** 159:9
176:14 199:23
**move** 58:12
123:22 124:6
138:5,20 163:8
**moved** 140:23
145:11
**movie** 166:19
166:21,24
**msm** 82:4,6,11
82:17,23 83:1
83:4,8,13,17,20
84:7,9 89:7
**msn** 82:5,17
89:7
**mt** 98:22
**multi** 141:10
**multimilliona...**
143:19
**multiple** 25:7
145:20 146:17
198:15
**munoz** 12:5,7
**muted** 71:1
**mutual** 18:1,2
30:10 103:2

**n**

**n** 3:1 7:21,21
90:18 136:22

**name** 6:16 7:18
7:18 10:23
11:8 12:3 16:7
16:24 18:11
19:10 26:16,24
28:4,17 30:20
30:23,24 33:20
33:21 36:12
41:8,10 44:11
45:25 54:19,21
60:8 61:23
63:3 82:3
84:25 85:7,21
86:7 88:18
90:17,19 91:1
95:5,6,13
110:21 117:19
130:15 147:9
153:17 175:9
175:15 177:17
183:18 188:8
211:20,23,25
212:23 213:5
**named** 59:25
89:13 146:6
**names** 60:3,4,4
108:18 136:14
136:24
**nand** 200:5
**narcotics** 87:7
**natalia** 1:20
2:16 6:18
215:4,25
**natalie** 211:24

**natalie's**
211:25
**national** 80:18
**nature** 92:16
93:7 100:15
**navy** 173:19
175:2,6 176:4
176:5,7 177:8
177:11,14
178:19,23
**near** 19:1 27:4
**nearly** 193:24
**necessarily**
152:10 187:9
207:18
**necessary**
216:14 217:3
**need** 11:14
13:13 127:5
134:25,25
139:12 158:20
172:18 180:3
213:9
**needed** 19:14
69:19 209:11
**needs** 109:3
**negotiating**
118:22
**net** 45:12
**network** 119:9
119:12,13
**never** 65:8 79:8
112:4 116:3,3
134:19 138:16
140:16 172:2

Page 31

**[never - offices]**

212:13
new 29:17
30:20 54:19
59:20 93:23
94:21 98:5
146:7,13 163:6
174:2 183:17
nickel 191:1
nine 34:14
79:23 80:4
102:10 123:21
125:7,14
nods 153:14
161:22
noncompliance
130:8
nonpayment
170:14 171:23
normally
206:14
notated 115:5
notating
216:15 217:4
note 6:3 115:9
noted 118:4
notes 55:24
56:2,6,6,11,13
112:24 113:6
114:12,15,17
114:19,25
131:4 215:16
notice 30:8,14
30:15 69:15,24
70:12 206:1

noticed 183:5,6
183:7
notices 70:10
notified 42:14
notifying 61:24
64:11 130:16
████████ ██
████
nuance 158:18
number 4:7
6:13 18:12,15
33:21,22 48:25
60:10,12,13,25
62:4,5 68:1,2,4
68:10 74:11,17
74:24 75:5,6
75:12,19 77:10
77:11 91:7
101:14 102:18
130:5,5,21,22
131:18 144:24
144:24 145:1,4
145:5,9,13
146:24 161:8,9
161:10 194:3
194:18 204:15
204:18 205:22
205:23 216:15
217:4
numbered
147:15,17
numbers 60:16
73:25 75:9,22
75:23,24 76:1
76:4,5,6,18,19

76:21,23 77:22
101:2 147:4,11
150:4,5,6
151:1 187:23
201:8

**o**

o 90:18 123:18
123:18 136:22
136:22,23
oath 69:10
95:24 143:14
211:5 215:8
object 31:21
55:3 70:2
77:12 78:1
94:12 104:10
116:12 120:13
124:16 167:7
197:12 200:18
201:14 203:16
208:8
objecting
129:12
objection 21:16
42:24 43:9
53:18 55:13
59:7 61:2
65:24 66:6
68:19 94:16
95:19 101:9
102:17 103:10
103:18,19,20
117:24 118:3
120:24 129:3
129:10 131:23

160:5 165:7
182:1,6,11
194:13
objection's
118:4
objections 6:21
56:19 215:10
observe 125:18
194:11
obtain 74:3
obtaining
198:3
occasion
125:18 206:19
occasionally
22:15 194:9
occasions 40:4
occurred 64:3
office 3:3 17:8
17:12 18:14,25
21:5 22:1,6,10
22:14,20 23:4
23:16 24:20
76:2 106:21
123:2,4,8
126:2,4,6,6,9
148:20 156:20
162:4 163:9
165:24 166:1,3
166:15,25
168:5,18 175:5
176:10 216:11
offices 17:11
23:18,19 36:13
54:16 126:4

[oh - okay]

| | | | |
|---|---|---|---|
| **oh**   17:19 30:2 | 46:17 47:9 | 92:15,24,25 | 132:22,25,25 |
| 76:3 77:18 | 48:8,12 49:10 | 93:12,15,20 | 133:7,13,16 |
| 119:12 134:2 | 49:18,22,25 | 94:8,11 95:1,7 | 134:5,16,21 |
| 135:2 148:19 | 51:18 52:20 | 95:16 96:1 | 135:7,16,21 |
| 211:18 | 53:20 54:2,13 | 97:7,24 98:7 | 136:16,25 |
| **okay**   9:6,22 | 54:24 55:11 | 98:20 99:5,13 | 137:5,14,19,25 |
| 10:4,9,10 11:6 | 56:5,13 57:10 | 99:16,25 | 138:18 139:4,6 |
| 11:10,13,17,20 | 57:15,22 58:1 | 101:16 102:6 | 139:15,17,19 |
| 11:23 12:1,14 | 58:4,6,11 59:1 | 102:23 103:4 | 139:24 140:3,6 |
| 12:21,25 13:7 | 59:16 60:6,24 | 103:25 104:13 | 140:6,11,14,18 |
| 13:10,11,16,21 | 61:18 62:6,13 | 104:17,20,24 | 140:19 141:8 |
| 13:25 15:5,6 | 62:20,23 63:11 | 105:3,7,11,23 | 141:13,20 |
| 16:10 17:11,22 | 63:24 64:14,18 | 106:10,16 | 142:14 143:15 |
| 18:2,6,12,14,19 | 65:21 66:13,17 | 107:6,13,20 | 143:25 144:2,4 |
| 19:1,4,8,10,13 | 67:13,16,24 | 108:8 109:17 | 144:15 145:22 |
| 19:16 20:24 | 68:3,7,22 | 109:24 110:19 | 146:5,11,11,14 |
| 21:4,7,19 22:4 | 69:24 71:9,14 | 111:5,8,12,25 | 146:19,23 |
| 22:9,16,22 | 72:8,11,20 | 112:6,8,9,19 | 147:2,8,14,15 |
| 23:3,14,19,22 | 73:4,18,21 | 113:5,21,24 | 147:20 149:8 |
| 24:6,9,23 25:4 | 74:16,21 75:1 | 114:8,18 115:4 | 149:12,17,25 |
| 25:23 26:1,4,6 | 75:4,11,17 | 115:8,24 116:5 | 150:3,10,15,18 |
| 27:12,18 28:9 | 76:3,5,19,25 | 117:6,18,22 | 150:21,24 |
| 28:21 29:3 | 77:7,23 78:12 | 118:14,15,20 | 151:3,8,8 |
| 30:5,17 32:1,3 | 78:17,19,25 | 118:24 119:3 | 153:7,9,12,19 |
| 33:15 34:6,14 | 79:11,15,22,25 | 119:21 120:17 | 153:19,25 |
| 34:18,22 35:1 | 81:14,23 82:2 | 120:22 121:2 | 154:10,14,20 |
| 35:17,21 36:2 | 82:8 83:14,25 | 121:19,21,24 | 154:24 155:10 |
| 36:16,22 37:4 | 84:12,21,25 | 124:14,20,25 | 155:10,12,16 |
| 37:9,15,19 | 85:11 86:12,16 | 125:22 126:1,5 | 155:22 157:15 |
| 38:1,10,17,22 | 86:18,20 87:4 | 126:10,13,21 | 157:18,24 |
| 39:3,15,19,22 | 87:17,19 88:15 | 127:7,11,21,24 | 158:9 159:3,8 |
| 40:6 41:8,11 | 88:18 89:10,17 | 127:25 128:2,3 | 159:19,22,25 |
| 41:20 42:6 | 89:20,25 91:10 | 128:11,14,21 | 161:19 162:8 |
| 43:10,25 44:2 | 91:12,17,20,25 | 130:3,7,23 | 163:15,17,22 |
| 44:3 45:1,9,14 | 92:4,6,8,10,14 | 131:1,12 132:7 | 164:4,7 165:10 |

Page 33

**[okay - owned]**

165:17 166:1,6
166:10,21,24
168:5 172:19
173:8 174:18
175:9,15,19
176:11,13,21
177:1,10,15,20
177:23 178:9
178:13,19,22
178:25 179:8,8
180:5,7,17
181:4,4,7,13,18
181:20 182:12
182:17 184:9
184:13,22,25
185:15 186:1,7
186:17 187:3,3
188:13,18
189:4,7,18
191:4 192:14
193:23,25
194:7,10
195:20 196:6
196:12,25
198:2 199:9,21
201:18,24
203:21 204:8
204:15,23,24
205:1 207:15
207:19 208:1
208:25 209:5,9
209:22 210:5
210:14,21,22
210:23 211:11
211:14,20,22

212:19 213:7
213:20
**old**   26:5,6
54:11 87:7
98:4 107:4
112:2,8,11,17
112:22 136:5
146:6 159:22
159:23 160:1
175:20 183:12
202:6 204:9,13
**older**   112:4
208:23
**once**   33:7 58:17
92:21 136:12
187:24 198:25
199:5 200:2
205:15
**ones**   23:16
79:12 202:4,12
202:15
**ontario**   8:19
**opened**   34:17
172:21
**operation**
28:14,22 29:3
126:15
**operations**   4:18
29:23 38:3,4
156:4
**opinion**   78:15
102:20,20
158:15 181:6
181:10 198:12
200:8 201:11

203:23 204:19
205:4,10
**opportunity**
22:13 58:7
69:10 111:9
194:10
**opposed**   83:16
166:13,14
**options**   18:4,8
54:7
**order**   71:6
164:8 191:20
**ordered**   114:5
**organization**
23:8 36:20
105:22 122:16
156:5 193:8
**organization's**
162:19
**organizations**
196:18
**origin**   78:7
**original**   33:21
176:7 216:10
216:21
**originally**
59:16
**originated**
33:22
**outage**   42:1
48:22
**outbound**
74:12 115:2,12
115:25

**outcome**   6:20
**outdated**   98:5
183:9
**outgoing**
115:20
**outside**   10:5
79:1
**outsource**
82:22 83:17
**overdraft**
202:10
**owe**   192:1
198:18
**owed**   163:1
**own**   11:19
20:14 23:17
27:9,12 28:25
29:21 38:18
54:2 60:4
64:25,25 66:4
72:17,17 74:7
81:21,24 83:11
83:15 91:23
104:4 107:24
112:15 114:23
119:25 121:6
123:11 136:8
148:15 151:19
167:25 173:17
185:12 187:25
193:7
**owned**   20:9,10
36:25 60:14
186:19,23,25
208:22

Page 34

**[owner - pbarry]**

**owner** 33:6
37:8 65:1
125:20 126:14
**owners** 61:24
64:11 130:16
**owns** 26:13
27:13 60:17
83:4 151:22

**p**

**p** 3:1,1
**p.m.** 143:6,7,10
210:23 211:1
213:14,16
**p.m..** 213:23
**package** 76:14
147:5
**page** 4:3,7 5:10
5:15 133:22
136:3 138:14
140:6 143:16
145:7,12,20,23
216:15 217:4
218:4,7,10,13
218:16,19
**pages** 58:4,6
145:12,21
146:11,17
183:11,12
206:18,24,24
216:14,17,17
217:3,6,6
**paid** 18:20,24
19:21,21,24
20:1 81:14
108:12 111:24

157:5 163:11
163:12
**paint** 200:16
204:6
**paragraph**
92:10 93:14
**paralegal** 99:7
99:8
**parameters**
152:6
**pardon** 16:6
100:6
**park** 8:15,16
17:9 27:5,6,8
**part** 15:19 18:3
24:16 34:5
44:24 65:1
92:23 96:8
131:1,2 150:3
150:21 161:7
179:5,7 184:9
187:4 193:11
207:17,19,19
**parted** 17:20
17:23 22:10
30:3
**participants**
6:5
**participate**
122:19
**particular**
143:17 165:13
180:23
**particularly**
16:15,16

**parties** 6:8
83:23 92:17,21
92:22 93:8,11
93:24 215:18
**partner** 12:24
36:24 37:7
211:15,15
**partnered**
206:12
**partners**
195:15 197:2
211:10
**parts** 130:25
150:18 186:18
**party** 6:19
35:14,14,16
83:21,25 84:3
92:20 120:12
120:18 122:19
**pass** 213:3,7
**past** 45:5,10
102:11 135:23
202:7
**patrick** 110:24
111:3 136:17
136:23 137:1
137:12
**pause** 62:25
**pay** 126:19
148:15,18
152:17 156:15
156:23 162:21
163:1,2 169:1
170:17 171:4
178:6,23 180:3

192:1 199:1
204:6,23
206:20
**paying** 81:11
81:11,12,13
94:24 118:22
127:14 152:2
153:5 160:22
161:17 170:7
171:1 179:23
192:4,6
**payment** 1:7
2:8 4:8 6:12
7:4 14:17,20
15:4,16 17:8
19:18 20:9,10
20:13,17 21:10
26:13 32:18
34:6,15,18
43:16 48:5
65:1 80:21
81:13,20,24
83:13 89:14
98:3 115:17
120:6 121:7
128:5 129:16
153:3 155:2,3
155:4,20
167:12 176:17
189:16,20
193:4 194:21
196:7,13 216:4
218:1
**pbarry** 3:6

Veritext Legal Solutions
866 299-5127

**[pdf - places]**

| | | | |
|---|---|---|---|
| **pdf** 216:12 | **percent** 20:6,8 | **personal** 78:15 | 147:11 187:22 |
| 217:1 | 20:10 27:12,14 | 78:15 84:12,16 | 200:24,24 |
| **pedro** 16:9,10 | 38:21,22,23 | **personality** | 205:22 |
| 16:11 27:19 | 108:12,14,15 | 139:3,7,13 | **phones** 51:3 |
| 30:25 39:7 | 140:22 141:7 | **personally** | 67:8 144:22 |
| 50:4 60:22 | 158:14 159:1 | 60:18 63:18 | 148:21 168:8 |
| 89:23 | 179:16,19 | 64:22 121:24 | **phrase** 63:5,8 |
| **peeking** 187:21 | 180:3 191:9,9 | 129:19 137:6 | 63:13,17,21,25 |
| 189:7 | **percentage** | 201:10 | 64:14,21,23 |
| **penalties** 81:17 | 20:4 191:7 | **personnel** 29:8 | 65:4,5,6,9,12 |
| **penalty** 214:7 | **perfect** 18:7 | **persons** 143:9 | 65:17,19,23 |
| 215:20 216:16 | 190:5 | **pete** 6:24 | 66:7,10 67:1 |
| 217:5 | **perform** 50:16 | **peter** 3:3 89:23 | 67:17,21 68:3 |
| **pending** 13:14 | **performing** | **philosophy** | 74:19 165:22 |
| 62:2 67:15,16 | 191:11 | 193:3 204:3 | 180:23 199:9 |
| 67:19,22 80:20 | **period** 80:5 | **phoenix** 137:12 | **phrases** 68:5,7 |
| 83:1 130:19 | 103:8,15 | **phone** 4:11 9:9 | **physically** 19:1 |
| **pennsylvania** | 216:18 217:7 | 9:14,19 10:8 | 21:5 22:6 |
| 78:22 | **periodic** 19:18 | 18:12,15 51:1 | **pick** 77:9 |
| **people** 23:7 | **perjury** 214:7 | 51:4 60:25 | 154:11 180:23 |
| 25:1,8 35:18 | 215:20 216:17 | 62:4 68:1 | **picture** 145:24 |
| 40:5,7 89:16 | 217:6 | 74:11,12,17,24 | 200:16 |
| 115:23 140:7 | **permits** 152:16 | 75:5,6,12,19,20 | **piece** 179:22 |
| 148:14,17 | **person** 23:4 | 75:22,24 76:7 | **pinata** 88:12,12 |
| 151:17,24 | 44:11 60:25 | 76:15,18,19,21 | 88:19,20,21 |
| 161:16 162:21 | 63:20 90:4,8 | 76:23 77:1,9 | **pines** 62:3 |
| 167:1,3,4 | 90:11 112:21 | 77:10 97:11,18 | 67:25 130:20 |
| 170:13,25 | 121:11 122:23 | 98:4 100:14 | **pinkish** 162:3 |
| 172:5 195:14 | 131:21 147:10 | 101:2,13 115:2 | **place** 6:7 29:14 |
| 196:14 198:24 | 153:9 154:6 | 115:4,5,6,9,11 | 36:10 56:4 |
| 207:25 208:3 | 170:21 171:23 | 115:12,23,25 | 143:8 190:23 |
| **people's** 39:23 | **person's** 16:7 | 130:21 144:23 | 215:7 |
| 187:21 189:6,7 | 211:20 | 144:24,24 | **placed** 164:7 |
| **pepsico** 195:4,7 | **persona** 138:2 | 145:9,24 | **places** 111:4,5 |
| | | 146:24 147:4 | 160:25 192:10 |

**[plaintiff - previously]**

**plaintiff** 1:5 2:6
  2:15 3:2,7 6:11
  6:25 104:8
**plaintiff's**
  57:16 61:8
  70:23 92:18
  133:19 144:17
  148:1 151:11
  156:1 160:19
  162:16 168:23
  170:5 173:14
  179:10 183:1
  187:15 191:15
  195:2 198:8
  202:1 205:13
**plan** 47:25
  128:24,25
**plans** 123:22
**platforms** 86:4
**play** 61:6,20
  130:11 147:25
  151:9 154:10
  155:23 160:18
  187:14
**played** 154:5
  154:12 159:6
  181:13 199:25
**playing** 170:19
**please** 6:2,22
  6:23 7:7 42:2
  48:22 114:25
  167:14 213:13
**pled** 94:22
**poindexter**
  12:17,18

**point** 13:14
  58:12 81:10
  138:13 181:4
  198:3 204:21
**policies** 48:4
**policy** 4:12
  31:20 32:4
  40:18 41:22
  42:4,12,21
  43:15 48:3
  51:12 70:17
  167:23
**pomona** 45:23
**popular** 138:1
**portfolio** 82:4,6
  82:9,11 89:7
**position** 35:1
  36:22 38:1
  140:15
**possession** 87:6
  87:7,25 96:24
**possible** 95:11
  95:13,16
  118:23 192:11
  193:5
**possibly** 115:23
  195:16 196:8
**post** 99:11
  135:1,5,12,17
  137:19 138:1,1
  138:15 139:2
  140:11,12,20
  141:11 160:24
  161:3,14
  188:22 201:10

**posted** 134:19
  135:14,15
  137:20 138:16
  140:16 149:15
  162:12 174:23
  180:11 184:1
  192:20
**posting** 199:14
  203:4 207:10
**posts** 133:25
  134:3,17 135:3
  135:8,16
**potentially**
  92:17
**powerful**
  208:20
**practical**
  125:17 190:18
**practice** 13:1
  18:22 21:13,21
**practices** 40:22
  40:25 99:15,21
  102:9 104:7
  121:7,10,12,25
  122:4,20 160:2
  160:11,15
  197:7,22,23
  210:10
**precipitated**
  18:2
**preface** 98:8
**prepared**
  105:14
**prepares** 49:7

**presence** 101:4
  139:13 164:16
**present** 3:18
  37:24 143:9
**presentation**
  151:18 184:22
  185:5
**presentations**
  207:23
**president** 27:21
  28:1,2 31:4
  38:7
**pressure**
  166:25
**presumably**
  18:19 24:15
  53:25 66:17
  96:21 117:2
**presume**
  105:17
**pretty** 15:10
  59:1 83:18
  107:24 108:8
  173:23 174:1
  210:20
**previous** 102:7
  102:20 103:1
  122:7,7
**previously**
  22:19 51:21,23
  90:22 97:25
  133:10,17
  160:17 162:14
  168:21 170:4
  173:12 179:9

Page 37

**[previously - punitive]**

182:24 187:14
195:1 198:7
201:25 205:12
**price**  33:8
**pricey**  210:4
**primarily**
84:12,15,16
**prior**  34:11,22
34:22 52:11
121:16,21
**privacy**  73:23
186:2 197:10
197:23
**privilege**  43:8
43:13 59:8
94:16 103:14
104:1
**privileged**
42:25
**pro**  32:10,11,13
32:16 33:4,7
69:17 109:24
110:13,15,16
110:22 111:17
111:20 172:12
172:16
**probably**  43:8
44:18 57:22
60:20 62:19
67:11 85:2
89:19 91:16
101:7,10
102:10 110:9
120:8 138:10
138:13,22,23

140:10 141:15
158:25 201:23
202:20
**problem**  61:16
146:21 147:21
**procedure**
40:18 167:23
216:19,20
**proceed**  142:12
**proceeding**
6:21
**proceedings**
143:6,8 213:22
215:6,13
**process**  20:16
23:6 33:3
49:15 61:23
63:3,5,8,13,22
63:25 64:15
79:20 100:21
104:5 130:15
131:17 132:13
132:16 156:7
157:22 158:7
158:15,18
159:2,16
181:14 201:7
**processed**  80:9
80:11
**produce**  44:1
114:5
**produced**  46:6
**product**  33:8
71:20 184:15
185:18

**production**
107:18
**professional**
34:3,10 37:16
37:16 100:14
101:16 102:3
135:22 186:14
215:4
**professionals**
139:8
**profitable**
39:24
**program**  40:8,9
99:3
**prohibit**  10:4
**project**  12:24
**pronouncing**
88:18
**prop**  138:24
**properties**
185:1
**property**  61:25
64:12 130:17
161:9 186:19
**proposition**
19:17
**propounded**
215:10
**protected**
185:24
**protection**
73:23 80:18
186:2 197:10
197:23

**protective**
185:21
**provide**  13:12
61:10 69:20
119:6 128:13
**provided**  69:21
106:24 113:22
216:19 217:8
**providers**
137:17
**public**  135:25
161:1 164:16
164:18,20,22
164:24 165:1
183:10 207:10
**publically**
184:1 188:23
**published**
146:9
**pull**  133:13,14
174:7 189:21
189:23 205:15
206:6 209:19
209:22 210:1
**pulled**  175:18
176:10
**pulling**  183:13
187:22 206:3
**punished**  167:2
167:5
**punitive**  47:15
47:19,23
127:18,22
128:5

Page 38

**[purchase - received]**

**purchase** 20:13
32:25 69:25
109:7,7,24
**purchased**
20:18 21:2
32:20 70:12
83:24 84:1,2
110:12 111:20
112:16
**purchases** 32:4
**purchasing**
125:15
**purpose** 208:6
**purposes** 71:25
84:13,17
184:12 208:20
**pursue** 152:20
**pushed** 173:21
**pushing** 125:9
**put** 141:4,15
154:18,19
158:3 159:9
161:8 163:5
164:10 169:3
176:14 181:15
199:23 215:8
**putting** 151:1
198:21

**q**

**quality** 6:4,4
**quarters** 57:23
**queens** 140:22
**question** 9:13
10:9 13:14,17
13:19,23 25:19

43:7,11,11
46:13 53:2,21
55:12 58:18
59:3,9,11
61:20 62:19,20
67:7 74:1 92:6
94:10 98:8
103:22 104:4
104:22 109:3
109:19 112:13
116:14 117:2,6
118:4,15
120:14 126:23
128:7,25 129:7
129:12 139:12
140:17 142:7
151:24 158:18
158:25 172:13
178:16 181:11
190:9 194:1
196:25 197:4
197:16 201:5
205:6
**questioning**
61:13,19 73:7
98:8 103:8,15
**questions** 5:9
62:2 63:1
67:14 90:1
99:14 103:12
103:17 130:19
134:5 213:18
215:9
**queue** 158:20

**quick** 142:11
142:14 198:11
199:24
**quickly** 15:10
58:6 156:6
**quite** 124:1,1
**quiz** 186:1
**quotation**
141:3

**r**

**r** 3:1 7:21
136:22,23
218:3,3
**r&s** 217:1,9
**races** 23:12
49:20
**racking** 25:4,5
25:7
**rancho** 7:25 8:2
8:6,14 9:7
**rather** 15:2
44:9 68:9
184:3
**reach** 52:15,22
**reached** 52:25
**read** 92:11,12
92:13,15
134:24 213:19
214:8
**reading** 216:23
217:9
**ready** 124:6
170:16
**real** 12:24,24
13:1,1,4 43:4

76:1,4,23
82:18 89:5
96:11 97:2
140:21 148:3
148:10,22
151:15 156:8
183:3,18 185:1
186:19 188:9
198:10 206:7
206:15 207:25
208:1,3,10
211:17,18
**reality** 150:14
**really** 30:12
40:7 55:2
56:16 75:22
140:5 154:4
156:6 158:24
174:9,9 175:3
175:6 178:3
185:17
**realtime** 183:13
**realty** 150:15
**reask** 13:18
**reason** 116:4
118:20 218:6,9
218:12,15,18
218:21
**reasons** 102:18
**recalibrate**
197:19
**recall** 95:6
179:1 212:3
**received** 29:8
43:1,17,18

Page 39

**[received - remember]**

105:25 106:3,6
106:16,19
**receiving**
131:21
**recently**  104:22
104:25 106:15
106:23 113:8
153:3
**recess**  61:14
143:5
**recognize**  62:9
74:24 75:7,10
90:17,19 91:1
133:23,24
141:6 144:24
145:1,5,8,13
146:24 194:18
196:17
**recommend**
152:20
**recommends**
158:5
**record**  6:2,8,23
7:19 8:22 13:9
19:5 50:22
51:1,4,6,10,11
69:4,5,7 72:12
80:13 107:8,10
107:13,21
115:9,19
140:14,19
143:4,11
154:12 159:6
161:2 169:22
171:17 174:15

174:16,17
185:22 186:4
188:22 189:11
192:18 195:24
199:14,25
210:24,25
211:2,5 213:12
213:15,17
**recorded**  6:6,9
149:12 153:15
157:15 184:4
203:3 215:11
**recording**  4:11
6:4,7 61:6,11
61:12,20 62:6
62:9 64:3
138:12,23
154:5 181:13
**recordings**
54:25 55:20
**records**  80:21
115:5,13,24
**recovery**  32:10
32:11,13,16
33:4,7 36:1,2,5
69:17 109:25
110:13,15,16
110:22 111:17
111:21 122:14
172:12,16
**recycled**  183:9
208:10
**rees**  12:19
15:21 43:14

**reese**  3:14
103:2 173:8
**refer**  99:23
**reference**  21:17
55:25
**referenced**
216:6
**referencing**
15:3 103:10
**referral**  23:2
**referrals**  23:8
49:17
**referred**  147:6
176:15
**referring**  32:18
71:15 130:4
**reflect**  56:13
199:18 203:6
**reflecting**
161:2
**refresh**  212:7
**refused**  163:2
**regard**  16:11
21:14
**regarding**  62:2
67:15 130:19
**registered**
108:20 215:4
**regulation**
124:25
**regulations**
40:15 124:10
124:15
**relate**  211:12

**related**  6:18
12:22 13:1
90:1 91:13
99:14 122:20
122:24,25
**relations**  24:9
**relationship**
17:25 47:7
69:18 92:17
93:8,10 105:20
172:22
**relative**  215:17
**released**  216:21
**reliant**  36:1,2,5
122:14
**relied**  125:24
**relying**  129:19
193:7
**remedy**  160:24
161:3,14
**remedying**
157:3
**remember**
10:23 11:8
12:5,6 14:4,19
14:20,24 15:9
23:1 36:12
42:17 56:15
85:24 86:11,17
87:11,12 88:22
100:4,8 138:25
140:10 154:4
162:22 166:22
175:10 176:22
210:3,4 213:1

Veritext Legal Solutions
866 299-5127

**[remote - rico]**

**remote** 1:14
  2:14 79:11
**remotely** 6:15
**rename** 146:5
**renewed** 153:2
**rent** 76:5
**repeat** 43:11
  53:4
**repeatedly**
  67:12
**report** 156:20
  157:2 161:3
  169:4 189:12
  189:15,19
  190:10,20,23
  198:22 209:20
  210:2
**reported** 1:20
**reporter** 6:17
  7:7 13:9
  142:19,19
  215:5
**reporter's**
  215:1
**reporting** 72:1
  72:2 182:21
  197:11,24
  200:4
**reports** 187:22
  189:6,8,13,21
  209:17,22
**represent** 58:4
  64:3 127:21
  144:20 189:18

**representative**
  31:22 70:4
**represented**
  11:3 12:15
**representing**
  10:25
**request** 107:17
  114:3 115:13
  115:16,23
**requested**
  102:19 115:15
  215:14 217:1,9
  217:10
**requesting**
  114:1 177:12
  177:13
**require** 50:7,10
  50:13
**required** 64:16
**requirements**
  197:8
**requiring**
  61:25 64:12
  80:1 130:17
**research** 183:7
**reservation**
  44:8,9
**reserves** 92:19
**residences**
  64:11
**residents** 61:24
  130:16
**resign** 30:6
**resignation**
  30:16

**resigned** 30:7
**resolve** 48:10
**resolved** 12:12
  178:2,3
**resources**
  89:20 90:4,5,7
  91:13 183:11
**respect** 32:4
  38:17 158:9
  162:1,8 171:20
  171:22 175:2
  193:17 197:5,9
  202:23
**response**
  196:22
**responsibility**
  138:19 193:13
  193:16
**responsible**
  22:22 93:24
**restart** 73:7
  155:5,20
**restarting**
  155:18
**restate** 116:14
  117:2
**restroom** 61:14
  186:10
**resume** 37:13
  37:16
**resumed** 143:6
**return** 45:18
  216:17 217:6
**returns** 49:8

**revenue** 44:14
  44:20 45:1,2
  45:10,14
**review** 25:15
  57:2,7 58:8
  215:13 216:8
  216:10,13
  217:2
**reviewed** 58:9
  113:6
**rewarded**
  167:2,4
**rico** 16:24,25
  17:12,15,22
  18:3,19,23
  19:8,18 20:3
  21:3,4,8,11,14
  21:20,22 22:1
  22:4,5,14,17,19
  22:23 23:4,19
  23:22 24:15,21
  25:9,12 29:9
  39:2,7,8,9,10
  49:4,11,12,16
  49:22 50:1
  52:9,15 53:3,5
  54:4,14 55:17
  55:22 56:8
  91:13 93:3
  94:23 105:17
  105:20,24
  114:18 117:22
  118:16,25
  119:1 120:3,22
  121:2,4 129:15

**[rico - saying]**

| | | | |
|---|---|---|---|
| 130:1 165:17 | 121:13 124:22 | 198:1 199:4 | **rumors** 54:16 |
| 165:17 167:18 | 124:23 125:7 | 200:13,17 | 212:20 |
| 194:11,11 | 126:7 127:23 | 202:23 205:11 | **run** 126:19 |
| 212:12,12 | 128:4,13,15 | 207:2 208:4 | 191:22 195:11 |
| **rico's** 18:12,15 | 130:5 131:10 | 209:3 212:19 | 198:15 |
| 19:10 53:24 | 133:8,13 | 213:10 | **running** 28:13 |
| 94:1 95:2 | 134:16,18,21 | **rights** 44:9,9 | 28:21 34:23 |
| 117:16,18 | 135:21 136:2 | **ring** 90:14 | 148:10 195:8 |
| 118:16 123:2 | 140:1 141:2,17 | **ringing** 148:21 | **runs** 156:4 |
| 125:18 | 142:4 143:1,13 | **rio** 3:9 | |
| **ridiculous** | 145:25 146:10 | **rise** 55:22 | **s** |
| 102:21,23 | 146:15 147:14 | **riverside** 79:3 | **s** 3:1,9,15 7:21 |
| **right** 7:1 8:18 | 147:24 149:5 | 87:2 | 28:18,19,20 |
| 11:13 13:15,20 | 149:24,25 | **roger's** 35:6,9 | 82:8 136:23 |
| 16:20 17:3,17 | 151:8 154:20 | 35:17 122:8 | 218:3 |
| 20:3 22:9,11 | 155:6 163:19 | **rogers** 35:7,12 | **salary** 19:24 |
| 24:25 25:4,5 | 165:20 166:19 | 35:22,24 | **sale** 32:25 33:7 |
| 25:20,25 33:20 | 167:18 168:6,8 | **role** 193:11 | 69:13,19 172:8 |
| 33:23 34:22 | 168:13,13,19 | **room** 25:20,24 | 172:11,15 |
| 47:19 49:10 | 170:3 171:7,24 | 26:2,7,10,11 | **sales** 78:11 |
| 51:18,25 53:8 | 172:3,4,6,12 | 186:8 | 166:16,25 |
| 55:11 57:19 | 173:10,18 | **rosenthal** 40:25 | 167:1 |
| 58:1,23 60:21 | 174:9 177:23 | 197:22 210:10 | **salmon** 162:4 |
| 61:6 64:25 | 177:24 178:6 | **ross** 166:18 | **sam** 82:9 |
| 65:1 66:4 69:9 | 178:23,24 | **roughly** 34:15 | **san** 3:10 98:22 |
| 72:16 73:4,18 | 179:8 181:21 | 36:8 127:13 | 151:15 |
| 77:11,25 79:23 | 181:23,25 | 131:12 | **saved** 146:1,8 |
| 80:12 87:15 | 182:3,8,18,23 | **rpa** 36:25 37:1 | **saw** 104:20 |
| 88:21 92:19 | 186:11,17 | 37:3,20 122:24 | 159:13 |
| 93:20 96:22 | 187:4 188:14 | **rpr** 1:20 2:17 | **saying** 96:8 |
| 99:15,24 | 189:8,24 | 215:4,25 | 118:11,12 |
| 101:10,10 | 190:25 191:18 | **rules** 10:4 | 138:25 140:10 |
| 104:24 105:11 | 193:19 194:25 | 40:15 100:9,11 | 150:11,13,14 |
| 109:13,16 | 195:8 196:18 | 101:4 182:14 | 151:5 154:24 |
| 112:6 118:6,13 | 196:23 197:25 | 217:8 | 181:14 189:23 |

Veritext Legal Solutions
866 299-5127

**[says - share]**

| | | | |
|---|---|---|---|
| says  41:23,25 | seconds   130:13 | 159:12 166:21 | server   42:1 |
| 48:21 92:16 | security   33:21 | sees   75:18 | 48:21 64:15 |
| 101:13 135:22 | see  29:3 41:23 | selection   38:11 | 131:17 |
| 136:3,3 138:18 | 41:24 48:10 | sell   76:8,14 | service   48:22 |
| 141:8,14 142:8 | 52:24 57:20 | 156:17 174:6 | 61:23 63:3,6,8 |
| 155:18 177:5 | 58:16,18,20,23 | 202:3 | 63:14,22,25 |
| scary   173:23 | 58:24 65:8 | sellers   110:14 | 76:11 100:21 |
| 174:2,9 177:24 | 78:9,11,16 | selling   208:10 | 130:15 131:17 |
| 178:14,17,20 | 80:18 90:6 | sells   76:11 | 132:13,16 |
| 179:7 | 92:8 111:8 | seminars   206:4 | 137:17 181:14 |
| schedule | 113:18,19 | send   70:10,11 | 201:7 |
| 216:10 | 116:4 127:8 | 109:25 116:9,9 | services   36:1,2 |
| school   98:12,14 | 132:15 134:21 | 116:16,19 | 36:6 122:14 |
| 98:15,20 99:10 | 135:2,16 137:9 | 117:9,13 119:2 | session   9:16 |
| 136:5 183:12 | 142:3 143:1 | 119:3 | set   23:10 32:3,3 |
| score   169:6 | 145:22 146:1,5 | sending   49:21 | 74:13,14 |
| screen   6:6 42:7 | 146:17 149:5 | 114:6 | 114:21 191:9 |
| 49:1 57:14,23 | 154:10 155:3 | sense   79:7 | 215:7 |
| 70:21 93:12 | 158:15 166:18 | 110:7 125:21 | sets   31:20 |
| 133:14 144:21 | 168:2,2 172:10 | 190:5,22 191:4 | settle   105:11 |
| 155:22 | 177:4 189:14 | 191:6 | 170:23 202:8 |
| screenshots | 194:7 200:23 | sent   44:11 | 202:15 |
| 4:14 | 207:2 | 69:24 117:22 | settled   12:13 |
| screws   169:5 | seeing   174:3 | 118:17,21 | 15:10 102:14 |
| scully   3:14 | seek   43:5 | 196:13 | settlement |
| search   58:14 | seeking   103:25 | sentence | 102:19 |
| 107:14 | seem   68:13 | 143:17 | seven   102:10 |
| second   12:14 | 125:17 203:14 | separate | 202:7 |
| 12:21 126:10 | 203:18 | 137:14 | several   36:13 |
| 133:15 136:3 | seems   52:22 | serious   156:21 | 106:15 125:24 |
| 143:14 168:17 | seen   6:5 58:1 | 196:20 199:3 | 150:25 |
| 179:3 193:21 | 71:3 97:24 | serve   87:21 | shakes   119:11 |
| 194:2,21 | 104:17,18,19 | served   53:13 | shape   66:9 |
| secondary | 104:22,24 | 107:17 | share   42:5,6,25 |
| 98:17 99:11 | 105:1,2 111:6 | | 49:1 57:14 |

Veritext Legal Solutions
866 299-5127

**[share - somebody]**

| | | | |
|---|---|---|---|
| 70:15,21 93:12 | **shown**  156:24 | **six**  17:21,24 | 151:25 153:23 |
| 127:4 133:18 | **shows**  189:24 | 18:3 19:22 | 158:3,5,12 |
| 147:17 155:22 | **shut**  136:6 | 22:6,11 35:23 | 162:12 164:2 |
| **shared**  94:2,6 | 138:5 196:19 | 120:4 143:16 | 164:15,15 |
| 145:19 151:19 | **shutdown** | 156:9 | 165:5 166:4,4 |
| **shares**  27:12 | 123:25 124:3 | **size**  205:25 | 174:23 176:19 |
| **sharing**  59:9 | **sic**  207:3 | **skip**  71:15,25 | 176:22,25 |
| 188:2 | **side**  73:2,18 | 72:9,11,13,14 | 178:15 180:11 |
| **sheet**  115:20 | **sign**  62:1 67:14 | 72:17 74:3 | 184:1 188:23 |
| **sheets**  104:18 | 130:18 213:19 | 135:22 179:23 | 192:20 199:15 |
| **shift**  25:8 | 216:16 217:5 | 183:8,18 | 200:21,23 |
| **shirt**  162:3,4 | **signature**  62:1 | 184:15 185:4 | 201:9 203:4 |
| **shit**  148:19 | 64:12 130:18 | 185:13,18 | 205:24 207:10 |
| 149:3 180:2 | 215:24 216:21 | 187:11,24 | **software**  23:10 |
| **shoe**  205:25 | 216:23,23 | 188:3,8 190:4 | 23:11 24:4,7,9 |
| **short**  61:13 | 217:9 | 205:16,19,20 | 24:13 38:11 |
| **shorthand** | **signed**  4:12 | 206:7,8,14 | 119:18 168:13 |
| 114:11,14,19 | **significant** | 208:4,9 209:2 | **solar**  211:17,18 |
| 114:21,23 | 48:14 | 209:19 | **sold**  175:7 |
| 215:16 | **simplicity** | **small**  91:7 | 176:8 198:17 |
| **shortly**  7:2 | 38:16,17 50:25 | **smaller**  57:24 | **solutions**  216:7 |
| **shots**  144:21 | 71:8,9,10 76:9 | **smoke**  144:2,4 | **somebody** |
| **show**  147:17 | 109:12 110:5 | **snapchat**  165:3 | 11:20 26:10 |
| 162:14 | 112:24 113:7 | **snort**  144:7 | 38:24 39:20 |
| **showed**  158:10 | 114:16 119:18 | **snow**  78:19,20 | 43:1 49:15 |
| 159:11 | 119:21 | **social**  33:21 | 60:24 77:8 |
| **showing**  133:16 | **sir**  139:8 | 84:19,21 | 95:7 106:10 |
| 145:7 151:8 | **sit**  19:4 80:15 | 133:24 134:2 | 122:3 132:11 |
| 155:22 160:17 | 194:22 | 134:16 135:9 | 132:11 135:8 |
| 168:21 170:3 | **site**  21:21,23 | 135:11 136:12 | 135:16 136:11 |
| 173:12 179:8 | **sitting**  104:14 | 136:13 137:4 | 138:11,15 |
| 182:23 187:13 | 176:9 | 138:3,23 139:5 | 140:9 141:4 |
| 191:13 194:25 | **situation** | 139:7,13 140:1 | 152:1,4,11 |
| 198:6 201:24 | 152:15 154:9 | 141:5,7,13 | 154:21 155:3 |
| 205:11 | 162:25 204:9 | 149:15 150:2 | 157:24 159:25 |

Veritext Legal Solutions
866 299-5127

**[somebody - states]**

166:7 177:16
186:7 188:14
198:13
**somebody's**
100:24 155:2
**somewhat**
125:20
**son** 26:5,6
**sorry** 9:2 26:20
27:22,24 29:25
34:13 35:7
39:9 46:13
48:15 52:21
53:4,20 57:5
70:25 88:12
108:2 111:15
113:12,16
114:13 123:6
123:17 136:18
139:11 145:11
146:7,19 154:1
171:10 172:13
200:20 204:20
209:10 211:18
211:22 212:19
**sort** 58:19 79:3
98:2 102:6
119:14,22
166:12,24
185:4 193:12
**sound** 59:20
62:16 95:5,6
178:22 197:6
197:20

**sounded**
176:14
**sounds** 19:17
39:13 47:13
119:21 126:14
128:11 143:1
178:10 184:18
184:19 185:15
**sourced** 38:21
38:23
**sources** 135:25
**space** 25:1
**speak** 13:10
22:15 180:25
**speaker** 184:23
184:25
**speaking**
103:19 157:11
185:9 203:24
**special** 53:25
**specialized**
50:11 170:13
**specifically**
191:5 196:13
**specifics** 23:1
**speculate** 53:23
95:21 109:17
132:2
**speculation**
53:18 65:24
95:19 120:24
131:23 201:14
**speed** 100:3
**spell** 7:19 28:17
136:20

**spend** 125:11
**spending**
196:15
**spent** 34:4
**split** 27:10
**spoken** 121:4
121:19
**spoof** 101:2
**spoofed** 75:23
**spoofing** 74:17
74:17,19,21,23
75:1,8 77:20
101:13
**spot** 25:10
**spreadsheet**
33:17,18 110:1
110:4
**spring** 111:14
**ss** 214:1
**staff** 65:18
173:6
**stair** 20:7
**staircase** 194:4
194:6
**stand** 37:1,2
85:9
**standard**
114:21,24
**standing** 156:3
162:2,4
**stands** 85:10,17
134:9
**start** 8:9 23:12
29:21 34:11
49:20 50:14,17

62:24 81:23
200:8 205:17
**started** 26:2
28:5,25 30:11
37:21 80:1
116:10,17
148:3,4,8,14,17
148:18,22
151:18 170:10
187:24,25
188:1,3 206:3
206:3,7
**starting** 125:15
148:9 202:17
**state** 6:22,23
7:17 8:8,9 12:9
41:2,14 79:18
80:15 81:4,17
106:20 152:17
155:17 214:1
214:14 216:9
216:12
**statement**
65:22 93:16
113:17 141:17
143:22 157:18
159:4,14
**statements**
46:6 138:4
149:18 215:10
**states** 1:1 2:1
6:12 41:18
80:25 81:1,5
82:24 83:2
88:10 108:20

Page 45

**[statistics - sure]**

statistics
  109:21
statues 153:2
status 79:15
statute 152:7,9
  152:16 153:1
  153:22 154:21
  155:5,19 172:7
  172:8
statutes 155:2
  200:10
stay 9:4
stenographic...
  215:11
step 157:3
stepped 20:7
steps 43:7
  194:1
sterling 90:24
  90:24
steven 7:20,20
  82:6
stewart 90:10
stipulation
  216:20
stocks 27:9
stop 39:23 96:6
  118:7 170:22
stopped 172:23
  190:4
storage 42:1
strategies
  150:6,7
strategy 103:13
  207:18

street 3:15 27:7
stress 13:9
stressful 174:2
strictly 20:1
strong 15:15
  184:11 205:17
structure 19:25
stuck 45:2
student 202:14
  202:17 203:11
  203:14,19,21
stuff 38:21
  57:12 76:8
  89:22,24
  135:14 154:7
  178:15 183:12
  183:16 187:25
  206:5 207:24
stupid 181:19
  181:20
subject 15:7,9
  55:12 174:21
  180:14 184:7
  189:1 192:23
  196:4 199:18
  203:7 207:13
subscriber
  209:14
subscription
  186:18
success 188:1
successful
  140:8 195:5
  198:15

suddenly 125:9
sue 11:21,23
  12:1 47:25
  152:1,11 153:4
  154:21 157:5
  159:21,23
  161:16 171:3
  172:5,9,24
  200:12,13,14
sued 11:20 12:4
  15:2 102:8,12
  121:24 126:22
  126:24 133:8
  157:25 160:1
  160:21 169:9
  170:7 171:1,23
  172:2 173:23
  175:17 176:5,6
  176:7
suffice 58:21
  112:6
suggest 132:20
suggesting
  187:8
suggests 131:20
  132:17,17,21
suing 154:7
  170:13 177:15
  177:18,18
suit 102:16
  176:16
suite 3:4,10,15
suites 126:9
suits 102:14

summarizing
  157:22,24
supervision
  126:15
supplement
  94:21
supplied 5:14
  23:22,25
supply 23:14
  24:20
support 129:20
suppose 166:20
  200:21
supposed
  154:19 193:9
  193:10
sure 12:11 13:8
  20:22 29:11
  31:13 43:25
  44:17 48:20
  53:5 54:12
  57:13 58:11
  61:16 70:6
  72:1 73:8
  74:25,25 76:17
  80:10 101:5
  107:19 115:18
  116:8 121:23
  127:20 133:5
  139:1,16,23
  145:25 158:16
  166:9,24 171:4
  176:24,24
  181:9 186:15
  187:8 193:18

Veritext Legal Solutions
866 299-5127

**[sure - ten]**

196:24 200:16
204:14,17
205:4 213:2,11
**surprise** 61:1
155:16,20,21
189:14,17
**surprised** 95:7
**suzy** 90:16
**swallow** 144:11
**swear** 7:7
**sweet** 153:4
**swigart** 3:8,9
7:1 73:2
104:15
**swigart's**
104:24
**swigartlawgr...**
3:11
**sworn** 7:10
14:14,16 96:14
**system** 50:25
76:7 90:21
109:12 112:25
113:7 114:16
115:8,11,12,25
119:23
**system's** 98:4
**systems** 32:10
32:11,14,16
33:4 69:17
72:2 109:25
110:13,15,16
110:23 111:18
111:21 116:5
168:10 172:12

172:16

**t**

**t** 7:21,21 28:18
28:19,20,21
218:3,3
**tactic** 78:9,11
78:12
**tactics** 148:22
**tail** 206:25
**take** 6:7 13:15
37:20 61:5,13
61:14 68:23,23
69:10 120:3
131:4 133:22
138:19 141:22
141:22 142:9
142:10,15,17
142:18,20
145:22 170:17
188:15 189:4
198:13 207:15
210:19
**taken** 2:14 6:10
10:11,15 13:25
14:3,11,13
25:16 112:25
143:6 144:21
215:6,16
**takes** 37:19
**tale** 178:10
**talk** 22:13 77:9
93:4 158:4,6,7
168:25 184:23
184:25 198:10

**talked** 14:11
15:24 29:5
30:17 32:13
43:10 55:17
96:10 102:6
106:2 122:5
200:3,4,5
**talking** 67:1
103:11 138:11
139:11 151:4
165:10 178:25
179:1 196:10
196:11 201:7
**tall** 178:10
**tap** 156:13
**tax** 45:18 49:8
**taxes** 108:15
156:16
**tcpa** 210:10
**team** 38:20
133:25 134:2
134:17 135:9
135:11 136:12
136:13 137:4
138:17 141:5,7
141:14 148:9
158:5 175:8
**teams** 195:10
**technology**
6:15 98:3,5
**telephone**
23:15,23 24:21
73:25
**telephones**
76:12,13,13

**tell** 10:20 11:17
12:15 14:1,7
15:16 16:16
20:16,24,25
23:6 34:2,10
43:9 49:14
57:1 65:3,16
66:13 71:9
73:21 78:5
79:15 82:2
86:22 91:17,17
93:14 95:22
98:11 100:1
102:23 103:4,5
103:24 107:4
124:9 129:18
131:1,8 133:23
136:4 137:19
152:10 155:13
159:12,19
163:19 165:21
166:12,13
168:3 175:1
180:1 185:7
192:8,25,25
193:2 196:6,6
210:8,13,15
212:4
**telling** 126:21
188:4 207:22
207:24
**tempted** 191:19
**ten** 65:10,11
111:19 162:22
202:8 210:18

Veritext Legal Solutions
866 299-5127

**[terminate - three]**

| | | | |
|---|---|---|---|
| **terminate** | **thanks**  146:18 | 108:11,21 | 213:1 |
| 51:15 | **theirs**  138:7 | 109:3 110:1,20 | **thinking**  49:6 |
| **terminated** | **thing**  15:17 | 112:13 113:5 | 54:1 77:7 |
| 17:19,24 | 16:18 49:23 | 113:23 117:18 | 133:3 174:5 |
| **terminology** | 59:12 82:21 | 117:22 121:18 | **third**  10:17 |
| 208:21 | 90:3 93:20 | 121:20,23 | 35:14 83:10,12 |
| **terms**  90:6 | 94:1 101:7 | 122:1 125:9,12 | 83:23,25 84:3 |
| 212:8 | 138:18 139:15 | 129:23,23,25 | 92:20 93:24 |
| **test**  40:11,14 | 155:19 160:24 | 130:7,7,12,24 | 108:12 120:12 |
| **tested**  48:17 | 169:2,8 176:22 | 131:2,20 | 120:18 |
| **testified**  7:11 | 191:18 193:7 | 132:15,17 | **thought**  30:9 |
| 93:1 96:18,19 | 208:13,14 | 133:10 138:2 | 75:4,5 104:4 |
| 96:20 108:11 | **things**  14:4 | 139:25,25 | 112:5 145:11 |
| 133:10 172:1 | 54:17 83:19 | 141:24 143:20 | 147:3 159:9,13 |
| 194:17 | 87:4 100:14 | 143:21 146:2,4 | 170:18,19 |
| **testify**  31:23 | 131:19 150:4 | 146:10,16 | 185:7 197:3 |
| 43:2 54:1 70:7 | 154:7 158:8 | 147:2 149:1 | 204:2 212:14 |
| 94:9,18 | 186:5 193:19 | 157:19,21 | **thoughts**  138:6 |
| **testimony** | 199:21 212:2 | 158:11,14,21 | 153:21 170:1 |
| 14:14,16 96:14 | **think**  8:21 18:7 | 158:25 159:1,8 | 171:20 180:14 |
| 117:24 118:2,5 | 21:25 29:2 | 160:14 161:23 | 184:7 189:1 |
| 118:9 147:3 | 33:2,2 42:4 | 163:11 165:20 | 192:23 196:3 |
| 214:11 215:9 | 45:8,15,15,25 | 170:25 172:1 | 199:18 203:7 |
| **texas**  151:15 | 48:13 52:13 | 176:15 182:14 | 207:13 |
| **text**  9:20 | 53:1 54:13,14 | 182:18 184:13 | **threat**  152:13 |
| 148:13 150:4 | 54:24 56:2 | 187:9 190:1,7 | **threaten** |
| **texted**  211:7,9 | 69:12,14,23 | 193:11,16 | 100:24 152:3 |
| 211:11,14,16 | 70:16 74:14,21 | 194:17 197:2 | 154:21 |
| **texting**  148:14 | 74:23 75:8 | 198:25 199:22 | **threatening** |
| **thank**  7:6 22:5 | 78:13 80:24 | 200:3 201:8,12 | 152:1 |
| 49:10 69:9 | 85:16 86:9 | 201:12,19,19 | **three**  9:5 30:14 |
| 143:13 188:10 | 87:12 88:5 | 201:21,22 | 39:21,22 57:23 |
| 211:4 213:20 | 91:2 93:1,4 | 203:24,25 | 84:4 97:1 |
| 213:21 | 94:3 98:6 | 205:1,7 210:20 | 102:13 105:5 |
| | 102:6 104:21 | 212:6,10,17 | 115:4 136:25 |

Veritext Legal Solutions
866 299-5127

**[three - transunion]**

138:14 145:12
146:11 161:10
183:16 185:10
185:17 206:13
207:20 213:13
**thrills** 140:23
**throwing**
124:11
**thursday** 1:16
2:16
**tickets** 97:6,7
**tiktok** 85:19,22
164:20
**time** 6:22 14:18
27:1 28:10
29:5,8 34:19
34:21 36:17
37:23 39:19
44:4 45:2
67:11 69:3,6
69:19 86:16,23
87:21 97:14
104:18,20,25
109:2 126:22
126:24 127:10
140:12 143:3
143:10 150:12
166:22 173:18
175:6 181:1
190:6 191:3
194:8,8 210:23
211:1 213:14
213:16 215:7,7
215:11 216:10
216:18,24

217:7
**times** 10:14
58:15,16 102:8
102:11 111:3,5
111:6
**timing** 114:4
**tiring** 124:23
125:1
**title** 27:24 28:1
**tlo** 71:17,18
185:12 187:7
189:22,23
190:3 208:12
208:13,22
**tloxp** 71:18
72:9 73:16,19
74:4 184:14
185:18,21
186:4,13
187:10 208:16
208:17 209:3
**today** 9:9 11:14
14:1,4 19:5
25:16 62:1
64:13 80:15
96:15,18
104:14 121:16
122:5 130:18
144:13 211:6
212:4
**today's** 97:2
**told** 42:23
43:14 63:16,21
63:24 64:20
95:8 159:25

172:10,14
176:24 177:3
178:10 187:9
208:25 212:14
**toll** 60:10,12,13
60:16
**took** 111:9
141:15
**top** 33:20,23
53:8 109:13,16
109:18 117:20
182:18 190:25
191:10 197:3
**topic** 198:11
**topics** 158:5
**total** 44:20
210:8,15
**town** 110:21
**trace** 71:15
72:9,11,17
74:3 184:15
187:11 205:21
208:9
**traced** 190:4
**tracer** 135:22
**traces** 205:16
**tracing** 71:25
72:13,14
179:24 183:8
183:18 185:4
185:13,18
187:24 188:3,8
205:19 206:7,8
206:14 208:4
209:2,19

**track** 17:2
24:11 107:7
109:21 115:1
115:12
**trade** 101:17,17
106:16 190:23
**traffic** 97:6,7
**train** 39:25
40:2,21,24
67:21,23 68:4
68:6
**trained** 57:11
195:7
**training** 40:8,9
50:11,14 210:8
210:16
**trans** 185:19
**transcribed**
138:23 215:12
**transcript** 56:8
214:8,11
215:14,15
216:6,8,10,13
216:13,21
217:2,2
**transfer** 18:24
**transferred**
36:14
**transmit**
147:19
**transmitted**
33:10
**transunion**
71:20 72:6,21
73:14 185:12

Veritext Legal Solutions
866 299-5127

**[transunion - unit]**

206:11,12
208:22
**transunion's**
184:15
**travel** 105:18
**trial** 105:15,19
**trick** 118:12
**tricked** 118:10
**tricking** 77:7
77:14,20
**tried** 48:16
52:15 172:19
**trip** 43:5
**truck** 12:2
**trucking** 11:19
96:10 97:2
**true** 44:23 60:4
75:22 141:17
143:22 150:11
150:12,12,19
150:22 154:8
162:11 163:22
176:20,23,25
177:1,3,3,7
178:14 179:5,5
179:7 201:23
207:18,20
214:10 215:15
215:21
**truly** 184:6
199:17
**truth** 14:1,7
150:24,25
159:1

**try** 13:18 20:24
41:24 42:2
48:22 70:17,20
97:12 117:7
146:12,15
147:18 156:22
192:3 193:5
196:16 210:14
**trying** 41:21,24
74:6 79:7
87:11 93:13
95:12 104:21
118:2,12 127:8
140:24 210:5
210:11
**turns** 151:22
**tweet** 138:14
**twice** 10:16,17
**twitter** 4:13
85:13,15
133:11 134:6
134:17,19
135:7 137:23
138:16 140:16
164:22
**two** 12:6 14:10
19:21,23 30:14
36:21 37:10
45:6,10 49:5
82:1 83:12,15
87:19,24 93:22
96:9,15 97:3,3
102:11,18
123:10 124:13
145:7 146:7

161:9
**type** 24:4 71:16
**types** 106:8
**typically** 126:2
191:8 202:12
202:14

**u**

**u** 27:2
**u.s.** 76:12,13,13
**un** 81:18
**unacceptable**
67:7
**unavailable**
62:1 67:14
130:18
**unclear** 13:18
**uncollectible**
204:10
**under** 69:10
92:20 95:23
102:12 121:6,9
121:24 122:3
122:10 134:17
135:17 143:14
197:21 211:5
214:7 215:8,20
215:20
**undersigned**
214:7
**understand**
10:2 13:17,22
15:4 20:20
40:6 47:18
54:1,2 66:22
72:16 93:13,24

94:15 98:9
99:18 103:1
104:6,11,13
106:10 111:12
111:15,22
118:5 120:14
127:13 128:1,9
131:7 132:12
139:10 140:14
150:15 151:25
158:16,17,24
159:15 166:1,6
176:21 178:3
178:14 185:21
186:3,6,14
193:23 196:16
197:15
**understanding**
20:21 24:6
54:4 56:3
115:18 155:8
155:11,12,13
156:8
**understood**
22:4 58:11
83:14
**underwriters**
43:22
**union** 173:20
175:2 176:4,5
176:7 177:8,11
177:14 178:19
178:23 185:19
**unit** 6:9

[united - uses]

| | | | |
|---|---|---|---|
| **united** 1:1,7 2:1 | 34:23,23 37:21 | 117:4,7,9,9,13 | 71:15,15,17 |
| 2:8 4:8 6:11,12 | 38:1,1,11,18,18 | 117:13,16 | 72:1,3,4,6,9,20 |
| 7:4 14:17,20 | 38:19,24 39:4 | 119:4,9,25 | 73:9,10,12,14 |
| 15:4,15 17:8 | 39:10 40:2,9 | 122:5 123:3 | 73:16,19 75:1 |
| 20:9,10,13,17 | 40:19 41:12 | 126:2,4,6 | 77:13,16,17 |
| 21:10 26:13 | 44:14 45:12,15 | 129:19 137:2 | 84:19,22,22 |
| 32:18 34:6,15 | 45:18 46:10,11 | 147:10,11 | 85:4,13,13,19 |
| 34:18 41:18 | 46:12,15,17,23 | 164:5,8 172:3 | 86:5 98:2 |
| 43:16 48:5 | 47:9 48:4 49:4 | 172:25 173:6 | 101:4 107:21 |
| 65:1 80:20 | 49:8,12,15 | 190:10 193:12 | 108:19 114:17 |
| 81:1,13,20,24 | 50:17,20,23 | 193:13 212:21 | 131:15,17 |
| 82:24 83:2,13 | 51:7,13 52:4,6 | **upc's** 17:11 | 132:3,4,7,18 |
| 89:14 98:3 | 52:8 53:3,5 | **upland** 17:10 | 143:22 150:7 |
| 115:17 120:6 | 55:1 56:16,23 | 17:11,12,13 | 165:3 168:8,10 |
| 121:7 128:5 | 60:14,14,17 | 18:15 19:2 | 185:13,17,18 |
| 129:16 167:12 | 61:1 62:14,17 | 22:20,23 23:20 | 186:10,16,18 |
| 176:17 189:16 | 63:11,21 65:14 | 27:4 47:5,13 | 187:2,3,6,6,7,9 |
| 189:19 193:4 | 65:19 67:1,17 | 82:12,13 97:20 | 187:10 206:24 |
| 194:20 196:7 | 71:6 73:18,18 | 111:2 123:20 | 208:16,17,23 |
| 196:13 216:4 | 73:25 74:11 | 126:2,7 137:9 | 208:24 209:2 |
| 218:1 | 75:1,22 76:20 | **upload** 48:16 | 209:13 |
| **unknown** 36:19 | 78:23 79:4,9 | 147:18,18 | **used** 11:19 25:1 |
| 122:16 | 82:15 84:3,7 | **uploaded** 41:25 | 25:12 39:18 |
| **unpaid** 169:12 | 84:15 88:16,21 | 48:18,21 | 60:3 64:18 |
| **untrue** 150:1,2 | 88:23 89:18 | **upstairs** 123:4 | 65:12 71:24 |
| 150:3 | 90:4,7,7,22 | 123:6,7 126:10 | 74:12 77:10 |
| **upc** 15:4,8 16:3 | 91:5,20 92:16 | **use** 23:14 25:2 | 97:24 114:11 |
| 16:14 17:23 | 92:19,22,24 | 38:10,10,15 | 114:15,18,22 |
| 18:20 19:19 | 96:2 102:7,8 | 46:4 51:3 60:6 | 133:1,2 141:14 |
| 21:23 22:20,23 | 102:12 106:4,7 | 60:8 63:10,13 | 141:18 149:18 |
| 23:4,19 24:12 | 106:14,17,21 | 63:16,21,24 | 172:21 184:14 |
| 24:16 27:9,13 | 107:7,22 108:5 | 64:21 65:3,9 | 189:21 190:6 |
| 27:16,18 31:10 | 108:19 109:1,8 | 65:16,19,23 | 208:22,24 |
| 31:12,20,22 | 109:22 112:16 | 66:10 67:1 | **uses** 63:8 |
| 32:1 33:24 | 114:22 116:23 | 68:5,8,9,9 71:6 | 114:23 |

Veritext Legal Solutions
866 299-5127

**[using - wage]**

**using** 6:15 9:15
25:8 66:6
95:11,13 141:9
143:18 179:24
190:4 208:21
209:2
**utilize** 114:25

**v**

**v** 7:21
**vacation**
111:13,14,16
**vague** 113:4
120:13
**valencia** 16:9
16:10,11 27:19
30:25 50:5
60:22 89:23,25
90:8 91:5
120:9 147:4,12
**valencia's**
27:24 90:21
**valid** 204:22
**various** 197:8
**variously**
149:15
**vas** 148:13
**vegas** 111:6
**vehicle** 185:22
185:25 186:4
187:4
**vehicles** 186:23
**vendor** 48:22
**ventures**
196:15

**verbiage** 58:10
**veritext** 6:16,18
41:23 48:9,11
145:19 216:7,9
216:11
**version** 38:15
**versus** 6:11
14:17,20 15:8
15:15 32:18
43:16 48:5
115:16
**vic** 4:17 151:13
211:21,22
**vice** 27:21 28:1
28:2 31:3
**victorville** 8:19
**video** 4:15,16
4:18,19,20,21
4:22,23,24,25
5:1,2,3,4,5,6
6:2,7,9 147:25
149:5,8,12,17
149:25 150:3,8
150:18 151:3,6
153:7,13,20,25
154:2,12,23
157:8,10
158:10,19
159:6 160:18
161:19,23
162:2,9,11
163:15 165:12
169:18,22,25
171:8,17
174:15,18,20

174:23 176:13
177:4,5 178:25
180:7,14
183:22 184:4
184:18 188:18
192:14 193:2
196:11 197:1,1
199:10,25
203:3 207:9,12
208:25
**videographer**
3:18 6:1,17 7:6
69:3,6 138:12
143:3,10
149:13,14
153:15 157:16
162:9 163:20
169:22 171:17
174:16,17
184:4 188:22
192:18 195:24
199:14 203:3
207:9 210:23
211:1 213:12
213:14,16
**videographer's**
153:17
**videos** 147:16
147:16 149:14
158:2 165:5
208:23,23
**videotaped**
184:3
**view** 98:15,16

**violate** 66:18
160:2,10,12
**violates** 68:17
101:14 130:24
131:2,15
160:14 181:20
**violating** 43:12
66:23
**violation** 66:14
66:15 104:7
121:12 152:8
**violations**
102:9
**virtual** 6:15
83:17
**virtually** 6:3
**visit** 21:23
**vitae** 37:15
**voice** 62:9
194:18 205:23
**voicemail**
62:16,17 66:11
68:13,14,15,16
68:17 129:25
130:3,4,23
131:14,15
**vs** 1:6 2:7 216:4
218:1

**w**

**w** 49:19 91:8
136:22
**w9** 19:7 23:11
49:22,23 108:8
**wage** 161:11
170:22

Veritext Legal Solutions
866 299-5127

**[waiting - wondering]**

| | | | |
|---|---|---|---|
| **waiting** 80:5,7 | 176:13 180:2 | **weak** 183:5 | **wishes** 142:3 |
| 80:8 | 187:23 199:22 | **web** 119:22 | **withdraw** 9:12 |
| **waived** 216:23 | 201:22 203:10 | **website** 80:18 | 25:19 61:19 |
| 216:23 | 206:25 | **week** 33:9 | 128:25 190:8 |
| **waiving** 216:20 | **wanted** 18:4,8 | 93:22 | **withhold** |
| **walk** 136:6 | 54:7 113:14,18 | **weeks** 19:21,23 | 108:15 |
| 156:6 | 167:20 | 30:14,14 87:24 | **witness** 4:2 5:9 |
| **wall** 51:14,16 | **washington** 3:4 | **welcome** | 6:6 7:5,7 31:24 |
| **walnut** 98:24 | **watch** 154:14 | 143:13 | 53:20 59:12 |
| **want** 13:8 18:6 | 159:4 165:12 | **went** 8:21 | 66:1 68:21 |
| 41:20,21 42:25 | 165:13 | 18:14 48:18 | 69:2 73:3 |
| 43:5,9,25 | **watched** 162:8 | 111:8,9 141:8 | 77:13 78:2 |
| 53:24 54:1 | **watching** | 143:17 148:5 | 94:8 101:10 |
| 59:17 65:23 | 125:22 | 148:23 | 102:18 104:11 |
| 66:17 68:23 | **water** 187:19 | **west** 198:16 | 119:11 120:14 |
| 78:5 79:17 | **way** 55:2 56:16 | **whatever's** | 120:25 127:3 |
| 91:2 92:5 | 59:13 66:9 | 138:1 | 129:11 131:24 |
| 93:15 94:17,18 | 75:17 80:2 | **white** 183:11 | 142:7,13 |
| 95:21,21 98:7 | 106:3,7,17,21 | 206:18,23,24 | 153:14 161:22 |
| 99:17 101:8 | 106:25 107:23 | **wholesaling** | 165:8 167:9 |
| 103:4,24 104:1 | 133:25 160:13 | 148:10 151:14 | 182:12 201:15 |
| 105:11 109:17 | 169:7 179:17 | 151:16 183:4 | 208:9 213:8,19 |
| 114:2 118:5,9 | 180:3,24 | 184:24 185:1 | 213:21 215:8,9 |
| 118:11 131:7,8 | 182:15 193:19 | **wife** 211:10,11 | 216:13,16 |
| 131:10 132:2 | 194:22 195:12 | **wife's** 13:6 | 217:2,5 218:2 |
| 135:5 137:20 | 208:13 | 211:23 | 218:24 |
| 139:3,6,14 | **ways** 17:21,23 | **willing** 140:7,7 | **witnessing** |
| 140:14,19 | 18:3 22:11 | **wilson** 110:24 | 191:24 |
| 142:20 144:23 | 30:3 96:8 | 110:25 | **womack** |
| 147:2,16 | **we've** 14:11 | **win** 191:21 | 136:17,18,19 |
| 148:18 150:1 | 30:25 44:24 | **wind** 52:13 | 136:19 137:1 |
| 158:23 159:8 | 70:12 96:9 | **wire** 33:8 | 153:19 |
| 164:1 165:21 | 106:2 115:14 | **wise** 8:8,8 | **woman** 140:24 |
| 166:10,11 | 121:19 122:4 | **wish** 157:19 | **wondering** |
| 167:15,17,17 | 131:9 212:2 | | 186:3,3 |

Veritext Legal Solutions
866 299-5127

**[word - years]**

| | | | |
|---|---|---|---|
| **word** 58:14,14 | 74:7 76:6 79:9 | 78:22 89:23 | 77:13 78:2 |
| 58:15,17 68:8 | 88:16,23,25 | 105:21 156:9 | 80:3,4 87:11 |
| 68:9,10 77:13 | 89:3,5,7,9 91:8 | **workshops** | 100:8 103:9,11 |
| 77:16,18 | 107:23 110:13 | 196:14,14 | 103:16 106:10 |
| 131:16 132:4,4 | 125:4,5,7,11 | **workweek** 25:9 | 114:24 115:22 |
| 132:7,16,16,18 | 137:14,18,18 | **world** 34:11 | 124:5 125:2,4 |
| 208:21 | 140:22 146:16 | **worrying** 179:1 | 127:20 131:24 |
| **worded** 109:20 | 165:16,18,24 | **worse** 199:6 | 132:23 134:4 |
| **words** 64:18 | 166:2 167:11 | 200:3,6,7 | 138:8,10,22 |
| 68:18 134:22 | 197:5 198:16 | 206:21 | 141:24 142:16 |
| 135:8,12,25 | 202:18 | **worth** 191:8 | 142:24 145:10 |
| 136:1,9,11 | **worked** 22:6 | **write** 140:25 | 146:3 149:23 |
| 138:21 140:9 | 23:19 36:10 | 156:16 | 154:16,18 |
| 149:10,18 | 37:6 49:5,12 | **writing** 69:22 | 155:7 159:18 |
| 152:23 153:12 | 59:25 61:1 | 117:23 118:18 | 172:14 175:23 |
| 157:13 159:9 | 62:14 89:14 | 118:21 | 185:24 186:1,6 |
| 161:21 163:17 | 90:22 97:25 | **written** 105:25 | 186:9,22 187:1 |
| 166:10 169:20 | 122:3,17,24 | 106:3 107:16 | 187:5 190:17 |
| 171:15 174:18 | 161:6 162:23 | 108:4 117:14 | 197:17 212:16 |
| 176:14 180:9 | 170:11 212:12 | **wrong** 66:21 | 213:13 |
| 180:13,18 | 212:14 | 129:24 131:14 | **year** 10:22 26:5 |
| 183:24 188:20 | **working** 18:4 | 132:3,4 152:22 | 26:6 29:6 35:2 |
| 192:16 195:22 | 21:15,15 22:14 | 197:25 | 86:23 87:11,12 |
| 196:2 197:1 | 25:13 36:16,16 | | 99:12 105:9 |
| 199:12,23 | 41:7,9 50:14 | **x** | 124:13 127:9 |
| 203:1 207:7 | 54:7,11,14 | **x** 217:1 | 141:16 159:22 |
| **work** 17:12,15 | 63:11 70:15 | **y** | 159:23 160:1 |
| 18:20 19:18 | 91:4 93:18 | **y** 136:23 | 188:4,6 195:17 |
| 21:4,5,24 | 108:7 111:17 | **yeah** 11:16 | 210:9,15 |
| 22:20,23 23:4 | 129:16 173:5,9 | 26:22 28:16 | **year's** 174:3 |
| 23:7,16,17 | 196:18 212:18 | 30:7 38:19 | **years** 34:1,8,13 |
| 24:1,16,16 | **works** 17:16 | 42:8 44:24 | 34:13,14 36:7 |
| 35:4,21,24 | 21:6,8,8,11 | 48:17 55:10 | 36:21 37:10 |
| 36:5,19 37:9 | 22:2,3,10 | 58:25 69:2 | 44:25,25 45:6 |
| 49:4,12 68:25 | 52:19 76:17,22 | 71:25 76:17 | 45:10 49:5 |

Veritext Legal Solutions
866 299-5127

**[years - zoom]**

65:10,11 79:23
87:7 97:16
100:4 102:10
102:12 105:5
106:15 111:19
112:2,8,10,17
112:22 123:21
125:7,14,25
131:8,12,13
150:9 162:22
170:10 191:24
198:14 202:7,7
202:8 204:9,13
204:16,16
205:19
**yellow**   183:11
**yesterday**
43:17,18 80:19
**yield**   191:9
**younger**   166:16
**youtube**   141:15
**yup**   85:12

**z**

**z**   7:21 27:2,7
**zoom**   9:16
121:16

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.