UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Brian Kelly,                                              File No. 22-cv-1799 (ECT/DLM)

    Plaintiff,

v.                                                        **OPINION AND ORDER**

United Payment Center Inc.,

    Defendant.

---

Peter F. Barry, The Barry Law Office, Ltd, Minneapolis, MN, and Joshua Brandon Swigart, Swigart Law Group, APC, San Diego, CA, for Plaintiff Brian Kelly.

Daniel Patrick Brees, David A. Schooler, and Suzanne L. Jones, Gordon Rees Scully Mansukhani, LLP, Minneapolis, MN, for Defendant United Payment Center Inc.

---

In this consumer debt-collection case, Plaintiff Brian Kelly accepted an offer of judgment from Defendant United Payment Center. United's offer included a $10,000 payment to Mr. Kelly "together with his reasonable attorneys' fees and costs to be determined by the court[.]" Offer of Judgment [ECF No. 53-1] at 1–2. Mr. Kelly has filed a motion seeking attorneys' fees in the amount of $120,093.00 and costs of $7,207.66.[1] United does not argue that Mr. Kelly's motion should be denied outright. It argues that Mr. Kelly's fee request should be reduced for a variety of reasons. It does not challenge

---

[1] The analysis that follows accounts for and corrects a minor math error in Mr. Kelly's motion. In his motion, Mr. Kelly claims to seek $127,240.66 of fees and costs (consisting of $98,100 for The Barry Law Office, $21,933 for the Swigart Law Group, and costs of $7,207.66). Motion [ECF No. 55]. But if my math is correct, the amount reflected in Mr. Swigart's declaration is $60 higher. Swigart Decl. ¶¶ 12, Exs. A–C (reflecting $21,9**9**3 of fees). This order uses the higher number as the starting point.

Mr. Kelly's costs request. The fighting issue, then, concerns the amount of fees to be awarded. The short story is that Mr. Kelly's requested fees deserve reduction for some of the reasons United has identified but not others. He will be awarded fees in the amount of $78,782.50, along with his requested costs.

*Plaintiff's factual allegations.* United is a debt collector. Am. Compl. [ECF No. 16] ¶¶ 10, 13. It "operates under the pseudonym 'Bradford Law Office' using various spoofed phone numbers to communicate with Minnesota consumers." *Id.* ¶ 15. United is not licensed to collect debts in Minnesota. *Id.* ¶ 16. "Sometime around 2005," Mr. Kelly "incurred . . . a personal auto loan with Citi Bank[.]" *Id.* ¶ 17. On June 29, 2022, United telephoned Mr. Kelly to collect this debt. *See id.* ¶¶ 23–67. In one call, a United representative named "Mary" reached Mr. Kelly's mother at her residence. *Id.* ¶¶ 23–33; *see also* N. Kelly Decl. [ECF No. 43] ¶¶ 4–13. The United representative "said that she was from 'Process Service Dispatch'" and said that Mr. Kelly "had a one-week window to resolve" the debt. Am. Compl. ¶ 31. After being told that Mr. Kelly did not live at his mother's residence, the representative asked Mr. Kelly's mother for Mr. Kelly's telephone number. *Id.* ¶¶ 27–28. Mr. Kelly's mother refused to provide it. *Id.* ¶ 28. According to Mr. Kelly's mother, the United representative "was very aggressive during the course of this collection call" and Mr. Kelly's mother "was intimidated by [the representative's] tone and demeanor." N. Kelly Decl. ¶ 14. That same day, a United representative left a voice message for Mr. Kelly "indicating that they were calling from 'Process Service Dispatch[.]'" B. Kelly Decl. [ECF No. 42] ¶ 26. The message indicated that United had placed a lien on Mr. Kelly's residence. *Id.* ¶ 27. Again that day, after he "had received a

call from his mother indicating she had received a collection [call] from [United], and [United] had also left a voicemail for [Mr. Kelly]," Mr. Kelly telephoned United. Am. Compl. ¶¶ 42, 43. A United receptionist answered Mr. Kelly's call by introducing the business as "'Bradford and Associates.'" *Id.* ¶ 45. The receptionist connected Mr. Kelly to a representative identified as "'Anthony Rubio.'" *Id.* ¶ 47. Mr. Kelly and Mr. Rubio discussed the nature of the alleged debt, and Mr. Kelly expressed his view that the debt had been settled. *Id.* ¶¶ 48–59. Mr. Rubio represented that United "had a judgment against [Mr. Kelly]" in the amount of $10,400 and implied that he "was a lawyer capable of obtaining such a judgment." *Id.* ¶¶ 51, 58. Mr. Kelly was upset and intimidated by these communications and "was required to take time off of work to handle, assess, and work out the financial risks that [United] threatened, and to determine a course of action in response to those threats." B. Kelly Decl. ¶ 42.

*Plaintiff's claims and requested relief.* In his Amended Complaint, Mr. Kelly asserted federal statutory, Minnesota statutory, and Minnesota common-law claims. He alleged "numerous and multiple violations" of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, Am. Compl. ¶¶ 150–152, and the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2721–25, *see id.* ¶¶ 179–181. He alleged a violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq. Id.* ¶¶ 182–195. He sought relief under Minn. Stat. § 481.02, claiming that United engaged in the unauthorized practice of law. *Id.* ¶¶ 174–178. And he asserted claims under Minnesota common law for fraud, *id.* ¶¶ 156–167, and invasion of privacy, *id.* ¶¶ 196–203. Each claim depended on one or more of several overlapping factual theories. For example, Mr.

3

Kelly alleged that the two June 29, 2022, telephone calls were unlawful for a variety of reasons related to the alleged debt's un-collectability and the manner in which United's agents conducted the calls. *See, e.g.*, *id.* ¶¶ 62–66. He alleged that United was not authorized to collect debts in Minnesota. *See, e.g.*, *id.* ¶¶ 74–84. He alleged that United held itself out as a law firm when it was not. *See, e.g.*, *id.* ¶¶ 95–105. And Mr. Kelly alleged that United improperly accessed his personal information to enable it to pursue its debt collection activities against him. *See, e.g.*, *id.* ¶¶ 106–139. For relief, Mr. Kelly sought actual, statutory, and punitive damages, and attorneys' fees and costs. *See id.* at 34–35.

*Procedural history.* Mr. Kelly filed this case in July 2022. *See* Compl. [ECF No. 1]. Since then, several events have occurred that, for this motion's purposes, deserve mention. Soon after answering Mr. Kelly's original Complaint on October 17, 2022, United filed a notice of hearing on a motion for partial judgment on the pleadings. ECF No. 14. On November 7, evidently in response to United's notice, Mr. Kelly filed his Amended Complaint. ECF No. 16. The Amended Complaint differed from the original in two noteworthy respects: (1) it dropped a claim under a California statute—the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788–1788.33—that Mr. Kelly had asserted in the original Complaint, and (2) it added a claim for punitive damages under Minn. Stat. § 549.20. United did not follow through with its motion for partial judgment on the pleadings. It did, however, file a partial motion to dismiss contending that the Amended Complaint's claim for punitive damages was improper under Minn. Stat. § 549.20. ECF No. 21. That motion was heard January 9, 2023, and the motion was denied

4

from the bench. *See* ECF No. 36 at 16–18. On April 25, 2023, Mr. Kelly filed a motion for partial summary judgment as to liability with respect to six of the Amended Complaint's eight claims. *See* ECF No. 41. On May 8, United moved to continue Mr. Kelly's summary-judgment motion pursuant to Federal Rule of Civil Procedure 56(d). ECF No. 48. United's motion was granted—and Mr. Kelly's partial-summary-judgment motion was denied without prejudice—in a three-page order dated May 10. ECF No. 51.

*Settlement history.* Amid their discovery and procedural activities, the parties engaged in settlement discussions. In a letter dated March 29, 2023, Mr. Kelly presented a settlement demand to United in the amount of $155,568. Brees Decl. [ECF No. 64] ¶ 2, Ex. 1 [ECF No. 64-1]. As of that date, Mr. Kelly claimed to have incurred attorneys' fees and costs totaling $59,668. *Id.* On April 7, United responded with a Rule 68 offer of judgment in the amount of $50,000 (including attorneys' fees and costs). *Id.* ¶ 3, Ex. 2. In a joint letter to Magistrate Judge Docherty dated April 13, Mr. Kelly explained that he viewed the offer to be "serious," was considering the offer, and intended to "provide a reasoned response." *Id.* ¶ 4, Ex. 3. Mr. Kelly did not accept the April 7 offer. *Id.* ¶ 3. In fact, billing records show that on April 13—the day the parties sent their joint letter to Magistrate Judge Docherty—Mr. Kelly's counsel began working on the partial-summary-judgment motion described in the preceding paragraph. *See* ECF No. 58-2 at 5. On May 2, 2023, United served Mr. Kelly with a second Rule 68 offer of judgment, this time for a $10,000 payment "together with his reasonable attorneys' fees and costs to be determined by the court[.]" ECF No. 53-1 at 2. On May 15, Mr. Kelly filed notice that he had accepted the offer of judgment. ECF No. 53.

*Law governing the fee-entitlement question.* That brings us to Mr. Kelly's motion for attorneys' fees and costs. Each of the three federal statutes under which Mr. Kelly sued includes a fee-shifting provision. Under the FDCPA, a non-compliant debt collector is liable for, among other amounts, "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1692k(a)(3). Under the DPPA, a "court may award . . . reasonable attorneys' fees and other litigation costs reasonably incurred[]" against "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under" the Act. 18 U.S.C. § 2724. And "in the case of any successful action to enforce any liability under" the FCRA, a non-compliant person is liable for, among other sums, "the costs of the action together with reasonable attorney's fees as determined by the court." 15 U.S.C. § 1681n(a).[2] Mr. Kelly and United do not suggest that any one of these provisions establishes a unique rule; they treat all three as if they imposed an identical standard for awarding fees.

*Law governing the fee award's amount.* The party seeking fees has the burden of establishing that the fees sought are reasonable and should submit evidence supporting the rates claimed and hours worked. *Hensley v. Eckerhart*, 461 U.S. 424, 433–34, 437 (1983). "To calculate attorney's fees, courts typically begin by using the lodestar method, which multiplies the number of hours reasonably expended by reasonable hourly rates. When determining reasonable hourly rates, district courts may rely on their own experience and

---

[2] Mr. Kelly does not seek attorneys' fees and costs under his Minnesota statutory or common-law claims.

6

knowledge of prevailing market rates." *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 529 (8th Cir. 2019) (cleaned up); *see In re RFC*, 399 F. Supp. 3d 827, 846 (D. Minn. 2019) ("Generally, to determine whether an hourly rate is reasonable, courts look at the rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). Trial-court judges need not "become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

*Analysis of Mr. Barry's claimed hourly rate.* Mr. Barry's claimed $600 hourly rate is reasonable. This is so for several reasons. (1) As Mr. Barry describes his credentials, they are extensive and relevant, and United does not dispute them. *See generally* Barry Decl. [ECF No. 58]. Mr. Barry has been practicing law for almost 27 years. *Id.* ¶ 3. He has "analyzed, litigated, handled, and settled thousands of FDCPA claims in Minnesota and nationwide on behalf of individual and class consumers." *Id.* ¶ 6. He has "trained thousands of attorneys, from all 50 states and Puerto Rico, throughout the country in an intensive multi-day FDCPA litigation seminar." *Id.* ¶ 36. He has "been featured on collection abuse stories" for major television networks and in national newspapers. *Id.* ¶ 32. (2) Several Twin Cities-based consumer-rights attorneys—Vildan A. Teske, Carl E. Christensen, Mark L. Heaney, Thomas J. Lyons, Jr., Todd Murray, and Mark L. Vavreck—have signed declarations attesting to the reasonableness of Mr. Barry's $600 hourly rate in

view of his credentials, legal skills, and the market. *Id.* ¶ 56, Ex. 4 [ECF No. 58-4]. United identifies no reason that might justify discrediting these declarations. (3) A little more than two years ago, Judge Susan Richard Nelson found in an FDCPA case that Mr. Barry's then-$550 hourly rate was reasonable. *See Hashi v. Law Offices of David M. Katz P.C.*, No. 20-cv-2443 (SRN/ECW), 2021 WL 1263720, at *2 (D. Minn. Apr. 6, 2021). The $600 rate Mr. Barry seeks here represents an increase of between 8 and 9 percent over that rate (or a little more than four percent per year since). Given economic and market conditions during that time, the $50 increase is reasonable. *See* James W. Jones et al., *2023 Report on the State of the Legal Market* at 7 (2023), https://www.thomsonreuters.com/en-us/posts/wp-content/uploads/sites/20/2023/01/2023-State-of-the-Legal-Market.pdf (last visited Sept. 25, 2023). (4) United relies on a recent FDCPA case—*Berscheid v. Experian Information Solutions, Inc.*, No. 22-cv-086 (JRT/LIB), 2023 WL 3750182 (D. Minn. June 1, 2023)—to argue that Mr. Barry's rate should be reduced, but this is not persuasive. In *Berscheid*, Judge John R. Tunheim addressed the reasonableness of $395 and $365 hourly rates sought by two attorneys. *Id.* at **3–4.[3] Judge Tunheim disagreed with declarations submitted by several attorneys attesting that the $395 rate for one of the attorneys was reasonable and discounted the attorney's hourly rate to $365 based on his experience, skills, and expertise. *Id*. The *Berscheid* lawyers had eight and ten years of experience each in

---

[3] Judge Tunheim described that "[i]n recent history, the District of Minnesota has typically awarded attorney's fees ranging from $275 per hour to over $500 per hour for consumer litigation attorneys in [FDCPA] cases[,]" and "[t]aking inflation into account, the median hourly rates for consumer law attorneys would now equal approximately $431." *Berscheid*, 2023 WL 3750182 at *4 & n.3 (citing cases).

8

consumer protection law. *Id*. Reducing Mr. Barry's rate by some comparable percentage would be unwise in light of his significantly greater experience and Judge Nelson's prior approval of Mr. Barry's $550 hourly rate.

*Analysis of Mr. Swigart's claimed hourly rate.* The better answer is to reduce Mr. Swigart's $595 claimed hourly rate to account for what the record here shows is a greater gap between his years of experience and credentials as compared with Mr. Barry's than is reflected in the $5 gap in their claimed rates and prevailing market conditions. (1) Mr. Swigart is an experienced lawyer. He has been practicing since 2003. Swigart Decl. [ECF No. 59] ¶ 6. But that is seven years less than Mr. Barry. And if the two years' experience Mr. Barry gained between Judge Nelson's decision in *Hashi* and this motion contribute (even in part) to justifying a $50 increase in Mr. Barry's hourly rate from then to now, then the seven-year difference between Mr. Swigart and Mr. Barry's experience should be reflected by a greater-than-$5 difference in their hourly rates. (2) The same can be said of the gap between Mr. Swigart and Mr. Barry's credentials. Mr. Swigart's credentials are substantial. Since his admission to the bar, Mr. Swigart has "been engaged exclusively in the area of consumer rights litigation[.]" *Id.* ¶ 16. He identifies some 36 "notable cases" in which he has been involved, *id.* ¶17, and he lists 27 "recent training conferences" he has attended, *id.* ¶ 18. But Mr. Swigart's list of 36 cases is difficult to compare with Mr. Barry's involvement in "thousands of FDCPA claims in Minnesota and nationwide[.]" Barry Decl. ¶ 6. The list of conferences does not really compare to Mr. Barry's teaching experience, either. The list is considerably shorter, and Mr. Swigart indicates that he taught or presented at nine of the conferences. *See* Swigart Decl. ¶¶ 18(k), (l), (m), (r), (s), (t),

9

(u), (w), and (aa).[4] Mr. Barry, by contrast, has "trained thousands of attorneys[.]" Barry Decl. ¶ 36. (3) Mr. Swigart has filed declarations signed by four consumer-rights attorneys attesting to the reasonableness of Mr. Swigart's $595 hourly rate in view of his credentials, legal skills, and the market. Swigart Decl. ¶¶ 32–35 [ECF Nos. 59-4–59-7]. These declarations deserve less weight. The declarant-attorneys all office in California. *See id.* Though each attorney testifies that he is acquainted with the prevailing hourly rates charged in the Twin Cities, three do not explain how they gained or maintain this familiarity. *See id.* [ECF Nos. 59-4, 59-5, and 59-6]. The fourth declarant testifies that he "gained an understanding of prevailing market rates in the District of Minnesota by reviewing" fee awards issued in this District "as they are published on LexisNexis and by discussing these orders with Minnesota attorneys." *Id.* [ECF No. 59-7]. Regardless, these declarants lack the market familiarity of a consumer-rights attorney who practices routinely in Minnesota, and none addresses the differences in experience and credentials between Mr. Swigart and Mr. Barry. (4) For all these reasons, I conclude on this record, informed by my own experience and knowledge of the market, that Mr. Swigart's claimed hourly rate should be reduced to $515. This roughly fourteen-percent reduction better reflects the differences in

---

[4]  There are other issues with Mr. Swigart's conference list. The list is supposed to reference "recent" conferences, but 15 of the 27 conferences occurred more than ten years ago. *See* Swigart Decl. ¶¶ 18(a)–(p). One of the "training conferences" on the list does not seem to have been a training conference, but a guest-speaker appearance at a law-school class. *Id.* ¶ 18(u). And at least judging by their title, some of the conferences were not consumer-law related or consumer-law specific. *See, e.g., id.* ¶ 18(y) ("Lawyer/Pilot Bar Association Convention, Lake Tahoe, California – 2018"); ¶ 18(z) ("Wisconsin State Bar Convention, Green Bay, Wisconsin – 2019").

credentials and experience between Mr. Swigart and Mr. Barry and is more consistent with prevailing market rates. *Berscheid*, 2023 WL 3750182 at *4 & n.3.

*Analysis of unidentified paralegal's claimed hourly rate.* Mr. Kelly has not carried his burden to show that a paralegal's claimed $225 hourly rate is reasonable. *See* Swigart Decl. ¶ 13, Ex. C [ECF No. 59-3]. Mr. Kelly seeks recovery of $9,855 for work performed by this paralegal. *Id.* ¶ 14. The only mention of the paralegal in Mr. Kelly's briefing, however, is that "Plaintiff also wisely used the resources of a paralegal billing at about 1/3 the rate of attorneys on this case." Pl.'s Mem. in Supp. [ECF No. 57] at 10; *see also* Swigart Decl. ¶ 30 (stating that counsel "delegated certain work to our paralegal, who bills at a lower rate" of $225/hour) & Ex. C (paralegal billing records). Though the paralegal evidently was employed by Mr. Swigart, the paralegal's identity, education, experience, and practice area are not disclosed. The absence of this basic information makes it impossible to determine whether the claimed $225 hourly rate is reasonable. Because it was Mr. Kelly's burden to show that this hourly rate was reasonable, the paralegal's fees of $9,855 will not be awarded.[5]

*Analysis of the claimed hours – reductions.* Mr. Kelly originally sought to recover $120,093.00 in attorneys' (and a paralegal's) fees. After recalculating Mr. Swigart's fees at the $515 hourly rate ($515 x 20.4 = $10,506) and backing out the paralegal's fees ($9,855), the remaining amount to analyze is $108,606. (1) Mr. Kelly will not be awarded

---

[5] The need for this information takes on greater importance considering the evidently substantive tasks the paralegal performed. *See* Swigart Decl. Ex. C (including time entries for "[r]esearching and drafting analysis" regarding numerous legal subjects for summary-judgment motion).

$19,607.50 in fees for Mr. Barry's time spent on the partial-summary-judgment motion he filed on April 25, 2023. ECF No. 41. The motion was ill-timed. It was filed with more than three months remaining in the fact-discovery period, more than six months before the dispositive-motions deadline, and before United had obtained significant discovery. *See* ECF No. 51. For these reasons, United justifiably sought, ECF No. 48, and was promptly granted a continuance to obtain discovery, and Mr. Kelly's motion was denied, ECF No. 51. One could argue that the work that went into Mr. Kelly's motion might have been put to good use at a later, more appropriate time, but this would not be persuasive. It seems reasonable to think that United's (and Mr. Kelly's) further discovery efforts would have at least added to, and perhaps changed, the factual picture, meaning Mr. Kelly's submissions would have required substantial revision, if not a re-do. And Mr. Kelly filed the motion just as "serious" settlement discussions were occurring and just under three weeks before the case would settle, which makes the motion seem inefficient. Brees Decl. ¶ 4, Ex. 3. Mr. Kelly does not argue that the motion contributed in any meaningful way to the parties' decisions to settle the case. (2) Mr. Kelly will not be awarded $4,686.50 in fees for 9.1 hours Mr. Swigart spent preparing for and attending the video deposition of Michael Martinez. Mr. Barry billed more than 20 hours and not quite $5,000 to preparing for and taking the deposition. The record includes no information suggesting that the deposition was complex or reasonably required two lawyers' presence. In view of Mr. Barry's experience and credentials, the better answer is that he was more than capable of deposing the witness on his own. (3) Mr. Kelly's award will be reduced by $300 to account for his assertion of a claim under the Rosenthal Act. "The Rosenthal Act was enacted by the

12

California Legislature to protect citizens of California from unfair debt-collection practices." *Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1036 (D. Minn. 2010) (citing *Pollock v. Bay Area Credit Serv., LLC*, No. 08–61101–Civ., 2009 WL 2475167, at *12 (S.D. Fla. Aug. 13, 2009)). Mr. Kelly withdrew this claim early in the case, presumably because he is a Minnesota citizen. Compl. ¶ 8. Mr. Barry's time records show that he incurred $300 in fees for a half hour spent researching the Act. (4) Mr. Kelly's award will be reduced by $5,229.50 to account for vague descriptions of internal calls included in the billing records. Several time entries regarding internal calls do not "identify explicitly the subject matter of their discussions so that [a court] may assess whether the amount of time recorded was reasonably expended." *Berscheid*, 2023 WL 3750182, at *5 (citation and internal quotations omitted); *see* Brees Decl. ¶ 13, Ex. 7.

*Analysis of the claimed hours – non-reductions.* Mr. Kelly's award will not be reduced for other reasons advocated by United. (1) United argues that any award should be reduced by sixty percent to account for the time Mr. Kelly's counsel "spent on . . . causes of action that do not contain a fee-shifting provision." Def.'s Mem. in Opp'n [ECF No. 63] at 7. I do not agree. Mr. Barry and Mr. Swigart's time records reflect that this case was centered on Mr. Kelly's federal statutory claims under the FDCPA, DPPA, and FCRA—statutes that include fee-shifting provisions. Apart from the Rosenthal Act claim discussed in the preceding paragraph, the time records include no entries suggesting that either Mr. Barry or Mr. Swigart devoted specific, separately identifiable time to researching or pursuing the non-fee-shifting claims. In other words, the better understanding is that the case really was about the federal statutory claims, and the attorneys' work pursuing those

fee-shifting claims reasonably overlapped with their work pursuing Mr. Kelly's other claims to a degree that does not allow for separation or a non-speculative reduction. (2) United argues that Mr. Kelly's fee award should be reduced by more than $5,000 to account for "purely clerical and administrative" tasks performed by his counsel. *Id.* at 12. As a legal matter, United is correct that clerical or administrative tasks may not be accounted for at an attorneys' (or a paralegal's) rate. *See Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989); *Rosen v. Wentworth*, 13 F. Supp. 3d 944, 952–53 (D. Minn. 2014). And as a factual matter, United is correct that Mr. Barry and Mr. Swigart's time records include entries describing seemingly administrative tasks. United's argument is nonetheless unpersuasive. In several instances, the administrative tasks are described alongside a substantive task and in a way that suggests the administrative task was a minor event. *See, e.g.*, Barry Decl. ¶ 11, Ex. 2 [ECF No. 58-2] at 2 ("Reviewed proposed stipulation to extend time. Made edits and corrections. Esigned and approved for filing."). In other instances, tasks described in seemingly clerical or administrative terms appear to have been substantive. For example, in one entry, Mr. Barry described he "bundled and sent" deposition exhibits to United. *Id.* at 5. "Bundling" and "sending" sound administrative, but the task's description also implies that Mr. Barry selected which exhibits to include for use in the deposition, and that is a quintessentially lawyer-appropriate task. (3) United argues that Mr. Kelly's fee award should be reduced by an unspecified amount because the requested fees are disproportionate to Mr. Kelly's $10,000 recovery. Mem. in Opp. at 12–13. This is not persuasive. Proportionality is not required. *See Wiley v. Portfolio Recovery Assoc., LLC*, 594 F. Supp. 3d 1127, 1151–52 (D. Minn.

2022). And this is not a case where either counsels' litigation tactics generally, or the gap between what Mr. Kelly recovered and the fees awarded (after the reductions described earlier), raise a reduction-worthy proportionality concern.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Plaintiff Brian Kelly's motion for attorneys' fees and costs [ECF No. 55] is **GRANTED IN PART**; and

2. Plaintiff is awarded attorneys' fees in the amount of $78,782.50 and costs in the amount of $7,207.66.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  September 27, 2023                    s/ Eric C. Tostrud
                                              Eric C. Tostrud
                                              United States District Court